**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>NATHANIEL CHASTAIN, )<br><br>Defendant. )<br> ) | No. 22-cr-305 (JMF)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF NATHANIEL CHASTAIN'S**
**MOTION TO DISMISS THE INDICTMENT**

David I. Miller
Gregory W. Kehoe
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Counsel for Defendant*
*Nathaniel Chastain*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .................................... 3

LEGAL STANDARD ...................................................................................... 6

ARGUMENT ................................................................................................... 6

I.   There Can Be No "Insider Trading" Wire Fraud Charge Because the NFTs
     At Issue Are Neither Securities Nor Commodities ................................................. 6

     A.   A *Carpenter* Wire Fraud Theory of Insider Trading Requires a
          Nexus to the Financial Markets ................................................................. 7
     B.   In Charging a *Carpenter* Wire Fraud Count Without Securities or
          Commodities Trading, the Government Seeks to Criminalize a
          Civil Employment Dispute ....................................................................... 10

II.  The Wire Fraud Count Must Also Be Dismissed Because the Allegedly
     Misappropriated Information Is Not "Property" ..................................................... 11

     A.   As a Matter of Law, Mr. Chastain's Selection of Featured NFTs Is
          Not OpenSea's Property ........................................................................... 12
     B.   Mr. Chastain's Selection of Featured NFTs Is Also  Not "Property"
          Under Relevant New York State Law ....................................................... 16
     C.   Even If OpenSea Could Claim a Property Right in the  Selection of
          Featured NFTs, As Alleged, Any Deprivation of that  Property
          Right Was Incidental or Non-Existent Under Settled Precedent .............. 17
     D.   The Wire Fraud Charge Here Is Impermissibly Vague and Any
          Ambiguity Regarding the Definition of "Property" Should Be
          Resolved in Favor of Lenity ..................................................................... 19

III. The Government's Novel Money Laundering Count Must Be Dismissed
     on Multiple Grounds ............................................................................................... 20

     A.   The Public Nature of the Ethereum Blockchain Renders it
          Impossible to Conceal the Relevant Cryptocurrency Transactions .......... 20
     B.   The Government Impermissibly Calls on the Money Laundering
          Statute to Criminalize Nothing More Than the Movement of
          Money ....................................................................................................... 22
     C.   The Government Failed to Adequately Allege a "Financial
          Transaction" .............................................................................................. 24

IV.  Alternatively, the Grand Jury Instructions Should Be Disclosed ......................... 25

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance Sec. Prods. v. Fleming & Co., Pharms.*,
   290 F. App'x 380 (2d Cir. 2008) ........................................17

*Brass v. Am. Film Techs., Inc.*,
   987 F.2d 142 (2d Cir. 1993) ............................................21

*BSH Hausgeräte GMBH v. Kamhi*,
   282 F. Supp. 3d 668 (S.D.N.Y. 2017) ..............................21

*Carpenter v. United States*,
   484 U.S. 19 (1987) .............................................. passim

*Cleveland v. United States*,
   531 U.S. 12 (2000) .............................................. passim

*Cuellar v. United States*,
   553 U.S. 550 (2008) ............................................21, 22, 23, 24

*Ganske v. Mensch*,
   480 F. Supp. 3d 542 (S.D.N.Y. 2020) ..............................21

*Hudson Hotels Corp. v. Choice Hotels Intl., Inc.*,
   995 F.2d 1173 (2d Cir. 1993) ..........................................16

*Johnson v. United States*,
   576 U.S. 591 (2015) .......................................................19

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ..........................................14, 16, 18

*Lapine v. Seinfeld*,
   31 Misc. 3d 736 (Sup. Ct., N.Y. Cnty. 2011) ....................17

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ...................................................19

*McGhan v. Ebersol*,
   608 F. Supp. 277 (S.D.N.Y. 1985) ..................................17

*McNally v. United States*,
   483 U.S. 350 (1987) .............................................12, 13, 19

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
   208 F.3d 368 (2d Cir. 2000) ...........................................16

*Rewis v. United States*,
   401 U.S. 808 (1971) .......................................................19

*Ring v. Estee Lauder, Inc.*,
  702 F. Supp 76 (S.D.N.Y. 1988)........................................................................17

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir 2000)..............................................................................16

*In re Search of One Address*,
  512 F. Supp. 3d 23 (D.D.C. 2021).....................................................................21

*Skilling v. United States*,
  561 U.S. 358 (2010).........................................................................12, 13, 19

*U.S. v. Walters*,
  997 F.2d 1219 (7th Cir. 1993) ..........................................................................18

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir 2012)...................................................................................6

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000)..............................................................................11

*United States v. Bari*,
  599 F.3d 176 (2d Cir. 2010)..............................................................................21

*United States v. Bass*,
  404 U.S. 336 (1971)..........................................................................................19

*United States v. Chestman*,
  947 F.2d 551 (2d Cir. 1991)................................................................................9

*United States v. Chow*,
  993 F.3d 125 (2d Cir. 2021)............................................................................8, 9

*United States v. Craft*,
  535 U.S. 274 (2002)..........................................................................................16

*United States v. Dimeck*,
  24 F.3d 1239 (10th Cir. 1994)...........................................................................22

*United States v. Dobbs*,
  63 F.3d 391 (5th Cir. 1995) ...............................................................................23

*United States v. Falcone*,
  257 F.3d 226 (2d Cir. 2001)................................................................................8

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir 2017).................................................................................16

*United States v. Gansman*,
  657 F.3d 85 (2d Cir. 2011)..................................................................................9

*United States v. Garcia*,
  587 F.3d 509 (2009).....................................................................................20, 24

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006)..............................................................................24

*United States v. Gratkowski,*
    964 F.3d 307 (5th Cir. 2020) ..............................................................21

*United States v. Heicklen,*
    858 F.Supp 2d 256 (S.D.N.Y. 2012) ....................................................6

*United States v. Libera,*
    989 F.2d 596 (2d Cir. 1993) ..................................................................9

*United States v. Moten,*
    582 F.2d 654 (2d Cir. 1978) ................................................................25

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014) ..................................................................9

*United States v. O'Hagan,*
    521 U.S. 642 (1997) ..........................................................................8, 9

*United States v. Pierce,*
    224 F.3d 158 (2000) ............................................................................18

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) ....................................................................6

*United States v. Rockelman,*
    49 F.3d 418 (8th Cir. 1995) ................................................................23

*United States v. Rodriguez,*
    727 F. App'x 24 (2d Cir. 2018) ..........................................................20

*United States v. Sanders,*
    929 F.2d 1466 (10th Cir. 1991) ..........................................................22

*United States v. Stephenson,*
    183 F.3d 110 (2d Cir. 1999) ..........................................................22, 23

*United States v. Sterlingov,*
    573 F.Supp 3d 28 (D.D.C. 2021) ........................................................22

*United States v. Universal C.I.T. Credit Corp.,*
    344 U.S. 218 (1952) ............................................................................19

*United States v. Velasegui,*
    199 F.3d 590 (2d Cir. 1999) ..................................................................6

**Statutes**

18 U.S.C. § 1343 ................................................................................ passim

18 U.S.C. § 1346 ......................................................................................13

18 U.S.C. § 1956 ................................................................................ passim

18 U.S.C. § 1961 ......................................................................................20

Securities and Exchange Act § 10(b) ...........................................7, 8, 9

**Other Authorities**

Federal Rules of Criminal Procedure Rule 12(b) ............................................................6

Federal Rules of Criminal Procedure Rule 6(e)...........................................................25

Federal Rules of Evidence 201 .....................................................................................21

SEC Rule 10b-5 ..........................................................................................................8, 9

Insider Trading Prohibition Act, H.R. 2655, 117th Cong. (2021) ...................................9

*Former Employee Of NFT Marketplace Charged In First Ever Digital Asset
    Insider Trading Scheme*, June 1, 2022, https://www.justice.gov/usao-
    sdny/pr/former-employee-nft-marketplace-charged-first-ever-digital-asset-
    insider-trading-scheme......................................................................................11

Nifty Gateway, https://www.niftygateway.com/ (last visited Aug. 19, 2022)............................17

SuperRare, https://superrare.com/ (last visited Aug. 19, 2022) ................................17

Defendant Nathaniel Chastain (the "defendant" or "Mr. Chastain") respectfully submits this memorandum of law in support of his motion to dismiss the Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

The government has brought the instant prosecution using ill-founded applications of criminal law to set precedent in the digital asset space.  While seeking to use this first-of-its-kind prosecution to posit broad assertions of insider trading, property theft, and money laundering, the government's arguments are contrary to years of settled precedent and are a transparent effort to plant a flag in the blockchain industry.  As shown herein, however, the government's effort to prosecute the defendant as part of its expansive use of wire fraud and money laundering laws—as charged in the Indictment—must fail for multiple independent reasons.

First, the government has charged this case under a *Carpenter v. United States*, 484 U.S. 19 (1987), wire fraud theory of insider trading.[1]  In doing so, the government not only ignores well-established precepts of the wire fraud statute, but also turns a blind eye to decades of jurisprudence outlining the boundaries of the misappropriation theory of insider trading.  These fundamental flaws are readily apparent on the face of the government's charging instrument.

The Indictment alleges that from in or about June 2021 to in or about September 2021, Mr. Chastain engaged in "insider trading" of Non-Fungible Tokens ("NFTs").  More specifically, Mr. Chastain is charged with defrauding his employer, OpenSea, by misappropriating its confidential business information.  As alleged, acting with purported criminal intent, Mr. Chastain exploited

---

[1] As stated in Count One of the Indictment, charging wire fraud under 18 U.S.C. § 1343, "[t]his case concerns *insider trading* in Non-Fungible Tokens or 'NFTs.'" Indictment ¶ 1 (emphasis added).  Further, as noted *infra* at 5, the government stated during a June 15, 2022 pre-trial conference that "[t]he government's theory … [is] premised on the Supreme Court's decision in [*Carpenter v. United States*, 484 U.S. 19 (1987)]."

his advance knowledge of which NFTs would be featured on OpenSea's homepage by purchasing certain NFTs before they were featured and selling them at a profit after they were featured.

The rub, however, is that the NFTs are neither securities nor commodities.  And the government agrees.  Thus, we are left with a case of first impression—on multiple fronts.  Can the government proceed on a *Carpenter* wire fraud theory of insider trading in the absence of any allegation involving securities or commodities trading?  The government, of course, says yes.  The Supreme Court and 40 years of insider trading precedent say no.

Any insider trading theory, even under *Carpenter*, *requires* trading in securities or commodities.  The government's position demonstrates its flawed understanding of *Carpenter*, specifically, and the misappropriation theory, generally.  In any prosecution under a *Carpenter* wire fraud theory of insider trading, the existence of securities or commodities trading remains an ***essential element of the offense*** because the object of the *Carpenter* decision, and the misappropriation theory, is not only to prevent the misappropriation of confidential information in breach of a duty owed to the source of that information, but critically, to protect our financial markets.  Accordingly, absent any connection to the financial markets, insider trading, in any form or context, cannot exist.

Second, even if this Court were to sustain the government's erroneous insider trading theory, flaws in the government's charge persist.  The sole wire fraud count lives and dies on the government's erroneous position that an employer has a property interest in information that has no inherent economic or market value, and is based on the unspoken personal thoughts and ideas of employees.  Recent Supreme Court precedent demonstrates that the definition of "property" under the wire fraud statute must be grounded on something that is capable of being distributed and sold by the owner of the relevant property interest.  A marketing concept, such as what should

essentially be featured in an art gallery window, which has no determinable economic or saleable value and is based on an employee's unspoken thoughts—regarding the mere selection of an item for prominent display—does not fit this bill.  And the potential consequence of any contrary holding is readily apparent.  Permitting the government to expand the scope of the wire fraud statute to reach such ethereal and intangible interests would serve to overextend the already far-reaching fraud statutes, criminalize run-of-the-mill civil employment disputes, and sow uncertainty into the public's perception of the statute's limitations.

Third, the government pursues a novel theory of money laundering, despite the fact that it cannot demonstrate any effort to conceal the unlawful proceeds of a specified unlawful activity, as every single cryptocurrency transaction at issue was conducted on the Ethereum blockchain, and thus, completely visible to the public.  Indeed, as alleged in the Indictment, the defendant did nothing more than move money in an obvious and perceptible manner.   The simple and manifest movement of money, however, does not constitute money laundering.  Finally, the government fails to, and cannot, allege that the relevant cryptocurrency movements—from one personal digital wallet to another personal digital wallet—qualify as a "financial transaction" under the money laundering statute.

For all of the aforementioned reasons, and as described more fully below, the Indictment must be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 31, 2022, a grand jury in the Southern District of New York returned Indictment 22 Cr. 305, charging Mr. Chastain with one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Each count is premised on Mr. Chastain's alleged "insider trading" of digital artwork.  Count One alleges that Mr. Chastain committed wire fraud by misappropriating OpenSea's confidential business

information regarding which NFTs were going to be featured on its homepage; specifically, by using that information to purchase NFTs before they were featured and to sell the NFTs after they were featured.[2]  Count Two alleges that Mr. Chastain committed money laundering by conducting a "financial transaction" involving the proceeds of a specified unlawful activity, knowing that the transaction was designed in whole or in part "to conceal or disguise" a listed attribute of the proceeds of unlawful activity generated through the allegations in Count One.

As the Indictment alleges, Mr. Chastain is the former Head of Product at OpenSea, an online NFT marketplace headquartered in New York City.  *See* Indictment ¶¶ 4, 7.  NFTs are digital assets stored on a "blockchain," which is a publicly accessible, decentralized ledger that contains information about, among other things, purchases and sales of digital assets.  *See* Indictment ¶ 5.  Many NFTs—including those relevant to this case—exist on the Ethereum blockchain.  *See* Indictment ¶ 6.  To buy and sell NFTs on the Ethereum blockchain, a person needs to have an Ethereum account or "address," which is a unique public identifier for that account.  *See id.*  When an NFT is bought, sold, or otherwise electronically transferred from one party to another, the transfer is recorded on the blockchain and any person can view the corresponding transaction history.  *See id.*  The NFTs in this matter are "digital artwork." Indictment ¶ 5.  OpenSea's platform allows for NFTs—such as these pieces of unique artwork— to be sold via the Ethereum blockchain directly at a fixed price, or, through an auction process (which was not implicated here).

Mr. Chastain began working at OpenSea in February 2021.  As the Indictment alleges, in or about May 2021, Mr. Chastain decided, on his own, to "feature" certain unique NFT artwork in a section of OpenSea's homepage.  Indictment ¶¶ 7-8.  As further alleged, Mr. Chastain took

---

[2] While not referenced in the Indictment, it is our understanding from the government's discovery that the government alleges that Mr. Chastain benefitted in the amount of approximately $65,000.

responsibility for selecting the NFTs that would be displayed or "featured" on OpenSea's homepage, and he changed the "featured artist" twice each week. *See id.*  As described in the Indictment, on some occasions, Mr. Chastain allegedly purchased NFTs prior to their display on the "featured artist" section, and then sold them to customers who had viewed them on OpenSea's homepage.  Indictment ¶ 10.  On each of these occasions, Mr. Chastain's alleged purchases and sales were documented and visible publicly on the Ethereum network's blockchain.  *See* Indictment ¶ 6.  OpenSea received a fee for each such sale.  The government has not alleged, because it cannot, that a single member of the NFT marketplace was harmed as a result of the alleged conduct.  Additionally, Mr. Chastain publicly discussed this activity with members of the Twitter community via his Twitter account.

On June 1, 2022, Mr. Chastain was arrested and arraigned on the Indictment before the Honorable Barbara Moses.  Mr. Chastain pleaded not guilty and was released on bond.  At a June 15, 2022 pre-trial conference, the parties set forth their respective positions, at which point the following colloquy ensued:

> **The Court**: I think when most people think of the term "insider trading," they think of securities fraud, but just to be clear, this charge is not a securities fraud charge; it's a conventional wire fraud charge. That is to say, the government's theory is not to say that the items here were securities. Is that correct?
>
> **AUSA Roos**: That's right. We're not alleging securities fraud. The government's theory … [is] premised on the Supreme Court's decision in [*Carpenter v. United States*, 484 U.S. 19 (1987)], which, I think, describes insider trading conduct as a wire fraud."[3]

During the June 15, 2022 pre-trial conference, the Court instructed the defendant to file its motion to dismiss before filing other motions in this case, which are due on or before September 30, 2022.

---

[3] June 15, 2022 Pre-Trial Conference Tr. at 3:19 – 4:6.

## **LEGAL STANDARD**

Rule 12(b) of the Federal Rules of Criminal Procedure permits pre-trial motions on "any defense, objection, or request that the court can determine without a trial of the general issue."  On such a motion, "the facts alleged by the government must be taken as true" and courts may not test the sufficiency of the evidence.  *United States v. Velasegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

A motion to dismiss an indictment must be granted where the indictment "fails to allege the essential elements of the crime charged."  *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *see United States v. Aleynik*ov, 676 F.3d 71, 75–76 (2d Cir. 2012) (dismissal required where conduct alleged is not prohibited by language of statute).  Put differently, where "the facts alleged [in an Indictment] do not constitute an offense as a matter of law," dismissal is appropriate. *United States v. Heicklen*, 858 F.Supp 2d 256, 262 (S.D.N.Y. 2012).

## **ARGUMENT**

### I.    **There Can Be No "Insider Trading" Wire Fraud Charge Because the NFTs At Issue Are Neither Securities Nor Commodities**

The government has billed this case as "insider trading" in NFTs.  It is anything but.  As discussed herein, the government's flawed interpretation of the Supreme Court's decision in *Carpenter v. United States*, 484 U.S. 19 (1987), contravenes 40 years of insider trading jurisprudence.  In charging this case—the first of its kind in the digital asset space—in which the government acknowledges that the NFTs at issue are not securities, *see supra* at 5, the government seeks to dismantle the well-established foundation upholding *Carpenter* and insider trading caselaw: the protection of our financial markets.[4]  The government's overreach also leaves unwitting employees exposed to criminal liability for alleged breaches of an employment agreement without fair warning.

---

[4] The government also does not allege that the NFTs at issue are commodities.

A.    A *Carpenter* Wire Fraud Theory of Insider
Trading Requires a Nexus to the Financial Markets

We begin with the Supreme Court's interpretation of the facts underlying the *Carpenter*

decision, as read in connection with the basic tenets of the misappropriation theory of insider

trading.  In *Carpenter*, the defendant was a reporter for the Wall Street Journal ("WSJ") and was

one of two writers of the daily column, "Heard on the Street" (the "Heard Column").  *Carpenter*,

484 U.S. at 22.  The Heard Column discussed and assessed the value of stocks and their

investment-worthiness.  *Id*.  Because of the Heard Column's perceived quality and integrity, it had

the potential to affect the prices of the stocks that it examined.  *Id*. at 22.  Despite an official WSJ

policy and practice to maintain pre-publication confidentiality of the Heard Column, the defendant

provided other individuals with information regarding the timing and content of the Heard

Column.  *Id.* at 23.  The recipients then bought and sold stocks based on the probable and

established impact of the Heard Column on the market.  *Id*.

As a result of this conduct, the defendant was convicted of violating: (i) section 10(b) of

the Securities and Exchange Act; and (ii) the mail and wire fraud statutes.  *Id*. at 20-21.  The

misappropriation of WSJ confidential information formed the foundation for these charges.  *Id*. at

24.  An evenly divided Supreme Court upheld the defendant's conviction under the securities laws.

*Id*.  A unanimous Court affirmed the appellate court's finding that the defendant's breached a duty

of confidentiality and misappropriated property within the meaning of the mail and wire fraud

statutes.  *Id.* at 22-28.  In so holding, the Court determined that the schedule and contents of the

Heard Column—the newspaper's "stock in trade"—constituted WSJ's confidential business

information, and further noted that confidential business information had long been recognized as

a property right.  *Id.* at 26.  According to the Court, the misappropriation of that information served

as a legitimate basis for a mail and wire fraud prosecution brought under a theory of insider trading. *Id*. at 22-26.

The Supreme Court's decision regarding the misappropriation of confidential information was grounded against a familiar backdrop: tippees engaged in securities trading based on a defendant's tip. *Id*. at 22-23. In finding that mail and wires were used in furtherance of the misappropriation scheme, the Court noted: "Had the column not been made available to Journal customers, *there would have been no effect on stock prices and no likelihood of profiting from the information leaked* by [the co-author]." *Id.* at 28 (emphasis added).

The misappropriation of confidential business information as a basis for a wire fraud theory of insider trading is inextricably related to the misappropriation theory of insider trading, devised from judicial interpretations of § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. A violation of the misappropriation theory of insider trading occurs when any person "misappropriates confidential information *for securities trading purposes*, in breach of a duty owed to the source of the information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (noting that the misappropriation theory grounds liability in "a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information") (emphasis added). Put another way, insider trading—and the misappropriation theory—applies only where trades are *"in connection with" securities or commodities*. *Id.* (emphasis added). Since *Carpenter*, the Second Circuit has continued to rely on these fundamental principles of insider trading, maintaining its view that the misappropriation theory constitutes fraud in connection with securities or commodities.[5]

---

[5] *See, e.g., United States v. Chow,* 993 F.3d 125, 137 (2d Cir. 2021) ("The misappropriation theory is thus designed to protec[t] the integrity of the securities markets …"); *United States v. Falcone,* 257 F.3d 226, 232 (2d Cir. 2001) ("[T]he misappropriation theory holds that a section 10(b) violation occurs when an individual 'misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information.'"

This distinction—*i.e.,* that insider trading applies specifically in the context of securities or commodities transactions—is not simply an issue of nomenclature.  The misappropriation theory, and insider trading generally, involves a breach of a duty and the use of material non-public information in a way that undermines the integrity of the securities or commodities markets and victimizes the public.[6]  Courts have emphasized this point by noting repeatedly that the very purpose of insider trading prohibitions is to "'insure honest securities markets and thereby promote investor confidence.'"[7]

Accordingly, whether under securities laws or the wire fraud statute, a common thread emerges: the misappropriation theory requires (i) the misappropriation of confidential information in breach of a duty to the source of that information, ***and*** (ii) the existence of trading in securities or commodities.  *See Carpenter*, 484 U.S. at 22-23; *see O'Hagan*, 521 U.S. 642 at 652.  Indeed, in considering 40 years of insider trading jurisprudence, the defense is unaware of ***a single case*** in which the government has charged "insider trading" under a *Carpenter*-related wire fraud theory

---

(internal citations omitted)); *United States v. Libera*, 989 F.2d 596, 599 (2d Cir. 1993) (noting that misappropriation theory "prohibits trading in securities based on material, nonpublic information…"); *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (noting that "a fraud-on-the-source theory of liability extends the focus of Rule 10b-5").

In cases involving a company insider who provides material, non-public information to an outsider, the Second Circuit has noted: "In prosecuting a putative 'tipper' under the misappropriation theory of insider trading, the government must prove as an element of the offense that the tipper conveyed material non-public information to his 'tippee' with the understanding that it would be used *for securities trading purposes*." *United States v. Gansman*, 657 F.3d 85, 92 (2d Cir. 2011) (emphasis added).  While there is no tipper/tippee relationship in this case, it would make little sense to find that the foundation of securities trading is not required where someone instead trades on their own account.

[6] Congress appears to be in accord with the view that insider trading conduct emanates from securities laws.  The "Insider Trading Prohibition Act" currently awaiting consideration in the U.S. Senate aims "to prohibit certain *securities trading* and related communications by those who possess material, nonpublic information." Insider Trading Prohibition Act, H.R. 2655, 117th Cong. (2021) (emphasis added).

[7] *Chow*, 993 F.3d at 137 (quoting *O'Hagan*, 521 U.S. at 658); *see also O'Hagan*, 521 U.S. at 653, 656 (holding that insider trading laws are designed to "protect the integrity of the securities markets" because a misappropriator "deceives the source of the information and simultaneously harms members of the investing public."); *United States v. Newman*, 773 F.3d 438, 445, 449 (2d Cir. 2014) (holding that "the unlawfulness of insider trading is predicated on the notion that insider trading is a type of securities fraud proscribed by Section 10(b) and Rule 10b-5," and that insider trading liability is meant to "promot[e] efficiency in the nation's securities markets.")

absent a key element of the crime: securities or commodities trading.  The government should not be permitted to do so now.

        B.      In Charging a *Carpenter* Wire Fraud Count Without
                Securities or Commodities Trading, the Government
                <u>Seeks to Criminalize a Civil Employment Dispute</u>

To eliminate the requirement of securities or commodities trading from the *Carpenter*-related wire fraud theory of insider trading is to criminalize personal use of information that may be tangentially work-related under a broad, boilerplate employment agreement.  The wide-reaching nature of such an expansion in potential wire fraud prosecutions would be manifest.

Consider the following examples:

      1.     An art gallery employee decides to promote one painting as a "gallery feature" on a prominent shelf at the front of the gallery.  She notices that promoted paintings often sell faster and at a higher price than un-promoted paintings.  As a result, she decides to promote one of her own paintings as the "gallery feature" during a highly attended silent art auction.  One day after the auction, the highest bidder is informed that they successfully bid on the employee's piece and the purchase is officially transacted and finalized online.

      2.     A coffeeshop employee decides to promote a specific bag of coffee beans in the storefront window.  Before the promotion, he personally purchases a large quantity of beans.  Immediately after the promotion, he notices a sharp increase in demand.  He then sells his bags online at a profit.

Does the above conduct constitute insider trading?  The answer is plainly no, as these scenarios epitomize transactions in ordinary goods as opposed to investment contracts.  The government, however, now answers yes.  The consequence?  The government's enforcement power would be expanded to matters that, quite literally, amount to a bag of beans—something never envisioned by Congress and the courts.

Accordingly, the government, having laced the Indictment with insider trading language,[8] and having made public statements announcing this case as sounding in insider trading,[9] should not be permitted to proceed on a *Carpenter* wire fraud theory of insider trading when it agrees that the relevant pieces of "digital artwork" are not securities.[10]   As shown above, allowing the government to do so would be akin to providing the government carte blanche to criminalize run-of-the-mill employment disputes.

## II.     The Wire Fraud Count Must Also Be Dismissed Because the Allegedly Misappropriated Information Is Not "Property"

To prevail on a wire fraud theory, the government must prove the following elements: (1) a scheme or artifice to defraud; (2) money or property as the object of the scheme; and (3) the use of wires to further the scheme.[11]   Ultimately, the wire fraud count of the Indictment rises and falls with the notion that the confidential information allegedly misappropriated is "property." Here, there has been no wire fraud because the information at issue does not constitute "property." Further, even if the Court were to find that OpenSea has a property interest in the information at issue, OpenSea was deprived of precisely nothing—neither fees nor any other property—as a result of Mr. Chastain's alleged "scheme."   The Indictment should be dismissed accordingly.

---

[8] *See* Indictment ¶¶ 1, 3.

[9] Upon announcing Mr. Chastain's indictment, the USAO's press release headline referred to this case as the "First Ever Digital Asset Insider Trading Scheme."  Department of Justice, *Former Employee Of NFT Marketplace Charged In First Ever Digital Asset Insider Trading Scheme*, June 1, 2022, https://www.justice.gov/usao-sdny/pr/former-employee-nft-marketplace-charged-first-ever-digital-asset-insider-trading-scheme.  The press release itself doubled down, noting that this case exemplifies the USAO's "commitment … to stamping out insider trading." *Id.*

[10] Indictment ¶ 5 (noting that NFTs are "digital artwork."); *see also supra* at 5 (pre-trial conference transcript).

[11] 18 U.S.C. § 1343 provides, that whoever "devises or intend[s] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice…" shall be guilty of wire fraud. *See also United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (noting elements of wire fraud).

11

A.    As a Matter of Law, Mr. Chastain's
      Selection of Featured NFTs Is Not OpenSea's Property

The government alleges that OpenSea is capable of claiming a property right in the mere selection of a featured artist for its website—as "confidential business information," Indictment ¶¶ 2-4, 7-8—even though the selection itself is completely devoid of any inherent economic value and based on Mr. Chastain's unspoken personal thoughts. The government is wrong.  Mr. Chastain's selection process, including the thoughts and ideas underlying that process, is not the "stock in trade" of OpenSea, capable of being distributed or sold.  Indeed, Mr. Chastain's mere personal selection of NFT artwork is not capable of being "property in the hands of [OpenSea]." *Cleveland v. United States*, 531 U.S. 12, 15 (2000).

To even begin to contemplate the possibility that an entity has a property right in mere information lacking any inherent economic value, or in an individual's personal thoughts, is to tread into a realm of "interest[s] too ethereal in [themselves] to fall within the protection of the mail [and wire] fraud statute."  *Carpenter*, 484 U.S. at 25.  It is evident that the government's instant wire fraud theory is well beyond the pale, in light of, as shown below, the Supreme Court's repeated unwillingness to extend the mail and wire fraud statute beyond "traditional" property interests.  *Cleveland*, 531 U.S. at 24 (rejecting government's theories of property rights, in part, "because they stray[ed] from traditional concepts of property").

Beginning with *McNally v. United States*, 483 U.S. 350 (1987), the Court held that the mail fraud statute did not extend to the "intangible right of the citizenry to good government."[12]  Instead,

---

[12] *McNally*, 483 U.S. at 356. In the decades leading up to the *McNally* decision, federal prosecutors increasingly used the mail fraud statute to attack corruption that deprived victims of certain "intangible rights" unrelated to money or property. *Cleveland*, 531 U.S. at 18.  Expanding the scope of the mail fraud statute in this manner stimulated the development of the "honest services" doctrine, which found that actionable harm may lie in the denial of an individual's right to the offender's "honest services." *Skilling v. United States*, 561 U.S. 358, 399-400 (2010).  The Supreme Court, however, halted this development of the intangible-rights doctrine with its decision in *McNally*. *McNally*, 483 U.S. at 401-02.

the Court found that, consistent with its original purpose, the mail fraud statute was "limited in scope to the protection of money or property." *McNally*, 483 U.S. at 359 n.8, 360; *see also* 18 U.S.C. § 1343 (wire fraud statute similarly limited in scope to "money or property").

Shortly after *McNally*, the Court decided *Carpenter*, which as discussed *supra*, highlighted the Court's focus on property rights in the context of the mail and wire fraud statutes, and found a cognizable interest in confidential market-related business information that "[had] long been recognized as property." *Carpenter*, 484 U.S. at 26.[13] As further indicated by the Court, however, the definition of "property," including defining confidential business information as "property," is not without limit. *Id.* at 25-28. On the one hand, some interests, such as the contractual right to honest and faithful services, have been recognized as "too ethereal" to come within reach of the mail and wire fraud statutes. *Id.* at 25. On the other hand, certain intangible interests, such as confidential business information, have been recognized as a "species of property," but as further clarified by the Court, such information comes within the purview of the mail and wire fraud statutes because it is capable of being "acquired or compiled by a corporation in the course and conduct of its business." *Id*. at 26 (internal citation omitted). Thus, the "news matter" at issue in *Carpenter* was deemed confidential business information because it was the WSJ's "stock in trade … gathered at the cost of enterprise … distributed and sold to those who [would] pay money for it." *Id*.

Over a decade later, the Court decided *Cleveland v. United States*, 531 U.S. 12 (2000). There, the defendant was prosecuted under the mail fraud statute for making false statements in

---

[13] In response to the *McNally* and *Carpenter* decisions, which effectively put an end to the intangible-rights doctrine, Congress passed the honest-services statute in 1988, which specifically defined a "scheme or artifice to defraud" as including a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346; *see also Skilling*, 561 U.S. at 401-02. The *Skilling* Court later narrowed § 1346 to only include "bribery and kickback schemes." *Skilling*, 561 U.S. at 408-09.

his application to the state police for licenses to operate video poker machines. *Cleveland*, 531 U.S. at 15. Vacating the defendant's conviction, the Court concluded that the ability of the state to issue licenses did not qualify as "property" under the mail fraud statute. *Id.* at 15, 23, 27. In so finding, the Court noted that "it does not suffice … that the object of the fraud may become property in the recipient's hands … *the thing obtained must be property in the hands of the victim*." *Id*. at 15 (emphasis added). Accordingly, a victim's ability to sell an item in hand is a significant contributing factor in determining whether that item qualifies as property. *See id.* at 23 ("[W]hile a patent holder may sell her patent … the State may not sell its licensing authority.") (internal citations omitted).

The Supreme Court's recent decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), followed in *Cleveland's* footsteps. In *Kelly*, the Court reversed the wire fraud convictions of two former government officials who allegedly schemed to realign toll lanes on the George Washington Bridge to punish the mayor of Fort Lee, New Jersey. *Id*. at 1569-71. Much like *Cleveland*, the *Kelly* Court held that the realignment scheme implicated thew Port Authority's regulatory power, and as such, it was not "property" under the wire fraud statute. *Id*. at 1572-73. But moving one step beyond its finding in *Cleveland*, the Court also held that the government could not support a wire fraud conviction by relying on an incidental property right implicated by the realignment scheme, such as an affected toll booth worker's time and labor. *Id*. at 1572-74. As specifically noted by the Court, "property must play more than some bit part in a scheme: It must be an object of the fraud." *Id*. at 1573 (internal citations omitted).

In proceeding with the instant prosecution, the government has latched on to an exceedingly "ethereal" interest in an attempt to designate a valueless thing as "property." *Carpenter*, 484 U.S. at 25. As stated in the Indictment, Mr. Chastain was a product manager at

OpenSea, and in that capacity, he "was responsible for selecting the NFTs that would be featured on OpenSea's homepage."  Indictment ¶¶ 4, 8.  In other words, Mr. Chastain was personally responsible for managing and implementing the "featured artist" section of the company's website—he personally thought about, selected, and saw to the implementation of each NFT feature.  Indictment ¶¶ 2, 4, 7-8.  Yet the government, relying on *Carpenter*, would have this Court believe that the unsellable, ethereal NFT selection process, based on Mr. Chastain's unspoken personal thoughts and ideas, constitutes the confidential business information of his employer.[14] Or, more abstractly, the government would have this Court believe that if an employee is at work, has a thought, and then acts in accordance with that thought, then the employee's thought—in and of itself—is the property of his employer.

Unlike *Carpenter*, in which the Court focused on the misappropriation of a property interest in the collaborative and profitable "stock in trade" news matter of the WSJ, Mr. Chastain's personal selection of NFTs to be featured on OpenSea's website, and the thought guiding that selection process, was neither collaborative, *see* Indictment ¶ 8, nor the "stock in trade" of OpenSea, as it was in no way "gathered at the cost of [the OpenSea] enterprise."  *Carpenter*, 484 U.S. at 26.  Instead, much like the "patent holder" analogy articulated in the *Cleveland* decision, Mr. Chastain's unspoken thoughts regarding his NFT selection process had no commercial value to his employer.  *Cleveland*, 531 U.S. at 23-24.  Indeed, even if it had desired to do so, OpenSea could not have distributed or sold its employee's unexpressed idea.  *Compare id*. at 23 (vacating wire fraud conviction where alleged "property" was not capable of being sold); *with Carpenter*,

---

[14] Notably, the government has not alleged, because it cannot, that at the time of Mr. Chastain's transactions, OpenSea had any policies regarding the use of information concerning "featured" NFTs by employees.

484 U.S. at 26-28 (upholding wire fraud conviction where collaborative news matter, deemed "property," was capable of being acquired, compiled, distributed, and sold). [15]

Clearly, Mr. Chastain's thoughts regarding which NFT would be featured on OpenSea's website were his alone and devoid of inherent economic value to OpenSea. Thus, they cannot possibly be deemed the "object of the [alleged] fraud," *Kelly*, 140 S. Ct. at 1573, or "property in the hands of [OpenSea]." *Cleveland*, 531 U.S. at 15, 23-24; *cf. Carpenter*, 484 U.S. at 26 (collaborative news matter capable of being obtained by petitioner, and capable of being property in the hands of the WSJ). Accordingly, consistent with the Court's findings in *Carpenter*, *Cleveland*, and *Kelly*, the traditional meaning of "property," as contemplated by the wire fraud statute, cannot possibly reach information that has no inherent economic value and is something as obscure as Mr. Chastain's inner thoughts regarding featured NFT selections.

B.     Mr. Chastain's Selection of Featured NFTs Is Also
       Not "Property" Under Relevant New York State Law

The wire fraud count must also be dismissed because the alleged confidential information was not property under relevant state law. Federal courts interpreting the concept of "property" frequently consult state law, including when defining property for the purposes of misappropriation claims. *See, e.g., United States v. Craft*, 535 U.S. 274, 278 (2002); *Hudson Hotels Corp. v. Choice Hotels Intl., Inc.*, 995 F2d 1173, 1178 (2d Cir. 1993). In this context, New York State law is clear that "a misappropriation claim can only arise from the taking of an idea that is original or novel in absolute terms, because the law of property does not protect against the misappropriation or theft of that which is free and available to all." *Nadel v. Play-By-Play Toys*

---

[15] While the Court in *United States v. Finazzo*, 850 F.3d 94, 105-107 (2d Cir 2017), found there is no requirement that property be "obtainable" or "transferable" in a wire fraud action, that analysis was in the context of the "right to control" theory of property, which is not implicated here. And surely, the ability (or lack thereof) to transfer an item is a factor in determining whether that item has economic value. *See Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir 2000) (noting that "determinable market value" is a factor in determining whether a thing is recoverable property.)

*& Novelties, Inc.*, 208 F.3d 368, 378 (2d Cir. 2000). New York law abounds with instances in which allegedly misappropriated ideas have fallen short of being deemed "novel," and therefore were found legally unprotectible as property.[16] Particularly relevant, information regarding marketing concepts or common promotional techniques is not considered protectible property. *Ring v. Estee Lauder, Inc.*, 702 F. Supp 76, 78 (S.D.N.Y. 1988) (holding that an idea for "a common promotional technique" in the cosmetics industry was not a legally protectible idea).

Here, Mr. Chastain's "featured artist" idea is not novel; it is a common practice in the marketing of artwork adapted to a digital platform. Much like the court found in *Estee Lauder*, it is a "common promotional technique," frequently utilized by various NFT platforms to promote NFTs on their homepage.[17] Accordingly, in the context of this case, the information that has been allegedly misappropriated, namely Mr. Chastain's personal thoughts regarding which NFT artist would be featured on OpenSea's homepage, falls squarely within the category of ideas not protected as property under New York law. For this additional reason, the government's wire fraud charge should be dismissed.

> C.    Even If OpenSea Could Claim a Property Right in the
>        Selection of Featured NFTs, As Alleged, Any Deprivation of that
>        <u>Property Right Was Incidental or Non-Existent Under Settled Precedent</u>

To the extent OpenSea is capable of claiming any property right in this matter—whether a property right in the non-transferable artist selection by Mr. Chastain or any other ancillary property right in connection with the alleged "scheme"—this Court should find that any ensuing

---

[16] *See, e.g., Alliance Sec. Prods. v. Fleming & Co., Pharms.*, 290 F. App'x 380, 382 (2d Cir. 2008) (idea for a new marketing strategy found to be not novel); *McGhan v. Ebersol*, 608 F. Supp. 277, 284-87 (S.D.N.Y. 1985) (idea for a music video show found not to be novel); *Lapine v. Seinfeld*, 31 Misc. 3d 736, 745-47 (Sup. Ct., N.Y. Cnty. 2011) (idea for a style of cookbook found not to be novel and therefore unprotectible).

[17] *Estee Lauder*, 702 F. Supp. at 78. As just two examples, NFT platforms SuperRare and Nifty Gateway both display featured NFTs on their homepages. SUPERRARE, https://superrare.com/ (last visited Aug. 19, 2022); NIFTY GATEWAY, https://www.niftygateway.com/ (last visited Aug. 19, 2022).

deprivation of property was incidental or entirely non-existent.  For example, if the government

were to argue that through the alleged scheme, Mr. Chastain in some way deprived OpenSea of its

tangential property rights, such as employee time and labor costs, then this Court, like the *Kelly*

Court, should conclude that any such deprivation was an "incidental byproduct of the [alleged]

scheme," incapable of supporting a wire fraud charge.  *See Kelly*, 140 S. Ct. at 1573.  Indeed,

allowing any sort of contrived incidental deprivation—no matter how indirect or abstract—to be

reached by the wire fraud statute would, as other courts have noted, lead to untenable results:

> A [e-mails] B an invitation to a surprise party for their mutual friend
> C. B drives his car to the place named in the invitation,' thus
> expending the cost of gasoline.  'But there is no party; the address
> is a vacant lot; B is the butt of a joke.' Wire fraud? No.

*Id.* at 1573 n.2 (quoting *U.S. v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993)).  At the end of the

day, reality, and legally sound wire fraud jurisprudence, must trump the ethereal.

Further, OpenSea was deprived of nothing by virtue of Mr. Chastain's alleged actions.  To

the contrary, OpenSea collected its standard fees in connection with each relevant NFT that was

bought and sold on its platform, regardless of identity of the buyer or seller or Mr. Chastain's

alleged involvement.  As a result, in the absence of any legally sufficient deprivation of property,

the government's case here is, at best, rooted in some form of alleged dishonesty.  But as courts

have continually insisted, "[a] scheme to deceive, however dishonest the methods employed, is

not a scheme to defraud in the absence of a property right to interfere with."  *United States v.*

*Pierce*, 224 F.3d 158, 165 (2000); *Kelly*, 140 S. Ct. at 1572 (finding that deceitful conduct in the

absence of a traditional property interest does not amount to property fraud).

As demonstrated above, OpenSea has been legally deprived of no protectable property

interest.  This prosecution flies in the face of 30 years' worth of Supreme Court jurisprudence and

is nothing but an attempted criminalization of an alleged civil breach of an employment contract. The wire fraud count must be dismissed.

        D.       The Wire Fraud Charge Here Is Impermissibly
                      Vague and Any Ambiguity Regarding the
                      Definition of "Property" Should Be Resolved in Favor of Lenity

Given the nature of the instant allegations, this Court should, at minimum, conclude that the ever-narrowing definition of "property" under the wire fraud statute would become impermissibly vague if applied here to encompass an employee's thoughts and commercially valueless information. Indeed, any conviction stemming from "so shapeless" a statutory provision "does not comport with the Constitution's guarantee of due process."[18]

Absent any "clear and definite" direction from Congress, ambiguity caused by the government's wire fraud application here weighs in favor of lenity. *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952). In *McNally*, for example, the Court applied the lenity rule when it articulated its interpretation of the mail fraud statute, specifically noting that, "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally*, 483 U.S. at 359 (citing *United States v. Bass*, 404 U.S. 336, 347-48 (1971)). Similarly, in reaching its decision regarding an interpretation of the word "property" under the mail fraud statute, the *Cleveland* Court insisted that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'"[19] For the reasons discussed above, the rule of lenity counsels against the government's instant application of the wire fraud statute.

---

[18] *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016) (quoting *Johnson v. United States*, 576 U.S. 591, 602 (2015); *Skilling*, 561 U.S. at 368 ("Construing [a] statute to extend beyond [its] core meaning … would encounter a vagueness shoal.")

[19] *Cleveland*, 531 U.S. at 25 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)); *see also Skilling*, 561 U.S. at 408-09 (applying the rule of lenity in narrowing the scope the honest-services statute to bribes and kickbacks).

### III.   The Government's Novel Money Laundering
###        <u>Count Must Be Dismissed on Multiple Grounds</u>

To prevail on a money laundering theory, the government must prove that the perpetrator of the alleged crime: (i) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity; (ii) conducted or attempted to conduct a financial transaction; (iii) which, in fact, involved the proceeds of that specified unlawful activity; and (iv) with knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.[20]  The Indictment does not, and cannot, allege these elements.

Initially, the instant money laundering count must be dismissed because it cannot stand in the absence of the wire fraud count, or the "specified unlawful activity," which must be dismissed for the reasons articulated in Section II *supra*.  *See* 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(c)(7), 1961(1)(B), and 1343. Additionally, the money laundering count must be dismissed because the government: (i) fails to allege sufficiently the concealment element of the charged crime; (ii) impermissibly seeks to transform the money laundering statute into a mere money movement statute; and (iii) fails to allege sufficiently the "financial transaction" element of the charged crime.

### A.   The Public Nature of the Ethereum Blockchain Renders it
###      <u>Impossible to Conceal the Relevant Cryptocurrency Transactions</u>

The government alleges that Mr. Chastain committed money laundering by transferring cryptocurrency from one personal digital currency wallet to another personal digital currency wallet on the Ethereum blockchain.  *See* Indictment ¶¶ 3, 6.  In setting forth this allegation, the

---

[20] Section 1956(a)(1)(B)(i) "prohibits certain financial transactions—including the transfer or delivery of cash—involving the proceeds of certain unlawful activities when the defendant knows 'that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'"  *United States v. Rodriguez*, 727 F. App'x 24, 28 (2d Cir. 2018) (citing *United States v. Garcia*, 587 F.3d 509, 515-16 (2009)).

government must conclude that the mere movement of funds from one personal wallet to another personal wallet is tantamount to a "design to conceal" any number of "listed attributes" associated with the proceeds of the alleged wire fraud conduct. *See Cuellar v. United States*, 553 U.S. 550, 559 (2008) (referring to the "nature, location, source, ownership, or control" of unlawful proceeds as the "listed attributes" of those funds). This conclusion, however, completely defies the open, visible, and public nature of the Ethereum blockchain. It is impossible to conceal something that by its very nature is exposed.

As noted *supra*, the NFTs at issue are stored on the public Ethereum blockchain. *See* Indictment ¶¶ 5-6. The blockchain is used to create and track transactions involving ether tokens. *See id.* at ¶ 6. Ethereum users' accounts each have a unique public identifier (an "address") and users store their crypto assets in software-based "wallets." *See id.* As the government alleges, every transaction or transfer on the Ethereum blockchain is recorded and visible to the public. *See id.* Furthermore, by reviewing certain transaction data, blockchain users' identities are readily ascertainable.[21] Naturally, once blockchain accounts are unmasked, they can never be hidden again.[22]

---

[21] *United States v. Gratkowski*, 964 F.3d 307, 312 (5th Cir. 2020) ("Due to [the public nature of the Bitcoin blockchain], it is possible to determine the identities of Bitcoin address owners by analyzing the blockchain."); *In re Search of One Address*, 512 F. Supp. 3d 23, 27 (D.D.C. 2021) ("Ironically, the public nature of the blockchain makes it exponentially easier to follow the flow of cryptocurrency over fiat funds").

[22] A Google search for the phrase, "Ethereum blockchain explorer," reveals dozens of websites that allow users to explore the Ethereum blockchain. In this case, members of the public—such as Twitter user @RiceFarmerNFT—used the public blockchain to track Mr. Chastain's transactions. A copy of the relevant tweets has been attached hereto as Exhibit A. While the tweets discussed herein are not referenced in the Indictment, a court can consider on a motion to dismiss "matters of which judicial notice may be taken" pursuant to Federal Rule of Evidence ("FRE") 201(b). *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (this exception allows a court to consider facts that are either generally known, or facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2)). Furthermore, "[t]he Court generally has the discretion to take judicial notice of internet material." *BSH Hausgeräte GMBH v. Kamhi*, 282 F. Supp. 3d 668, 677 n.1 (S.D.N.Y. 2017); *see Ganske v. Mensch*, 480 F. Supp. 3d 542, 546 (S.D.N.Y. 2020) (taking judicial notice of two tweets for the purposes of a motion to dismiss.); *United States v. Bari*, 599 F.3d 176, 179-180 (2d Cir. 2010) (finding no error where district court took judicial notice of material available online).

When considering these fundamental blockchain principles in connection with the money laundering statute, which prohibits financial transactions that are designed "to conceal" any number of "listed attributes" associated with the proceeds of unlawful activity, it strains credulity to conclude that one could ever design to conceal money by merely moving that money around in a public arena, as Mr. Chastain is alleged to have done.[23]  Yet, that is the basis for the instant charge, even though every single cryptocurrency transfer associated with this case was: (i) conducted in the open; (ii) specifically discernable; and (iii) visible to the public.[24]

B.   The Government Impermissibly Calls on the Money Laundering
     Statute to Criminalize Nothing More Than the Movement of Money

In alleging that Mr. Chastain was laundering cryptocurrency by simply moving it from one personal digital wallet to another personal digital wallet, the government improperly transforms the money laundering statute into a generic money moving statute, criminalizing the simple and publicly perceptible movement of money.  Notably, though, courts around the country have been resistant to expanding the scope of the money laundering statute under similar circumstances.  For example, courts have declined to hold that the mere physical transportation of money in a container amounts to the crime of money laundering.[25]  Additionally, various Circuit Courts, including this Circuit, have declined to interpret the money laundering statute in a way that would turn it into a mere money spending statute.[26]

---

[23] Indeed, the government has not alleged, nor could it, that the defendant here used a cryptocurrency mixing or tumbling service to obfuscate the source of the funds.  *See, e.g., United States v. Sterlingov,* 573 F.Supp 3d 28, 31 (D.D.C. 2021).

[24] Further belying the notion that Mr. Chastain aimed "to conceal" these transactions, in one instance, he freely discussed his purchase of a particular NFT with the Twitter community on the same day that he purchased it.  A copy of Mr. Chastain's tweet (published under his Twitter username, @natechastain) has been attached hereto as Exhibit B.

[25] *See, e.g., United States v. Dimeck*, 24 F.3d 1239, 1247 (10th Cir. 1994); *see also Cuellar,* 553 U.S. at 563 (finding that the mere transportation of funds in hidden car compartment did not amount to money laundering).

[26] *See, e.g., United States v. Stephenson*, 183 F.3d 110, 120 (2d Cir. 1999) ("Subsection (i) of the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity"); *United States v. Sanders,*

Accordingly, it defies logic to conclude that Mr. Chastain could be convicted of money laundering for publicly transporting cryptocurrency from one personal digital wallet to another personal digital wallet when several courts around the country, including the Second Circuit, would hold that he could not be convicted of money laundering for openly spending the proceeds of the alleged NFT sales.[27]  *See Stephenson*, 183 F.3d at 120.

Separately, as a matter of policy, allowing the government to proceed on this money laundering theory would open the metaphorical floodgates and allow the government to criminalize virtually all money movement going forward.  By way of brief example, under the government's instant theory, what would prevent the government from bringing a charge, under 18 U.S.C. § 1956(a)(1)(B)(i), against someone who robs a lemonade stand owner, pockets the proceeds of the robbery, and then moves those unlawful proceeds from his left pocket to his right pocket?  In that circumstance, one could potentially argue that the essential elements of money laundering have been established.

In *Cuellar*, 553 U.S. at 561-63, the Supreme Court acknowledged a similar "floodgates" argument when it overturned a money laundering conviction under 18 U.S.C. § 1956(a)(2)(B)(i), finding that the government had not proven that the defendant—who had been arrested after police found a sum of cash in a hidden compartment of the defendant's vehicle during a traffic stop— was transporting money in order "to conceal or disguise the specified attributes of the illegally obtained funds," rather than merely concealing the funds in order to transport them.  *Cuellar*, 553

---

929 F.2d 1466, 1470-72 (10th Cir. 1991) (finding that the money laundering statute should not be interpreted to criminalize ordinary spending of drug proceeds); *United States v. Dobbs*, 63 F.3d 391, 399 (5th Cir. 1995) (insufficient evidence to support money laundering conviction "where the use of the money was not disguised and the purchases were for family expenses and business expenses"); *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995) (rejecting a view of the money laundering statute that would transform it into a money spending statute).

[27] Notably, spending unlawful proceeds is far more surreptitious than publicly moving those proceeds from one public location to another.

U.S. at 553-55, 566-68. In disputing his conviction, the defendant argued that, if the "mere hiding" of funds constituted money laundering, then all cross-border transport of illicit funds would be covered by the money laundering statute because people regularly take minimal efforts to conceal money, "such as *placing it in a wallet* in order to secure it during travel." *Id.* at 562 (emphasis added). In response, the government argued that such concealment would not criminalize all cross-border transport of illicit funds because the money laundering statute encompassed only substantial efforts at concealment.[28] And consequently, the government agreed that "*a violation of [18 U.S.C. § 1956(a)(2)(B)(i) could] not be established by evidence that the defendant carried money in a wallet or concealed it in some other conventional or incidental way.*" *Id.* at 563 (emphasis added).[29]

Thus, according to the government (in *Cuellar*), moving money in a wallet is insufficient to establish the concealment element of a money laundering claim. The instant case involves just that: the movement of money through the use of publicly-viewable wallets on the blockchain. Accordingly, the money laundering count should be dismissed.

C.     The Government Failed to Adequately Allege a "Financial Transaction"

Under 18 U.S.C. § 1956(c)(4), a "financial transaction" is, as relevant here, "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments…." Here, the government has not alleged that Mr. Chastain's movement of cryptocurrency from one personal digital wallet to another affected interstate or foreign commerce or is otherwise a "financial

---

[28] *Id.* at 562-63; *see also United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ("highly complex and surreptitious [transactions]" support finding of concealment).

[29] The *Cuellar* decision involved an analysis of 18 U.S.C. § 1956(a)(2)(B)(i) (also known as "transportation money laundering"), whereas the instant matter involves 18 U.S.C. § 1956(a)(1)(B)(i) (also known as "transaction money laundering"). The concealment element is identical in both provisions. *See Garcia*, 587 F.3d at 517 ("[W]e have found [Cuellar's] holding equally applicable in transaction money laundering, in light of the identical language used in the two provisions.").

transaction." Unsurprisingly, the defense has found no case supporting a money laundering charge under these circumstances.  As a matter of law, a money laundering charge cannot stand on these facially insufficient allegations, and the count must be dismissed.

## IV.    <u>Alternatively, the Grand Jury Instructions Should Be Disclosed</u>

Should the Court be inclined to deny the motion at this time, the defendant respectfully request that the government be ordered to disclose its grand jury instructions pursuant to Fed R. Crim. P. 6(e)(3)(E)(ii).[30]  The defendant has shown a particularized need for those instructions because, as discussed above, issues of first impression are implicated here and the government's statements evidence their erroneous views of wire fraud and money laundering as applied to this case.[31]  Accordingly, the government's instructions to the grand jury should be disclosed.

## <u>CONCLUSION</u>

For the aforementioned reasons, and based on fundamental legal principles, Supreme Court jurisprudence, and due process, the Court should dismiss the Indictment with prejudice.

Dated: New York, New York
   August 19, 2022        Respectfully submitted,

               GREENBERG TRAURIG, LLP

               By: <u>*/s/ David I. Miller*</u>
               David I. Miller
               Gregory W. Kehoe
               Charles J. Berk
               One Vanderbilt Avenue
               New York, NY 10017
               (t) (212) 801-9200; (f) (212) 801-6400

               *Counsel for Defendant*
               *Nathaniel Chastain*

---

[30] In a June 15, 2022 letter to the government, defendant requested the instructions the government provided to the grand jury.  The government denied defendant's request in its July 28, 2022 response.

[31] *United States v. Moten*, 582 F.2d 654, 663-64 (2d Cir. 1978) (granting defendant access to grand jury testimony where particularized need was shown).