UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NATHANIEL CHASTAIN,<br><br>*Defendant.* | Case No. 22-cr-00305 (JMF) |

**BRIEF OF AMICUS CURIAE THE NEW YORK COUNCIL OF DEFENSE LAWYERS IN SUPPORT OF DISMISSAL OF THE INDICTMENT**

James M. Burnham
Harry S. Graver
S. Matthew Krsacok
JONES DAY
51 Louisiana Ave, N.W.
Washington, D.C. 20001
Tel: (202) 879-5429
jburnham@jonesday.com

Gary Stein
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, N.Y. 10022
Tel: (212) 756-2000
gary.stein@srz.com

Christine H. Chung
CHRISTINE H. CHUNG PLLC
14 Murray Street, No. 236
New York, N.Y. 10007
Tel. (917) 685-0423
christine@thechunglawoffice.com

*Counsel for Amicus Curiae New York Council of Defense Lawyers*

August 24, 2022

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................ 1

INTEREST OF AMICUS CURIAE ................................................................. 2

ARGUMENT .................................................................................................. 3

I.   Not All Confidential Business Information Is Property ......................... 3

II.  The Canons of Construction Weigh Heavily Against
     the Government's Sweeping Interpretation ........................................ 11

III. The Court Should Dismiss the Indictment ........................................ 12

CONCLUSION ............................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bond v. United States,*
    572 U.S. 844, 858 (2014) ............................................................................................ 11

*Carpenter v. United States,*
    484 U.S. 19 (1987) ................................................................................................ *passim*

*Cleveland v. United States,*
    531 U.S. 12 (2000) ............................................................................................... 2, 11

*Int'l News Serv. v. Associated Press,*
    248 U.S. 215 (1918) .................................................................................................... 7

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) ............................................................................................... 2

*McDonnell v. United States,*
    579 U.S. 550 (2016) .................................................................................................. 11

*Skilling v. United States,*
    561 U.S. 358 (2010) ............................................................................................... 2, 11

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012) ....................................................................................... 12

*United States v. Bergrin,*
    650 F.3d 257 (3d Cir. 2011) ..................................................................................... 12

*United States v. Blaszczak,*
    947 F.3d 19 (2d Cir. 2019), *vacated,*
    141 S. Ct. 1040 (2021) ................................................................................................ 7

*United States v. Carpenter,*
    791 F.2d 1024 (2d Cir. 1986), *aff'd,*
    484 U.S. 19 (1987) .................................................................................................... 10

*United States v. Covino,*
    837 F.2d 65 (2d Cir. 1988) ......................................................................................... 9

*United States v. Grossman,*
    843 F.2d 78 (1988) ................................................................................................... 8, 9

*United States v. Hoskins,*
    902 F.3d 69 (2d Cir. 2018) ....................................................................................... 13

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Mahaffey,*
   693 F.3d 113 (2d Cir. 2012) ................................................................................ 8, 9

*United States v. Miller,*
   997 F.2d 1010 (2d Cir. 1993) .......................................................................... 9, 10

*United States v. Mittelstaedt,*
   31 F.3d 1208 (2d Cir. 1994) .................................................................................. 9

*United States v. Newman,*
   773 F.3d 438 (2d Cir. 2014) ................................................................................ 14

*United States v. Ochs,*
   842 F.2d 515 (1st Cir. 1988) .............................................................................. 10

*United States v. Singhal,*
   876 F. Supp. 2d 82 (D.D.C. 2012) ..................................................................... 14

*United States v. Smith,*
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................................................ 12

## OTHER AUTHORITIES

John P. Anderson, et al., *Public Perceptions of Insider Trading,*
   51 Seton Hall L. Rev. 1035 (2021) ..................................................................... 14

Fed. R. Crim. P. 12 ................................................................................................... 12

Stuart P. Green & Matthew B. Kugler, *When Is It Wrong to Trade Stocks on*
   *the Basis of Non-Public Information? Public Views of the Morality of Insider*
   *Trading,* 39 Fordham Urb. L.J. 445 (2011) ...................................................... 14

Jed S. Rakoff, *The Federal Mail Fraud Statute (Part I),*
   18 Duquesne L. Rev. 771 (1980) ........................................................................ 11

## <u>INTRODUCTION</u>

The Government's prosecution of Nathaniel Chastain is premised on an unprecedently broad theory of property fraud.  There is no allegation that Mr. Chastain sought to deprive those who purchased his nonfungible tokens ("NFTs") of property, as all of them got precisely what they paid for.  Rather, the Government's theory is that Mr. Chastain fraudulently deprived his *employer* of property by "misappropriat[ing] OpenSea's confidential business information about what NFTs were going to be featured on its homepage and us[ing] that information to secretly purchase dozens of NFTs shortly before they were featured."  Indictment ¶ 3.

This theory is defective as a matter of law.  As the Government recently admitted in the Second Circuit, "confidential business information" constitutes property when the information has "inherent market value" to its owner. United States Supplemental Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021) (ECF No. 497).  Understanding "property" in that manner makes sense, as converting all "confidential business information"—which the Government here defines to include any information "received in connection with … work" and "not generally known or available outside of OpenSea," Indictment ¶ 9—into "property" would  effectuate a breathtaking expansion of federal fraud and criminalize a broad swath of conduct never before thought criminal.  It would, indeed, capture virtually every instance of an employee using internal employer information for non-work purposes.

Wire fraud does not reach every employee who diverts "confidential" information received at work to the employee's own purposes. This legal deficiency is clear on the face of the Indictment and is incurable on the facts alleged. The Court should thus dismiss the Indictment for failure to state an offense.

## **INTEREST OF AMICUS CURIAE**

The New York Council of Defense Lawyers ("NYCDL") is a non-profit organization of approximately 350 criminal defense lawyers whose principal area of practice is the defense of criminal cases, particularly in the federal courts in New York. Its purposes are, among other things, to support the criminal defense function by enhancing the quality of defense representation and to take positions on important defense issues. The NYCDL is deeply concerned about efforts by the Department of Justice to expand the scope of mail and wire fraud beyond the boundaries Congress has set. The Supreme Court routinely rebuffs such prosecutorial creativity. *See, e.g.*, *Kelly v. United States*, 140 S. Ct. 1565 (2020) (unanimously rejecting novel theory of fraud); *Cleveland v. United States*, 531 U.S. 12 (2000) (same); *Skilling v. United States*, 561 U.S. 358 (2010) (same). And the NYCDL believes the Government's theory here should be rejected as well.

*Amicus* has an acute interest on behalf of its many members and their past, present, and future clients in opposing further attempts to criminalize conduct that Congress has not actually made criminal.[1]

## ARGUMENT

## I.   Not All Confidential Business Information Is Property.

Like theft, fraud sounds in wrongfully depriving others of their property.  And yet the Government does not accuse Mr. Chastain of scheming to deprive anyone of *actual* property.  Rather, the Government contends that Mr. Chastain is guilty of fraud because he "misappropriated OpenSea's confidential business information" by timing the purchase and sale of NFTs around when OpenSea would feature them on its homepage.  That wrongly deprived OpenSea of property, the Government says, because OpenSea's employees "had an obligation to maintain the confidentiality of confidential business information received in connection with their work for OpenSea, and an obligation to refrain from using such information, except for the benefit of OpenSea or to the extent necessary to perform work for OpenSea."  Indictment ¶ 9. In the Government's view, "confidential business information"—and so "property"— "include[s] any information not generally known or available outside of OpenSea."  *Id.*

---

[1] *Amicus* states that (1) this brief was authored entirely by its counsel, and not by counsel for any party, in whole or part; (2) no party and no counsel for any party contributed money intended to fund preparing or submitting the brief; and (3) apart from the NYCDL and its counsel, no other person contributed money intended to fund preparing or submitting the brief.

The Government is wrong.  OpenSea was not in the business of selling "information not generally known or available outside of OpenSea."  Nor did OpenSea assign commercial value to such information generally, or to the information Mr. Chastain used specifically.  That information is accordingly not OpenSea's "property" in any traditional sense.  And that is true regardless of whether Mr. Chastain was professionally obligated to keep this information confidential, or even if Mr. Chastain "signed a written agreement" promising to maintain that confidentiality. *Id.*  Employees are expected to keep employer confidences, but that expectation does not convert everything learned about the employer's business into corporate property.

The broad implications of the Government's theory underscore its incorrectness. One of the key limits on property fraud is its requirement of an intended property deprivation.  The intent to deprive others of property is what converts mere deception into criminal fraud.  But if all "confidential business information" constitutes property, then the Government could bring fraud charges against any employee who deploys workplace information for non-work purposes.

If accepted, that broad theory would distort insider trading law, and much more besides.  Prosecutors would routinely forgo the doctrinal complexities of insider trading—and the careful legal limits on that doctrine—if they could simply prosecute insiders for "misappropriating" information from their employers.

And that would be just the beginning.  Under the Government's view, the below examples (and countless more) would constitute fraud:

- A corporate whistleblower surreptitiously gathers information about corporate malfeasance and provides it via email to a journalist in violation of a company policy prohibiting the use of company information for non-company purposes. Under the Government's theory, the whistleblower has committed wire fraud by "misappropriating" the employer's property for unauthorized uses.

- A CEO's personal aide keeps secret notes about the CEO's behavior in meetings and treatment of her employees. These interactions are confidential—the aide even signed a nondisclosure agreement as a condition of accepting a job—but the aide nonetheless records wide-ranging specifics about how the CEO acts. Then, after the aide leaves her job, she writes a tell-all book (which becomes a movie), casting the CEO as a well-dressed-but-tyrannical figure. Fraud. After all, the CEO's aide has "misappropriated" confidential workplace information and redeployed it for private use.

- An executive at a large corporation learns that his company is secretly planning to move its headquarters to a specific neighborhood in a new city. The executive has agreed that this information is confidential company information, but nonetheless proceeds to purchase a home for his son, knowing that the headquarters announcement will cause home prices to skyrocket. Fraud again. Just like Mr. Chastain, the employee "misappropriated" confidential business information for personal use.

- An executive at a major automobile manufacturer learns that the company will soon discontinue production of its signature sportscar. Realizing that the car will quickly become a collector's item, the executive leaves work and immediately buys the last model from his local dealer. Also fraud. This executive—like the others—has used inside knowledge for personal gain.

The Government has suggested that the Supreme Court endorsed its capacious understanding of property fraud in *Carpenter v. United States*, 484 U.S. 19 (1987), but that decision did nothing of the sort. In *Carpenter*, a journalist at the Wall Street Journal wrote a column called "Heard on the Street," which synthesized information the journalist gathered from corporate leaders along with analysis of the stock market and market trends. *Id.* at 22. The column was widely read and regularly moved markets.

*Id.* Recognizing as much, the journalist conspired with two securities brokers to trade ahead of what the column would say—a scheme that ultimately netted the trio nearly $700,000 in profits. *Id.*

The Supreme Court divided evenly on whether this conduct constituted securities fraud, but held that it was property fraud. As the Court put it: "The Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the 'Heard' column." *Id.* at 26. It did not matter that the defendants did not publish the information. It was "sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* at 26–27.

The Court's relatively brief opinion in *Carpenter* was narrow, and did not announce a sweeping rule that all information "not generally known or available outside of" the workplace constitutes property. Rather, looking to both history and precedent, the *Carpenter* Court explained that certain confidential business information constituted property when it bore the traditional hallmarks of property: when it could, for instance, be "gathered," "distributed," and "sold." *Id.* at 26. Simply put, what makes such information property is not its confidential nature *per se*, but whether the information has commercial value to the employer.

Those principles made *Carpenter* a straightforward case. After all, *Carpenter* was about *newspapers*—businesses where *the information is the product*. The Wall Street Journal

was in the business of selling columns like "Heard on the Street," as the Court emphasized. *See, e.g., id.* ("[N]ews matter, however little susceptible of ownership or dominion in the absolute sense, is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise.") (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918)).   In so many words, the confidential business information in *Carpenter* was the employer's property because it was the employer's product.   But the fact that confidential information is *sometimes* property—as with a soon-to-be published article, a trade secret, or other proprietary information with clear commercial value—does not mean that confidential information is *always* property.   The Government fails to grasp this basic point.

That failure is particularly striking given the Government's recognition of this reality elsewhere.   Last summer, the Solicitor General's Office acknowledged before the Second Circuit that *Carpenter* was a case about information like "confidential news material or stock-trading statistics," which constitute property because they "have inherent market value to their owners."   United States Supplemental Letter Brief at 7, *Blaszczak, supra.*.   The Government there recognized that *Carpenter* is limited to "confidential business information, which is closely related to *traditional forms of property such as trade secrets and copyrighted news matter.*"   *Id.* at 5 (emphasis added).   It is not enough that an employer keeps information confidential or "invests time and resources into generating and maintaining" confidentiality.   *Id.* at 6 (quoting *United States v. Blaszczak*,

947 F.3d 19, 33 (2d Cir. 2019), *vacated*, 141 S. Ct. 1040 (2021).).  To fall within *Carpenter*, information must be a "traditional form[] of property" that has "inherent market value"—a rule which dooms this prosecution.

Nor do the Second Circuit's post-*Carpenter* decisions support the Government's case.  For example, shortly after *Carpenter* the Second Circuit decided *United States v. Grossman*, 843 F.2d 78 (1988), a case in which a law firm associate used material, nonpublic information he learned about a pending transaction that his firm was handling to profit in the securities markets.  The Second Circuit deemed that property fraud even though the firm could not "commercially exploit" the information—as the Wall Street Journal could with the information in *Carpenter*—because the information nonetheless had clear "commercial value to the firm."  *Id.* at 86.  This made sense, since keeping client confidences is one of the most important services a law firm sells.  Clients pay their lawyers for advice, representation, and confidentiality—the confidential information entrusted to a law firm can thus be understood as integral to the commercial transaction between the firm and its clients and accordingly has genuine "commercial value" to the firm.  *Id.*  It can, in turn, be seen as the firm's "property."

In later decisions, the Second Circuit has emphasized the importance of "proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information," *United States v. Mahaffey*, 693 F.3d 113, 135 n.14 (2d Cir. 2012), but it has not suggested that information can be property even if it lacks objective "commercial value" to the employer.  *Mahaffey*, for

instance, concerned a brokerage firm's "information related to pending client orders for specific blocks of particular securities." *Id.* at 120.  Information about what orders a brokerage firm will place has clear commercial value, as this information can dictate market prices and (if leaked to others) enable "frontrunning" in which other market participants trade ahead of the brokerage firm and thereby cost the firm (or its clients) money.  *Id.*

This case thus differs from *Carpenter*, *Grossman*, and the rest in a critical and fundamental way.  As noted above, OpenSea does not sell information about its homepage listings, OpenSea does not assign economic value to this information, and the information does not have inherent market value to OpenSea, which does not itself trade in the NFTs that are bought and sold on its platform.  Whatever profits Mr. Chastain made by using this information, the information did not have commercial value to OpenSea and he did not deprive OpenSea of its "property."  This case thus falls squarely outside *Carpenter*.

The Second Circuit has repeatedly explained that federal prosecution is not the appropriate remedy to every form of workplace misconduct—an admonition that applies fully here.  As that court has emphasized time and again, it does not constitute mail or wire fraud whenever an employee breaches "a duty to his or her employer and to fail to inform the employer of [the] breach."  *United States v. Miller*, 997 F.2d 1010, 1019 (2d Cir. 1993) (quoting *United States v. Covino*, 837 F.2d 65, 70–71 (2d Cir. 1988)); *see also, e.g.*, *United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) ("[W]e [have]

declined to adopt a rule that would effectively 'convert every breach of a fiduciary duty that is not openly confessed into a deprivation of § 1341 'property.'") (quoting *Miller*, 997 F.2d at 1021).   Indeed, the Second Circuit made this point in *Carpenter* itself— explaining that "not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud." *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987).

The Second Circuit has accordingly rebuffed past attempts to expand the meaning of "property" so the Government can prosecute undisclosed breaches of fiduciary duties—even when the defendant allegedly profited from the breach.   In *Miller*, for example, the court rejected the "sweeping assertion" that a fraud prosecution could be brought "when a fiduciary has realized an economic benefit for which it may be made to account to its principal by means of a constructive trust." *Miller*, 997 F.2d at 1018.   "Conduct which is wrongful in the civil context" is not necessarily criminal, *id.* at 1019 (quotation omitted), and fiduciary delinquencies that do not "deprive[] [the principal] of 'money or property'" are not property fraud, *id.* at 1020.   Nor does it matter whether the defendant profited, as "the mere fact [that] a fiduciary profits from a breach of duty is not a sufficient property deprivation to satisfy the requirements" of fraud.   *Id.* (quoting *United States v. Ochs*, 842 F.2d 515, 526 (1st Cir. 1988)).

The Government's sweeping theory in this case collides directly with *Carpenter*, its progeny, and these principles.   The Court should reject it.

## II.     The Canons of Construction Weigh Heavily Against the Government's Sweeping Interpretation.

In the years since *Carpenter*, the Supreme Court has made plain that certain canons of construction weigh heavily in interpreting the federal fraud statutes. Those canons militate against both a broad reading of *Carpenter* and the Government's unbounded theory of property fraud here. In particular, the Supreme Court has held that the rule of lenity requires that an ambiguous statute be given its less punitive reading. *See, e.g.*, *Cleveland*, 531 U.S. at 25; *Skilling*, 561 U.S. at 410. That concern is particularly applicable to mail and wire fraud—once described as the "Stradivarius," "Colt 45," "Louisville Slugger," "Cuisinart," and "true love" of "federal prosecutors of white collar crime." Jed S. Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Duquesne L. Rev. 771, 771 (1980); *see also, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 576 (2016) (expressing concern about lack of "fair notice" caused by "standardless" and "shapeless" interpretation of fraud statute).

The Supreme Court has been emphatic, too, about the importance of recognizing that most misconduct should be left to state law and that not every bad act is a federal crime. As the Court put it in *Bond v. United States*, "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" 572 U.S. 844, 858 (2014). The Government's rule would do just that—federally criminalizing a wide array of workplace misconduct that has traditionally been left to state regulation.

These considerations weigh decisively against the Government here. It is, at best for the Government, ambiguous whether all information "not generally known or available" outside the workplace constitutes "property." That ambiguity triggers these principles, requiring a narrower reading that would provide fair notice as to what conduct is unlawful and that respects the traditional province of states. A limited construction is especially warranted here because the Government's interpretation would massively expand wire fraud to capture all sorts of workplace indiscretions that would frequently not result in employer sanction, much less federal prosecution.

## III. The Court Should Dismiss the Indictment.

For all these reasons, the Indictment fails to state an offense and this Court should dismiss it. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). The Court's dismissal inquiry is deferential and assumes the truth of the Government's allegations, but nonetheless requires dismissal if the Indictment "does not describe conduct that is a violation of the criminal statute charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014); *see also, e.g.*, *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("Since federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." (citation omitted)). The purpose of this procedure is to ensure "that legally deficient charges do not go to a jury." *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011).

This is the rare case where dismissal is appropriate. The Indictment does not mince words about the Government's legal theory: "From at least in or about June

2021 to at least in or about September 2021, NATHANIEL CHASTAIN, the defendant, misappropriated OpenSea's confidential business information about what NFTs were going to be featured on its homepage and used that information to secretly purchase dozens of NFTs shortly before they were featured." Indictment ¶ 3; *id.* ¶ 9 ("Confidential information included any information not generally known or available outside of OpenSea."). The Government's case thus expressly depends on the legal proposition that Mr. Chastain committed property fraud by using "information not generally known or available outside of OpenSea" for non-work purposes. That theory is legally deficient for the reasons detailed above.

Dismissing an Indictment is a serious step, but so is declining to dismiss a deficient one. The Government is free to appeal the dismissal of an Indictment, *United States v. Hoskins*, 902 F.3d 69, 76 (2d Cir. 2018), and thereby provide the Second Circuit an opportunity to pass upon the aggressive legal theory it is pursuing. Should this Court decline to dismiss the Indictment, however, it will then have to devote considerable judicial effort—at substantial personal and financial cost to Mr. Chastain—to resource-intensive criminal proceedings which are ultimately doomed as a matter of law for reasons that are entirely apparent today. That course benefits nobody. Should the Court agree that the Government's novel theory of property fraud is legally deficient, dismissal is the prudent course.

The Government's overly aggressive use of "insider trading" allegations has been a recurring issue within this Circuit. *See, e.g.,* United States Supplemental Letter Brief at

8, *Blaszczak*, *supra* ("Because the legal theory that supported these prosecutions under the property-fraud statutes—that the confidential government information obtained by defendants through their fraud scheme was 'property'—is no longer tenable, the convictions relying on that theory should be reversed."); *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014).  That fondness for accusing defendants of "insider trading" is understandable.  Most people view insider trading as deeply immoral.[2]  And lobbing that accusation at defendants gives the Government a leg-up before the jury—seriously and unfairly prejudicing defendants like Mr. Chastain who are not even accused of actual "insider trading."  *See United States v. Singhal*, 876 F. Supp. 2d 82, 103 (D.D.C. 2012) (striking gratuitous references to "insider trading" in indictment as "highly prejudicial to defendants because they reference a current hot topic in U.S. law that the defendants are not even charged with").  This Court should head off at the pass the Government's latest innovation in "insider trading" before it produces even more fatally flawed prosecutions.

## CONCLUSION

The Court should dismiss the Indictment.

---

[2] *See* John P. Anderson, et al., *Public Perceptions of Insider Trading*, 51 Seton Hall L. Rev. 1035, 1089–91 (2021); Stuart P. Green & Matthew B. Kugler, *When Is It Wrong to Trade Stocks on the Basis of Non-Public Information? Public Views of the Morality of Insider Trading*, 39 Fordham Urb. L.J. 445 (2011).

Dated: August 24, 2022

Respectfully submitted,

James M. Burnham
Harry S. Graver
S. Matthew Krsacok
Jones Day
51 Louisiana Ave, N.W.
Washington, D.C. 20001
Tel: (202) 879-5429
jburnham@jonesday.com

*/s/ Gary Stein*
Gary Stein
Schulte Roth & Zabel LLP
919 Third Avenue
New York, N.Y. 10022
Tel: (212) 756-2000
gary.stein@srz.com

Christine H. Chung
CHRISTINE H. CHUNG PLLC
14 Murray Street, No. 236
New York, N.Y. 10007
Tel. (917) 685-0423
christine@thechunglawoffice.com

*Counsel for Amicus Curiae New York Council of Defense Lawyers*