UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
UNITED STATES OF AMERICA
                                                          :
         - v. -                          No. 22 Cr. 305 (JMF)
                                                          :
NATHANIEL CHASTAIN,
                                                          :
              Defendant.
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas Burnett
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 2

ARGUMENT ........................................................................................................................ 4

I.   The Motion to Dismiss the Indictment Should be Denied.............................................. 4

    A.   Applicable Law ....................................................................................................... 4

    B.   The Indictment Properly Alleges Wire Fraud Under a Misappropriation Theory........ 6

        1.   *The Misappropriation Theory of Wire Fraud Is Not Limited to Cases Involving Traditional Securities or Commodities* ................................................................ 6

        2.   *Describing Chastain's Crime as "Insider Trading" Is Appropriate* .................. 11

    C.   The Indictment Properly Alleges That an Object of Chastain's Wire-Fraud Scheme Was "Property" ...................................................................................................... 13

        1.   *The Indictment Alleges That an Object of the Fraud Was "Property"* .......... 13

        2.   *Chastain's View of "Property" Is Legally Erroneous* .................................... 16

        3.   *The Amicus Brief Presents No Basis to Dismiss the Indictment* .................... 19

    D.   The Indictment Properly Alleges Money Laundering ................................................ 25

        1.   *The Indictment Alleges That the Defendant's Transactions Were Designed to Conceal* ........................................................................................................ 25

        2.   *The Indictment Properly Alleges That the Defendant Engaged in Money Laundering by Transferring Digital Assets Between Digital Wallets* ................. 28

        3.   *The Indictment's Allegation of a "Financial Transaction" Is Sufficient* ........... 30

II.   The Motion for Grand Jury Instructions Should Be Denied................................................ 31

CONCLUSION...................................................................................................................... 32

# TABLE OF AUTHORITIES

Page

*Bates v. United States*, 522 U.S. 23, 29 (1997) .................................................................... 8

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ........................................ 4-5

*Carpenter v. United States*, 484 U.S. 19 (1987) ..................................... 6-8, 10, 16-17, 19, 22-23

*Cleveland v. United States*, 531 U.S. 12 (2000) ................................................................. 18

*Costello v. United States*, 350 U.S. 359 (1956) ................................................................... 5

*Cuellar v. United States*, 553 U.S. 550 (2008) ............................................................. 26, 29

*DiPierre v. United States*, 564 U.S. 70 (2011) .................................................................. 19

*Dirks v. SEC*, 463 U.S. 646 (1983) ..................................................................................... 23

*Drye v. United States*, 52 U.S. 49 (1999) .......................................................................... 18

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ................................................................. 18

*Maracich v. Spears*, 570 U.S. 48 (2013) ........................................................................... 19

*Morissette v. United States*, 342 U.S. 246 (1952) .............................................................. 25

*Smith v. United States*, 508 U.S. 233 (1993) ..................................................................... 19

*Staples v. United States*, 511 U.S. 600 (1994) .................................................................... 8

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ............................................ 5, 13-14, 26

*United States v. Belt*, 868 F.2d 1208 (11th Cir. 1989) ............................................... 9, 11

*United States v. Biyiklioglu*, 652 F. App'x 274 (5th Cir. 2016) ...................................... 27

*United States v. Blair*, 661 F.3d 755 (4th Cir. 2011) ....................................................... 29

*United States v. Budovsky*, No. 13 Cr. 368, 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) .. 27, 30

*United States v. Burgos*, 254 F.3d 8 (1st Cir. 2001) ......................................................... 30

*United States v. Burns*, 162 F.3d 840 (5th Cir. 1998) ................................................. 28-29

*United States v. Carpenter*, 791 F.2d 1024 (1986) .................................................... 7, 16-17

*United States v. Chow*, 993 F.3d 125 (2d Cir. 2021) ......................................................... 9

*United States v. Costanzo*, 956 F.3d 1088 (2d Cir. 2020) ............................................. 30

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ............................................. 6, 11

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ............................................. 5

*United States v. Decker*, 832 F. App'x 639 (11th Cir. 2020) ............................................. 27

*United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ............................................. 9

*United States v. Forde*, 740 F. Supp. 2d 406 (S.D.N.Y. 2010) ............................................. 31

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ............................................. 5

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ............................................. 28-29

*United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988) ............................................. 8, 15, 17, 21

*United States v. Hager*, 879 F.3d 550 (5th Cir. 2018) ............................................. 9, 11

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) ............................................. 9

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) ............................................. 25

*United States v. Jasper*, No. 00 Cr. 825, 2003 WL 21709447 (S.D.N.Y. July 23, 2003) ............................................. 31

*United States v. Kneeland*, 148 F.3d 6 (1st Cir. 1998) ............................................. 28

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ............................................. 31

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ............................................. 14

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ............................................. 17, 20- 23

*United States v. Majors*, 196 F.3d 1206 (11th Cir. 1999) ............................................. 28

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................. 20

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ............................................. 12

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................................. 30

*United States v. Naranjo*, 634 F.3d 1198 (11th Cir. 2011) ............................................. 26-27

*United States v. O'Hagan*, 521 U.S. 642 (1997) ............................................. 9

*United States v. Percoco*, No. 16 Cr. 776, 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ............................................. 31

*United States v. Perholz*, 842 F.2d 343 (D.C. Cir. 1988) ............................................. 9-11, 15-16

*United States v. R. Enters., Inc.*, 498 U.S. 292 (1991) .................................................. 31

*United States v. Ramirez*, No. 20 Cr. 22, 2022 WL 865860 (S.D.N.Y. Mar. 23, 2022) ............... 31

*United States v. Regensberg*, 604 F. Supp. 2d 625 (S.D.N.Y. 2009) .................................. 9

*United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001) .................................................. 30

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018) ......................................... 14, 20, 25

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) .................................................. 12

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ................................... 13, 20, 25

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ............................................ 5, 12

*United States v. Thorpe*, 166 F.3d 1216, 1998 WL 738624 (6th Cir. 1998) ............... 9, 11, 15-16

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ...................................... 30

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................... 5

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ................................................. 14

*United States v. Willey*, 57 F.3d 1374 (5th Cir. 1995) ............................................... 27

*United States v. Williams*, 504 U.S. 36 (1992) ......................................................... 5

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) .............................................. 5

## PRELIMINARY STATEMENT

Nathaniel Chastain, the defendant, is charged with committing a classic criminal scheme. For over three decades, the Supreme Court and the Second Circuit have recognized that an employee misappropriating an employer's confidential business information can constitute wire fraud because confidential business information is a form of "property."  The Indictment alleges that Chastain did just that, misappropriating the property of his employer, OpenSea, then using it to purchase non-fungible tokens ("NFTs") in advance of the NFTs being featured on OpenSea's website.  Chastain also engaged in money laundering by using a series of anonymous blockchain wallets in an effort to conceal his ownership of those NFTs, when he sold them at a profit.

The motion to dismiss seizes on the novelty of NFTs to wrongly cast this case as a novel prosecution, in the process ignoring the text of the wire fraud statute, decades of case law, and the proper function of a motion to dismiss.  Chastain tries to convert a complaint about the indictment's use of the term "insider trading" into a motion to dismiss, claiming that the misappropriation theory of wire fraud applies only to cases involving securities trading.  That argument has no basis in Supreme Court or Circuit precedent, is at odds with the text of the statute, and is inconsistent with decisions from at least five Circuit Courts of Appeals.  Labelling Chastain's alleged conduct "insider trading in non-fungible tokens" is also perfectly appropriate: the phrase accurately captures his use of confidential, non-public information to trade an asset.

Chastain, supported by an *amicus* brief, also ignores the law about the proper scope of a motion to dismiss and seeks what amounts to summary judgment on whether Chastain misappropriated "property."  The arguments in both briefs show why courts do not weigh facts at the motion to dismiss stage: Chastain and the *amicus* brief mischaracterize the confidential business information at issue in this case to create a boogeyman for them to fend off, and make

speculative, incorrect claims about what the evidence will show.  Chastain and the *amicus* also ignore binding Circuit case law in an attempt to impose ill-defined limits on what types of confidential business information can constitute "property."

Finally, Chastain raises a grab-bag of arguments to dismiss the money-laundering charge. Those arguments again ignore inconvenient (for Chastain), but binding, law governing concealment money laundering and rely on factual assertions about transactions on the blockchain that are inappropriate for resolving on a motion to dismiss.  Chastain's motion should be denied.

## BACKGROUND

On May 31, 2022, a grand jury in the Southern District of New York returned an indictment (the "Indictment"), charging Chastain with one count of wire fraud, in violation of 18 U.S.C. § 1349, and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Both charges arise out of Chastain's scheme, carried out between June and September 2021, to misappropriate his employer's confidential business information about which NFTs the employer would featured on its homepage, so he could secretly purchase those NFTs before they were featured, and then resell them at a profit.  *See* Indictment ¶¶ 1-3.

As alleged in the Indictment, NFTs are a type of digital asset stored on a blockchain.  *Id.* ¶ 5.  Each NFT is typically associated with a digital object, such as a piece of artwork, and the NFT provides proof of ownership of that digital object and a license to use the object for specific purposes.  *Id.*

Chastain's former employer, Ozone Networks Inc., d/b/a OpenSea ("OpenSea"), is the largest online marketplace for NFTs.  *Id.* ¶ 4.  The company offers a centralized location where users can create, buy, and sell NFTs across a number of different blockchains.  *Id.* ¶ 7; *see id.* ¶ 5 ("[A] a blockchain . . . is a digital, decentralized ledger that stores information, including information about transactions.").

2

Chastain was a product manager at OpenSea. *Id.* ¶ 4. In that role, as the Indictment makes clear, he had access to the company's confidential business information and an obligation to refrain from using such information, except for the benefit of OpenSea or to the extent necessary to perform his work for the company. *Id.* ¶ 9. Chastain acknowledged that obligation when he began his employment, signing a written confidentiality agreement. *See id.*

In May 2021, OpenSea began devoting space at the top of its homepage to feature certain NFTs. *Id.* ¶ 7. When a new featured NFT appeared on the homepage, the value of that NFT—as well as the value of other NFTs made by the same NFT creator—typically appreciated due to the increase in publicity and demand for that asset. *See id.* OpenSea changed the featured NFT multiple times each week. *Id.* Information about what NFTs were going to be featured was valuable business information belonging to OpenSea, and that business information was kept confidential and not publicly available until the new featured NFT appeared on the OpenSea homepage. *Id.* ¶¶ 2-3, 7, 9-10, 13.

Chastain was responsible for selecting which NFTs would be featured on OpenSea's homepage, and thus possessed confidential information regarding which NFTs would be featured. *Id.* ¶ 8. Chastain understood that after OpenSea featured any particular NFT, its value and the value of other NFTs made by the same NFT creator typically rose. *Id.*

Notwithstanding his obligations to the company, Chastain misappropriated, for his own benefit, OpenSea's confidential business information about what NFTs were going to be featured on the homepage. *Id.* ¶ 10. Using his inside knowledge, Chastain bought NFTs he knew OpenSea would feature shortly before OpenSea in fact featured them, or others by the same creator, on its website. *Id.* He then sold those NFTs soon after OpenSea publicly featured them on its homepage, profiting from the increase in value. *Id.*

Chastain took steps to hide his purchase of NFTs OpenSea planned to feature by buying through anonymous OpenSea accounts—rather than an account he already had bearing his own name. In addition, before OpenSea featured the NFTs, he transferred funds into the anonymous accounts so that he could purchase the NFTs. He did so through anonymous Ethereum accounts, which held the cryptocurrency he used for NFT purchasing. *Id.* ¶ 11; *see id.* ¶ 6 (explaining that Ethereum is particular blockchain, on which many NFTs are stored).

In all, Chastain misappropriated OpenSea's confidential business information regarding which NFTs it would feature to purchase a total of approximately 45 of those to-be featured NFTs on eleven separate occasions. He then resold each NFT after OpenSea featured it for a profit typically of between two and five times his purchase price. *Id.* ¶ 12.

## ARGUMENT

On August 19, 2022, the defendant moved to dismiss the Indictment and, in the alternative, seeks disclosure of the grand jury instructions. *See* Dkt. Nos. 17-19.[1] On August 24, 2022, the New York Council of Defense Lawyers ("NYCDL") filed an *amicus curiae* brief urging dismissal of the Indictment. *See* Dkt. No. 20.[2] For the reasons that follow, the motions to dismiss and for grand jury minutes are meritless and should be denied.

**I.   The Motion to Dismiss the Indictment Should be Denied**

**A.   Applicable Law**

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343

---

[1] The defendant's memorandum of law, Dkt. No. 19, is cited as "Mot.," defense counsel's declaration in support of the motion, Dkt. No. 18, is cited as "Def. Decl.," and the exhibits to that declaration are cited as "Def. Decl., Ex. A" and "Def. Decl. Ex. B." Unless noted otherwise, all internal quotation marks and citations are omitted and all emphasis is in the original source.

[2] The NYCDL's brief is referred to herein as "NYCDL Br."

n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits."  *Costello v. United States*, 350 U.S. 359, 365 (1956).  The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).

"Pursuant to [Fed. R. Crim. P. 7], the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008).  Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met."  *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013).  Otherwise, "[a]n indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Id.* at 124.

Where a defendant has been given sufficient notice of the charges against him, the indictment should stand.  *See, e.g.*, *id.* at 124-25; *Yannotti*, 541 F.3d at 127.  Moreover, it is well settled that, "unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not subject to challenge based on the quality or quantity of evidence.  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see United States v. Williams*, 504 U.S. 36, 54 (1992).  To that end, "at the indictment stage,

[courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

### B.   The Indictment Properly Alleges Wire Fraud Under a Misappropriation Theory

Chastain claims that the misappropriation theory of wire fraud applies only in the context of securities trading. Mot. at 8-11. His argument, however, is at odds with the text of the statute and decades of case law applying the theory, both of which Chastain either ignores or tries to wish away. Chastain's real objection is to the Indictment's use of the descriptor "insider trading" outside of the context of traditional securities or commodities, but that is just a quibble regarding the nomenclature of this case, and it is neither well-founded, nor a basis to dismiss the Indictment. In fact, the Indictment properly charges wire fraud by alleging that Chastain misappropriated OpenSea's confidential business information. *See* Indictment ¶¶ 3, 10, 13.

#### 1.   *The Misappropriation Theory of Wire Fraud Is Not Limited to Cases Involving Traditional Securities or Commodities*

The wire fraud statute prohibits using interstate wires as part of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Misappropriation of confidential business information can be a wire fraud because it is a species of fraud.

The Supreme Court endorsed the misappropriation theory of wire fraud 35 years ago in *Carpenter v. United States*, 484 U.S. 19 (1987), which arose out of a prosecution in this District. The Wall Street Journal's "Heard on the Street" column contained information that, while not consisting of "corporate inside information," "had the potential of affecting the price of the stocks which it examined." *Id.* at 22. Recognizing that influence, a columnist hatched a scheme to give

6

traders information "as to the timing and contents" of the column, so they could trade on that information and share the profits. *Id.* at 23. Participants in the scheme were charged with, and convicted of, securities fraud and mail and wire fraud, and the Second Circuit affirmed. *United States v. Carpenter*, 791 F.2d 1024 (1986). With respect to mail and wire fraud, the Circuit noted that it "need not dwell at length" because "[i]t is clear that confidential and nonpublic commercial information may constitute . . . property," and the defendants fraudulently misappropriated that property. *Id.* at 1034-35.

The Circuit also affirmed the securities-fraud convictions, deciding that the scheme was "in connection with" a securities transaction even though the securities traded were not issued by the Wall Street Journal. *Id.* at 1032-33. The Supreme Court granted certiorari, in part to determine whether the charged scheme was "in connection with a purchase or sale of securities" and thus properly charged under the securities-fraud laws. *Carpenter*, 484 U.S. at 24. It was, however, unable to resolve that question, ultimately affirming by an equally divided Court. *Id.*

By contrast, the Supreme Court unanimously affirmed the mail- and wire-fraud convictions. *Id.* "Confidential business information," the Court held, "has long been recognized as property," and the Journal's "interest in the confidentiality of the contents and timing of the 'Heard' column" was a version of that "property right." *Id.* at 25-26. The Court explained that the defendants' scheme—while not causing the Journal monetary loss or preventing it from using the column—deprived the Journal "of its right to exclusive use of the information," which "is an important aspect of confidential business information and most private property." *Id.* at 26-27. This was not, the Court continued, merely a "violation of workplace rules" because the convicted columnist, by virtue of his employment, had a "fiduciary obligation to protect [his employer's]

confidential information," and misappropriating that information for his own benefit was "fraud" akin to "the act of embezzlement." *Id.* at 27-28.

*Carpenter* and the Second Circuit's interpretation of it is clear: an employee's scheme to misappropriate an employer's confidential business information can constitute wire fraud. *Id.* at 25-28; *see United States v. Grossman*, 843 F.2d 78, 85-86 (2d Cir. 1988). Chastain's claim that the misappropriation theory applies only to cases involving securities or commodities is at odds with the text of the statute—which Chastain conspicuously ignores—and the case law.

Moreover, there is no statutory basis for Chastain's proposed limit to the misappropriation theory of wire fraud. "The definition of the elements of a criminal offense is entrusted to the legislature," *Staples v. United States*, 511 U.S. 600, 605 (1994), and courts "resist reading words or elements into a statute that do not appear on its face," *Bates v. United States*, 522 U.S. 23, 29 (1997). Here, the misappropriation theory comes from the statute's prohibition on schemes to "defraud." The statute makes no reference to securities or commodities, and nothing in the statute limits its reach to situations where the scheme involves securities or commodities.

Consistent with the text, Courts applying the misappropriation theory of wire fraud do not require that the scheme be in connection with securities. *Carpenter* is a case in point. There, the Supreme Court was unable to issue a reasoned decision on the securities-fraud charge because the Justices could not agree whether the scheme was "in connection with a purchase or sale of securities." 484 U.S. at 24. The Court had no such difficulty with the wire-fraud charges, however, because that was not an element of the crime.[3] *See id.* at 25-28. Indeed, courts in this District

---

[3] Chastain cites one sentence from *Carpenter*, which notes that, "[h]ad the column not been made available to Journal customers, there would have been no effect on stock prices and no likelihood of profiting from the information." 484 U.S. at 322. But that sentence simply explains why the use of mail and wires—an element of wire fraud—was "an essential part of scheme." *Id.*

routinely deny arguments that securities- and wire-fraud charges are multiplicitous, in part because wire fraud does not require proving a "connection with the purchase or sale of securities." *United States v. Regensberg*, 604 F. Supp. 2d 625, 634 (S.D.N.Y. 2009) (collecting cases).

Moreover, at least five other Circuits have upheld convictions under the misappropriation theory of wire fraud in cases that had nothing to do with trading securities or commodities. *See, e.g.*, *United States v. Hager*, 879 F.3d 550 (5th Cir. 2018) (using confidential pricing information to profit by selling products to employer); *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) (using confidential testing information to cheat on examination for maintaining visa eligibility); *United States v. Perholz*, 842 F.2d 343 (D.C. Cir. 1988) (using confidential business information to gain advantage in competitive bidding process); *United States v. Thorpe*, 166 F.3d 1216, 1998 WL 738624 (6th Cir. 1998) (same); *United States v. Belt*, 868 F.2d 1208 (11th Cir. 1989) (same). What mattered in each of those cases was an employee's misappropriation of property—specifically, confidential business information—for personal, rather than corporate purposes.

Trying to limit the misappropriation theory of wire fraud to securities, Chastain cites cases that he claims show, under the securities laws and the wire fraud statute, that the misappropriation theory requires a connection to "trading in securities or commodities." Mot. at 8-9. But every one of the passages he cites discusses the securities laws, which explicitly require a connection to trading securities, and none refer to the wire fraud statute. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (discussing the securities-fraud laws); *United States v. Chow*, 993 F.3d 125, 137 (2d Cir. 2021) (same); *United States v. Falcone*, 257 F.3d 226, 232 (2d Cir. 2001) (same).

It does not purport to add a separate requirement that the misappropriation theory of wire fraud involve securities, and no court has held otherwise.

This is not surprising; the wire-fraud statute has no such language, and none of the decisions Chastain cites supports reading a new element into the statute.

Chastain's claim that applying the misappropriation theory outside the context of securities trades would criminalize civil employment disputes, Mot. at 10, is also no basis for rewriting the statute. The defendant in *Carpenter* made the same argument, and the Supreme Court rejected it, reasoning that "'fraud' includes the act of embezzlement," which includes an employee misappropriating confidential business information. 484 U.S. at 27-28. Notably, the Court's explanation did not rely on limiting the misappropriation theory to cases involving securities.

Chastain poses "hypotheticals" he says support his prediction that allowing this case to go forward will cause the sky to fall. But unlike the facts of this case, it is not clear that any of these hypotheticals involve the misappropriation of confidential business information. In the art gallery hypothetical, for example, the only information the employee appears to be using is the fact that featured paintings sell at a higher price, Mot. at 10, and there is no reason on the facts given to believe that constitutes confidential business information.

In any event, the hypotheticals illuminate nothing of legal significance, and derive appeal only from the fact that they describe arguably trivial schemes. Slight modifications show the error in Chastain's argument. Imagine, for instance, that an employee at an art gallery is responsible for collecting bids for the gallery's silent auction, and the gallery has a policy of keeping all bids confidential until the auction is over. Seeing an opportunity, the employee, for a fee, emails a prospective buyer information about bids in an ongoing auction, so that buyer can win the painting for the lowest possible price. That misappropriation of confidential business information is not, and should not be treated as, legally different from the scheme in *Carpenter* simply because it does not involve securities, and other Circuits agree. *See Perholz*, 842 F.2d at 366 (applying wire fraud

10

to misappropriation of bidding information); *Thorpe*, 1998 WL 738624, at*5-*6 (same); *Belt*, 868 F.2d at 1213 (same).  Under Chastain's theory, however, those Circuits would be wrong.

Similarly, imagine a publicly traded coffee chain with plans for a major promotion on Yemeni coffee.  The plan was a secret, and confidential corporate research showed it would be a big hit for sales and increase the demand for Yemeni beans.  Suppose an employee secretly emailed that research to a coffee broker, so the broker could corner the Yemeni bean market and the two could split the proceeds of selling beans to the chain.  At the same time, the employee also emailed the research to a trader, for a fee, so the trader could buy stock in the chain.  Under Chastain's view, only the employee's activity with the trader amounts to wire fraud under the misappropriation theory.  But that is plainly not the case.  *See Hager*, 879 F.3d at 553-55 (using confidential information about employer's supply needs to profit by selling to employer is wire fraud).  There is no basis in the text of the wire fraud statute or the case law to draw the arbitrary distinction that Chastain urges.  Nor is there any basis to dismiss this case before trial based on the inapposite hypotheticals Chastain posits; rather, the Indictment "alleges facts adequate to satisfy the elements of the charged offense," and it should go forward.  *See Dawkins*, 999 F.3d at 780.

## 2.    *Describing Chastain's Crime as "Insider Trading" Is Appropriate*

At bottom, Chastain's argument is grounded in the complaint that the Indictment describes the alleged crime as "insider trading."  *See* Mot. at 11.  But that is an appropriate label here and, in any event, is no basis to dismiss the Indictment.

There is no federal "insider trading" statue.  The term, instead, is a shorthand for several different theories of fraud (e.g., "classical" and "misappropriation"), that are prohibited under a handful of different statutes in Title 18 and Title 15.  The label is often a misnomer if taken literally: in misappropriation cases and cases involving tips, for instance, no "insider" is actually "trading." Nonetheless, it is useful shorthand to describe crimes in which someone with non-public

11

information about an asset improperly uses that information to trade the asset or helps someone else trade it.

The "insider trading" label is appropriate here. The Indictment alleges Chastain improperly used confidential, non-public (or "inside") information about an asset to buy and then sell (or "trade") that asset on a public market. *E.g.*, Indictment ¶ 1 (alleging "insider trading of non-fungible tokens"). Nothing about the term "insider trading" requires it to be limited to securities. What is important is that the phrase aptly captures the conduct, which it does.

Even if the label were not a perfect match, that is not a basis for dismissal. The phrase appears only twice in the Indictment, and only in the factual allegation section. The presence of that language does not take away from the fact that the rest of the Indictment "contains the elements of the offense charged," "fairly informs [him] of the charge against which he must defendant," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Stringer*, 730 F.3d at 124. To the contrary, the phrase provides additional description and notice of the nature of the offense. At worst, the phrase is "surplusage," but surplusage is properly handled through a motion to strike, and such a motion is warranted only where the challenged allegations "are not relevant to the crime charged and are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990); *see United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (noting that indictments can include background and describe the means and methods of an offense). Here, there is nothing inflammatory or prejudicial about the phrase "insider trading," simply because it is used on the context of NFT trading instead of securities trading. It succinctly captures the conduct alleged. The language should remain unchanged.

**C.     The Indictment Properly Alleges That an Object of Chastain's Wire-Fraud Scheme Was "Property"**

Chastain, supported by an *amicus* brief, next argues that the wire-fraud charge should be dismissed because the allegedly misappropriated information is not "property."  This argument, too, should be rejected.  Chastain seeks summary judgment, speculating about the Government's proof based on inferences from the Indictment and making factual arguments about what he suspects the evidence will show.  That is not an appropriate basis for dismissing the Indictment. Chastain's brief also relies on legal arguments about the meaning of "property" that the Second Circuit has already rejected.  The *amicus* brief suffers from the same errors.

**1.     *The Indictment Alleges That an Object of the Fraud Was "Property"***

The Indictment's wire-fraud charge easily satisfies the minimal requirements necessary to survive a motion to dismiss.  There is no dispute that the Indictment alleges an object of Chastain's scheme was "property," "track[s] the language of the statute charged," and "state[s] the time and place (in approximate terms) of the alleged crime."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  That is all that is required.  *See Alfonso*, 143 F.3d at 776 ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").  Chastain's motion, accordingly, should be denied.

Of course, this Indictment does more than track the language of the wire-fraud statue: it also outlines the basic contours of the alleged offense, which includes a description of the "property" at issue as "OpenSea's confidential business information about what NFTs were going to be featured on its homepage."  Indictment ¶ 1.  But that additional content is not an invitation to test pre-trial whether the facts alleged in the Indictment satisfy the elements of the offense.  "At

13

the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021). "That is something" for "after trial." *Id.* The Indictment "cannot fairly be said" to constitute "a full proffer of the evidence [the Government] intends to present at trial," and there is no rule requiring the Government to "reveal its complete case" before that time. *United States v. Sampson*, 898 F.3d 270, 280-82 (2d Cir. 2018). These principles are particularly important for "mixed question[s] of law and fact"—such as whether certain information qualifies as property—which are "well suited for jury determination." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (explaining that materiality is a mixed question of law and fact best suited for a jury).

Chastain's motion asks the Court to make a factual determination not appropriate for a motion to dismiss. His argument relies on speculative assertions about facts, based on improper inferences from the Indictment, to claim that those facts do not amount to "property." *See Alfonso*, 143 F.3d at 777 (reversing dismissal of indictment when court "drew inferences as to the proof that would be introduced by the government at trial"). Chastain, for instance, makes a variety of unfounded assertions about the confidential information at issue, claiming, at different points, that the information was (i) the "selection process" for picking featured NFTs, (ii) his "thoughts regarding [that] process," (iii) his "thoughts regarding which NFT would be featured," (iv) the "featured artist idea," and (v) even any thought that pops into an employee's head. Mot. at 14-16. None of those come from the Indictment.

Chastain also makes unsupported factual assertions that are central to his motion. From the Indictment's statement that Chastain "was responsible for selecting the NFTs that would be featured on OpenSea's homepage," Indictment ¶¶ 4, 8, he asserts that selecting featured NFTs was not "collaborative" and involved no cost to OpenSea, Mot. at 15. As explained below, there is no

14

requirement that the selection of NFTs cost OpenSea money.  Yet, even assuming, *arguendo*, that

those points are relevant, they appear nowhere in the Indictment and are not even logical inferences

from the facts that are alleged.  One can be "responsible" for a task and still collaborate with others.

Moreover, devoting a senior employee's work time to a project can certainly be understood as a

cost to a business.

Similarly, Chastain's assertion that information about what NFTs were going to be featured

on the homepage was "devoid of inherent economic value to OpenSea," Mot. at 16, is also baseless.

First, this "fact" does not appear in the Indictment.  To the contrary, the Indictment shows that

information about upcoming featured NFTs *was* valuable, which is why Chastain used it to buy

NFTs before they hit the homepage and sell shortly after, at a profit.  Indictment ¶¶ 2-3.

That Chastain, rather than OpenSea, profited from the scheme does not mean that the

information, and keeping it confidential, had no value to the company.  The Indictment clearly

alleges that the information had value to NFT traders.  *See id.* ¶ 7.  OpenSea could have tapped

into that value by, for instance, giving tips about upcoming featured NFTs as perks to business

partners.  Not doing so was a business decision, not a sign that the information was valueless.

Along those lines, multiple Circuits, including the Second Circuit, have recognized that

confidential information is a company's "property" even when the company does commercialize

it because keeping information confidential can, by itself, be of value to a business.  In *United*

*States v. Grossman*, for example, the Second Circuit held that client information was a law firm's

"confidential business information," even though the firm did not "commercially exploit" it,

because keeping the information confidential had value to the firm by "protect[ing] or enhanc[ing]

[the firm's] reputation."  843 F.2d 78, 86 (2d Cir. 1988).  Similarly, in *Thorpe*, the Sixth Circuit

held that a company had a property interest in the confidentiality of information about a bidding

process.  1998 WL 738624, at \*5-\*6.  That information was "property" not because the company commercialized it, but because maintaining the confidentiality of the information served an important business purpose.  *See id.*; *accord Perholtz*, 842 F.2d at 343 (holding that information was property when confidentiality was essential to "integrity of the competitive bidding process").

The Indictment, properly, does not delve into the facts of why it might be important for OpenSea to keep confidential information about upcoming featured NFTs.  But it is not hard to imagine why.  OpenSea is a marketplace for buying and selling NFTs.  If certain participants in that marketplace had an unfair advantage because they were using OpenSea's information about upcoming featured NFTs to trade, it could erode confidence in the fairness of the market, harming OpenSea's reputation, and costing it users.  OpenSea might, accordingly, have an important business interest in keeping exclusive control over information about upcoming featured NFTs.

The takeaway is that Chastain is wrong to claim that the Court should (or can) now dismiss the Indictment because of the nature of the confidential information at issue.  Whether Chastain misappropriated "property" is a factual question, and the key facts are not properly before the Court at this stage of the proceedings.  The Indictment alleges that the information was confidential business information, and the Government is entitled to a trial on the facts.

### 2.    *Chastain's View of "Property" Is Legally Erroneous*

In addition to improperly seeking what amounts to summary judgment, Chastain's motion also misstates the law about what constitutes "property" by ignoring binding Circuit precedent.

When the Second Circuit decided *Carpenter*, it was already "clear" in this Circuit that "confidential and nonpublic commercial information" is "property" for purposes of wire fraud. *Carpenter*, 791 F.2d at 1024.  The Supreme Court agreed.  As explained above, the Court held in *Carpenter* that "[c]onfidential business information has long been recognized as property," and

16

the owner has the "right to exclusive use of the information, for exclusivity is an important aspect of confidential information and most private property."  484 U.S. at 25-27.

Trying to limit *Carpenter* to some undefined subset of confidential business information, Chastain argues that only information that is "stock in trade" or capable of being sold can be "property."  *See* Mot. at 12.  But the Second Circuit rejected both arguments in *Grossman*.  There, the Circuit dismissed the idea that confidential business information is "property" only when it is stock-in-trade akin to the information in *Carpenter*.  843 F.2d at 86.  It instead concluded that *Carpenter* "holds *generally* that, even though confidential business information is intangible, it has long been recognized as property."  *Id.* (emphasis added).  The Court also, as explained above, rejected the argument that confidential business information is not "property" if the company cannot "commercially exploit the information by trading on it."  *Id.*

The Second Circuit reaffirmed these points in *United States v. Mahaffy*, where it addressed the jury instructions courts use when the "property" in a wire-fraud case is confidential business information.  693 F.3d 113, 134 (2d Cir. 2012).  The Court held that the defendant's proposed instruction was legally erroneous because it "borrowed from case law discussing trade secrets" and listed factors "that do not necessarily bear on . . . confidentiality . . . , including the value of the information to the business and the business's investment in developing the information."  *Id.* at 135.  The Court went on to emphasize that all *Carpenter* requires is "proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information," and that the jury instructions should focus on whether the employer "treat[s] information as confidential."  *Id.* at 135 & n.14.  This decision leaves no doubt that "property" is not limited to "stock in trade" that an employer sells.

Ignoring the Second Circuit law, Chastain struggles to rely instead on *Cleveland v. United States* and *Kelly v. United States*, Mot. at 15-16, but neither case supports his argument regarding "property," because neither involved confidential *business* information.   In *Cleveland*, the Supreme Court drew a "distinction between property and regulatory power." *Kelly v. United States*, 140 S. Ct. 1565, 1572 (2020) (discussing *Cleveland*, 531 U.S. 12 (2000)).  The Court held in *Cleveland* that a scheme to influence a State's issuance of licenses was not wire fraud because the State's right to allocate licenses was its "sovereign power to regulate," not a "property interest." *Cleveland*, 531 U.S. at 20-23.  *Kelly* applied the same distinction.  The Court held that, like in *Cleveland*, the object of the scheme was to influence a State's "exercise of regulatory power"— specifically, its power to allocate lanes on a bridge—which "cannot count as a taking of property." *Id.*  Here, the distinction between regulatory power and property has no role because OpenSea has no regulatory authority.

Chastain's remaining arguments do not provide a basis to dismiss the wire fraud charge. His foray into New York State law, Mot. at 16-17, is neither legally relevant, nor appropriate for a motion to dismiss.  Sources other than federal law, including state law, define rights, but whether those rights qualify as "property" under a federal statute "is a matter of federal law." *Cleveland*, 531 U.S. at 25 n.4 (citing *Drye v. United States*, 52 U.S. 49, 58 (1999)).  In *Carpenter*, the Supreme Court found that the common law and New York courts recognize rights in confidential business information and, accordingly, held that confidential business information was "property" for purposes of the wire-fraud statute.  484 U.S. at 320-21.  What New York labels "property" cannot undermine that decision.  And even if it could, the decisions Chastain cites highlight that what constitutes "property" under New York law is a fact-intensive inquiry that cannot be resolved without a full presentation of the Government's case at trial.

18

Chastain's argument that confidential business information was "incidental" to the scheme here, and that OpenSea was "deprived of nothing," Mot. at 17-19, is also legally (and factually) wrong and, at a minimum, requires factual development.  Confidential business information was at the heart of Chastain's fraud: misappropriating that information was his key to knowing which featured NFTs to purchase.  By using OpenSea's confidential information for his own gain, Chastain deprived OpenSea of the company's right to exclusive use of that information.  In both respects, this case is on all fours with *Carpenter*.  There, the Wall Street Journal's confidential information was an object of the scheme because the defendants needed it to make profitable stock trades, and the Court held that this misuse "deprived [the Wall Street Journal] of its right to exclusive use of the information."  484 U.S. at 19.  To the extent that there is any question about the centrality or significance of confidential information to Chastain's scheme, or the effect the scheme had on OpenSea, those are fact issues that require a trial.

Finally, the rule of lenity does not support Chastain's construction of "property" to exclude the information at issue in this case, despite Chastain's protestations to the contrary.  *See* Mot. at 19.  The rule of lenity is tool of last resort, "reserved for cases where, after seizing everything from which aid can be derived, the Court is left with an ambiguous statute."  *DiPierre v. United States*, 564 U.S. 70, 88 (2011).  It is not a general thumb on the scale in favor of defendants, and the "mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable."  *Smith v. United States*, 508 U.S. 233, 239 (1993).  Here, there is no "grievous ambiguity" that warrants applying the rule.  *Maracich v. Spears*, 570 U.S. 48, 76 (2013).  For the reasons discussed above, those conditions simply do not obtain here.

### 3.    The Amicus Brief Presents No Basis to Dismiss the Indictment

The NYCDL's *amicus* brief suffers from the same fatal flaws as Chastain's brief: it makes claims about the Government's legal theory and the facts that are wrong and not appropriately

resolved at the motion to dismiss stage.  And it advances an erroneous interpretation of the law that relies on two clauses of taken out of context from a letter brief in another case, while misreading years of Circuit case law.

There is, again, no question that the Indictment tracks "track[s] the language of the statute charged," and "state[s] the time and place" of the crime.  *Stavroulakis*, 952 F.2d at 693.  NYCDL does not claim otherwise, and the Indictment is therefore sufficient to allow the case to proceed to trial.

NYCDL makes incorrect factual claims that highlight the peril of prematurely addressing the merits without "a full proffer" of the Government's evidence.  *Sampson*, 898 F.3d at 280.  For instance, it stands up a strawman that the Government's case depends on the broad proposition that "any information not generally known or available" outside a company is "confidential business information."  NYCDL Br. at 3.  That is wrong.  The language NYCDL cites is from a part of the Indictment describing the confidentiality agreement Chastain signed.  *See* Indictment ¶ 9.  The agreement is relevant, *see Carpenter*, 484 U.S. at 322 (citing employee manual), but is not a statement of the Government's legal theory, *see United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (holding that the Government is not required to preview "legal theories" before trial).  As the Second Circuit explained in *Mahaffy*, whether business information is "property" is a fact-specific inquiry examining whether the employer "treated" the information to "in a way that maintained [its] exclusive right" to it, not whether the employer simply "considered" it confidential.  693 F.3d at 135 n.14.  Here, the jury should perform that fact-specific inquiry with respect to the information the Indictment charges Chastain with misappropriating.

Like Chastain, NYCDL also asserts that the information Chastain allegedly misappropriated had no "inherent value" to OpenSea.  The errors of this argument are described

above, *supra* at 14-16, but one bears emphasis in light of NYCDL's discussion of *Grossman*. That case noted that information can have "commercial value" if keeping the information confidential can help "protect or enhance" a business's reputation. *Grossman*, 843 F.2d at 86. NYCDL accepts that principle and agrees that client information has value to law firms. Yet NYCDL, operating without any facts, breezily ignores the possibility that the same principle could apply to a marketplace like OpenSea. As explained above, however, it is not hard to see how a company running a marketplace could have a commercial interest in ensuring that its confidential information is not used to give certain participants a leg up; for example, to avoid the perception of running a rigged market and to avoid actually running a rigged market.

In any event, the new "inherent market value" test NYCDL proposes, NYCDL Br. at 3, is at odds with the case law and is legally unsupported. Contrary to NYCDL's position, the Second Circuit in *Mahaffy* held that a defense instruction on the meaning of "confidential business information" was legally erroneous because it included factors such as "the value of the information." 693 F.3d at 135. The Court also provided guidance for future instructions on the issue and did not even mention the "value" of the information in that guidance. *Id.* Along those lines, other Circuits have held that information relevant to bidding is "confidential business information." *See supra* Part I.B.1. Those decisions would be wrong under NYCDL's test because such information has "market value" only when misused.

Trying to distinguish *Mahaffy*, NYCDL ignores the opinion's unambiguous language and suggests that the information in that case met an "inherent market value" test because it could be misused for a profit. NYCDL Br. at 9. But if that were true, then this should be an easy case: the Indictment alleges Chastain misused the information at issue to easily profit by trading NFTs. The reality is that NYCDL's legal theory is irreconcilable with Second Circuit precedent.

21

In fact, NYCDL does not cite a single case that adopts its "inherent market value" test. Rather, it relies on two clauses taken from a letter brief filed by the Solicitor General's Office before the Second Circuit in another matter. NYCDL Br. at 7. But those clauses cannot bear the weight that NYCDL would place on them. The brief was not on the right topic: it addressed whether "confidential *government* information" in a particular case constituted "property," not the contours of when confidential *business* information is property. Ltr. at 1-2. The brief used the phrase "market value" only once. *Blaszczak* Ltr. Br. at 7. And the two clauses NYCDL cites are part of sentences that briefly describe discrete examples of confidential business in drawing contrasts to confidential government information. *Id.* at 4, 7. Neither purport to limit the confidential business information that can qualify as "property" to only information that has "inherent market value"—and obviously neither clause functions as precedent binding on this Court.

Indeed, it is difficult to discern from NYCDL's brief what it proposes "inherent market value" to even mean. To qualify as confidential information, a company must already have an interest in protecting its "exclusive right" to use that information. *See Mahaffy*, 693 F.3d at 135 n.14. That interest typically reflects the fact that the information has value to the company. *See Carpenter*, 484 U.S. at 26-27 (explaining that being deprived "exclusive use" of information is harm to the company). NYCDL does not explain how there is some undefined subset of information that is sufficiently important for a company to protect, but that nonetheless lacks inherent value.

NYCDL rattles off a series of hypotheticals that supposedly supports its position, but the examples are all bark and no bite.

For one, it is not clear that any actually amount to wire fraud.  There are elements to wire fraud beyond the definition of "property," including whether the defendant misappropriated the property and acted with specific intent to defraud.  But NYCDL ignores the limiting role those elements play.  It is far from certain, for example, that a corporate whistleblower—like the one in NYCDL's first example—engages in misappropriation or a scheme to defraud under the statute.  *See Dirks v. SEC*, 463 U.S. 646, 663-66 (1983) (holding that whistleblower who disclosed inside information did not violate fiduciary duty or engage in scheme to defraud).  It is similarly unclear (at least on the facts given) that an employee of a car manufacturer acts with specific intent to defraud by purchasing a single car before the company discontinues that model.  And even focusing on the "property" issue, it is hardly self-evident that information about a CEO's behavior is confidential business information simply because an employee signs a non-disclosure agreement.  *See Mahaffy*, 693 F.3d at 135 n.14 (explaining that a company calling information confidential is not sufficient under *Carpenter*).

Next, the hypotheticals shed no light on the relevant issue—what types of confidential business information qualify as "property"—and instead draw whatever force they have from their unusual settings.  Take the hypothetical about an employee who gathers information about a terrible CEO, then "writes a tell-all book (which becomes a movie)."  NYCDL Br. at 5.  That example is eye catching because writers are not typically charged with wire fraud.  But that has nothing to do with the issue at hand.  Making a movie could also be a wire fraud under NYCDL's proposed "inherent market value" test.  Imagine a law-firm associate secretly uses confidential client information about a case to write a tell-all book, which becomes a movie.  Under NYCDL's test, that associate has misappropriated the law firm's property and could be at risk of prosecution

for wire fraud.  NYCDL's approach, then, does not avoid the hypothetical.  It just introduces a bizarre distinction between a movie like "The Devil Wears Prada" and one like "Erin Brockovich."

This same problem cuts across all of the hypotheticals.  As another example, consider the one about an employee who buys his son a home after learning that the company headquarters will move to that neighborhood.  NYCDL Br. at 5.  This draws its force from the oddity of imagining a wire-fraud charge for buying a house.  But NYCDL's proposed test produces the same result. Imagine a slight tweak: an executive at a real estate developer learns his company has secret plans for a major development in a neighborhood, so he buys his son a home in the neighborhood, knowing its value will skyrocket.  That misappropriated information undoubtedly had "inherent market value," so the employee should face potential wire-fraud prosecution under NYCDL's theory.  The hypothetical, in short, reveals nothing of value about when confidential business information should qualify as property.

Finally, the last hypothetical exposes the ambiguity in NYCDL's "inherent market value" test.  NYCDL conjures a scenario of an executive at a major automobile manufacturer, who learns that the company will discontinue production of its signature sportscar, then buys one before it becomes a collector's item.  NYCDL Br. at 5.  The premise of this hypothetical seems to be that this information is not "property" because it lacks inherent market value.  But it is difficult to fathom how that is the case: a car company's secret plan to stop making its signature car would seem to have immense significance to the company, its investors, and its customers.  The fact NYCDL could think otherwise shows the fatal uncertainty at the heart of its novel test.

In sum, NYCDL's *amicus* brief does not present a basis for dismissing the Indictment and advances a flawed view of the law.  It should not move the needle on Chastain's motion.

### D.      The Indictment Properly Alleges Money Laundering

The Indictment properly charges money laundering by alleging that Chastain engaged in NFT sales and cryptocurrency transactions in a manner designed to conceal his ownership and control of the proceeds of his wire fraud.  Chastain's claims that the Indictment fails to allege the "concealment" and "transaction" elements of money laundering, Mot. at 21-22, are fact-dependent arguments for a jury.  They are not proper bases for the dismissal of the Indictment.

### 1.      *The Indictment Alleges That the Defendant's Transactions Were Designed to Conceal*

The money laundering statute makes it a crime for a person to conduct a financial transaction involving proceeds of unlawful activity, with knowledge both that the funds are proceeds of that unlawful activity and that the transaction was "designed in whole or in part … to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."  18 U.S.C. § 1956(a)(1)(B)(i).  Knowledge that the transaction was "designed … to conceal or disguise" requires "proof of intent to conceal," not merely concealment.  *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) (citations omitted).  Such questions of intent are rarely "resolvable pretrial, in a criminal setting" on a motion to dismiss.  *Sampson*, 898 F.3d at 282.  Indeed, "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."  *Morissette v. United States*, 342 U.S. 246, 274 (1952).

The defendant argues that the Indictment fails to allege the concealment element of money laundering.  Mot. at 20.  Not so.  Like the wire fraud charge, the money laundering charge in the Indictment tracks the statutory language and states the time and place of the offense.  For that reason alone, the defendant's motion should be denied.  *See Stavroulakis*, 952 F.2d at 693 (an indictment need only "track the language of the statute charged" and "state the time and place . . .

of the alleged crime"); *Alfonso*, 143 F.3d at 776 (same).  Beyond the statutory allegations, which alone would be sufficient, the Indictment details the steps the defendant took to designs his transactions to conceal his ownership and control.  It alleges that the defendant sold the NFTs he had obtained through fraud by "using anonymous digital currency wallets and anonymous accounts on OpenSea," Indictment ¶ 3, that he "transferred funds through multiple anonymous Ethereum accounts in order to conceal his involvement in purchasing and selling the featured NFTs," *id.* ¶ 11, and that he "used new Ethereum accounts without any prior transaction history in order to further conceal his involvement in the scheme," *id.*

Notwithstanding the fact that the Indictment on its face alleges that the defendant's transactions were designed to conceal, the defendant argues that because of the "open, visible, and public nature of the Ethereum blockchain," it is "impossible to conceal something."  Mot. at 20-22.  There are several problems with this argument, particularly at this stage.  First, it confuses whether the defendant intended to conceal with whether the defendant was particularly good or successful at concealment. *See Cuellar v. United States*, 553 U.S. 550, 566 (2008) ("*[H]ow* one moves the money is distinct from *why* one moves the money." (emphasis in original)).  As the Indictment alleges, Chastain's transactions were designed to conceal his connection to the wire fraud.  The fact, for instance, that a Twitter user, @RiceFarmerNFT, Mot. at 21 n.22, was able to trace some of those transactions on the blockchain *after* Chastain's scheme was revealed is not probative of Chastain's intent in designing his transactions in the first place.  And it is doubly irrelevant at this stage when the Indictment's allegations concerning his intent are accepted as true.

There is a second issue with Chastain's argument: "the statute requires only that proceeds be concealed, not that they be concealed well."  *United States v. Naranjo*, 634 F.3d 1198, 1210 (11th Cir. 2011) (holding that it was "irrelevant" that the defendant "left enough evidence to allow

a novice investigator to trace [his] cash withdrawals" to his fraud); *see also United States v. Biyiklioglu*, 652 F. App'x 274, 287 (5th Cir. 2016) (evidence that the defendant "intended to conceal the fraudulent source of his funds" is sufficient, and "it is not necessary to prove with regard to any single transaction that the defendant removed all trace of his involvement" (quoting *United States v. Willey*, 57 F.3d 1374, 1386 (5th Cir. 1995))).  The defendant may well, if the evidence is admissible, seek to establish at trial that it was not particularly difficult for federal agents or Twitter sleuths to trace his transactions, and argue the inference that the defendant lacked intent to conceal.  Of course, the Government would similarly be entitled to argue—at trial—what is obvious, which is that the fact that he got caught trying to conceal his involvement in purchasing NFTs is not particularly probative of whether the defendant intended to and did conceal the source, ownership, and control of the laundered proceeds.

Third, Chastain has not cited a single authority for the proposition that it is impossible to engage in concealment money laundering on the blockchain.  The opposite, of course, is true.  That is why courts have approved of money laundering charges involving bitcoin transactions.  *See, e.g.*, *United States v. Decker*, 832 F. App'x 639, 650 (11th Cir. 2020) (finding the defendant's guilty plea proffer sufficient to meet the elements of money laundering because, among other things, the defendant's "outgoing bitcoin transactions were sent to a peer-to-peer exchange frequently used to conceal the origin of the bitcoin funds by trading anonymously for fiat currency"); *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (denying motion to dismiss money laundering charge based on use of virtual currency).  That is not to say that every blockchain transaction is money laundering.   While Chastain is correct that in some circumstances, "by reviewing certain transaction data, blockchain users' identities are readily ascertainable," Mot. at 21, that is not always the case.  Blockchain

transactions are by default anonymous, and individuals can take many steps (like Chastain did) to prevent their connection to a wallet from being revealed. Even though a transaction may be "visible to the public," the identity of the person behind the transaction is not. For that reason, at bottom, whether blockchain transactions can be involved in concealment money laundering is a case-by-case question for a jury to decide.[4]

**2.   The Indictment Properly Alleges That the Defendant Engaged in Money Laundering by Transferring Digital Assets Between Digital Wallets**

Chastain next argues that moving cryptocurrency "from one personal digital wallet to another" is not money laundering, but rather mere "money moving." Mot. at 22. This argument is wrong. Starting with the statute, "transaction" is defined broadly to include a "transfer," 18 U.S.C. § 1956(c)(3), and a "financial transaction" in turn means, among other things, "a transaction . . . involving the movement of funds by wire or other means," 18 U.S.C. § 1956(c)(4). Thus, "when a person accepts a transfer or delivery of funds, he has … conducted a transaction." *United States v. Gotti*, 459 F.3d 296, 335 (2d Cir. 2006). The same is true when a defendant transfers funds between personal accounts, *see United States v. Kneeland*, 148 F.3d 6, 17 (1st Cir. 1998), "move[s] ill-gotten funds in and out of various corporate bank accounts," *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999), or makes as part of a larger scheme "an ordinary transaction between two bank accounts, conducted in plain view," *United States v. Burns*, 162 F.3d 840, 849

---

[4] Chastain's tweet appended to his motion proves the point. On August 2, 2021, OpenSea featured a new artist on its homepage. *See* Def. Decl., Ex. B. Shortly afterward, a Twitter user posted a screenshot of blockchain activity and wrote that the defendant "had the jump on everyone else." *Id.* Chastain replied, falsely stating that he "just wanted to secure one of these before they all disappear." *Id.* A Twitter user was easily able to attribute the trading activity to the defendant because he used an NFT wallet registered to his own name. After this, as the Indictment alleges, the defendant used only anonymous, new wallets to front-run NFT features, proving that his decision to do so was motivated by his intent to conceal what he was doing.

(5th Cir. 1998).  Even "mere receipt of funds *does* constitute the conducting of a transaction." *Gotti*, 459 F.3d at 335 (emphasis in original); *United States v. Blair*, 661 F.3d 755, 764 (4th Cir. 2011) (same).

In this case, the Indictment alleges that Chastain engaged in multiple transactions in proceeds of his wire fraud when he sold the NFTs he obtained using misappropriated information and transferred the funds out of cryptocurrency accounts or wallets.  The inclusion of that allegation in the Indictment is a basis alone for denying this motion.  There is no reason—particularly in the context of a motion to dismiss—why transactions among blockchain wallets or accounts should be treated differently than money laundering through bank transfers.

The defendant, nonetheless, equates the conduct alleged in the Indictment with "physical transportation of money."  Mot. at 22-23 & n.25.  These things are not the same.  In *Cuellar*, the Supreme Court held that the money laundering statute "requires proof that the purpose—not merely the effect—of the [transaction] was to conceal," 553 U.S. at 563, and the problem with the physical transportation of money in that case was that the purpose was not concealment.  But here, the Indictment alleges that Chastain transferred NFTs and cryptocurrency with the intent to conceal.  Nor does the Indictment allege that Chastain was simply openly spending the proceeds of his wire fraud, which were the facts in the cases cited in the defendant's motion.  Mot. at 22-23 & n.26.  Rather, the Indictment alleges that he conducted transactions with the intent to conceal his connection to the wire fraud.

Notably, and in any event, all the cases cited by the defendant had the benefit of a full factual trial record to assess whether the government had proven the elements of money laundering.  At this stage, the standard is different—all that is necessary is that the Indictment

29

pleads the statutory language and states the time and place of the offense.  Chastain's quarrels with that allegation are for trial, not pre-trial motion practice.

### 3.    *The Indictment's Allegation of a "Financial Transaction" Is Sufficient*

The defendant next asserts that the Indictment does not allege that Chastain's movement of cryptocurrency between accounts affected interstate or foreign commerce, or is otherwise a "financial transaction" as defined in 18 U.S.C. § 1956(c)(4).  Mot. at 24.  The Indictment does allege that Chastain conducted a "financial transaction."  Indictment ¶ 15.  And the defendant provides no support for the suggestion, now repeatedly rejected in prior cases, that movement of cryptocurrency cannot constitute a financial transaction. *United States v. Ulbricht*, 31 F. Supp. 3d 540, 568-70 (S.D.N.Y. 2014); *see also United States v. Murgio*, 209 F. Supp. 3d 698, 707-08 (S.D.N.Y. 2016); *Budovsky*, 2015 WL 5602853, at *14.

Further, it is not necessary to allege effect upon interstate or foreign commerce in an indictment.  *See United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001) (indictment need not explicitly allege effect on interstate or foreign commerce because, when liberally construed, it can "reasonably be read to allege at least a *de minimis* effect on interstate commerce); *United States v. Burgos*, 254 F.3d 8, 11 (1st Cir. 2001) (indictment alleging a "financial transaction" sufficiently alleged interstate commerce as an element because interstate commerce is a component part of "financial transaction," which is a term of art). Regardless, in light of Chastain's sale of NFTs and transfer of funds, it is not difficult to discern that his conduct effected interstate and foreign commerce. Indeed, as one court has observed, "the transfer of bitcoin through a digital wallet, which by its nature invokes a wide and international network," is reason to conclude that transactions had an effect on interstate commerce. *United States v. Costanzo*, 956 F.3d 1088, 1093 (2d Cir. 2020).

* * *

For the foregoing reasons, the defendant's motion to dismiss the Indictment should be denied.

## II.    The Motion for Grand Jury Instructions Should Be Denied

The defendant moves, in the alternative, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), for the instructions given to the grand jury.  Mot. at 25.  The bar for obtaining disclosure of grand jury minutes is exceedingly high, and such relief is never granted absent extraordinary circumstances.  *See, e.g.*, *United States v. Ramirez*, No. 20 Cr. 22 (PAC), 2022 WL 865860, at *2 (S.D.N.Y. Mar. 23, 2022); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 21709447, at *7 (S.D.N.Y. July 23, 2003).  That is because grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991).  A review of grand jury minutes "should not be permitted without concrete allegations of Government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994).  "Mere speculation that . . . the Government may have improperly instructed the grand jury . . . falls far short of the showing to overcome the presumption of secrecy." *United States v. Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010); *see also United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *11 (S.D.N.Y. Dec. 11, 2017) ("essentially recycling the arguments already made with respect to the Indictment's sufficiency . . . without any other evidence" is not "a particularized need to review the minutes of the grand jury proceeding").

Chastain offers no "concrete allegations of Government misconduct," *Leung*, 40 F.3d at 582.  Instead, he reasons that because, in his view, the Indictment does not properly allege wire fraud, the grand jury must have been mis-instructed on the law to have returned an Indictment. The problem with this argument is its premise.  The Indictment does sufficient allege the crime of

wire fraud, and this request is nothing more than a "recycling" of those arguments.  As a result,

there is no reason to believe that the Government incorrectly instructed the grand jury on the law,

and no basis for disclosing the grand jury minutes.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court deny the defendant's

motions to dismiss the Indictment or disclose grand jury minutes.

Dated: New York, New York
      September 7, 2022

                                            Respectfully submitted,

                                            DAMIAN WILLIAMS
                                            United States Attorney

                        By:        /s
                                    Thomas Burnett
                                    Nicolas Roos
                                    Assistant United States Attorneys