**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 22-cr-305 (JMF) |
| | ) | |
| NATHANIEL CHASTAIN, | ) | **<u>ORAL ARGUMENT REQUESTED</u>** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**<u>NATHANIEL CHASTAIN'S MOTION TO DISMISS THE INDICTMENT</u>**

David I. Miller
Gregory W. Kehoe
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Counsel for Defendant*
*Nathaniel Chastain*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ........................................................................................ 2

    I.     The Government Misunderstands the Argument That There Can Be No
             "Insider Trading" Wire Fraud Charge Without Securities or Commodities........... 2

    II.    The Government's View of "Property" Is Legally Erroneous............................... 6

    III.   The Government's Novel Money Laundering Claims Must Fail ........................ 13

    IV.   Alternatively, the Grand Jury Instructions Should Be Disclosed ........................ 15

CONCLUSION.................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States*,
  484 U.S. 19 (1987)................................................................5, 6, 7

*Cleveland v. United States*,
  531 U.S. 12 (2000)........................................................................8

*Kelly v. United States*,
  140 S. Ct. 1565 (2020)...............................................................8, 12

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir. 2012)...........................................................5, 8

*United States v. Belt*,
  868 F.2d 1208 (11th Cir. 1989) ........................................................3

*United States v. Blair*,
  661 F.3d 755 (4th Cir. 2011) ........................................................14

*United States v. Blaszczak*,
  Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021)...................11

*United States v. Bongiorno*,
  No. 05 Cr. 390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)........................8

*United States v. Budovsky*,
  No. 13 Cr. 368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) ..................14

*United States v. Burns*,
  162 F.3d 840 (5th Cir. 1998) ........................................................14

*United States v. Cassese*,
  273 F. Supp. 2d 481 (S.D.N.Y. 2003)..................................................8

*United States v. Decker*,
  832 F. App'x 639 (11th Cir. 2020) ..................................................14

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006)..........................................................14

*United States v. Grossman*,
  843 F.2d 78 (2d Cir. 1988)..........................................................9, 10

*United States v. Hager*,
  879 F.3d 550 (5th Cir. 2018) ..........................................................3

*United States v. Hedaithy*,
  392 F.3d 580 (3d Cir. 2004)............................................................3

*United States v. Kneeland*,
  148 F.3d 6 (1st Cir. 1998)............................................................14

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012)..................................................................9, 10

*United States v. Majors*,
196 F.3d 1206 (11th Cir. 1999) ...........................................................14

*United States v. Miller*,
997 F.2d 1010 (2d Cir. 1993)................................................................8

*United States v. O'Hagan*,
521 U.S. 642 (1997).............................................................................2

*United States v. Perholz*,
842 F.2d 343 (D.C. Cir. 1988)..............................................................3

*United States v. Pierce*,
224 F.3d 158 (2000).............................................................................7

*United States v. Pirro*,
96 F. Supp. 2d 279 (S.D.N.Y. 1993), *aff'd*, 210 F.3d 356 (2d Cir. 2000) ................8

*United States v. Thorpe*,
No. 97-5078, 1998 WL 738624 (6th Cir. 1998) ...................................3

*United States v. Ulbricht*,
31 F. Supp. 3d 540 (S.D.N.Y. 2014)....................................................13

*United States v. Yates*,
16 F.4th 256 (9th Cir. 2021) ................................................................9

**Statutes**

15 U.S.C. § 78(j)....................................................................................2

15 U.S.C. § 78ff....................................................................................5

18 U.S.C. § 1348....................................................................................5

18 U.S.C. § 1956....................................................................................14

**Other Authorities**

U.S. SENTENCING GUIDELINES MANUAL § 2B1.4 (2021) ...............................5

## PRELIMINARY STATEMENT

In his Opening Brief ("Opening Br.") (ECF No. 19), the defendant Nathaniel Chastain (the "Defendant") argued: (i) the Indictment's insider trading charge ignores the long-held prerequisite that the misappropriation theory of insider trading requires securities or commodities trading; (ii) the government's view of "property" must be rejected under Supreme Court jurisprudence; and (iii) the money laundering charge fails where the Indictment does not allege activity that constitutes concealment or a "financial transaction."

The Opposition Brief ("Opp. Br.") (ECF No. 23) utterly fails to refute the Defendant's arguments. The government contends that wire fraud may be charged outside the context of securities and commodities trading, a point the Defendant has never challenged. Instead, the Defendant argued that where the government charges wire fraud *pursuant to the misappropriation theory of insider trading*, the charge must bear a nexus to securities or commodities trading. Plainly, there is no such connection here. The government's rejoinders to Defendant's "property" argument are similarly unpersuasive, ignoring that wire fraud requires property deprivation—not just a breach of duty and profit—devising ambiguous theories of property, and contriving nominal distinctions between this case and Supreme Court precedent requiring rejection of the government's expansive property theory.

The Opposition Brief also falls short in defending the money laundering charge, arguing erroneously that the mere use of blockchain accounts, which are "by default anonymous," constitutes concealment, and advocating for a definition of "financial transactions" so broad as to include a transfer of funds from one's left pocket to one's right pocket.

For all the reasons set forth in the Opening Brief and herein, the Indictment should be dismissed.

## ARGUMENT

**I.      The Government Misunderstands the Argument That There Can Be No
        "Insider Trading" Wire Fraud Charge Without Securities or Commodities**

The Defendant has shown that the government's insider trading charge fails on its face, but instead of addressing the Defendant's argument head-on, the government refutes an argument that the Defendant never advanced.  The Defendant does not argue that a wire fraud may not be prosecuted outside of the securities or commodities context, but rather that an *insider trading* charge under the wire fraud statute must involve securities or commodities trading.

In the Opening Brief, the Defendant demonstrated that through this unprecedented case, the government seeks to dismantle the well-established foundation upholding *Carpenter* and insider trading law:  the protection of our financial markets.  Indeed, a wire fraud theory ***of insider trading*** is inextricably related to the misappropriation theory of insider trading, which is derived from judicial interpretations of § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.[1]  Thus, insider trading—and its misappropriation theory—applies only where trades are *"in connection with" securities or commodities*.[2]

The fact that a charge of insider trading, whether by securities fraud or wire fraud, applies in the context of securities or commodities transactions is not a "quibble regarding [] nomenclature."[3]  As discussed in the Opening Brief, the misappropriation theory ***of insider trading*** involves a breach of a duty and the use of material non-public information ("MNPI") in a way that undermines the integrity of the securities or commodities markets and victimizes the public.[4]  Even

---

[1] *See* Opening Br. at 8. A violation of the misappropriation theory of insider trading occurs when any person "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (noting that the misappropriation theory grounds liability in "a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information").

[2] *O'Hagan*, 521 U.S. at 652 (emphasis added).

[3] Opp. Br. at 6.

[4] *See* Opening Br. at 9.

2

though the misappropriation theory involves a breach of duty to the source of the MNPI, there is still a requirement of securities or commodities trading for insider trading liability to attach.[5]  For this reason, it is unsurprising that in more than 40 years of insider trading jurisprudence, the government cannot cite *a single case*—and one does not appear to exist—in which it has charged "insider trading" under a *Carpenter*-related wire fraud theory absent a nexus to the financial markets.[6]  The glaring lack of caselaw proves the Defendant's point: securities or commodities trading is an element of the offense.

The Opposition Brief misstates the above argument in contending that the Defendant is challenging caselaw sustaining wire fraud charges.[7]  For example, the government argues that "five other Circuits" have applied a "misappropriation theory of wire fraud" in cases unrelated to securities or commodities trading.[8]  But these are cases in which the government did not charge— nor does the Court even mention—insider trading and in which there was no trading in the financial markets.[9]  And the Defendant is not challenging that theft or misappropriation of property may constitute wire fraud.  The argument is that the government cannot apply the misappropriation theory *of insider trading* without satisfying the elements of that offense.

The government contends that the Defendant is exaggerating that "the sky [will] fall,"[10] through presenting hypothetical, yet logical consequences of the government's novel case theory.

---

[5] *Id.*

[6] The government attempts to dispense with *Carpenter's* explicit note that the "effect on stock prices" was a critical part of the scheme by supposing that this line only relates to "the use of mail and wires." Opp. Br. at 8 n.3.  But the government cannot escape that *Carpenter* did, in fact, involve securities trades.

[7] *See* Opp. Br. at 8.

[8] *Id.* at 9.

[9] *Id.* (citing *United States v. Hager,* 879 F.3d 550 (5th Cir. 2018) (defendant surreptitiously bought and sold computer parts); *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) (scheme involving standardized testing); *United States v. Perholz*, 842 F.2d 343 (D.C. Cir. 1988) (scheme involving Small Business Administration procurements); *United States v. Thorpe*, No. 97-5078, 1998 WL 738624 (6th Cir. 1998) (scheme involving coal supply contracts); *United States v. Belt*, 868 F.2d 1208 (11th Cir. 1989) (scheme involving subcontractor bidding information).

[10] Opp. Br. at 10.

3

But the issue is not that the government's case could cause the sky to fall; it is that when it comes to prosecutorial power, the sky is not the limit. For example, the government nitpicks Defendant's "art gallery" hypothetical[11] by resting on the notion that it is not "clear" enough that the example presents use of information that is—in the government's view—confidential information. That example, however, is spot-on with the facts here, recast in the context of a physical art gallery rather than an internet-based platform. In the "art gallery" hypothetical, and in this case, an employee has allegedly used knowledge of a promotion to make a profitable sale. Altering the hypothetical such that the art gallery employee purchases a painting in order to feature it and sell it later does not remove the error in deeming that activity "insider trading." Further, as discussed *infra*, the government's attack on the proposed hypotheticals fails to refute that the information at issue is not OpenSea's "property" under law.[12]

Realizing their error, the government now appears to minimize the import of the words "insider trading" and even suggests that the Defendant could move to strike the phrase from the indictment.[13] There are several obvious issues with this.

First, the government has shouted through a proverbial megaphone that this case has been charged as a wire fraud based on insider trading. The U.S. Attorney's first press release was entitled, "Former Employee of NFT Marketplace Charged in First Ever Digital Asset Insider Trading Scheme."[14] The U.S. Attorney referred to the case as "insider trading … [on] the blockchain," *id.*, which unsurprisingly generated significant media attention repeating the "insider

---

[11] *See* Opening Br. at 10.
[12] The government's modified "art gallery" hypothetical is still not insider trading for the reasons above. Also, the Defendant does not dispute that the "Yemeni beans" coffee chain employee's activity with respect to the coffee broker and the stock trader could amount to wire fraud *if* the coffee company was deprived of property. But only the employee's activity *with the stock trader* could amount to insider trading (under a wire fraud theory or otherwise).
[13] *See id.* at 11.
[14] *See* Department of Justice, Former Employee Of NFT Marketplace Charged In First Ever Digital Asset Insider Trading Scheme, June 1, 2022, https://www.justice.gov/usao-sdny/pr/former-employee-nft-marketplace-charged-first-ever-digital-asset-insider-trading-scheme.

trading" label.[15]   And further, the ***first line of the Indictment*** states: "This case concerns ***insider trading*** in Non-Fungible Tokens…"[16]   Similarly, the lead prosecutor stated during the June 15, 2022 court conference, "[t]he government's theory … [is] premised on the Supreme Court's decision in [*Carpenter v. United States*, 484 U.S. 19 (1987)], which, I think, describes ***insider trading conduct*** as a wire fraud."[17]   The government's motive to charge this case is clear.   As are the necessary elements of the offense.

Second, in referring to insider trading as "useful shorthand" to describe the offense here, and in stating that "[n]othing about the term 'insider trading' requires it to be limited to securities,"[18] the government adds non-existent language into statutes and decades of caselaw, including Supreme Court jurisprudence.   Insider trading is more than mere shorthand.   It refers to specific behavior in the securities or commodities space such that "Insider Trading" contains its own section in the U.S. Sentencing Guidelines and carries heavy criminal and civil penalties.[19]

Third, the government adds its traditional refrain that the Indictment contains the talismanic language to survive dismissal.[20]   As discussed *infra*, an indictment must be dismissed where the facts alleged fail to allege a crime within the terms of the applicable statute.[21]   Here, the insider trading wire fraud count cannot stand.

Finally, the government surprisingly suggests—after charging this case as insider trading and subjecting the Defendant to press scrutiny as a result—that the Defendant can merely move to

---

[15] *See, e.g.*, CNBC, Former OpenSea employee charged in first-ever NFT insider trading case, June 1, 2022, https://www.cnbc.com/2022/06/01/former-opensea-employee-charged-in-first-ever-nft-insider-trading-case.html; NBC News, Former OpenSea employee arrested, charged with NFT insider trading, June 1, 2022, https://www.nbcnews.com/tech/internet/opensea-nft-nate-chastain-arrest-charged-insider-trading-rcna31489.
[16] Indictment ¶ 1 (emphasis added).
[17] June 15, 2022 Pre-Trial Conference Tr. at 3:19 – 4:6 (emphasis added).
[18] Opp. Br. at 11-12.
[19] *See* U.S. Sentencing Guidelines Manual § 2B1.4 (2021); 15 U.S.C § 78ff; 18 U.S.C. § 1348.
[20] *See* Opp. Br. at 12.
[21] *See United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).

strike "insider trading" as "surplusage."  Putting aside that the government appears to have realized its press objective and now is content to proceed without this mischaracterization, while the count should still be dismissed, the Defendant will move to strike "insider trading" from the Indictment and preclude reference to the phrase at trial given its inflammatory and prejudicial nature.

## II.     The Government's View of "Property" Is Legally Erroneous

As demonstrated in the Opening Brief, the Indictment must be dismissed because the government has not alleged, and cannot allege, that through the Defendant's conduct, OpenSea was deprived of property under the wire fraud statute.  The government's theory of property flies in the face of recent Supreme Court precedent—including *Cleveland* and *Kelly*—and the Court's unwillingness to extend the mail and wire fraud statutes beyond "traditional" property interests.[22] As the Opening Brief discusses, the featured artist selection process, including the Defendant's thoughts and ideas underlying that process, are not the "stock in trade" of OpenSea, capable of being distributed or sold, or possessing inherent commercial and/or market value.[23]

The government's view of property in this matter—which provides an entity with a seemingly limitless property right in information lacking any inherent economic value, or based on an individual's personal thoughts and ideas—treads into a realm of "interest[s] too ethereal in [themselves] to fall within the protection of the mail [and wire] fraud statute."[24]  Further, the government's effort to use *Carpenter* to convert anything it labels as "confidential business information"—including the unsellable and ethereal NFT selection process—into "property" would criminalize virtually every instance of an employee using internal employer information for non-work purposes.  Indeed, even if the Defendant was obligated to maintain the confidentiality

---

[22] *See* Opening Br. at 12-16.
[23] *See id.*
[24] *Carpenter*, 484 U.S. at 25.

of the information at issue, OpenSea still would not retain a property interest in that information because it was not in the business of selling all "information not generally known or available" outside of the company, and it did not assign the relevant information any commercial value.[25] Thus, unlike in *Carpenter*, where the confidential information was the employer's property because it was the employer's product—news to a newspaper—here OpenSea was not deprived of information that had independent commercial value.[26]

Moreover, any claimed deprivation of property in the form of employee time, or labor costs, is legally insufficient to support a wire fraud count because such costs simply amount to an "incidental byproduct of the [alleged] scheme."[27]   Finally, it bears re-emphasizing that OpenSea was deprived of nothing by virtue of the Defendant's alleged actions.[28]   OpenSea collected its standard fees in connection with each NFT marketplace transaction regardless of the Defendant's alleged involvement.   Clearly, any ambiguity caused by the government's wire fraud application should be resolved in favor of lenity.

At best, the government's case is nothing more than an alleged scheme to deceive premised upon an undisclosed breach of fiduciary duty.   An alleged scheme to deceive, however, does not constitute "a scheme to defraud in the absence of a property right to interfere with."[29]

In its Opposition Brief, the government levies several unpersuasive rejoinders to the above points.   First, the government repeatedly asserts that any and all issues of significant import are questions of fact for a jury to decide.[30]   Not so.   Courts in this Circuit have long held that "there is

---

[25] *See* Amicus Br. at 3, 6; Opening Br. at 15-16.
[26] The Defendant's featured artist selection also is not property under New York State law.  *See* Opening Br. at 16-17.  The government's suggestion that this Court cannot seek guidance from New York state courts is belied by *Carpenter*, where the Supreme Court specifically drew upon New York state law in reaching its decision.  *See Carpenter*, 484 U.S. at 27-28.
[27] *See* Opening Br. at 14, 17-18.
[28] Opening Br. at 18.
[29] *See id.* (quoting *United States v. Pierce*, 224 F.3d 158, 165 (2000)).
[30] Opp. Br. at 14, 16, 19-20, 25, 28.

no reason for the Court to delay ruling on the merits of defendants' arguments" in support of a motion to dismiss where "the government has set forth enough facts in the indictment to rule on [defendant's] motion and has not averred that it intends to present additional theories … at trial."[31] Where, as here, the allegations of the Indictment reveal that there is an "infirmity of law" underpinning the Government's theory, dismissal is the appropriate remedy.[32]

Second, the government astonishingly, and inappropriately, appears to fault the Defendant for failing to adequately define "property," or "confidential business information," under the wire fraud statute.[33]  The Defendant, however, has no burden to define terms or concepts set forth in the government's charging instrument.  That is the government's burden, which it fails to meet.[34]

Third, the government repeatedly endeavors to support its wire fraud charge by focusing on the Defendant's alleged breach of fiduciary duty and personal profit.[35]  But breach of duty and personal profit do not make a wire fraud:  there must, of course, be a deprivation of property.[36] This basic yet fundamental requirement dictates that the relevant fraud statutes are not a general license for "the Federal Government … to enforce (its view of) integrity."[37]  Instead, the property fraud statutes operate to protect traditional property rights only.[38]

---

[31] *United States v. Bongiorno*, No. 05 Cr. 390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006).

[32] *See United States v. Pirro*, 96 F. Supp. 2d 279, 283 (S.D.N.Y. 1993) (internal quotation marks omitted), *aff'd*, 210 F.3d 356 (2d Cir. 2000); *see also Aleynikov*, 676 F.3d at 75-76 (indictment must be dismissed where it "fails to allege a crime within the terms of the applicable statute"); *United States v. Cassese*, 273 F. Supp. 2d 481, 485-88 (S.D.N.Y. 2003) (dismissing insider trading count where indictment failed to sufficiently allege existence of fiduciary duty).  The Defendant ought not be subjected to the extraordinary stress and expense of "submit[ting] the case to a jury only to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial." *Bongiorno*, 2006 WL 1140864, at *4.

[33] Opp. Br. 17, 22, and 24 (specifically faulting the Defendant and Amicus for failing to define property).

[34] As a matter of fundamental fairness, as well as due process, the government is responsible for demonstrating clear and definite rules, such that everyday citizens are on notice regarding the conduct proscribed by criminal statutes.

[35] Opp. Br. at 7-8, 15-16, 19-21, 23.

[36] The mail and wire fraud statutes require the government to show that a defendant not only "engaged in deception, but [also] that an object of the fraud was [money or] property." *Kelly*, 140 S. Ct. at 1571 (internal quotation marks and alterations omitted); *see also United States v. Miller*, 997 F.2d 1010, 1020 (2d Cir. 1993) (noting that fiduciary breach and personal profit alone are insufficient to satisfy the requirements of property fraud).

[37] *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020).

[38] *Cleveland v. United States*, 531 U.S. 12, 24 (2000).

Fourth, although the government seeks to distinguish this matter from settled Supreme Court precedent, it fails to articulate any cogent definition of "property," or "confidential business information" under the wire fraud statute.  Instead, the government appears to argue that anything can constitute confidential business information, as long as the employer *potentially* perceives that thing to serve an "important business interest [or purpose]" (a new amorphous test).[39]  But the Supreme Court, in both *Kelly* and *Cleveland*, instructs that the government cannot simply affix an ambiguous "property," "confidential business information," or now, "important business interest [or purpose]" label to anything it pleases, and in turn argue that it is entitled to proceed with its property-based prosecution based on that designation.  In this context, the government seemingly recognizes that *Cleveland* and *Kelly* threaten its legally erroneous property theory, and it narrowly describes those decisions as being about whether the sovereign power to regulate constitutes a property right.[40]  This is a distinction without difference—the analysis in *Cleveland* and *Kelly* circumscribing "property" under the wire fraud statute is what is critical (in the regulatory context or not).  Indeed, despite the government's efforts to insist otherwise, *Cleveland* and *Kelly* serve as an important reminder that the definition of "property" under the wire fraud statute has limits.[41]

Nonetheless, the government rejects the Supreme Court's guidance, drawing on *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), and *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), to further its assertion that an item's inherent market value is not relevant to a "property," "confidential business information," or "important business interest [or purpose]" analysis.  The government's reliance on *Grossman* and *Mahaffy*, however, is misplaced.  To be sure, in *Grossman*, the Second Circuit ruled that MNPI regarding a law firm client's pending

---

[39] Opp. Br. 15-16..
[40] *Id.* at 18.
[41] *See United States v. Yates*, 16 F.4th 256, 264-65 (9th Cir. 2021) (citing *Kelly* to help define "property deprivation" and finding that bank did not have property interest in "accurate [financial] information [in its books and records]").

financial transaction amounted to "property" under the wire fraud statute, even though the firm was not able to "commercially exploit" the information.[42] That information, however, had obvious "commercial value" to the firm, as keeping client confidence is one of the most important services a law firm sells.[43] A client pays for the protection of the attorney-client privilege, and confidentiality is an essential component of legal representation.

*Mahaffy* is similarly inapposite. In *Mahaffy*, the Second Circuit overturned the defendant's conspiracy to commit securities fraud conviction based on *Brady* violations and inaccurate jury instructions with respect to the scope of honest services fraud.[44] There, however, unlike the instant case, the broker defendants never contested whether the financial information at issue had commercial value.[45] And indeed, information about what orders a brokerage firm will place has clear commercial value to the firm, as this information can dictate market prices, and if leaked, cost the firm and its clients money.[46] To this end, and unlike the instant case, the broker defendants' scheme in *Mahaffy* actually harmed their employer through the breach of their fiduciary duties, which in turn caused the brokerage firm to breach its duties to their clients, all of which cost the clients money.[47] The government, however, ignores these critical distinctions, selectively quoting dicta relating to jury instructions that were crafted to address the issue disputed in the case—whether the "squawked" financial information was *confidential* in nature.[48]

Notably, the government goes to great lengths to argue that an item's commercial value has no bearing on whether it may be deemed "property" under the wire fraud statute,[49] yet

---

[42] *Grossman*, 843 F.2d at 86.
[43] *Id.*
[44] *Mahaffy*, 693 F.3d at 118-19.
[45] *Id.* at 118-22, 134-35.
[46] *See id.* at 118-22.
[47] *See id.* at 118-22, 134-35.
[48] *See id.* at 120; *see also* Opp Br. at 17. As discussed, the issue here is not whether the Defendant profited from trading. The issue is whether he deprived OpenSea of its property in doing so. *Mahaffy* is thus clearly inapposite.
[49] See Opp. Br. at 16-17, 20-24.

completely fails to justify the *Blaszczak* letter brief, in which the United States Solicitor General's Office states that an item's "inherent market value" is a determining factor in any "property" analysis under the wire fraud statute.[50]

Fifth, the government spends an extraordinary amount of time contorting defense (and Amicus) hypotheticals. But its modifications either confirm the extraordinary breadth of its theory or change the facts in fundamental ways. For example, in the case of the executive purchasing a home, the government posits an alternative scenario that is functionally equivalent in form and substance to the original hypothetical.[51] In both instances, just like the matter at hand, the employer suffered no loss as a result of the executive's actions. Additionally, in the case of the art gallery, the government modifies the hypothetical to an alternative scenario in which a gallery employee emails a prospective buyer information about silent auction bids "so that the buyer can win the painting for the lowest possible price."[52] In that circumstance, fraud was clearly committed—and possibly bid-rigging too—because the employee defrauded the artist of money through the higher price that a competitive bidding process would yield. Unlike information, money is property by any measure.

Sixth, the government's remaining efforts to show that the NFT selection process constitutes "property" under the wire fraud statute further highlight the uncertainty surrounding the definition. Indeed, on the one hand, the government rejects consideration of inherent market value in any "property" analysis, but on the other hand, the government argues that the NFT

---

[50] United States Supplemental Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021) (ECF No. 497). The government's rejection of this argument, and its reliance on the fact that regulatory information was at issue in *Blaszczak*, *see* Opp. Br. at 22, suggests there may be a conflict between the U.S. Solicitor General's Office and the U.S. Attorney's Office for the Southern District of New York regarding the definition of "property" under the wire fraud statute. We note that should the Court grant the Defendant's motion to dismiss the indictment, as the Court is aware, the U.S. Attorney's Office would be required to seek permission from the Solicitor General's Office to appeal the Court's decision.
[51] *Compare* Amicus Br. at 5 *with* Opp. Br. at 24.
[52] *Compare* Opening Br. at 10 *with* Opp. Br. at 10.

selection process did have value, or at least potential value, to OpenSea in the form of: (i) employee "work time" devoted to the NFT selection process (ignoring *Kelly*'s rejection of an identical theory); and/or (ii) OpenSea's fictional ability and/or desire to "giv[e] tips about upcoming featured NFTs … to [its] partners."[53]  To further confuse the issue, the government does little to clarify its position by insisting that OpenSea had a business interest in keeping "exclusive control" over the featured artist selection process.[54]

Finally, the government strangely argues that this case *does not* rely on the erroneous proposition that confidential business information includes "any information not generally known or available" outside of OpenSea.[55]  But that is ***exactly*** what the Indictment alleges and the government should be held to that theory.[56]  Nevertheless, if the government is permitted to walk away from this allegation,[57] presumably because the government realizes it is indefensible—just as its other theories of property discussed above—then they have abandoned this definition of "property" and cannot argue it at trial.

In sum, the government's rejoinders only serve to highlight the ambiguous and shapeless nature of the definition of "property" under the wire fraud statute.[58]  Accordingly, and as shown in the Opening Brief, the wire fraud count should be dismissed.

---

[53] Opp. Br. at 15; *see also Kelly*, 140 S. Ct. at 1572-74.

[54] Opp. Br. at 15-16.  The government appears to have invoked the right to control theory of wire fraud by stating, *inter alia*, that: (i) OpenSea potentially had a business interest in keeping "exclusive control" over information about upcoming featured NFTs; (ii) the information at issue was potentially valuable; and (iii) OpenSea's decision to refrain from "tapp[ing] into" the potentially valuable information was a discretionary economic decision. As the Court is aware, the right to control theory of wire fraud is currently before the Supreme Court in *Ciminelli v. United States*, and we note that the Supreme Court's decision now may have bearing on this case.

[55] Opp. Br. at 20; Indictment ¶¶ 7, 9.

[56] Indictment ¶¶ 7, 9.

[57] Opp. Br. at 20.

[58] Indeed, any ambiguity regarding "property" should be resolved in favor of lenity.  *See* Opening Br. at 19.

### III.   The Government's Novel Money Laundering Claims Must Fail

Should the wire fraud count survive—and respectfully, it should not—the money laundering count should still be dismissed because, as shown in the Opening Brief, the government (i) fails to allege concealment sufficiently, (ii) impermissibly seeks to charge mere money movement, and (iii) fails to allege a "financial transaction."

In opposition, the government argues that it has alleged the Defendant's movement of funds through multiple digital wallets to have been for the purpose of "conceal[ing] his involvement in purchasing and selling the featured NFTs."[59]  To this end, the Opposition Brief merely contends that it is possible to engage in money laundering on the blockchain.  The Defendant, however, does not argue that blockchain money laundering is impossible, but simply that, as alleged, the charged conduct here falls short of that offense.[60]

Notably, the government fails to address the Defendant's argument that it is impossible to conceal something that by its very nature is conspicuous.  Instead, the government argues that the Indictment properly alleges the Defendant's intent to conceal because the Indictment alleges that the Defendant sold NFTs "'using anonymous digital currency wallets and anonymous accounts on OpenSea,'" and that he "transferred funds through multiple anonymous Ethereum accounts."[61]  As the government admits, however, blockchain transactions are "visible to the public," and user accounts are "by default anonymous."[62]  Without more, use of blockchain accounts that are anonymous by default cannot constitute money laundering.[63]

---

[59] Opp. Br. at 26.
[60] *See* Opening Br. at 20-21.
[61] Opp. Br. at 26 (quoting Indictment ¶ 3, 11).
[62] Opp. Br. at 27-28.
[63] *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569 (S.D.N.Y. 2014) ("[A]n allegation that [cryptocurrencies] are used as a payment system is insufficient ... to state a claim for money laundering. The fact that [cryptocurrencies] allow for anonymous transactions does not *ipso facto* mean that those transactions relate to unlawful activities.").

13

The government also fails to adequately address the Defendant's argument that mere movement of money—*i.e.,* conspicuous wallet-to-wallet transfers of digital currency on the public blockchain—is not proscribed by the money laundering statute. The caselaw the government relies on[64] is factually and legally distinguishable from the instant case. For example, in *Decker*, unlike the publicly visible wallet-to-wallet Ethereum transfers at issue in this matter, the defendant engaged in "a *series* of complex bitcoin transaction[s]," funneling his bitcoin through a third-party peer-to-peer exchange platform "frequently used to conceal the origin of the bitcoin funds by trading anonymously for fiat currency."[65] The government has not alleged such activity here; only the mere use of blockchain accounts.[66]

The government forces the mere movement of money into the arms of the money laundering statute by noting that a "transaction," as used in 18 U.S.C. § 1956(c), includes a "transfer," and that a "financial transaction" means "a transaction . . . involving the movement of funds by wire or other means." The government ignores, however, that the cases on which it relies involve instances in which money is transmitted either (1) from one party to another, or (2) through a financial institution.[67] The distinction between mere movement, as in this case, and "transfer[s] between accounts"—which 18 U.S.C. § 1956(c)(3) references to movement at a financial institution—is not a trivial one; it is what prevents the money laundering statute from being applied

---

[64] *See* Opp. Br. at 27.

[65] *United States v. Decker*, 832 F. App'x 639, 650 (11th Cir. 2020).

[66] Furthermore, *Budovsky* is inapposite, as the court there simply addressed whether "virtual currencies" fall within the legal definition of "funds" under the money laundering statute. *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *13-15 (S.D.N.Y. Sept. 23, 2015).

[67] In *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), for instance, the government's money laundering allegations involved payment of funds from one party to another, and while the Court recognized that "the delivery or transfer of cash to another person is a financial transaction," it suggested "the 'mere transportation of cash' does not meet the definition of a financial transaction" because it does not constitute a "disposition of funds." *Gotti*, 459 F.3d at 335-336. All the other cases the government points to, similarly, involve transfers between individuals or through financial institutions. *See* Opp. Br. at 28-29 (citing *United States v. Kneeland,* 148 F.3d 6 (1st Cir. 1998) (movement between bank accounts); *United States v. Majors,* 196 F.3d 1206 (11th Cir. 1999) (movement between bank accounts); *United States v. Burns,* 162 F.3d 840 (5th Cir. 1998) (movement between bank accounts); *United States v. Blair,* 661 F.3d 755, 764 (4th Cir. 2011) (transfer of funds between parties and through financial institution)).

14

in scenarios such as the "left-pocket-to-right-pocket" hypothetical posited in the Opening Brief (which, notably, the Opposition Brief does not address).[68]   Here, the government has merely alleged that the Defendant moved money from one of his wallets to another.   Cryptocurrency "wallets" are so named because they function as just that: a digital version of a physical wallet.   It is hard to imagine that a person who transferred funds from a wallet in their desk drawer to a wallet in their pocket would be accused of money laundering.   The same activity, merely adopted to a digital platform, ought not compel a different conclusion.[69]

## IV.   **Alternatively, the Grand Jury Instructions Should Be Disclosed**

Should the Court deny the Defendant's motion, the Defendant respectfully requests that the government be ordered to disclose its grand jury instructions for the reasons in the Opening Brief, which have only been strengthened by the confusion sowed by the Opposition Brief.

## **CONCLUSION**

For the aforementioned reasons, and based on fundamental legal principles, Supreme Court jurisprudence, and due process, the Court should dismiss the Indictment with prejudice.

Dated: New York, New York
     September 19, 2022

          Respectfully submitted,

          GREENBERG TRAURIG, LLP

          By: */s/ David I. Miller*
          David I. Miller
          Gregory W. Kehoe
          Charles J. Berk
          One Vanderbilt Avenue
          New York, NY 10017
          (t) (212) 801-9200; (f) (212) 801-6400

          *Counsel for Defendant*
          *Nathaniel Chastain*

---

[68] Opening Br. at 23.

[69] Nor does the Defendant argue, as the Opposition Brief suggests, "that movement of cryptocurrency cannot constitute a financial transaction." Opp. Br. at 30.  Rather, transferring money from one wallet to a second wallet of the same owner is not a financial transaction.  The government's inapposite cases—*Ulbricht, Murgio,* and *Budovsky*—merely stand for the proposition that cryptocurrencies constitute "funds" under the money laundering statute.