**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA )
)
v. )
) No. 22-cr-305 (JMF)
NATHANIEL CHASTAIN, )
)
Defendant. )
)
)

## MEMORANDUM OF LAW IN SUPPORT OF NATHANIEL CHASTAIN'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

David I. Miller
Gregory W. Kehoe
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Counsel for Nathaniel Chastain*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 2

    I.       The September 20, 2021 Search Warrant ......................................................... 2

    II.     Execution of the Search Warrant ...................................................................... 4

ARGUMENT ...................................................................................................................... 5

    I.       The Defendant's Statements, Which Were Elicited During the Search
          Warrant's Execution, Were Obtained in Violation of His Fifth
          Amendment Rights ........................................................................................... 5

         A.    The Defendant Was in Custody  During the
               Search Warrant's Execution ................................................................ 6
         B.    The Defendant Was Interrogated  During the
               Search Warrant's Execution ................................................................ 9

    II.     The Digital Contents of the Defendant's Cell Phone Should Be
          Suppressed as the Unlawful Fruits of a Fifth Amendment Violation.................. 12

    III.    The Contents of the Defendant's Cell Phone Should Be Suppressed
          Because They Were Seized Outside the Scope of the Search Warrant ............... 14

    IV.    Should the Court Not Grant the Defendant's Motion to  Suppress
          Summarily, It Should Order an Evidentiary Hearing ........................................... 16

CONCLUSION.................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkemer v. McCarty*,
   468 U.S. 420 (1984)..................................................................................................7

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018)........................................................................................15, 16

*Grady v. North Carolina*,
   575 U.S. 306 (2015)................................................................................................15

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*,
   670 F.3d 1335 (11th Cir. 2012) ..............................................................................11

*Minnesota v. Carter*,
   525 U.S. 83 (1998)............................................................................................14, 15

*Miranda v. Arizona*,
   384 U.S. 436 (1966)..............................................................................................5, 6

*Rhode Island v. Innis*,
   446 U.S. 291 (1980)..............................................................................................9, 10

*Riley v. California*,
   573 U.S. 373 (2014) ........................................................................................ *passim*

*United States v. Ali*,
   68 F.3d 1468 (2d Cir. 1995)................................................................................6, 7, 9

*United States v. Bershchansky*,
   788 F.3d 102 (2d Cir. 2015)................................................................................12, 15

*United States v. Butt*,
   No. 18-CR-00087 (NSR), 2019 WL 479117 (S.D.N.Y. 2019) ....................... *passim*

*United States v. Debbi*,
   244 F. Supp. 2d 235 (S.D.N.Y. 2003)......................................................................15

*United States v. Dixon*,
   No. 20-cr-368 (NSR), 2021 WL 106419 (S.D.N.Y. 2021)..........................................6

*United States v. Djibo*,
   151 F. Supp. 3d 297 (E.D.N.Y. 2015) ........................................................... *passim*

*United States v. Doe*,
   487 U.S. 201 (1987)................................................................................................11

*United States v. FNU LNU*,
   653 F.3d 144 (2d Cir. 2011)................................................................................6, 7

*United States v. George*,
   975 F.2d 72 (2d Cir. 1992)......................................................................................15

*United States v. Hubbell,*
  530 U.S. 27 (2000)..................................................................................5, 11

*United States v. Kirschner,*
  823 F. Supp. 2d 665 (E.D. Mich. 2010)..............................................................11

*United States v. Newton,*
  369 F.3d 659 (2d Cir. 2004)................................................................6, 7, 8, 9

*United States v. Patane,*
  542 U.S. 630 (2004)..........................................................................................13

*United States v. Perkins,*
  No. 12-CR-6006L, 2013 WL 6145753 (W.D.N.Y. 2013)...................................9, 10

*United States v. Rogozin,*
  No. 09-CR-379 (S)(M), 2010 WL 4628520 (W.D.N.Y. Nov. 16, 2010) ................11

*United States v. Shamsideen,*
  No. 03 CR 1313 (SCR), 2004 WL 1179305 (S.D.N.Y. Mar 31, 2004)............16, 17

*United States v. Shi Yan Liu,*
  239 F.3d 138 (2d Cir. 2000)..............................................................................15

*United States v. Voustianiouk,*
  685 F.3d 206 (2d Cir. 2012)..............................................................................15

*United States v. Watson,*
  404 F.3d 163 (2d Cir. 2005)..............................................................................16

*Wong Sun v. United States,*
  371 U.S. 471 (1963).........................................................................................12

**Statutes**

7 U.S.C. § 9(1)....................................................................................................2

15 U.S.C. § 78ff..................................................................................................2

15 U.S.C. § 78j(b)...............................................................................................2

18 U.S.C. § 1343.................................................................................................2

18 U.S.C. § 1348.................................................................................................3

18 U.S.C. § 1956.................................................................................................3

**Other Authorities**

17 C.F.R. § 180.1(a)...........................................................................................2

17 C.F.R. § 240.10b-5.........................................................................................2

Fed. R. Civ. P. 12(b)...........................................................................................1

U.S. CONST. amend. IV.......................................................................................15

U.S. CONST. amend. V.........................................................................................5

Defendant Nathaniel Chastain (the "Defendant") respectfully moves this Court, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, for an order suppressing statements and evidence obtained by the government in violation of the Defendant's Fourth and Fifth Amendment rights.   Should the Court not grant this motion summarily, the Defendant respectfully requests that this Court order an evidentiary hearing to address the issues set forth herein.

## PRELIMINARY STATEMENT

The Supreme Court and the Second Circuit have long held that the government may not use statements obtained by questioning from law enforcement while an individual is subject to custodial interrogation unless the government has used procedural safeguards to guarantee the Fifth Amendment's privilege against self-incrimination.  This privilege, of course, is an essential mainstay of our adversarial system and requires the government to inform an individual of their right to remain silent prior to any period of custodial interrogation.  Here, however, the government failed to do so.  And its failure not only resulted in a violation of the Defendant's constitutional rights, but also provided the government with illegal access to the contents of the Defendant's cell phone.

On September 22, 2021, the government executed a search warrant authorizing a search of the Defendant's home and the seizure of his electronic devices.  At no point during the execution of the search warrant did the Federal Bureau of Investigation ("FBI") read the Defendant his *Miranda* rights or inform the Defendant that he was free to leave.  Throughout the course of the search, however, in violation of the Defendant's Fifth Amendment rights, the FBI subjected the Defendant to an illegal custodial interrogation, including asking the Defendant to disclose the password to his cell phone.  In response, the Defendant, who was effectively subjected to a formal arrest—confined to his bed in a small studio apartment, surrounded by armed FBI agents, and unable to leave—provided the information but then requested to call his lawyer.  After speaking

with his lawyer, the Defendant told the FBI that he did not have to provide them with his cell phone password.  The FBI responded that they had authority to access the phone using "biometrics" anyway, but then never sought to do so—and, indeed, biometrics appear to not have been enabled on the cell phone at the time of the search.

Notably, in applying for the search warrant, the government represented to the issuing Magistrate Judge that it would not ask the Defendant to provide the password to his phone.  The government, however, in executing the search warrant, did just that.  And to make matters worse, the government then used the illegally-obtained password to access the digital contents of the Defendant's cell phone, which contained, *inter alia*, privileged communications with counsel. Accordingly, in light of the government's egregious violations of the Defendant's Fifth Amendment privilege against self-incrimination, as well as his Fourth Amendment protection against unreasonable searches and seizures, the Defendant's statements, and the cell phone data seized in connection with those statements, should be suppressed.

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendant respectfully refers the Court to the factual and procedural background section set forth in the Defendant's Memorandum of Law in Support of his Motion to Dismiss the Indictment (ECF. No. 19), dated August 19, 2022, which is incorporated by reference herein.

## I.    The September 20, 2021 Search Warrant

On September 20, 2021, the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, signed a search warrant authorizing the government to search the Defendant's home (the "Subject Premises") for evidence, fruits, and instrumentalities of various alleged crimes, including wire fraud (18 U.S.C. § 1343), insider trading in commodities (7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a)), insider trading in securities (15 U.S.C. §§ 78j(b) & 78ff; 17

C.F.R. § 240.10b-5), securities fraud (18 U.S.C. § 1348), and money laundering (18 U.S.C. § 1956) (the "Subject Offenses").[1]

The search warrant authorized the government to seize from the Subject Premises, *inter alia*, computer devices, cell phones, and storage media (the "Subject Devices"). *See* Search Warrant Attachment A at p. 1. Additionally, the search warrant stated, in pertinent part, that the Subject Devices "consist[ed] of" evidence relating to: (i) the Defendant's purchase of non-fungible tokens ("NFTs"); (ii) the Defendant's use of digital wallets; (iii) OpenSea's code of conduct; and (iv) "the location of other evidence relating to the commission of the Subject Offenses including emails reflecting registration of online accounts" (the "Subject Information"). *See id*. at p. 1-2.

The search warrant also authorized "the search of the person of Nate Chastain in the event he [was] located in the Subject Premises at the time the warrant [was] executed." *See id*. at p. 1. Additionally, following the seizure of "any computer devices and storage media," the search warrant authorized the government to review those devices for electronically stored information ("ESI") contained therein relating to the Subject Information. *See id*. at p. 2. Further, the search warrant authorized law enforcement, during the execution of the warrant, to obtain from the Defendant the display of any physical biometric characteristics "for the purpose of attempting to unlock the device(s)." *See id*. And with respect to the government's authorization to access the devices, the search warrant affidavit stated that the government was *not* seeking authorization to compel the Defendant to provide the password to his cell phone.[2] More specifically, the search

---

[1] The September 20, 2021 search warrant, including its incorporated attachment, is appended to this motion as "Exhibit A." It is cited hereinafter as "Search Warrant" or "Search Warrant Attachment A."

[2] The September 20, 2021 search warrant application, including an FBI agent's sworn affirmation in support of the search warrant, is appended to this motion as "Exhibit B." It is cited hereinafter as "Search Warrant Affidavit."

warrant affidavit stated, "[t]his authority is not to compel Chastain to provide a numeric passcode." *See* Search Warrant Affidavit at ¶ 19.

## II.    <u>Execution of the Search Warrant</u>

During the early morning hours of September 22, 2021, several armed FBI agents wearing bullet proof vests went to the Subject Premises (*i.e.*, the Defendant's home) and rang the doorbell. *See* Declaration of Nathaniel Chastain dated September 30, 2022 ("Decl.") at ¶¶ 3-4.  When the Defendant opened the door, one of the FBI agents informed the Defendant that they had a warrant to search his home and take electronic devices.  *See* Decl. at ¶¶ 4-5.  The FBI agents entered the Subject Premises—a small studio apartment (approximately 500 square feet)—and instructed the Defendant to sit on his bed while they executed the search warrant.  *See* Decl. at ¶¶ 3, 6.

During the execution of the search warrant, the agents seized, *inter alia*, one cell phone, one laptop, and one iPad.  Upon seizing these items, an FBI agent asked the Defendant if the cell phone that they had seized was his only cell phone, and the defendant answered the agent's question in the affirmative.  *See* Decl. at ¶ 7.  Next, acting outside of the judicially-authorized scope of the search warrant, and likely knowing that the Defendant had counsel,[3] an FBI agent asked the Defendant for the password to his cell phone.  *See id.*  The Defendant, sitting on his bed and unable to leave his apartment, provided it.  *See* Decl. at ¶ 8.  But the Defendant then informed the FBI agent that he wanted to talk to his lawyer, and the FBI agent permitted him to make a phone call.  *See id.*

After speaking to his lawyer, the Defendant informed an FBI agent that he was not required to provide the password to his cell phone.  *See* Decl. at ¶ 9.  Another FBI agent—believed to be

---

[3] At the time the search warrant was executed, the Defendant's counsel had been in communication with OpenSea regarding the government's investigation into the Defendant's alleged conduct.  And as the discovery in this case demonstrates, the government and OpenSea were in frequent communication during this period of time.

the search warrant affiant—responded that the search warrant authorized the FBI to access the cell phone through the use of biometrics anyway.  *See id.*  The FBI, however, never attempted to use the Defendant's biometrics to access the cell phone.  *See id.*  Further, at the time the warrant was executed, the relevant cell phone settings were apparently not enabled to allow access through the use of biometrics.  *See* Decl. at ¶ 10.

Throughout the course of the search, despite asking the Defendant questions about his cell phone and cell phone password, the FBI agents never read the Defendant his *Miranda* rights.  *See* Decl. at ¶ 12.  Moreover, they never told the Defendant that he was free to leave and not under arrest.  *See id.*  Later, using the above-referenced password, the FBI searched the contents of the Defendant's cell phone.  Notably, the cell phone contained information that was not also stored on the Defendant's laptop and iPad.  *See* Decl. at ¶ 11.  The cell phone also contained several privileged, or potentially privileged, documents and recordings.  At least one of those recordings was accessed by the government and has been the subject of discussion between the parties.[4]

## ARGUMENT

### I.     The Defendant's Statements, Which Were Elicited During the Search Warrant's Execution, Were Obtained in Violation of His Fifth Amendment Rights

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V; *see also United States v. Hubbell*, 530 U.S. 27, 34 (2000) (noting that the Fifth Amendment protects an individual from being compelled to provide incriminating communications that are testimonial in nature).  To safeguard against Fifth Amendment violations, the Supreme Court established strict standards for government agents to follow when eliciting statements from an accused in custody.  *See Miranda v. Arizona*, 384 U.S.

---

[4] Over last two months, the Defendant has requested details concerning the government's privilege "filter" review, which the government has provided in correspondence.

436 (1966).  Now, it is axiomatic that prior to custodial interrogation, the government must inform

an individual of his or her *Miranda* rights to protect against self-incrimination.  *See id*. at 467-73

This includes, of course, the right to remain silent and the right to an attorney.  *Id*. at 478-79.

      In this case, the FBI agents that executed the September 20, 2021 search warrant violated

the defendant's Fifth Amendment rights when they elicited un-*Mirandized* statements, pursuant to

a custodial interrogation, which were testimonial in nature.  As a result of the constitutional

violation, the Defendant's statements that were elicited during the course of the search warrant

execution—specifically, the Defendant's cell phone password—should be suppressed.

      **A.**      **The Defendant Was in Custody**
                      **During the Search Warrant's Execution**

      Statements elicited during a custodial interrogation, whether inculpatory or exculpatory,

are generally inadmissible unless a suspect has first been advised of his rights.[5]  "[C]ustody for

*Miranda* purposes is not conterminous with… the colloquial understanding of custody." *United*

*States v. Dixon*, No. 20-cr-368 (NSR), 2021 WL 106419, at *6 (S.D.N.Y. 2021) (quoting *United*

*States v. FNU LNU*, 653 F.3d 144, 152-153 (2d Cir. 2011)) (internal quotation marks omitted).

Instead, the test for determining whether someone is in custody is an objective inquiry that asks

(1) whether "a reasonable person would have thought he was free to leave the police encounter at

issue" and (2) whether "a reasonable person would have understood his freedom of action to have

been curtailed to a degree associated with formal arrest."  *United States v. Newton*, 369 F.3d 659,

672 (2d Cir. 2004) (internal citations omitted); *see also United States v. Ali*, 68 F.3d 1468, 1473

---

[5] To safeguard the Fifth Amendment privilege, the government must clearly inform a person in custody, prior to any interrogation, that they have the right to remain silent, that anything they say will be used against them in court, that they have a right to consult an attorney and have an attorney present with them during any questioning, and that, if they cannot afford one, a lawyer will be appointed to represent them.  *See Miranda v. Arizona*, 384 U.S. 436, 444, 467-71 (1966).

(2d Cir. 1995) ("The proper inquiry is [] whether a reasonable person in [the defendant's shoes] would have felt free to leave under the circumstances.")

An individual who understands that his detention is not likely to be "temporary and brief" and feels that he is "completely at the mercy of police" could reasonably deem his situation comparable to a formal arrest. *Newton*, 369 F.3d at 675 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984)).   In this context, pertinent considerations include: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether the officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (internal citations omitted).   Ultimately, all factors must be weighed, and no single factor is dispositive. *See United States v. Butt*, No. 18-CR-00087 (NSR), 2019 WL 479117, at *12 (S.D.N.Y. 2019).   Rather, the court must determine "whether the circumstances would tend to make an individual reasonably feel as though they were being questioned in a police-dominated setting." *See id*.

In weighing the above-listed factors, *United States v. Butt* is instructive.   There, several law enforcement officers executed a search warrant authorizing the seizure of firearms and ammunition inside of the defendant's home. *Id*. at *1-2.   Upon entering the defendant's home, the agents patted down the defendant and directed him to sit on the couch in his living room. *Id*. at *6.   Throughout the course of the search, while the defendant remained confined to his couch, several agents asked him incriminating questions regarding certain items, such as ammunition, that they found in his home. *Id*. at *3.   Additionally, they asked the defendant if he had any firearms in his home. *Id*.   Prior to asking the defendant these questions, which the defendant ultimately

answered, none of the officers read the defendant his *Miranda* rights.  *Id*.  And notably, none of

the officers explained to the defendant that he was not under arrest; none of the officers explained

to the defendant that he was free to leave; and none of the officers explained to the defendant that

he did not need to speak with them or answer their questions.  *Id*. at *2, 17

 In suppressing the relevant statements, the court found that the defendant was in custody,

such that *Miranda* warnings were required prior to any questioning, during the course of the search

warrant execution.  *See id*. at 12-19.  In reaching this conclusion, the court noted several

aggravating factors that weighed in favor of a finding of custody.  *See id*.  For example, the court

noted that the defendant was greatly outnumbered by the officers executing the search; the

defendant was confined to the living room, where he remained throughout the entirety of the

search; and the defendant was *not* told that he was free to leave, call an attorney, or refrain from

answering questions.  *See id*.  Further, the court emphasized that the particular circumstances of

the search warrant execution, coupled with the location of the execution, weighed in favor of a

finding of custody.  *See id*.  Indeed, as several agents overran his home during the course of the

search, the defendant was "deprived of the very sovereignty over his home that would otherwise

empower him."  *Id*. at 15.

 Here, just as the court found in *Butt*, the relevant factors weigh in favor of a finding that

the Defendant was in custody when FBI agents asked him for the passcode to his cell phone.

Initially, the actions of the agents upon entering the Defendant's home support the conclusion that

a reasonable person in the Defendant's position would not have felt free to leave.  *Newton*, 369

F.3d at 672.  At the time of the execution, for example, several agents entered the Defendant's

home in a show of force, wearing bullet proof vests, carrying holstered firearms, and presenting

the defendant with a judicially-authorized search warrant authorizing, *inter alia*, a search of the Defendant's person. *See* Decl. at ¶¶ 4-6; *see also* Search Warrant Attachment A at p. 1.

Additionally, the circumstances underlying the warrant's execution, in addition to the location in which the warrant was executed, would have led a reasonable person to believe that his freedom of action was "curtailed to the degree associated with a formal arrest." *Newton*, 369 F.3d at 672. Not only was the Defendant outnumbered by several FBI agents, *see* Decl. at ¶¶ 4-6, but he was also deprived of "sovereignty over his home," *Butt*, 2019 WL 479117, at *48, as he was required to remain on his bed during the execution of the warrant, which took place in a small studio apartment (approximately 500 square feet), further limiting the potential for any movement. *See* Decl. at ¶¶ 3-6. Moreover, the Defendant was asked multiple questions about items found during the course of the search—including his cell phone—without first being read his *Miranda* warnings, and without being told that he was *not* under arrest, that he did *not* need to answer the agents' questions, and that he was free to leave. *See id.* at ¶¶ 7-8, 12. Accordingly, just as the court concluded in *Butt*, the totality of the circumstances necessitates a finding that the Defendant was in custody during execution of the September 20, 2021 search warrant.

### B.      The Defendant Was Interrogated During the Search Warrant's Execution

The test for determining whether the conduct of law enforcement agents amounted to "interrogation" is whether the words or actions of law enforcement agents "were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The term "interrogation" includes both express questioning or its functional equivalent and includes any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Id.*; *see also Ali*, 68 F.3d at 1472 (noting there was no dispute that law enforcement questioning constituted interrogation); *Butt*, 2019 WL 479117, at *12 (same). In determining

whether an interrogation took place, the Court must consider the totality of the circumstances of the agents' conduct. *See, e.g., United States v. Perkins*, No. 12-CR-6006L, 2013 WL 6145753, at *2-9 (W.D.N.Y. 2013) (noting that an officer's un-*Mirandized* questioning, eliciting certain statements from defendant after the discovery of a gun and marijuana during a parole search, constituted a custodial interrogation).

Here, the totality of the circumstances reveal that the FBI agents improperly obtained the Defendant's cell phone passcode from him by means of an un-*Mirandized* custodial interrogation. *See United States v. Djibo*, 151 F. Supp. 3d 297, 305-06 (E.D.N.Y. 2015) (finding that the questioning of an individual regarding his cell phone password constituted a custodial interrogation). Critically, the agents were fully aware that their request for the Defendant's cell phone password was "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301, because they were in possession of a search warrant specifically indicating that the Defendant's devices, including his cell phone, contained "evidence, fruits, and instrumentalities" of various crimes. *See* Search Warrant Attachment A at p. 1. Accordingly, by the terms of the search warrant alone, the agents necessarily interrogated the Defendant when they asked him for his cell phone password because they knew, or at the very least should have known, that the password was the key to revealing the Defendant's alleged links to purported criminal activity. *See* Decl. at ¶¶ 4-9.

Furthermore, the agents should have known that they had impermissibly interrogated the Defendant after the Defendant spoke to an attorney and informed them that he was not required to provide his cell phone password. *See id.* at ¶¶ 7-9. Indeed, at that point, the agents should have recognized: (i) that they were required to have read the Defendant his *Miranda* rights before asking for his password; (ii) that they failed to do so; and (iii) that as a result of such a failure, they were not permitted to access the Defendant's phone using the password that they illegally obtained.

10

Instead, without any indication that the cell phone could have been accessed through the use of biometrics, the agents simply responded that the cell phone warrant allowed them to access the cell phone through the use of the Defendant's biometrics. *See id.* at ¶¶ 7-10. And although the warrant did allow the agents to access the cell phone in such a manner, *see* Search Warrant Attachment A at p. 2, the agents acted outside the scope of the warrant when they entered the cell phone through the use of an illegally-obtained password and obtained voluminous documents, records, and communications. *See* Decl. at ¶¶ 7-12. Of particular note, some of those documents, records, and communications were privileged and some were stored exclusively on the cell phone itself (as opposed to being stored on a cloud-based server). *See id.* at ¶ 11.

Finally, as discussed in greater detail below, the FBI agents also should have known that any questioning regarding the Defendant's cell phone password was legally impermissible because the search warrant affidavit specifically stated that the government was *not* seeking authorization to compel the defendant to provide the password to his cell phone. *See* Search Warrant Affidavit ¶ 19. In other words, the mere fact that the government assured the Court that agents would not ask the Defendant for his cell phone passcode—plainly stating "[t]his authority is not to compel Chastain to provide a numeric passcode"—is an implicit acknowledgment that they understood it would be unconstitutional to do so in the first instance.[6] Therefore, asking for the Defendant's

---

[6] *See* Search Warrant Affidavit at ¶ 19. Notably, in applying Fifth Amendment protections, courts have concluded that a defendant cannot be compelled to provide a cell phone password because the password itself conveys information or asserts a fact that is testimonial in nature. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding that decryption of hard drives is testimonial); *United States v. Rogozin*, No. 09-CR-379 (S)(M), 2010 WL 4628520, at *6 (W.D.N.Y. Nov. 16, 2010) ("[D]efendant's statement as to the password was testimonial in nature."). As one District Court has noted, "forcing [a] Defendant to reveal the password for [a] computer communicates [a] factual assertion to the government, and thus, is testimonial [because] it requires Defendant to communicate 'knowledge,' unlike the production of a handwriting sample or a voice exemplar." *United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. 2010) (citing *United States v. Doe*, 487 U.S. 201, 208-17 (1987), and *Hubbell*, 530 U.S. at 35, 39, 43); *see also Doe*, 487 U.S. at 213 ("There are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts. The vast majority of verbal statements thus will be testimonial."); *Riley v. California*, 573 U.S. 373 (2014) (noting that many cell phones are in fact "minicomputers"). Here, just as the courts found in *Rogozin* and *Kirschner*, the Defendant's statement regarding his cell phone password is testimonial, and thus, subject to Fifth Amendment

password, *see* Decl. at ¶¶ 7-8, in direct contravention of the dictates of the warrant, *see* Search Warrant Affidavit at ¶ 19, affirmatively served to elicit an incriminating response that cannot be used in trial.

In sum, the government violated the Defendant's Fifth Amendment rights when it subjected the defendant to an un-*Mirandized* custodial interrogation and illegally elicited statements regarding the Defendant's cell phone and cell phone password.  *See* Decl. at ¶¶ 3-12.  As a result, all of the Defendant's statements regarding his cell phone must be suppressed.  And as described in more detail below, all of the data on the Defendant's cell phone must be suppressed as well.

## II.     The Digital Contents of the Defendant's Cell Phone Should Be Suppressed as the Unlawful Fruits of a Fifth Amendment Violation

Physical evidence obtained in violation of (i) an individual's Fourth Amendment Right to be free from unreasonable searches and seizures and (ii) an individual's Fifth Amendment privilege against self-incrimination should be suppressed.  *See, e.g., United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)); *Djibo*, 151 F. Supp. 3d at 307-10.  Here, the digital contents of the Defendant's cell phone must be suppressed as the fruits of the aforementioned Fifth Amendment violation, and, as discussed *infra*, as fruits of a Fourth Amendment violation.

*Djibo* is instructive.  In *Djibo*, an individual was stopped at JFK airport with a quantity of heroin.  151 F. Supp. 3d at 298.  After questioning, the individual informed law enforcement that the defendant was his source for the illicit narcotics.  *Id*.  Consequently, a Homeland Security Investigations ("HSI") agent "set up an alert" to monitor the defendant's travel plans.  *Id*. at 299. When the HSI agent received an alert that the defendant was planning to fly to the United

---

protections.  As a result, prior to any custodial interrogation concerning his cell phone password, the FBI agents executing the search warrant were required to read the Defendant his *Miranda* rights.

Kingdom, the agent arranged for a Customs and Border Patrol ("CBP") agent to stop the defendant at the gate to his flight and search him for weapons, drugs, and money. *Id*. Although the CBP agents did not find contraband, they did find multiple cell phones during their search. *Id*. After the CBP agents ended their search, the HSI agent stepped in and asked the defendant for the phone number and passcode to one of the phones. *Id*. The defendant provided the agent with the requested information, and he was subsequently arrested and taken to an office where he invoked his *Miranda* rights. *Id*. at 300. While at the office, the agent performed a search of the defendant's phone and retrieved a large quantity of data that included call lists and text messages. *Id*. at 300-03 (noting that the government referred to this search as a "preliminary peek"). Approximately one month later, the agent sought and obtained a search warrant for the cell phone. *Id*.

Ultimately, the court not only granted the defendant's motion to suppress his statement regarding his cell phone password, as it was obtained by way of a custodial interrogation in violation of his *Miranda* rights, but the court also granted the defendant's motion to suppress the data that was recovered from the defendant's cell phone as the fruit of an illegal search.[7] In so granting the defendant's motion to suppress the relevant cell phone data, the court distinguished *United States v. Patane*, 542 U.S. 630 (2004),[8] finding that: (i) the defendant's statement regarding his cell phone password necessarily invoked the Fourth and Fifth Amendments; (ii) the contents of the cell phone at issue implicated significant privacy concerns; and (iii) there existed significant incentive to deter police misconduct. *Id*. at 307-11. So too here.

---

[7] *Id*. at 305-11. Notably, the government conceded that its initial warrantless "peek" into the defendant's cell phone was suppressible, but argued that the documents and data obtained through the subsequent search warrant were legally and permissibly obtained. *Id*. at 307-08.

[8] In *United States v. Patane*, the Supreme Court, in a plurality decision, held that the failure to provide a suspect *Miranda* warnings did not require suppression of the physical fruits of the suspect's unwarned but *voluntary* statements. As described above, *Patane* is distinguishable from the instant case because the data recovered from the Defendant's cell phone was not only obtained in violation of his *Miranda* rights, but was also involuntary under the circumstances and obtained in violation of the Fourth Amendment.

As similarly discussed by the *Djibo* court, the discovery of the entire contents of the Defendant's cell phone—through the use of the Defendant's un-*Mirandized* and involuntary statement regarding his cell phone password—not only invokes the Fifth Amendment's privilege against self-incrimination, but also invokes the Fourth Amendment's protection from unreasonable searches and seizures. *Id.* at 308. In this context, and as noted by the Supreme Court in *Riley*, 573 U.S. at 396-97, the digital content of an individual's personal cell phone triggers Fourth Amendment concerns of critical import:

> A cell phone search would typically expose to the government *far more* than the most exhaustive search of a house. [Further, a cell phone] contains a broad array of private information never found in a home in any form—unless the phone is.

Given the fundamental privacy concerns associated with an individual's cell phone content, the government's deliberate and illegal access to the Defendant's cell phone here is all the more egregious. Accordingly, to deter future instances of similar misconduct, the contents of the Defendant's cell phone should be suppressed. As discussed in greater detail below, the government should not be permitted to advance the idea that it is narrowing the scope of its warrant—presumably to comply with the constitutional rights afforded by the Fourth and Fifth Amendments—and then execute the warrant outside of that defined scope. In sum, for the same reasons articulated in *Djibo*, the fruits of the illegally obtained password, and subsequently illegal search, should be suppressed.

## III.   The Contents of the Defendant's Cell Phone Should Be Suppressed <u>Because They Were Seized Outside the Scope of the Search Warrant</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that "he personally has an expectation of privacy in the place

14

searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

The "touchstone" of the Fourth Amendment, therefore, is reasonableness, *Riley*, 573 U.S. at 381,

which is determined by "the totality of the circumstances, including the nature and purpose of the

search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*

*v. North Carolina*, 575 U.S. 306, 310 (2015).

A search violates the Fourth Amendment when the agents executing a search warrant

"exceed[] the authority that they had been granted by the magistrate judge." *United States v.*

*Voustianiouk*, 685 F.3d 206, 212 (2d Cir. 2012).  Generally, the remedy for an overbroad search

and seizure is suppression of the evidence obtained outside the scope of the warrant.  *See*

*Bershchansky*, 788 F.3d 102, 110-14.  Wholesale suppression is appropriate when the government

"flagrantly" disregards the terms of the warrant and (1) effects a widespread seizure of items not

within the scope of the warrant and (2) does not execute the warrant in good faith.  *United States*

*v. Shi Yan Liu*, 239 F.3d 138, 140-41 (2d Cir. 2000); *see also United States v. Debbi*, 244 F. Supp.

2d 235, 238 (S.D.N.Y. 2003) (finding "that the Government chose to blatantly disregard the very

limitations that saved the warrant from overbreadth" and setting a hearing to determine whether

blanket suppression was appropriate).  The government maintains the burden of demonstrating

"the objective reasonableness of the officers' good faith reliance." *United States v. George*, 975

F.2d 72, 77 (2d Cir. 1992) (internal citation omitted).

Here, the Defendant can "claim the protection of the Fourth Amendment," *Carter*, 525 U.S.

at 88, because he maintains a reasonable expectation of privacy in the digital contents of his cell

phone.  *See Riley*, 573 U.S. at 403 (finding that law enforcement must get a warrant before

searching a cell phone); *see also Carpenter v. United States*, 138 S. Ct. 2206 (2018) (holding that

individuals have reasonable expectation of privacy in cell site location information obtained from

their cell phones). Accordingly, the relevant inquiry in determining whether the government violated the Defendant's Fourth Amendment rights is whether the government's search exceeded the terms of the search warrant. Undoubtedly, the government's search did just that.

The terms and limitations of the warrant were clear. With respect to the government's authorization to access the Defendant's devices, including the Defendant's cell phone, the search warrant affidavit specifically stated that the government was *not* seeking authorization to compel the Defendant to provide the password to his cell phone. *See* Search Warrant Affidavit at ¶ 19 ("This authority is not to compel Chastain to provide a numeric passcode."). Consequently, the search warrant only authorized the use of the Defendant's biometrics to unlock the cell phone. The government's actions in contravention of its assurance and the warrant's scope exceeded the explicit terms and limitations of its authority to execute the search warrant and were thus unconstitutional. *See* Decl. at ¶¶ 3-12. The clear remedy is suppression of the contents of the Defendant's cell phone.

**IV.   Should the Court Not Grant the Defendant's Motion to**
**       <u>Suppress Summarily, It Should Order an Evidentiary Hearing</u>**

The Defendant submits that the showings made in this motion are sufficient to demonstrate that the government violated his Fourth and Fifth Amendment rights. If, however, the Court is unwilling to grant summarily the Defendant's motion to suppress, then the Court should exercise its discretion and order an evidentiary hearing to determine the extent of, and remedies for, the above-described constitutional violations. *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (noting that an evidentiary hearing "ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of [a] search are in question.") (internal quotation marks and citation omitted); *see also United States v. Shamsideen*, No. 03 CR 1313 (SCR), 2004

16

WL 1179305, at *9-10 (S.D.N.Y. Mar 31, 2004) (noting that "District Courts have broad discretion when deciding whether or not to hold a suppression hearing."). Indeed, as demonstrated above, an evidentiary hearing would be particularly appropriate here, given the FBI agents' disregard for the search warrant's explicit parameters.

## **CONCLUSION**

For the reasons stated above, the Court should grant this Motion to Suppress Statements and Evidence, or should the Court not do so summarily, it should hold an evidentiary hearing.

Dated: New York, New York
         September 30, 2022                         Respectfully submitted,

                                                    GREENBERG TRAURIG, LLP

                                                    By: _s/ David I. Miller_

                                                    David I. Miller
                                                    Gregory W. Kehoe
                                                    Charles J. Berk
                                                    One Vanderbilt Avenue
                                                    New York, NY 10017
                                                    Telephone: (212) 801-9200
                                                    Facsimile: (212) 801-6400

                                                    _Attorneys for Defendant_
                                                    _Nathaniel Chastain_