**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| NATHANIEL CHASTAIN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

No. 22-cr-305 (JMF)

**MEMORANDUM OF LAW IN OPPOSITION TO**
**THE GOVERNMENT'S MOTION TO EXCLUDE THE TESTIMONY OF**
<u>**DR. MATTHEW EDMAN AND PROFESSOR DOUGLAS SKINNER**</u>

David I. Miller
Daniel P. Filor
Nicholas T. Barnes
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Counsel for Nathaniel Chastain*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARD......................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

I.      THE GOVERNMENT MUST PROVE THAT INFORMATION
        CONCERNING UPCOMING FEATURED NFTs HAD
        INHERENT ECONOMIC VALUE TO OPENSEA ............................................... 3

II.     PROFESSOR SKINNER'S REBUTTAL
        TESTIMONY IS RELEVANT, RELIABLE, AND ADMISSIBLE............................... 7

        A.      Professor Skinner Is Qualified to
                Testify as An Expert in the Field of Economics ...................................... 8

        B.      Professor Skinner's Discussion of Confidential
                Business Information, As It Is Understood in
                Academic Literature, Is Relevant and Helpful to the Jury...................... 9

        C.      The Government's Discussion of Value is
                Incoherent and Internally Inconsistent.................................................. 10

        D.      Professor Skinner's Testimony Regarding
                "Fundamental Information" and "Informed Trading"
                Fits the Facts and Will Help the Jury.................................................... 11

        E.      Professor Skinner Reliably Responds to the Government's
                "Erosion of Trust" Argument and His Rebuttal Testimony
                Does Not Increase the Government's Burden ........................................ 15

        F.      Professor Skinner's Testimony Regarding
                Two-Sided Markets and OpenSea's Business
                Model Is Relevant, Reliable, and Admissible........................................ 17

III.    DR. EDMAN'S TESTIMONY IS
        RELEVANT, RELIABLE, AND ADMISSIBLE ......................................................... 18

        A.      Dr. Edman Is Qualified to Testify About Digital
                Asset Technology and His Testimony Will Help the
                Jury Understand the Technical Evidence in this Case .......................... 19

B.    Dr. Edman Will Not Opine on Mr. Chastain's
      Mental State, Nor Will He Tell the Jury What Result to Reach .......................... 20

C.    Dr. Edman's Testimony About Common
      Practices Among Sophisticated Cryptocurrency
      Users Is Highly Relevant, Helpful, and Admissible .............................................. 23

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
     336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................2, 3, 14

*Carpenter v. United States*,
     484 U.S. 19 (1987)................................................................................................4, 5

*Cleveland v. United States*,
     531 U.S. 12 (2000)...........................................................................................4, 5, 6

*Daubert v. Merrell Dow Pharm., Inc.*,
     509 U.S. 579 (1993)..................................................................................................3

*EEOC v. Bloomberg, L.P.*,
     No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ................3

*In re Fosamax Products Liability Litigation*,
     645 F. Sup. 2d 164, 191 (S.D.N.Y. 2009) .....................................................21, 22

*Kelly v. United States*,
     140 S. Ct. 1565 (2020)....................................................................................4, 5, 6

*United States v. Bilzerian*,
     926 F.2d 1285 (2d Cir. 1991)................................................................17, 20, 24, 25

*United States v. Blaszczak*,
     56 F.4th 230 (2d Cir. 2022) ............................................................................4, 5, 6

*United States v. Bourne*,
     No. 08-CR-888, 2011 WL 4458846 (E.D.N.Y. Sep. 23, 2011)............................20

*United States v. Brown*,
     776 F.2d 397 (2d Cir. 1985)..................................................................................22

*United States v. Duncan*,
     42 F.3d 97 (2d Cir. 1994)........................................................................................2

*United States v. Ganesh*,
     No. 16 Cr. 211, 2017 WL 11439292 (N.D. Cal. Oct. 20, 2017)............................21

*United States v. Garcia*,
     No. 09-cr-330, 2020 WL 2733986 (E.D.N.Y. May 26, 2020)................................23

*United States v. Girard*,
     601 F.2d 69 (2d Cir. 1979)................................................................................5, 6

*United States v. Grossman*,
     843 F.2d 78 (1988)...........................................................................................5, 6

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)..............................................................................3, 4, 6, 7

*United States v. Mermelstein*,
    487 F. Supp. 2d 242 (E.D.N.Y. 2007) ........................................................................21

*United States v. Nektalov*,
    03 Cr. 828 (PKL), 2004 WL 1469487 (S.D.N.Y. June 30, 2004) .........................23

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000)...........................................................................................4

*United States v. Scop*,
    846 F. 2d 135 (2d Cir. 1988)................................................................................22, 23

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984).........................................................................................22

## Statutes

18 U.S.C. § 1343 ....................................................................................................................5, 6

18 U.S.C. § 1956(a)(1)(B)(i)...................................................................................................23

## Other Authorities

Fed. R. Crim. P. 16 ....................................................................................................12, 17, 18

Fed. R. Evid. 702 ........................................................................................................2, 17, 21

Fed. R. Evid. 703 .............................................................................................................15

United States Supplemental Letter Brief, *United States v. Blaszczak*,
    Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021)............................4

Defendant Nathaniel Chastain (the "defendant" or "Mr. Chastain") respectfully submits this Memorandum of Law in Opposition to the Government's Motion to Exclude the Testimony of Dr. Matthew Edman and Professor Douglas Skinner.

## PRELIMINARY STATEMENT

The government has repeatedly emphasized in writing that it does not have to prove that information concerning soon-to-be-featured NFTs had inherent value to OpenSea. The government is wrong. And its legal position stands in stark contrast to relevant Supreme Court and Second Circuit precedent holding to the contrary. As made clear throughout its motion to exclude the testimony of Professor Skinner and Dr. Edman, however, the government cares less about proving the elements of the wire fraud statute, and more about enforcing its own view of integrity. To this end, the government's arguments in support of exclusion are not only meritless, but frequently confusing and contradictory.

First, the government has designated its own expert, Professor Daniel Taylor, to opine that upcoming featured NFT information was valuable to OpenSea. In response, the defense has designated Professor Skinner as an expert in the field of economics to rebut Taylor's conclusory assertions and explain that Taylor's unfounded opinions do not hold up under economic scrutiny. For example, and as discussed herein, where Taylor may opine that Mr. Chastain's actions cased an "erosion of trust in OpenSea's marketplace," Professor Skinner will respond by explaining that: (i) Taylor has not demonstrated that the academic literature on "trust" is applicable in the context of this case; and (ii) he has seen no reliable empirical evidence to suggest that any such erosion occurred. Notwithstanding Professor Skinner's relevant and admissible rebuttal testimony, several contradictions arise throughout the government's arguments in support of exclusion. Indeed, if the government does not need to prove that the relevant information had value to OpenSea (as the government suggests), then its own expert (who intends to opine that the relevant information had

value to OpenSea) is wholly irrelevant and must be excluded.  If, however, the government does need to prove value (consistent with relevant binding precedent), then Professor Skinner must be permitted to testify as a corrective rebuttal to the government's designated valuation expert.

Second, despite any assertion to the contrary, Dr. Edman's proposed testimony is relevant, reliable, and helpful.  Indeed, where the jury will be presented with technical terms like "digital assets" and "the Ethereum blockchain," Dr. Edman will educate the jurors on the definition of these terms, which are not commonly understood, and explain how they fit within the context of this case.   Further, where the government will argue that Mr. Chastain's alleged activity purportedly evinced an effort to conceal certain cryptocurrency transactions, Dr. Edman will explain that—based on his experience and review of the relevant records in this case—he has seen no evidence to support the conclusion that Mr. Chastain employed any techniques or technologies that are commonly used to obfuscate one's identity and/or crypto assets on the blockchain.   Dr. Edman's testimony is plainly admissible and critically supports the proposition that the government's concealment theory of money laundering is completely unsupported by the technology involved and the public nature of the Ethereum blockchain.   Accordingly, the government's motion should be denied.

## LEGAL STANDARD

The Court may admit expert testimony "in the form of an opinion or otherwise" if it "will help the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702. Expert testimony helps the factfinder when it "shed[s] light on activities not within the common knowledge of the average juror."  *United States v. Duncan*, 42 F.3d 97, 101 n.3 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative.").  Additionally, expert testimony may be offered to

rebut expert opinions proffered by an opponent.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020).  "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id*.

The "traditional and appropriate means of attacking" an expert's methodologies are "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof" at trial.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).  "If an expert's testimony lies within the range where experts might reasonably differ, the jury, not the trial court, should decide among the conflicting views of different experts."  *EEOC v. Bloomberg, L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3466370, *6 (S.D.N.Y. Aug. 31, 2010) (internal quotation marks and citation omitted).

## ARGUMENT

## I.    THE GOVERNMENT MUST PROVE THAT INFORMATION CONCERNING UPCOMING FEATURED NFTs HAD INHERENT ECONOMIC VALUE TO OPENSEA

The government incorrectly contends that it "does not have to prove that information about upcoming featured NFTs had inherent value to OpenSea."  Motion to Exclude Dr. Edman and Professor Skinner ("Motion") at 20 n.3.  As demonstrated in prior briefing on this issue,[1] to establish wire fraud, the government must prove, *inter alia*, that the relevant featured NFT artist information—solely derived from the Defendant's own thoughts and ideas—was the confidential business information of OpenSea (*i.e.*, that the information was considered *and* treated as

---

[1] *See* Defendant's Motion to Exclude the Report, Testimony, and Opinions of Professor Daniel Taylor at 9-12 (ECF No. 58); Defendant's Motion to Dismiss the Indictment at 11-19 (ECF No. 19) ("MTD Opening Br."); Defendant's Reply Brief in Support of his Motion to Dismiss the Indictment at 6-12 (ECF No. 25) ("MTD Reply Br."); Brief of Amicus Curiae the New York Council of Defense Lawyers (ECF No. 20) ("NYCDL Amicus Curiae Br.").

confidential by OpenSea), *see United States v. Mahaffy*, 693 F.3d 113, 135 n.14 (2d Cir. 2012);

and that the information had inherent value to OpenSea, *see United States v. Blaszczak*, 56 F.4th

230, 244 (2d Cir. 2022) (confidential information not "inherently valuable" to victim agency where

"premature[] disclos[ure] … [had] no direct impact on government's fisc"); *see also Carpenter v.*

*United States*, 484 U.S. 19, 26 (1987) ("[N]ews matter … is stock in trade, to be gathered at the

cost of enterprise … to be distributed and sold to those who will pay money for it." (internal

quotation marks and citation omitted)); *Cleveland v. United States*, 531 U.S. 12, 15 (2000) ("[T]he

thing obtained must be property in the hands of the victim.").  Absent such proof, the instant wire

fraud charge must fail.

As the government has already admitted in the Second Circuit, "confidential business

information" constitutes property when the information has "inherent market value" to its owner.

United States Supp. Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867,

18-2878 (2d Cir. June 4, 2021) (ECF No. 497).  This makes sense, as the government's current

theory—that inherent value of the subject information is immaterial—would capture virtually

every instance in which an employee used internal employer information for non-work purposes.

But not everything learned about an employer's business is corporate "property."  *Carpenter* never

announced a sweeping rule that all information "not generally known or available outside of,"

Indictment ¶ 9, the workplace constitutes property, which is consistent with the caselaw in this

Circuit that a wire fraud does not always exist from an employee's breach of duty to his employer.

*See* NYCDL Amicus Curiae Br. at 9-10 (ECF No. 20).  Indeed, as courts have continually insisted,

"[a] scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in

the absence of a property right to interfere with." *United States v. Pierce*, 224 F.3d 158, 165 (2d

Cir. 2000); *see Kelly v. United States*, 140 S. Ct. 1565, 1572 (2020) (finding that deceitful conduct

in the absence of a traditional property interest does not amount to property fraud).  And as noted in the Defendant's Motion to Dismiss in this case, absent clear direction from Congress, the patent ambiguity surrounding the definition of property under wire fraud statute counsels in favor of lenity.  *See* MTD Opening Br. at 19.

The Second Circuit's recent decision in *Blaszczak* demonstrates that confidential business information must have, *inter alia*, inherent value to constitute property under 18 U.S.C. § 1343. *Blaszczak*, 56 F.4th at 243-44.  To this end, when confidential business information is a company's "stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and  money, and *to be distributed and sold to those who [would] pay money for it*," then it may constitute property. *Id.* at 243 (quoting *Carpenter*, 484 U.S. at 26 (emphasis in original)).  Such information will impact the company's "fisc."  *Id.* at 244.

Instead of complying with binding precedent, the government would prefer the Court to apply only part of the property definition: "whether the information was created or compiled by OpenSea for a business purpose, and considered and treated as confidential."  Motion at 20 n.3. This contention, however, does not comport with the government's own citation to *United States v. Grossman*, 843 F.2d 78 (1988).  *See id.* at 20 (citing *Grossman*, 843 F.2d at 86, "finding information has commercial value" to law firm).

*Blaszczak*'s inherent value requirement is not dependent on whether the alleged property-based fraud arises in a commercial or regulatory context.[2]  This is clear from the majority opinion that discussed why the value requirement that applied to the publisher victim in *Carpenter* also applied to the Circuit's precedent regarding the DEA's confidential records in *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979).  Specifically, *Blaszczak* explained that its holding was

---

[2] Indeed, the analysis in *Cleveland* and *Kelly* circumscribing "property" under the wire fraud status is not limited to a regulatory context.  *See* MTD Reply Br. at 9.

consistent with *Girard* because the DEA's confidential records of informant identities were property, as they were "inherently valuable" information of the DEA.  56 F.4th at 244 (citing *Girard*, 601 F.2d at 71).  The dissent similarly recognized that *Blaszczak*'s requirement that confidential information have inherent value to the victim applied equally to regulatory and commercial entities.  *See Blaszczak*, 56 F.4th at 256 (Sullivan, J., dissenting) ("[T]he majority opinion offers no rationale for a rule that would protect rights of commercial entities but not those of government agencies possessing comparable information…. Certainly, no such distinction appears on the face of sections 1343 or 1348, and it defies common sense to think that Congress would give fraudsters carte blanche to misappropriate the 'confidential information' of any and every 'regulatory agency.'").  Critically, *Blaszczak*'s holding is consistent with the Supreme Court's direction that property fraud statutes not be used by the "Federal Government … to enforce (its view of) integrity," but operate to protect traditional property rights only.  *Kelly*, 140 S. Ct. at 1574; *see also Cleveland*, 531 U.S. at 24.

The Second Circuit's pre-*Blaszczak* cases do not support the government's absence-of-value rule either.  To be sure, in *Grossman*, the court ruled that non-public information regarding a law firm client's pending financial transaction amounted to "property" under the wire fraud statute, even though the firm could not "commercially exploit" the information by trading on it. That information, however, had obvious "commercial value" to the firm—and was indeed its stock in trade—as keeping client confidence is one of the most important services a law firm sells. *Grossman*, 843 F.2d at 86.  A client pays for the protection of the attorney-client privilege, and confidentiality is an essential component of legal representation.  *Mahaffy* is similarly inapposite. In *Mahaffy*, the court overturned the defendant's conspiracy to commit securities fraud conviction based on *Brady* violations and inaccurate jury instructions with respect to the scope of honest

services fraud.  *Mahaffy*, 693 F.3d at 118-19.  There, however, unlike the instant case, the broker

defendants never contested whether the financial information at issue had commercial value.  *Id.*

at 118-22, 134-35.  And indeed, information about what orders a brokerage firm will place has

clear commercial value to the firm, as this information can dictate market prices, and if leaked,

cost the firm and its clients money.[3]  *See id.* at 118-22.

Accordingly, as has been demonstrated throughout the briefing in this case, contrary to the

government's assertion in its Motion to Exclude, the government must prove that the featured NFT

artist information had inherent value to OpenSea.

## II.    PROFESSOR SKINNER'S REBUTTAL TESTIMONY IS RELEVANT, RELIABLE, AND ADMISSIBLE

The government's meandering motion to exclude Professor Skinner's proposed testimony

is misplaced, confusing, and internally inconsistent.  The bottom line is this: Professor Skinner is

offered to rebut the government's designated valuation expert, Professor Taylor.  Where Taylor

may opine that "[c]onfidential business information about upcoming featured digital art was

valuable," Taylor Report at 2, Professor Skinner will respond by explaining that different types of

information exist (*e.g.*, proprietary information; fundamental information), and not all information,

including the information at issue here, is valuable in a corporate setting, *see* Skinner Disclosure

("Skinner Discl.") ¶ II(d)-(f).  Similarly, where Taylor may opine that Mr. Chastain's actions

caused an "erosion of trust in OpenSea's marketplace," Taylor Report at 4, Professor Skinner will

respond by explaining that: (i) "Taylor has not demonstrated that the literature on trust is applicable

to either the context of Mr. Chastain's alleged activities or any purported effects on OpenSea,"

---

[3] In fact, the broker defendants' scheme in *Mahaffy* actually harmed their employer through the breach of their duties, which in turn caused the brokerage firm to breach its duties to their clients, all of which cost the clients money.  *See id.* at 118-22, 134-35.

Skinner Discl. ¶ II(g); and (ii) he has seen "no reliable empirical evidence that OpenSea suffered harm from the alleged conduct, including through any purported 'erosion of trust,'" *id.* ¶ II(h).

Based on his education and experience, Professor Skinner is qualified to opine on the economic issues at play and explain to the jury that Taylor's proffered opinions do not stand up to economic scrutiny. Accordingly, if Taylor is permitted to testify, then so should Professor Skinner.

### A.     Professor Skinner Is Qualified to Testify as An Expert in the Field of Economics

With a bachelor's degree in accounting and finance, a master's degree in applied economics, and a doctorate degree in accounting and finance, Professor Skinner is qualified to testify about several key issues lying at the heart of this wire fraud prosecution, including, *inter alia*, the economics of two-sided platforms, the notion of "trust" in the context of two-sided platforms, and the ways in which different types of information, as documented in relevant academic literature, are relied upon and utilized in various corporate settings.

As the Deputy Dean for Faculty and the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business, Professor Skinner has taught undergraduate, graduate, and Ph.D course on topics that include, but are not limited to, corporate financial reporting and analysis, and empirical methods in accounting research. *See* Skinner Discl. ¶¶ I(a), (d). Among his other accomplishments, he has served as Senior Editor of the Journal of Accounting Research, one of the preeminent academic accounting journals in the world, and his research has been published in several leading accounting and finance journals. *See id.* ¶¶ I(c), (e). With over three decades of relevant experience, and stellar credentials, Professor Skinner is supremely capable of relating relevant economic concepts to jurors in a manner that will help them understand the evidence in this case. The government's objections to Professor Skinner's qualifications, as well as his proposed testimony, are meritless.

**B.**      **Professor Skinner's Discussion of Confidential Business Information, As It Is Understood in Academic Literature, Is Relevant and Helpful to the Jury**

At the outset of its Motion, the government objects to Professor Skinner's testimony to the extent "[he] plans to explain that 'confidential (or more precisely, proprietary) business information is understood in the academic literature as that which relates to an entity's business model and its ability to generate a sustainable advantage.'"  Motion at 13.  The crux of the government's position is that Professor Skinner's proposed testimony is too detailed in its discussion of relevant economic concepts, and that any such testimony would purportedly infringe upon the Court's role in instructing the jury on the legal meaning of "confidential business information."  *Id*.  Indeed, as its strawman argument unfolds, the government insists that Professor Skinner "proposes to give his own view on how the academic literature supposedly uses [the term 'confidential business information'] and when it constitutes property."  *Id*.

Critically, the government fails to appreciate that Professor Skinner's proposed testimony **_directly rebuts_** Taylor's opinions, which **_repeatedly, explicitly, and improperly_** state that information regarding soon-to-be-featured NFTs constitutes "valuable" "confidential business information."  *See, e.g.*, Taylor Report at 1-2 ("Confidential information about upcoming featured digital art was valuable…").[4]  Nevertheless, the government is also wrong about Professor Skinner's opinion.  Professor Skinner will not testify about the legal definition of "property" (or "confidential business information").  Nor will he opine on an ultimate issue in this case.  Rather, he will "explain that the information purportedly at issue here is distinct from the type of confidential business information in the examples discussed by Prof. Taylor (e.g., for Coca-Cola,

---

[4] In its Motion (at p. 3, n.1), the government walks back on Taylor's opinions, now stating that "the phrase 'confidential business information' [was used] as part of tracking the language in the indictment, but Professor Taylor will not be offering an opinion that information about upcoming featured NFTs was confidential business information."

supply contracts)."  Skinner Discl. ¶ II(e).  To do so, he must educate the jury on the ways in which different types of information are perceived by economists.  Indeed, if Taylor is permitted to compare—either explicitly or implicitly—the information at issue here with "confidential business information regarding the formula for Coca-Cola,"[5] Taylor Report at 3, then Professor Skinner is entitled to critique Taylor's opinion by demonstrating that the two sets of information are distinct.[6]

### C.    The Government's Discussion of Value Is Incoherent and Internally Inconsistent

This brings us to the concept of value.  Throughout the government's Motion, it frequently falls back on a common refrain: that Professor Skinner's proposed testimony is irrelevant, unreliable, or misleading because it somehow fails to grasp Taylor's point that information about soon-to-be-featured NFTs had value.  The government's point is ubiquitous:

- "Professor Skinner couches his opinion as responding to Professor Taylor, but again misses the basic point.  Professor Taylor plans to opine that information about upcoming featured NFTs *had value*…"  Motion at 18 (emphasis added).

[5] We pause to note a contradiction in the government's argument.  As referenced in n.4 *supra*, the government now insists that: (i) the phrase "confidential business information," as used throughout its Expert Disclosure, was actually meant to track the language of the Indictment, *see, e.g.,* Indictment ¶ 7 ("Information about what NFT was going to be a featured NFT was OpenSea's confidential business information…"); and (ii) Taylor "will not opine that information about upcoming featured NFTs was 'confidential business information' or try to offer a definition of that term," Motion at 3.  The government's assurances, however, ring hollow.  Here, Taylor's reference to "confidential business information" does not track the Indictment.  Rather, he is asserting that Coca-Cola's formula is in fact "confidential business information." Taylor Report at 3.  Accordingly, in comparing information regarding soon-to-be-featured NFTs to "*confidential business information* regarding the formula for Coca-Cola," *id.* (emphasis added), he necessarily instructs the jury to conclude that the NFT feature information is OpenSea's confidential business information.  And, of course, he does so: (i) without "reliably demonstrat[ing] that there is a uniform manner in which confidential … business information is understood in [academia]," Motion at 14 (quoting the government's objection to Professor Skinner's proposed testimony); and (ii) without "provid[ing] [any] basis to conclude that his understanding of 'confidential business information' tracks the legal meaning of confidential business information as developed in the case law applying the wire fraud statute," *id*. at 15 (quoting the government's objection to Professor Skinner's proposed testimony).

[6] Notably, the government also attacks the reliability of Professor Skinner's opinion by suggesting that a source he references in citation is too old (because it was published in 2010).  *See* Motion at 14-15.  This argument should be dismissed, as the 2010 and 2020 publications discuss valuation considerations using Coca-Cola as an example.  The text is thus directly relevant to his critique of Taylor's Coca-Cola analogy.

- "[Taylor's opinion] will show one way in which information about upcoming featured NFTs was *valuable*…" *Id*. at 18 (emphasis added).

- "Nor is [Taylor's opinion] that [NFT feature information] was confidential business information—just that it was *valuable*." *Id*. at 19 (emphasis added).

Clearly, Taylor is the government's valuation expert.  But in the middle of its repeated emphasis on the value of information regarding soon-to-be-featured NFTs, the government reverses course and argues that it "does not have to prove that information about upcoming featured NFTs had inherent value to OpenSea."  Motion at 20 n.3.  Here, the government's about-face is incoherent, perplexing, and plainly inconsistent with its arguments in support of Taylor's proposed testimony. If it does not need to prove that information concerning upcoming featured NFTs had value, then Taylor's testimony is wholly irrelevant and should be stricken in its entirety.  If it does need to prove value, then Professor Skinner is an appropriate rebuttal expert witness.  The palpable confusion over this issue supports the proposition that this case should be resolved in favor of lenity, *see* Section I *supra*, as the uncertainty surrounding the scope of the wire fraud statute is now on full display—to the detriment of Mr. Chastain.

### D.    Professor Skinner's Testimony Regarding "Fundamental Information" and "Informed Trading" Fits the Facts and Will Help the Jury

The notion of "information" (and what makes it valuable) is central to this case.  The government concedes as much by noticing its intent to call an expert witness to discuss the purported ways in which information concerning soon-to-be-featured NFTs may have had value to third-party purchasers, which is of course irrelevant to the task at hand, or to OpenSea.  *See* Taylor Report; *see also* Defense Motion to Exclude at 13-15.  Accordingly, it is critical for the jury to understand that, from an economic perspective, different types of information exist, not all information is treated equally in a corporate setting, and not all information is valuable to a

company.  Professor Skinner, therefore, serves as a necessary, corrective counterbalance to Taylor, who speciously concludes that information about upcoming featured NFTs was valuable to OpenSea.  *See* Taylor Report; *see also* Motion at 18.  Considered in this light, Professor Skinner's proposed testimony regarding "fundamental information" and "informed trading," and how those concepts relate to the facts of this case, will help the jury understand and evaluate the evidence.

Beginning with "fundamental information," the government's arguments in support of exclusion are unfounded.  The government has framed the conduct at issue in this case as "insider trading."  *See* Indictment ¶ 1 ("This case concerns insider trading…").  Insider trading, of course, involves the (mis)appropriation of fundamental information.[7]  Accordingly, Professor's Skinner's explanation of fundamental information is highly relevant and appropriate, as is his opinion that the information at issue in this case "differs from fundamental information as economists understand it."  Skinner Discl. ¶ II(d).  As Professor Skinner will explain, different types of information may or may not be valuable, and various factors, such as investor attention, "can affect asset prices, even in the absence of fundamental information, under certain conditions."  *Id.*  The government's remaining arguments—including that Professor Skinner's opinion is not adequately explained and that any testimony regarding fundamental information will confuse or mislead the jury—do not warrant exclusion.  Indeed, the Federal Rules do not require experts to provide "a verbatim recitation" of the testimony that they will give at trial, FED. R. CRIM. P. 16, Advisory Committee Notes to 2022 Amendment, and the Court will instruct the jury on the law.

Next, the government disingenuously claims that the concept of "informed trading" is "not relevant to the case," Motion at 19, *even though their own expert uses the economic theory of* *"informed trading"* as the basis for his claim that "information about upcoming featured NFTs

---

[7] Taylor skirts this issue by referring to it as "edge."  Taylor Report at 2-3.

was valuable,"[8]  Taylor Report at 2.  For this reason alone, government's arguments regarding the preclusion of testimony on the subject of "informed trading" should be cast aside.  Barring outright rejection, however, a closer inspection of the government's arguments will yield the same result.

Despite the government's claims to the contrary, Taylor explicitly relies on the economic theory of "informed trading" when he suggests that, if one can form "profitable investment strategies" using certain information, then: (i) that information has "value"; *and* (ii) "[t]here is a market for [it]."  *Id*. at 2-3 (citing to Grossman and Stiglitz article discussing *informed trading*). Professor Skinner, however, relying on the same article, will provide the jury with an alternative to Taylor's conclusory approach by explaining to them that "informed trading" (or trading profitably based on information) can be driven by different types of information (other than confidential business information), and that those alternatives are not necessarily "marketable."[9]

Notably, in opposing Professor Skinner's testimony on the subject of "informed trading," the government simultaneously expands the scope of Taylor's opinions.  Now, the government posits: if information regarding soon-to-be-featured NFTs "was valuable … to traders," then it was also valuable to OpenSea, because OpenSea "could have sold the information, sold the featured NFT spot, or bought the upcoming featured NFT."[10]  Motion at 18.  This position, however, is entirely speculative and illogical.  A TV network, for example, could sell commercial spots to

---

[8] Indeed, Taylor's analysis of Mr. Chastain's alleged trading profits—which, according to the government, is based on the notion that "the value of information is tied to the profit one can make by using it," Motion at 18-19—cites to an article that lays the foundations for the economic theory of "informed trading," Taylor Report at 2 (citing Grossman and Stiglitz, 1980).  If this theory "is not relevant to the case," Motion at 19, then Taylor's opinion and analyses are also irrelevant.

[9] In other words, Professor Skinner will rebut Taylor's conclusion that information concerning soon-to-be-featured NFTs had value to OpenSea, and his opinion will be tethered to relevant economic principles.

[10] The government's position, of course, directly contradicts Taylor's opinion that a company could not sell this type of information because any such sale would result in marketplace participants feeling "cheated," which would in turn result in an erosion of trust (which would, supposedly, harm the company's bottom line).  *See* Taylor Report at 4.  To frame this contradiction in another light: if information has value because it is marketable, as the government suggests, then, according to Taylor, the information at issue here cannot have value because marketing it would undermine trust.

make money, but the information about which product advertisement to run on a particular channel is not "marketable" information.   By suggesting otherwise, the government unintentionally demonstrates the relevance of Professor Skinner's testimony, which will rebut such faulty logic.

The government further objects to Professor Skinner's proposed opinion that information about soon-to-be-featured NFTs "has not been shown by Prof. Taylor to have value to OpenSea," Skinner Discl. ¶ II(f), because the opinion "is unsupported," Motion at 20.   The government, however, misses the point.   Professor Skinner will explain that Taylor has not met the requisite standards, established in the economic profession, for demonstrating that something (*i.e.*, value) exists.   And Professor Skinner will articulate that Taylor's theoretical arguments and examples, notably unsupported by empirical analysis, do not apply in the context of this case.   Nothing more is required of Professor Skinner, who bases his own opinion on relevant academic literature.   *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 29 ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." (internal quotations and citations omitted)).

Underlying the government's argument in support of precluding Professor Skinner's testimony is its concern that the jury will be confused if Professor Skinner discusses "informed trading" because that term sounds too much like "insider trading."   Motion at 19.   This position is astounding: coming out of one side of the government's mouth is the unfounded concern that Professor Skinner's testimony will interfere with the Court's ability to instruct the jury on the elements of the wire fraud statute, *see id*. at 22, and coming out the other side is the concern that Professor Skinner's testimony will interfere with the government's own ability to trumpet Mr. Chastain's conduct as "insider trading" (which has not been charged here), *see id*. at 19.   The hole digs deeper: where the government would have this Court *ignore* the concept of "insider trading"

to preclude Professor Skinner's testimony about "fundamental information," it simultaneously would have the Court *consider* the concept of "insider trading" to preclude Professor Skinner's testimony about "informed trading."  Contradictions aside, the government's argument is meritless and vastly underestimates the ability of our jury and judicial system.

### E.   Professor Skinner Reliably Responds to the Government's "Erosion of Trust" Argument and His Rebuttal Testimony Does Not Increase the Government's Burden

According to the government, Taylor will opine that an "erosion of trust" in OpenSea's marketplace "could directly harm OpenSea's business."  Motion at 21.  In the same breath, the government argues that Professor Skinner's testimony—assessing, in part, empirical data in relation to the above-noted purported erosion of trust—must be precluded because harm (to the victim) is not an element of the wire fraud statute.  *See id.*  The government's argument, however, falls flat, as it would necessarily result in the preclusion of Taylor's "erosion of trust" testimony, which is inextricably intertwined with potential economic harm to OpenSea.  *See* Taylor Report at 4 ("A reduction in trust reduces the number of transactions that are conducted, and fewer transactions lead to less transaction fees for the marketplace.").  In any event, the government's remaining arguments on this point are equally confusing and miss the mark.

First, the government argues that Professor Skinner's proposed testimony on the trust issue is unreliable and fails to respond to Taylor's "core point."  Motion at 22.  Embedded in its argument, however, is the suggestion that Taylor's analysis of the purported "erosion of trust" in OpenSea's marketplace was reliable from the outset.  To the contrary, Taylor "evidence[ed]" this alleged erosion of trust (*i.e.*, "the reaction by the digital art community to public reporting about [Mr.] Chastain's trading"), *see* Taylor Report at 4, through reference to hearsay contained within two online articles, without any indication (however flimsy) that "experts in the [] field would reasonably rely on" such evidence, FED. R. EVID. 703.  Notwithstanding Taylor's approach, the

government insists that Professor Skinner's approach—referencing empirical data in an effort to understand how OpenSea users reacted to the allegations at issue in this case—is unreliable.

The government is wrong.  Professor Skinner directly and reliably responds to Taylor's "core point" in two ways: (i) theoretically, using economic concepts contained within the academic literature that Taylor cites in support of his opinion, *see* Skinner Discl. ¶ II(g) ("I expect to opine that Prof. Taylor has not demonstrated that the literature on trust is applicable..."); and (ii) empirically, looking for measurable evidence that could suggest an erosion of trust in the relevant marketplace, *see* id. ¶ II(h) ("I have seen no reliable empirical evidence that OpenSea suffered harm from the alleged conduct, including through any purported 'erosion of trust.'").[11]

Second, propping up an abundantly transparent strawman argument (yet again), the government asserts that "Professor Skinner's core argument—that there is no evidence OpenSea was harmed—is not legally relevant." Motion at 22.  Here, the government manipulates Professor Skinner's actual opinion to achieve its desired result.  Professor Skinner will not opine "that there is no evidence OpenSea was harmed." *Id.*  Instead, Professor Skinner will rebut Taylor's internet-based hearsay conclusion regarding a purported erosion of trust in OpenSea's marketplace by informing the jury that he has seen "no reliable empirical evidence [including from Taylor]" that any such erosion occurred.  Skinner Discl. ¶ II(h).  To the extent the government objects to any other aspects of Professor Skinner's testimony on this issue,[12] such as the lack of any "event study"

---

[11] In other words, if Taylor is going to make a claim of impact, he needs to show impact.  The defense is not making a claim of impact, nor is it required to demonstrate any impact (or lack thereof) in response.  It suffices to say that Taylor *has not* shown impact, and his theorizing will be refuted by Professor Skinner.

[12] In one such instance, the government argues that Professor Skinner is "not qualified" to analyze empirical data.  Motion at 22.  This argument is frivolous.  Professor Skinner is an expert in the field of economics and accounting.  He has a Ph.D in both subjects, his research has been published in leading accounting and financial journals, and he has been qualified to testify as an expert several times over the last four years.

analysis,[13] *see* Motion at 23, its objections are misplaced—as Taylor similarly plans to opine on

an "erosion of trust" without such analysis—and properly suited for cross-examination.

### F.   Professor Skinner's Testimony Regarding Two-Sided Markets and OpenSea's Business Model Is Relevant, Reliable, and Admissible

The government concedes that Professor Skinner's testimony on two-sided markets and

OpenSea's business model "is not necessarily impermissible."  Motion at 24.  The Court should

permit Professor Skinner's testimony based on this concession, and also because the government's

alternative arguments in support of exclusion are unpersuasive.  First, OpenSea is a two-sided

market, and the jury would benefit from testimony regarding the definition and nature of two-sided

markets, as it would help them to better understand the issues in this case.  *See United States v.*

*Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (noting that "expert testimony may help a jury

understand unfamiliar terms and concepts").  Second, despite the government's objection (which

applies equally to Taylor), Professor Skinner is entitled to discuss OpenSea's business model,

based on his review of relevant records, and as it relates to the issues in this case, subject to rigorous

cross-examination.  *See* FED. R. EVID. 702 (court may admit expert testimony "in the form of an

opinion or otherwise" if it "will help the trier of fact to understand the evidence or to determine a

fact in issue.").  And third, any objection to "lack of detail" in Professor Skinner's Expert

Disclosure is not a proper basis for exclusion.  *See* FED. R. CRIM. P. 16, Advisory Committee Notes

to 2022 Amendment (disclosure rules "do[] not require a verbatim recitation of the testimony the

---

[13] Again, the government's arguments lack consistency.  On the one hand, the government argues that
Professor Skinner's testimony is inadmissible because it is too detailed (*i.e.*, Professor Skinner's application
of actual economic principles—such as "fundamental information"—to the facts of this case will confuse
or mislead the jury), *see* Motion 16-18; on the other hand, the government argues that Professor Skinner's
testimony is not detailed enough (*i.e.*, he failed to perform an "event study"), *id.* at 22.  In any event,
Taylor's purported "Promotion impact analysis," Taylor Report at 7, does not appear to meet any of the
criteria that the government sets out for an "event study" analysis; namely, it "fails to account for any
relevant variables, such as … the effect of other product-related announcements; and the general volatility
in the NFT market," Motion at 23.

expert will give at trial").  Professor's Skinner's testimony is relevant and reliable, and should be admitted as such.  Moreover, the bottom line is:  Professor Skinner's testimony directly rebuts Professor Taylor's.  If Professor Skinner's testimony is excluded, so too should Professor Taylor's.

### III.  DR. EDMAN'S TESTIMONY IS RELEVANT, RELIABLE, AND ADMISSIBLE

The government fundamentally misconstrues Dr. Edman's proposed testimony.  Despite any assertion to the contrary, Dr. Edman will testify, *inter alia*, that he has seen no evidence to support the conclusion that Mr. Chastain employed any techniques or technologies that are commonly used to obfuscate one's identity and/or crypto assets on the blockchain.  *See* Edman Disclosure ("Edman Discl.") ¶¶ I(c)(i)-(ii).  In response, the government raises another strawman argument, suggesting that Dr. Edman's testimony is inadmissible because he plans to tell the jury that Mr. Chastain did not intend to commit money laundering.  Dr. Edman will do no such thing.

Instead, he will support the proposition that the government's concealment theory is inconsistent with—and completely unsupported by—the public nature of the Ethereum blockchain and the technology that Mr. Chastain used and did not use.  *See id*.  More specifically, Dr. Edman's testimony, founded upon his extensive educational background and experience, will include, among other things, descriptions of relevant crypto-based technologies, clarifications of common crypto-laundering techniques, and explanations of common practices relating to the use of multiple cryptocurrency wallets, or wallet addresses.  *See* FED. R. CRIM. P. 16, Advisory Committee Notes to 2022 Amendment (disclosure rules "do[] not require a verbatim recitation of the testimony the expert will give at trial").

Without question, Dr. Edman possesses the requisite expertise to assist the jury in understanding the complicated technology at issue, as well as the technical flaws in the government's case, and his proposed testimony is relevant, reliable, helpful, and admissible.

**A.     Dr. Edman Is Qualified to Testify About Digital
Asset Technology and His Testimony Will Help the
Jury Understand the Technical Evidence in this Case**

Dr. Edman is qualified to testify about cryptocurrency fraud and the technology individuals

use to engage in such fraud.  With bachelor's, master's, and doctorate degrees in computer science,

and over ten years of professional experience conducting cryptocurrency and digital forensic

investigations, his credentials readily substantiate his expertise.  *See* Edman Discl. ¶ I(a)(v).

Indeed, as a Partner and Co-Founder of NAXO, a cybersecurity and investigations firm, he

frequently conducts Blockchain analysis for clients who have been victimized by cryptocurrency

scams, frauds, and hacks.  *See id*. ¶¶ I(a)(i)-(ii).  And since 2009, he has notably: (i) assisted the

United States Attorney's Office for the Southern District of New York in the investigation and

prosecution of Silk Road Defendant Ross Ulbricht by analyzing digital forensic evidence to

establish links between cryptocurrency wallets identified on Silk Road computer servers and

Ulbricht's personal cryptocurrency wallets; and (ii) provided expert consultation in computer and

network security, conducting investigations and analyses of addresses and transactions related to

different crypto-assets, including Bitcoin and Ethereum.  *See id*. ¶¶ I(a)(iii)(1)-(3).

Against this backdrop, Dr. Edman's proposed testimony will help the jury understand the

facts of this case—facts with which they are likely unfamiliar.  To be sure, one need not look

beyond the Indictment itself, which provides a snapshot of the government's case-in-chief, and

heavily relies on technical terms.  By way of brief example, the Indictment sets forth: (i) references

to "Non-Fungible Tokens," Indictment ¶ 1; "digital currency wallets," *id*. ¶ 3; "digital asset[s],"

*id*. ¶ 5; "the Ethereum blockchain," *id*. ¶ 6; "cryptocurrency," *id*.; and "Ether," *id*.; and (ii)

allegations that Mr. Chastain "transferred funds through multiple anonymous Ethereum accounts

in order to conceal his involvement in purchasing and selling the featured NFTs," *id*. ¶ 11, and

"used new Ethereum accounts without any prior transaction history in order to further conceal his involvement in the scheme," *id*.

Quite plainly, the jury will need help to decipher the meaning of these technical terms and allegations, which are not self-defining or commonly understood. *See Bilzerian*, 926 F.2d at 1294 (noting that "expert testimony may help a jury understand unfamiliar terms and concepts"). Moreover, the jury will need assistance in understanding how these allegations stand in comparison to common crypto-laundering techniques. *See, e.g., United States v. Bourne*, No. 08-CR-888, 2011 WL 4458846, *8 (E.D.N.Y. Sep. 23, 2011) (permitting expert testimony on "the means and methods used by drug traffickers to launder drug proceeds").

The government cannot seriously argue otherwise. So instead, confronted with the possibility that an opposing expert will expose the baselessness of the instant money laundering charge, the government disparages Dr. Edman's opinions as general "musings," *see* Motion at 11, and narrowly focuses on the alleged impropriety of specific words or phrases included in his Expert Disclosure to argue that his testimony should be excluded in full. As discussed below, however, there is zero basis to exclude his testimony.

**B.    Dr. Edman Will Not Opine on Mr. Chastain's Mental State, Nor Will He Tell the Jury What Result to Reach**

The government devotes several pages of its Motion to advance the notion that Dr. Edman will improperly opine on Mr. Chastain's state of mind, and encroach on an ultimate issue, when he testifies at trial. *See* Motion at 7-11. To support this argument, the government cites to Dr. Edman's first and second opinions: (1) "Defendant did not attempt to obfuscate his identity or conceal his OpenSea activity *by using a VPN or other anonymizing technology (e.g. Tor)*," Edman Discl. ¶ I(c)(i) (emphasis added); and (2) "Defendant did not attempt to obfuscate his OpenSea

activity *by laundering cryptocurrency funds through the use of mixers, non-KYC exchanges, or other techniques often associated with illicit activity*," *id.* ¶ I(c)(ii) (emphasis added).

As noted above, consistent with these opinions, and the bases for these opinions, Dr. Edman will not offer testimony regarding Mr. Chastain's state of mind. Instead, he will educate the jury on, among other things, crypto-based technologies and common crypto-laundering techniques. Further, he will explain to the jury, *inter alia*, that he has seen no evidence to support the conclusion that Mr. Chastain employed any techniques that are commonly used to launder cryptocurrency. *See id.* ¶¶ I(c)(i)-iii). The government's arguments, therefore, do not warrant exclusion.

First, the government's state of mind and ultimate issue arguments are unfounded. Here, for example, the government ostensibly emphasizes and imputes legal significance to Dr. Edman's use of the word "attempt"—ignoring that Dr. Edman's opinion is that Mr. Chastain did not attempt to obfuscate or conceal using *certain technology* (*see* Dr. Edman's use of "by using" or "through the use of" in those same sentences)—and suggests that his testimony is tantamount to an assertion that "Mr. Chastain did not intend to commit the crime of money laundering." But Dr. Edman says no such thing. Indeed, he does not suggest, nor will he testify, that Mr. Chastain lacked the requisite *mens rea* to commit the charged crime.[14]  Nor will his testimony, which is plainly and

---

[14] To the extent the Court deems the "attempt" language contained in Dr. Edman's Expert Disclosure not proper, the appropriate remedy would be to instruct that Dr. Edman not use such terminology. Preclusion of Dr. Edman's testimony is not warranted. *See United States v. Mermelstein*, 487 F. Supp. 2d 242, 267-68 (E.D.N.Y. 2007) (finding that although the proposed expert testimony "might arguably be construed to impute an intention on the defendant's behalf, [] the problem [was] merely one of semantics and [could] be easily resolved" by prohibiting testimony regarding "any direct knowledge of [defendant's] state of mind."); *In re Fosamax Products Liability Litigation*, 645 F. Sup. 2d 164, 191 (S.D.N.Y. 2009) (excluding expert testimony where expert report was "replete with such conjecture" as to defendant's state of mind; *permitting expert to opine on other topics*); *United States v. Ganesh*, No. 16 Cr. 211, 2017 WL 11439292, at *1 (N.D. Cal. Oct. 20, 2017) (granting government's preemptive request to exclude state of mind testimony; *permitting expert to opine on other topics*); *see also* FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments ("[T]he rejection of expert testimony is the exception rather than the rule").

directly connected to the technology associated with digital assets, preclude the government from arguing otherwise based on their own presentation of evidence relating to these concepts.

Second, the government's assertion that Dr. Edman's testimony impedes on an ultimate issue lacks force, as courts in this Circuit routinely admit similar testimony about actions taken, or not taken, that speak to an ultimate issue. *See, e.g., United States v. Brown*, 776 F.2d 397, 400-03 (2d Cir. 1985) (expert law enforcement witness permitted to testify that narcotics transaction took place, and that defendant acted as a steerer); *United States v. Young*, 745 F.2d 733, 753 (2d Cir. 1984) (jury permitted to rely on detective's expert testimony that "[defendant] was distributing narcotics"); *see also In re Fosamax*, 645 F. Supp. 2d at 191 (permitting ultimate issue testimony, as expert's "assessment of the reasonableness of [defendant's] conduct in light of her experience and her understanding of FDA regulations [would] be helpful to the jury").

Third, the government's argument that Dr. Edman improperly "relies directly upon the language of the statute … by invoking the concealment language … in the money laundering statute," Motion at 10, is meritless.  Dr. Edman does no such thing.  In support of its proposition, however, the government cites to *United States v. Scop*, 846 F. 2d 135 (2d Cir. 1988), which is plainly inapposite.  In *Scop*, the Second Circuit overturned the defendant's conviction on mail fraud, securities fraud, and conspiracy counts, in part because the government's expert witness impermissibly tracked the language of the relevant statutes when he testified that "certain individuals were active participants and material participants in the manipulation of [] stock.  And that [those] individuals engaged in a manipulative and fraudulent scheme in furtherance of that manipulation." *Id*. at 136, 138.  As the court observed, the expert's conscious repetition of the relevant statutory language was improper, particularly because "'manipulation,' 'scheme to

defraud,' and 'fraud' are not *self-defining terms* but rather have been the subject of diverse judicial interpretations." *Id*. at 140 (emphasis added).

Unlike *Scop*, which arose in a different procedural posture, Dr. Edman's pre-trial Disclosure does not track the concealment language of the statute.[15]   To the contrary, the Disclosure states, among other things, that the "[d]efendant did not attempt to obfuscate his identity or conceal his OpenSea activity by using a VPN or other anonymizing technology (e.g., Tor.)."   Edman Discl. ¶ I(c)(i).   Here, the government's grievance apparently lies in Dr. Edman's use of the word "conceal."   But as the Circuit has indicated, the use of "self-defining terms"—like "conceal"—would not render the proposed expert testimony improper.   *Scop*, 846 F. 2d at 140; *see also United States v. Garcia*, No. 09-cr-330, 2020 WL 2733986, at \*11 (E.D.N.Y. May 26, 2020) (expert testified "that the instant methods of money laundering are common ways to conceal or disguise drug proceeds").

### C.    Dr. Edman's Testimony About Common Practices Among Sophisticated Cryptocurrency Users Is Highly Relevant, Helpful, and Admissible

The government continues by arguing that Dr. Edman's testimony regarding common practices among sophisticated cryptocurrency users is unhelpful, irrelevant, and risks confusing the jury.   *See* Motion at 12.   And as it did before, it again fights against a flawed premise.   Initially, the government suggests, through citation to *United States v. Nektalov*, 03 Cr. 828 (PKL), 2004 WL 1469487, at \*3-4 (S.D.N.Y. June 30, 2004), that Dr. Edman will opine that Mr. Chastain's conduct did not constitute money laundering.   *See* Motion at 12.   Our response, however, is as follows: Where in his expert disclosure does he say that?   Clearly, he does not.

---

[15] To prevail on a theory of concealment money laundering, the government must prove, in pertinent part, that the alleged perpetrator "kn[ew] that the [alleged financial] transaction was designed in whole or in part … to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of [the] unlawful activity."   18 U.S.C. § 1956(a)(1)(B)(i).

Next, the government argues that Dr. Edman suggests that "because various activities have a supposedly non-criminal application, Chastain must not have engaged in criminal behavior." *Id*. Again, where does he say that?  Here, to the best of our understanding, the government appears to be arguing that Dr. Edman will suggest to the jury that the alleged crypto transfers at issue in this case were "non-criminal."  Wrong.  Dr. Edman will testify, *inter alia*, that he has seen no evidence to support the conclusion that Mr. Chastain employed techniques that are commonly used to obfuscate one's identity and/or crypto-assets on the blockchain.  The government is free to cross-examine Dr. Edman on this issue and argue otherwise to the jury.

Finally, in yet another instance of hyper-focusing on select words and phrases in support of its effort to exclude Dr. Edman's testimony, the government argues that it would be improper for Dr. Edman to testify as to "security and privacy best practices."  Motion at 12.  Dr. Edman's disclosure, however, states the following:

1.  Besides security best practices, sophisticated cryptocurrency users may use multiple wallet addresses for storing crypto-assets for privacy reasons … [because] blockchain transactions are inherently public.

2.  Besides security and privacy best practices, sophisticated cryptocurrency users may use multiple wallet addresses to segregate crypto-assets for organizational or accounting reasons, similar to how some might have separate bank accounts or credit cards for different purposes.

Edman Discl. ¶¶ I(c)(iii)(2)-(3) (emphasis added).  To the extent applicable, and despite the government's incorrect argument that courts in this district have precluded expert testimony concerning industry "best" practices,[16] testimony relating to "ordinary practices" in an industry is appropriate in fraud cases.  *See Bilzerian*, 962 F.2d at 1295 ("[T]estimony concerning the ordinary

---

[16] None of the cases cited by the government preclude expert testimony on industry "best" practices.  Rather, they preclude expert testimony on general industry practices because such practices were, among other things, irrelevant to key issues in those cases.  Here, the manner in which digital wallet addresses are commonly used is highly relevant in light of the instant money laundering allegations.

practices in the securities industry may be received to evaluate a defendant's conduct against the standards of accepted practice."). Moreover, the jury should be permitted to hear testimony about how and why different addresses may be created and utilized within a single digital currency wallet. Such information is particularly relevant here because the government's evidence will focus on this exact topic,[17] which is surely beyond the scope of everyday knowledge. The government's ultimate concern that this testimony might shift its burden of proof is unfounded, and in any event, easily alleviated by the Court's instruction to the jury on the elements of the money laundering statute.

The government's entire position with respect to Dr. Edman's proposed testimony is disconcerting. On the one hand, it attempts to strike Dr. Edman's testimony—regarding highly-relevant discussion on relevant crypto technology—in full because it deems certain nit-picked words and phrases improper; while on the other hand, it attempts to block a full line of defense because it knows that Dr. Edman's testimony has the potential to expose the factual and fatal flaws underlying its money laundering theory. The government's motion should be denied. Dr. Edman's testimony is relevant, reliable, and helpful to the jury, and this Court should allow him to testify.

## CONCLUSION

For the foregoing reasons, Mr. Chastain respectfully submits that this Court should deny the government's Motion to Exclude the Testimony of Dr. Matthew Edman and Professor Douglas Skinner.

---

[17] The government intends to present this testimony through non-expert law enforcement witnesses. The defense reserves its right to object to such testimony at trial because those witnesses have not been designated as experts with appropriate Rule 16 disclosures.

Dated:  New York, New York
        April 11, 2023                          Respectfully submitted,

                                                GREENBERG TRAURIG, LLP

                                                By: */s/ David I. Miller* _____.
                                                David I. Miller
                                                Daniel P. Filor
                                                Nicholas T. Barnes
                                                Charles J. Berk
                                                One Vanderbilt Avenue
                                                New York, NY 10017
                                                Telephone: (212) 801-9200
                                                Facsimile: (212) 801-6400