UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :

UNITED STATES OF AMERICA          :

                                                 :

     - v. -                             :                 22 Cr. 305 (JMF)

                                                 :

NATHANIEL CHASTAIN,           :

                                                 :

                         Defendant.      :

                                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTIONS *IN LIMINE*

 

 

                                             DAMIAN WILLIAMS
                                             United States Attorney
                                             Southern District of New York
                                             One St. Andrew's Plaza
                                             New York, New York 10007

Thomas Burnett
Allison Nichols
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................... 1

APPLICABLE LAW ............................................................................................................... 1

    A.     Rules 401-403 ................................................................................................. 1

    B.     Direct Evidence and Rule 404(b)..................................................................... 2

    C.     Rule 1006 ........................................................................................................ 3

ARGUMENT ......................................................................................................................... 3

I.     The Court Should Permit the Government to Describe Chastain's Conduct as Insider Trading and Front-Running ...................................................................................... 3

II.    The Court Should Deny the Defendant's Motion to Preclude the Government's Use of Legally Accurate Statements in its Jury Addresses ...................................................... 6

III.   Evidence of the Defendant's Compensation Is Admissible................................................ 9

IV.   Evidence the Defendant Shared Confidential Information Related to a Larva Labs Project Is Relevant and Admissible as Direct Evidence and under Rule 404(b) ......................... 11

    A.     Relevant Facts.................................................................................................. 12

    B.     Discussion ........................................................................................................ 13

V.    The Motion to Restrict Testimony About Upcoming Featured NFTs Must Be Denied... 15

    A.     Factual Background ......................................................................................... 15

    B.     Discussion ........................................................................................................ 16

VI.   The Government's Summary Charts Are Relevant, Admissible, and Helpful to the Trier of Fact ................................................................................................................................ 19

    A.     Summary Charts Using the Word "Anonymous" or Using a Faceless Silhouette Are Admissible ................................................................................................ 20

    B.     Summary Charts Depicting Wallets Are Admissible ......................................... 22

    C.     The Summary Chart Referencing "Insider Trading" Will Be Revised................. 23

    D.     The Conversion of Ethereum to U.S. Dollars in the Summary Charts Is Proper . 23

    E.     The Chart Referencing the Defendant's Compensation Is Admissible ................ 25

CONCLUSION........................................................................................................................ 26

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Page</u>

## Table of Authorities

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 2009 U.S. Dist. LEXIS 89183 (S.D.N.Y. Sep. 28, 2009) ........................................................................................................................................ 6

*Chiarella v. United States*, 445 U.S. 222 (1980) ...................................................................... 7

*Dirks v. SEC*, 463 U.S. 646 (1983) ........................................................................................... 7

*Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) .................. 6

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558 (S.D.N.Y. 2017) .......... 6

*SEC v. Payton*, 97 F. Supp. 3d 558 (S.D.N.Y. 2015) ................................................................ 8

*Salman v. United States*, 137 S.Ct. 420 (2017) ....................................................................... 7

*United States v. Bulgin*, 563 F. App'x 843 (2d Cir. 2014) ...................................................... 10

*United States v. Cadet*, 664 F.3d 27 (2d Cir. 2011) ............................................................... 14

*United States v. Caputo*, 808 F.2d 963 (2d Cir. 1987) ........................................................... 14

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) ............................................................ 2, 3

*United States v. Ferguson, No. 06 Cr. 137* (CFD), 2007 WL 4240782 ................................... 11

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ....................................................... 1, 2

*United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988) .................................................... 19, 20

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................................. 8

*United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) ................................................................... 3

*United States v. Hoey*, 725 F. App'x 58 (2d Cir. 2018) .......................................................... 10

*United States v. Inniss, No. 18-CR-134* (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ............ 11

*United States v. Jamil*, 707 F.2d 638 (2d Cir. 1983) .............................................................. 13

*United States v. Logan*, 250 F.3d 350 (6th Cir. 2001) ........................................................... 10

*United States v. Massino*, 546 F.3d 123 (2d Cir. 2008) .......................................................... 15

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ......................................................... 15

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ........................................................... 1-2

*United States v. Mostafa*, 16 F. Supp. 3d 236 (S.D.N.Y. 2014) .............................................. 13

*United States v. Parnas, No. 19 Cr. 725* (JPO), 2022 WL 669869 (S.D.N.Y. Mar. 7, 2022) .................. 3

*United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) ...................................................... 19

iv

*United States v. Peters*, 543 F. App'x 5 (2d Cir. 2013) ........................................................... 10

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ......................................................... 10

*United States v. Quinones*, 417 F. App'x 65 (2d Cir. 2011) ....................................................... 1

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ............................................................. 10-11

*United States v. Riley*, 638 F. App'x 56 (2d Cir. 2016) ........................................................... 25

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) ............................................................. 2

*United States v. Thorpe*, 166 F.3d 1216, at *6 (6th Cir. 1998) ............................................... 19

*United States v. Vaccarelli, No. 18 Cr. 92* (JBA), 2020 WL 1329695 (D. Conn. 2020) ................ 13-14, 2

*United States v. Weiss*, 914 F.2d 1514 (2d Cir. 1990) ............................................................. 10

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ................................................................. 3

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ........................................................... 14

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in opposition to the motions *in limine* filed by defendant Nathaniel Chastain.  Chastain seeks pretrial rulings precluding the Government from using "insider trading," "front running," or "similar terms" to describe Chastain's conduct (Dkt. 81); precluding the Government from describing the NFT marketplace as a "level playing field" or "similar notion" (Dkt. 74); precluding evidence of his compensation (Dkt. 68); precluding evidence that he shared OpenSea's confidential information relating to an undisclosed project by creative technology company Larva Labs (Dkt. 65); precluding evidence relating to the manner in which third-party purchasers might use information concerning upcoming featured NFTs (Dkt. 76); and precluding certain summary exhibits (Dkt. 78).  These motions should be denied.

## APPLICABLE LAW

### A.      Rules 401-403

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401.  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  So long as evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence," it is relevant. *United States v. Quinones*, 417 F. App'x 65, 68 (2d Cir. 2011).  Under Rule 403, a court may exclude relevant evidence only "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see also United States v.*

*Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

### B.    Direct Evidence and Rule 404(b)

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 942. State of mind evidence is also admissible as direct evidence of the charged crimes. *See e.g.*, *United States v. Vaccarelli*, No. 18 Cr. 92 (JBA), 2020 WL 1329695, at *7 (D. Conn. 2020) (defendant's knowledge and evasion of his employer's rules was "highly relevant to his mental state in committing the charged fraud"), *aff'd,* No. 20-3768-CR, 2021 WL 4805218 (2d Cir. 2021) (affirming district court's ruling that such evidence was direct evidence of the charged crimes).

Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act' evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). To determine admissibility under Rule 404(b) (in conjunction with Rule 403), the Court should consider whether (1) the evidence is offered for a proper purpose; (2) the evidence is relevant to a disputed issue; and (3) the probative value of the evidence is substantially outweighed by its

prejudicial effect. *Curley*, 639 F.3d at 50. In addition, the Court should give an appropriate limiting instruction to accompany any such evidence, if the defense so requests. *Id.*

### C.    Rule 1006

Rule 1006 of the Federal Rules of Evidence permits "use [of] a summary [or] chart . . . to prove the content of voluminous writings, recordings, or photographs that cannot conveniently be examined in court." Fed. R. Evid. 1006.   Summary charts are permitted "to draw the jurors' attention to particular evidence culled from a voluminous set of records," *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003), and are routinely approved of in "complex trials," *United States v. Ho*, 984 F.3d 191, 209-210 (2d Cir. 2020).   Provided nothing in the charts is "false," the fact that it may "support the government's narrative" of the case is not a basis for exclusion.   *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022) (citing *Ho*, 984 F.3d at 209-10).

### <u>ARGUMENT</u>

### I.    The Court Should Permit the Government to Describe Chastain's Conduct as Insider Trading and Front-Running

Repackaging an argument he has made twice before, in connection with his motion to dismiss (Dkt. 19) and motion to strike surplusage (Dkt. 31), Chastain seeks to preclude the Government from using the term "insider trading" to describe his conduct at trial.  (Dkt. 81).  He also seeks to preclude the term "front running" and unspecified "similar terms."   (*Id.* at 3).[1] Because the terms "insider trading" and "front-running" aptly describe the conduct that will be proven at trial, they are relevant and useful descriptors that will neither confuse the issues nor

---

[1] Page numbers refer to those in the ECF-generated headings.

mislead the jury.  Nor has Chastain demonstrated that the use of such terms will impart any unfair prejudice.  The motion should be denied.

At the core of Chastain's argument is the fact that the term insider trading has, historically but not exclusively, been applied in the context of the securities laws.  But it does not follow, and Chastain makes no effort to meaningfully draw the connection, that the term cannot apply to trading of assets that do not qualify as securities.  Rather, the phrase "insider trading in [NFTs]" is an appropriate descriptor for the crime alleged in the Indictment and expected to be proven at trial. Chastain is accused of improperly using confidential, non-public (or "inside") information about an asset to buy and then sell (or "trade") that asset on a public market.  The moniker "insider trading" aptly captures that conduct.  Trading in securities is not expected to arise at trial, and therefore there is little danger of confusion about whether Chastain was trading a different type of asset rather than NFTs.

As the Government explained in its opposition to Chastain's previous motions, there is no textual basis in the wire fraud statute for Chastain's theory that insider trading must be limited to trading in securities, and that theory is refuted by *United States v. Carpenter*, where the Supreme Court upheld an insider trading conviction under the wire-fraud statute, rather than the securities fraud laws, because the Justices could not agree whether the scheme was "in connection with a purchase or sale of securities."  484 U.S. 19, 24 (1987); *see* Dkt. 23 at 6-11 (responding to Chastain's insider trading theory).

There is also nothing inherent in the phrase "insider trading" that makes it inapplicable to the facts expected to be established at trial.  There is no federal "insider trading" statute.  As explained in the Government's opposition to the motion to dismiss, the term is, instead, a shorthand for several different theories of fraud (e.g., "classical" and "misappropriation"), that are prohibited

under a handful of different statutes in Title 7, Title 15, and Title 18.  The label is often applied, without concern that its literal meaning could cause confusion or undue prejudice, to factual situations less obviously described by the term than Chastain's conduct here: in misappropriation cases and cases involving tips, for instance, no "insider" is actually "trading."  Nonetheless, it is useful for identifying a particular species of misconduct: namely, crimes in which someone with non-public information about an asset improperly uses that information to trade the asset or helps someone else trade it.

Chastain is therefore wrong when he asserts that insider trading cannot describe his conduct because his conduct did not involve securities trading.  Nor has he established that the use of the term would be unduly prejudicial.  The Court's previous rulings apply with equal force to the latest iteration of Chastain's argument.  As the Court noted in denying the motion to strike surplusage:

> First, to a large extent, defendant's motion is premised on his argument pressed in the motion to dismiss, that by proceeding on an insider trading theory of wire fraud, the government would have to prove a nexus to securities or commodities. For the reasons I explained in my written opinion a few days ago, that argument is without merit. Beyond that, I disagree with defendant's contention that the term "insider trading," particularly when used in context, as it would be in any trial, is so loaded or inflammatory as to be prejudicial. Its classic meaning, notwithstanding -- and as I noted in my written opinion, I acknowledge that it has a classic meaning -- the term is not an inapt description of the facts of this case, and any concerns about either negative pretrial publicity or potential confusion at trial can and would be addressed through a combination of appropriate voir dire and jury instructions.

(Oct. 27, 2022 Conf. Tr. 2-3).  Chastain does not provide any rationale for the Court to revisit its prior assessment that insider trading "is not an inapt description of the facts of this case," that the term when appropriately contextualized is not "so loaded or inflammatory as to be prejudicial," or that "any concerns about either negative pretrial publicity or potential confusion at trial can and would be addressed through a combination of appropriate voir dire and jury instructions."  (*Id.*).

Instead, to support his argument that the term insider trading is inflammatory and unduly prejudicial, Chastain cites to three civil cases that have no application here. (Dkt. 81 at 5). In one, the court excluded the use of certain terms due to concern that the jury would unfairly be given the misimpression that a party to the civil litigation had been accused of committing a crime. *See Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 193 (S.D.N.Y. 2008) ("use of the term 'inside information' may lead a juror to believe that the Schneiders engaged in improper or illegal conduct"). In the other two, the court excluded certain inflammatory terms not at issue here. *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) (prohibiting references to claim holders as "vulture funds" or "treasure hunters"); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 2009 U.S. Dist. LEXIS 89183, at *20 (S.D.N.Y. Sep. 28, 2009) (prohibiting reference to the term "tax haven" as irrelevant and inflammatory). The defendant cites to no criminal case in which a court found that the term "insider trading" was unfairly prejudicial as applied to charged criminal conduct in which the defendant stood accused of improperly using confidential, non-public information about an asset to buy and then sell that asset on a public market.

As the Court has already noted, appropriate questions during voir dire are more than adequate to address Chastain's remaining concerns about pretrial publicity or a supposedly "widespread sentiment in society" about appropriate levels of regulation. (Dkt. 81 at 6). The motion should be denied.

## II. The Court Should Deny the Defendant's Motion to Preclude the Government's Use of Legally Accurate Statements in its Jury Addresses

The defendant argues that the Government should be precluded from using expressions like "unfair advantage" or "illegal edge" to describe the defendant's use of confidential business information to trade and from referring to the NFT marketplace in which he traded as one that

should have operated as a "level playing field." (Dkt. 74). The defendant argues that the Government's use of such terms in its jury arguments will improperly suggest that the law requires markets to operate with perfect parity of information, a position that has been rejected by the Supreme Court. *See Chiarella v. United States*, 445 U.S. 222, 232-33 (1980). Contrary to the defendant's arguments, there is no risk of jury confusion. The Court will instruct the jury that the charged offense is the misappropriation of OpenSea's confidential business information. But the fact that fact that the defendant could use his employer's information to obtain an advantage in the market for NFTs that he was not entitled to have is powerful evidence of his motive to violate the law and of the wrongfulness of that conduct. The Court should therefore reject the defendant's invitation to use this strawman argument to impose restrictions on the Government's use of relevant, legally accurate descriptions of his conduct in jury addresses.

The Government routinely—and properly—asserts that when a defendant illegally obtains material, non-public information, he gains an illegal and unfair advantage prohibited by federal law. (Dkt. 74 at 1-2). The Government's point is not that it is illegal for there to be any information disparity in a market, and the Government does not intend to make such an argument here.

Rather, the point is to make clear that trading on certain types of information—here, confidential business information—provides an illegal advantage. *See, e.g., Salman v. United States*, 137 S.Ct. 420, 423 (2017) ("The tippee acquires the tipper's duty to disclose or abstain from trading if the tippee knows the information was disclosed in breach of the tipper's duty, and the tippee may commit securities fraud by trading in disregard of that knowledge."); *Dirks v. SEC*, 463 U.S. 646, 661 (1983) ("In determining whether a tippee is under an obligation to disclose or abstain, it this is necessary to determine whether the insider's 'tip' constituted a breach of the insider's fiduciary duty."). Prior opening statements in similar cases have properly addressed

concepts of fairness because insider trading is nothing more than "a form of cheating, of using purloined or embezzled information to gain an unfair advantage." *S.E.C. v. Payton*, 97 F. Supp. 3d 558, 559 (S.D.N.Y. 2015); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (Rakoff, J.), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As people have come to understand that insider trading is not only a sophisticated form of cheating but also a fundamental breach of trust and confidence, they have increasingly internalized their revulsion for its commission.").

Responding to a similar motion in *United States v. Pinto-Thomaz*, Judge Rakoff ruled that "the Government is allowed to point out that the motivation for insider trading in this kind of case is to give an advantage that otherwise would not be available to the tipper and tippees. That I think clearly is relevant to motivation." No. 18 Cr. 579 (S.D.N.Y. Apr. 16, 2019) (Dkt. 127 at 5). Judge Rakoff further noted that it would be "fair for Government counsel to point out, in effect, that the reason why someone might misappropriate information and give it to a tippee or breach a fiduciary duty and give information to a tippee is because the information gives the person who trades on it an unlawful advantage." (*Id.* at 6). The Government intends to make similar, legally proper arguments at trial here and does not intend to suggest, in openings or otherwise, that the law requires "equal information" among all participants in a market.

Furthermore, in this case any notion that OpenSea should or aspired to operate as a "level playing field" in which employees or other insiders are not advantaged over other users comes from OpenSea itself, not any gloss from the Government. In a blog post dated September 16, 2021—before the Government's investigation began—announcing Chastain's resignation for the conduct at issue in this trial, one of the co-founders of OpenSea wrote: "As a marketplace at the forefront of this new space [referring to NFTs], we want OpenSea to be a level playing field for buyers, sellers, creators, collectors, developers, and those who are new to the space." OpenSea,

*Our Commitment to the OpenSea Community* (Sept. 16, 2021), available at https://opensea.io/blog/announcements/employee-information-use-at-opensea/.          OpenSea employees may express similar sentiments during trial testimony.  Evidence that OpenSea's co-founders considered Chastain's actions to compromise the values and objectives they had for the business, including that it should operate as a "level playing field" for all users irrespective of their background or experience, is just another way of saying that OpenSea considered the information Chastain appropriated to be "confidential business information" belonging to OpenSea and Chastain's conduct to be a breach.  Witnesses at trial should be free to express these concepts in words and language natural to them, and the Government should likewise be able to make arguments to the jury in summation based on witness's testimony and opening statements that reasonably preview what the evidence is expected to show.  No *in limine* restriction on these word choices is required, and the defendant's motion should be denied.

## III.    Evidence of the Defendant's Compensation Is Admissible

The Government intends to offer evidence relating to the defendant's OpenSea compensation and the money he made front-running NFTs, which will include his OpenSea employment contract and charts reflecting analysis of his profit from tansacting in featured NFTs. The Government likewise intends to offer evidence seized from Chastain's phone, including Google searches for "living on 160k in nyc" and handwritten notes of his goals, including that he wants "1 million from NFTs" and "10 million (minimum) from OpenSea."  The evidence will show that the money the defendant made from insider trading was meaningful to him, that he had goals for how much to make from trading NFTs, and that he was concerned about living on his legitimate income.  It is thus admissible to show his motive to engage in the charged scheme.

Courts routinely admit such motive evidence. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of the defendant's substantial wealth and compensation—

over $200 million in two years—properly admitted, including because it was "relevant to [the defendant's] motive to protect his reputation and that of [his company]") (collecting cases); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (evidence of defendants' income "relevant to demonstrate that financial gain was the motive for the crime charged") (cited in *Quattrone*); *United States v. Weiss*, 914 F.2d 1514, 1523-24 (2d Cir. 1990) (evidence of defendant's wealth was not prejudicial when Government argued that it showed defendant's motive to commit Medicare fraud) (cited in *Quattrone*); *United States v. Bulgin*, 563 F. App'x 843, 846 (2d Cir. 2014) ("we have upheld a district court's decision to allow evidence of monetary gain when a defendant is on trial for a crime in which pecuniary gain is the usual motive") (internal quotation marks omitted); *United States v. Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) ("The record shows . . . that the district court appropriately limited the prosecution's references to the defendant's lifestyle, and that some evidence of the defendant's wealth was relevant to the question of motive.").

Contrary to the defendant's suggestion that the evidence will impermissibly suggest a distasteful affluence, evidence of the defendant's compensation level compared to what he hoped or wanted to earn will show his incentive to engage in the charged conduct. Evidence of financial motivation is often particularly probative in fraud cases, and courts therefore routinely consider such evidence more probative than prejudicial. *See, e.g.*, *United States v. Hoey*, 725 F. App'x 58, 60-61 (2d Cir. 2018) (affirming, in fraud case, the district court's admission of evidence of the defendant's personal spending habits because such evidence was "highly probative" of the defendant's motive for taking the money); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981) ("a defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial"); *United States v. Inniss*, No. 18-CR-134 (KAM), 2019 WL 6999912, at *11 (E.D.N.Y. Dec. 20, 2019) ("In a number of cases within the Second Circuit, courts have admitted

evidence of financial difficulty on the grounds that it is relevant and not unduly prejudicial") (citing cases); *United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782, at *1 ("Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud.").

Here, evidence of the defendant's compensation, and evidence suggesting his dissatisfaction with it and desire for a significantly higher realization both from OpenSea and from his trading in NFTs, is particularly relevant in light of the total amount he gained during the fraudulent scheme, just over $57,000. That sum, while not insignificant in isolation, is most relevant—and therefore most probative of the defendant's motive—when considered in the context of his salary, which started at $135,000 when he joined OpenSea in January 2021. In other words, the defendant's ill-gotten gains amounted to somewhere between four to six months' worth of legitimate employment, and the evidence will show that during the month of August 2021, shortly before the defendant got caught, his profits from trading featured NFTs were approximately three times his pre-tax OpenSea salary. Accordingly, evidence of the defendant's compensation plan, and notes and searches from his phone relating to his salary and wealth, are relevant and admissible at trial. The Government will, however, limit its proof of compensation to the defendant's salary and evidence set forth above.

## IV.    Evidence the Defendant Shared Confidential Information Related to a Larva Labs Project Is Relevant and Admissible as Direct Evidence and under Rule 404(b)

The Government intends to offer evidence that, in March of 2021, the defendant disclosed a confidential NFT project to a friend who did not work at OpenSea so that the friend could benefit from the launch of the as-yet undisclosed project. Chastain learned about the project as a result of his employment at OpenSea, and he cautioned the friend twice against revealing that Chastain had shared the information with him. This evidence is admissible as direct evidence of the charged

crimes, including evidence of the defendant's access to confidential information obtained as part

of his employment at OpenSea, the defendant's relationship with and duties to OpenSea, and his

understanding of a duty to keep such information confidential.  In the alternative, the evidence the

evidence is admissible under Federal Rule of Evidence 404(b), as proof of the defendant's motive,

opportunity, intent, knowledge, and absence of mistake or accident.

### A.    Relevant Facts

The defendant shared confidential information related to an upcoming project by creative

technology company Larva Labs with his friend Chris Battenfield before the project had been

publicly released.  The defendant learned of the confidential project through his work at OpenSea.

The evidence of this disclosure will include excerpts from a text message conversation between

the defendant and Mr. Battenfield recovered from the defendant's phone, including the following

messages on or about March 17, 2021:

| | |
|---|---|
| Chastain: | Blanket statement that this is information that can't leave this conversation: |
| Chastain: | Larva Labs is going to release a 3D project soon and airdrop to all current Punk holders. So keep at least 1 punk[2] |
| Chastain: | Not sure on the timeline just yet |
| Chastain: | Please don't broadcast publicly because I'm not sure if they've told many people outside of OpenSea (they asked one of our engineers to audit the contract) |
| Battenfield: | I definitely will keep it to myself. I may sell a couple more but plan on holding many of them into the future. |

---

[2] The evidence will show that "Punk" refers to an NFT collection by Larva Labs.  The disclosure that Larva Labs will soon release a project to "all current Punk holders" and the advice to "keep at least 1 punk" therefore means that collectors who own at least one of the "Punk" NFT series stand to benefit from the upcoming release of the new project.

**B.      Discussion**

Contrary to the defendant's narrow and cribbed reading of what may constitute direct evidence (Dkt. 65), proof that the defendant disclosed the non-publiac Larva Labs project is part of the same transaction and is inextricably intertwined with the charged offense insofar as it relates to a breach of the same confidentiality agreement he had entered with the same employer at issue in this case.  Moreover, evidence that Chastain previously breached his confidentiality agreement with OpenSea—and appeared to understand that he was breaching that agreement—is admissible as direct evidence of his mental state.

The Government must establish that the defendant participated in a scheme to defraud OpenSea of its confidential business information and that he acted knowingly and with intent to defraud.  Evidence that he obtained and shared information he learned through his employer, which he believed to be confidential ("[b]lanket statement that this is information that can't leave this conversation"; "Please don't broadcast publicly because I'm not sure if they've told many people outside of OpenSea") is direct proof of his knowledge and intent.  *See e.g.*, *United States v. Mostafa*, 16 F. Supp. 3d 236, 256 (S.D.N.Y. 2014) (defendant's prior statements supporting bin Laden admissible as direct evidence of charged crime of conspiring to provide material support for terrorists probative of his state of mind, including motive, knowledge, and intent); *see also United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983) (recognizing substantial probative value of tape recording that provided direct evidence of knowledge element of crime charged); *United States v. Vaccarelli*, No. 18 Cr. 92 (JBA), 2020 WL 1329695, at *7 (D. Conn. 2020) (defendant's knowledge and evasion of his employer's rules was "highly relevant to his mental state in committing the charged fraud"), *aff'd*, No. 20-3768-CR, 2021 WL 4805218 (2d Cir. 2021) (affirming district court's ruling that such evidence was direct evidence of the charged crimes).

The Government expects one of the defenses at issue in the case will be an argument that OpenSea's confidentiality policy was unclear.  The Larva Labs evidence is thus relevant and highly probative direct evidence of the defendant's knowledge and understanding that he had a duty to keep OpenSea's information confidential.

In the alternative, the evidence the evidence is admissible under Federal Rule of Evidence 404(b), as proof of the defendant's motive, opportunity, intent, knowledge, and absence of mistake or accident, and is particularly salient as to intent and knowledge for the reasons already discussed.

Prior act evidence is admissible to demonstrate intent "[w]here a defendant claims that his conduct has an innocent explanation." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). "Where intent to commit the crime charged is clearly at issue"—i.e., where it is an element of the crime—"evidence of prior similar acts may be introduced to prove that intent." *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987).  "Evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent." *United States v. Cadet*, 664 F.3d 27, 32-33 (2d Cir. 2011).  Because intent to defraud is an element, evidence tending to show Chastain's understanding that non-public information he obtained through OpenSea should be kept confidential is relevant and admissible.  Moreover, contrary to the defense's suggestion that proving the confidentiality of the Larva Labs project will be unduly time consuming or distracting (Dkt. 65 at 9-10), the relevance of the Larva Labs evidence turns on the defendant's *belief* that the information was confidential and his exhortations to his friend not to further disclose it.

The evidence is also relevant and admissible as proof of motive, as it demonstrates that Chastain knew and understood that OpenSea's confidential information had value to others outside of the company and that he—and his friends—could utilize such information for their own

monetary benefit.  The Larva Labs evidence further demonstrates opportunity, as it shows Chastain had access to and was trusted with confidential information as part of his employment.  The Larva Labs evidence is thus relevant and admissible.

Nor is there any meaningful concern about unfair prejudice to Chastain from admission of the evidence.  Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008).  Prejudice is "not likely to be great" where the prior bad acts "are not especially worse or shocking than the transactions charged." *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009).  Here, Chastain's disclosure of the Larva Labs project to his friend so that his friend could be sure to hold on to a "Punk" NFT and thus benefit from the release of the upcoming Larva Labs project is not worse than his conduct secretly buying soon-to-be featured NFTs to realize their increase in value after they were featured. The defendant's motion to preclude the evidence should be denied.

## V. The Motion to Restrict Testimony About Upcoming Featured NFTs Must Be Denied

Chastain moves to preclude "any and all reference, or evidence relating to, the manner in which third-party purchasers might use or perceive information concerning upcoming featured NFTs."  (Dkt. 76 at 1).  This proposed prohibition would stop the Government from establishing important facts about the case, including proving the defendant's motive for misappropriating OpenSea's confidential business information; explaining why it was important for OpenSea to control information about upcoming featured NFTs; and, if necessary, establishing some of the ways in which that information had economic value, including to OpenSea.  The motion should be denied.

### A.    Factual Background

At trial, the Government anticipates introducing testimony about why people buy and sell NFTs, about factors that contribute to an NFT's value increasing, and about the significance of an

NFT being promoted by a platform like OpenSea—both in the featured NFT section and otherwise—for the value of the promoted NFT.

This testimony is likely to come in multiple forms.  One form is through the expert testimony of Professor Dan Taylor.  He will explain that, from an economic perspective, information about upcoming featured NFTs had value because it allowed whoever possessed that information to predict increases in the price of those NFTs.  He will also testify that, again from an economic perspective, that OpenSea had an economic interest in controlling that information, rather than selling or trading on it, because the company used it for a business purpose and was exposed to suffering a loss of trust in the marketplace if customers perceived they might be taken advantage of by people with inside information.

Other witnesses are also likely to testify about why people buy and sell NFTs and some of the factors that contribute to the value of NFTs.  The Government expects that NFT creators and traders will explain why they make, sell, and buy NFTs.  The Government also expects that these witnesses, and OpenSea employees, will explain that having an NFT promoted by a platform like OpenSea can significantly increase the interest in, and price of, the featured NFT, as well as others by the same artist.  OpenSea employees, in particular, will also explain that the company committed resources to promoting NFTs because helping artists and promoting NFTs generally was good for OpenSea's business.  Finally, witnesses will also testify that, from their experience at OpenSea or monitoring OpenSea's homepage, being featured tended to increase the value of the featured NFT, and so information about what was going to be featured was valuable.

### B.    Discussion

The broad motion to exclude "any and all reference, or evidence relating to" the ways "third-party purchasers might use or perceive information concerning upcoming featured NFTs," (Dkt. 76 at 1), would keep out relevant evidence that is important to the Government's case.

First, the defendant's motion would prevent the Government from introducing evidence that is necessary for the jury to understand the basic issues in the case.  NFTs are not a widely purchased asset class.  There is a good chance members of the jury will have never heard of an NFT, let alone know why people buy and sell them.  Because the jury needs to have some understanding of the world of NFT trading to grasp the basic context for the case, the Government needs to introduce testimony that not only explains what NFTs are, but also helps the jury grasp why people buy and sell them and what factors drive their value.  This necessarily includes introducing evidence about how promotions—like the featured NFT section—can increase the value of NFTs, and why information about upcoming promotions is valuable for NFT traders.

Second, the defendant's motion would prevent the Government from introducing essential evidence about the defendant's motive.  Because the defendant is accused of misappropriating OpenSea's information about upcoming featured NFTs, the Government is entitled to introduce evidence showing *why* the defendant would want to misappropriate that information.  The reason, of course, is because that information was valuable: it could be used to predict what NFTs would increase in price, allowing the defendant to make an essentially risk-free profit in his NFT trading. It follows that the Government should be allowed to introduce testimony about why the information was valuable.  Otherwise, the jury will not fully understand the motive for the crime.

Third, evidence that information about upcoming NFTs was valuable is also important for helping the jury understand some of OpenSea's relevant business decisions.  The testimony will help the jury understand why OpenSea had employees sign confidentiality agreements prohibiting the use of confidential information for non-business purposes.  The information—like other confidential information at OpenSea—was valuable, so an employee might be tempted to misuse it, prompting the need to protect the information.  Separately, the boost that featured NFTs received

was one of the business reasons that OpenSea created the Featured NFT section and promoted NFTs generally.  Featuring NFTs helped OpenSea garner goodwill among artists and grow interest in, and the value of, NFTs generally, all of which ultimately helped grow OpenSea's marketplace. The jury will need to understand that dynamic to grasp the OpenSea's business decisions.

The relevance of this evidence is not "substantially outweighed" by the danger of confusing or misleading the jury.  Fed. R. Evid. 403.  The premise of the defense motion is that evidence about the value of information about upcoming featured NFTs for people who trade NFTs will confuse the jury about whether such information had inherent economic value to OpenSea.  (Dkt. 76, at 4-5.)  As explained previously, there is no need to prove that the information had inherent economic value to OpenSea (Dkt. 62, at 7-11), so this argument is legally misplaced.  Even if the Government had to prove that element, though, the motion should still be denied.

Evidence that information about upcoming featured NFTs had market value *is* evidence that the information had value to OpenSea.  OpenSea is a for-profit enterprise.  If the information had market value, it could have sold it to an NFT trader, or used the information itself to buy featured NFTs and resell them at a profit.  To be sure, OpenSea did not do either of those things. But that does not mean this valuable market information lacked value to OpenSea; rather, it means the company decided the information was more valuable for other purposes.

The Government will also (again, if needed) show that information about upcoming featured NFTs was valuable to OpenSea for other, non-trading reasons.  The information, for instance, was "integral to the proper operation" of the Featured NFT section, which was a valuable part of OpenSea's business.  *United States v. Thorpe*, 166 F.3d 1216, at *6 (6th Cir. 1998) (quoting *Belt v. United States*, 868 F.2d 1208, 1213 (11th Cir. 1989)); *see United States v. Perholtz*, 842 F.2d 343, 366 (D.C. Cir. 1988) (information was important to "[t]he integrity of" a "competitive

18

bidding" process).   Controlling the information was also important to protecting trust in the marketplace.  *See United States v. Grossman*, 843 F.2d 78, 86 (2d Cir. 1988) ("[M]aintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation . . . .").  But the fact the information had market value is a separate reason it had inherent value to OpenSea, even if OpenSea elected not to tap into that information.

Finally, there is no substantial risk of the jury being confused or misled.  The defense is perfectly capable of arguing to the jury that value to the market is different than value to OpenSea, and this Court's jury instructions can appropriately guide the jury about how to evaluate value— if that issue is even necessary for the jury to address.  The probative value of the evidence is too great to be substantially outweighed by the easily addressable risks the defense has claimed.

## VI.   The Government's Summary Charts Are Relevant, Admissible, and Helpful to the Trier of Fact

The Government intends to call as a witness Special Agent Amelia Whitehead of the Federal Bureau of Investigation, who will testify about summary charts that relate principally to (i) the NFTs that were featured on the homepage of OpenSea's website; (ii) the OpenSea accounts and cryptocurrency wallet addresses used by the defendant; (iii) the defendant's purchase and sale of featured NFTs; and (iv) the proceeds the defendant obtained through the trading of featured NFTs.  *See* Dkt. 79 (attaching the Government's summary charts).  The defendant argues that some of the summary charts are improper for the following reasons: (a) use of the word "anonymous" in GX-927 and use of faceless silhouettes in GX-911 to GX-925 are improper because use of the term "anonymous" is "factually inaccurate" and "misleading" (Dkt. 79 at 2-3); (b) use of the word "wallets" in GX-926, GX-927, and GX-929, as well as use of images of wallets in GX-901, GX-902, and GX-911 through GX-927 are improper because factually incorrect (*id.* at 3-4); (c) use of

the term "insider trading" on GX-910 is objectionable (*id.* at 4-5); (d) charts referencing amounts in U.S. dollars instead of Ethereum prices are improper (*id.* at 5-6); and (e) GX-932, which references the defendant's compensation, should be excluded (*id.* at 6).   Each of these objections should be denied for the reasons set forth below.   The defendant also argues that Special Agent Whitehead should not be permitted to provide expert testimony.   The Government does not intend to qualify Special Agent Whitehead as an expert, and she will not offer expert opinion testimony.

### A.      Summary Charts Using the Word "Anonymous" or Using a Faceless Silhouette Are Admissible

At trial there will be evidence that the defendant had certain OpenSea accounts attached to cryptocurrency wallet addresses that were known and attributed to him publicly, including the OpenSea accounts "natechastain" and "nate," both of which use the defendant's name, link to his public Twitter account, and use as a profile picture a blue-haired CryptoPunk NFT that is owned by the defendant.   As part of his criminal scheme, the defendant used over twenty wallet addresses that were not associated publicly with any individual or identity, did not have a username on OpenSea, and are not identifiable in any way other than with the wallet's numerical address.   To represent these wallet addresses visually in summary charts, the Government intends to use a neutral image of a wallet with its address listed inside it, along with a silhouette of a person since the owner of the wallet address was not publicly known.   *See* Dkt. 79 (attaching GX-911 to GX-925).   An example of how these wallet addresses are depicted in the summary charts is below:



In addition to this visual depiction, one of the summary charts, GX-927, refers to these wallet addresses as "anonymous," and the Government anticipates that word will also be used by

witnesses and in jury addresses.  The defendant argues, without citation to any factual or legal authority, that use of "anonymous" is factually inaccurate because cryptocurrency wallets have "pseudonymous identifiers."  (Dkt. 78 at 3.)  The use of the term "anonymous," as well as wallet icons with faceless silhouettes is consistent with the evidence, and there is no basis under Rule 403 to sanitize the trial of the word.

The use of the word "anonymous" to describe certain wallet addresses and OpenSea accounts is proper because the defendant and other witnesses used the term to describe wallet addresses or accounts with which their identities were not publicly associated.  For instance, in one Slack message exchange, the defendant proposes buying an NFT "from an anon account with no OpenSea history," which he later clarified would be "a brand new MetaMask" wallet address.  Ex. A (GX-201).  In another Slack exchange, one of the defendant's co-workers describes having "an anon account."  Ex. B (GX-213).  Trial witnesses will also describe accounts or wallet addresses without a user's identity attached as "anonymous" accounts or wallets.  The use of the word "anon" or "anonymous" by the defendant and other witnesses reflects the fact that the word has a plain meaning, is contextually appropriate, and is not factually inaccurate.

Moreover, the defendant's argument incorrectly conflates a feature of cryptocurrency wallets with the identity of the owner of those wallets.  Simply knowing a 64-character Ethereum address tells a person nothing about the owner of that wallet with that address.  For that reason, "[a]nonymity … based on the fact that users can create any number of anonymous [cryptocurrency] addresses" is one of the defining properties of cryptocurrency.  *See* Jordi Herrera-Joancomartí, *Research and Challenges on Bitcoin Anonymity* (Mar. 2015), available at: https://allquantor.at/blockchainbib/pdf/herrera-joancomarti2015research.pdf.    Indeed, if the defendant is correct that all wallet addresses are pseudonymous, then use of the word anonymous,

and by extension the faceless silhouettes on the charts, is necessary to distinguish those wallet addresses publicly associated with a person's identity and those that are not.

Finally, Chastain has not made a showing of unfair prejudice under Rule 403. The defendant cites no authority for the proposition that "anonymity" carries with it a "connotation of impropriety." When New Yorkers call 3-1-1 and are asked whether they want to make complaints "anonymously," there is no connotation of impropriety and certainly no one believes the operator is referring to the infamous hacking collective Anonymous. Jurors will not be confused by the word or the charts' use of silhouettes. Rather, these are helpful graphics that will help jurors make sense of the evidence and understand the witness testimony. The objection should be denied.

## B. Summary Charts Depicting Wallets Are Admissible

Several summary charts use graphics of wallets with Ethereum addresses below them to depict cryptocurrency wallets and addresses used by Chastain. *See* Dkt. 79 (GX-901, GX-902, Gx 911 to GX-927). Several charts also use the word "wallet." *See id.* (GX-926, GX-927, and GX-929). The defendant asserts he used two wallets—a wallet on a physical device and a wallet provided by the service MetaMask—with which multiple addresses are associated. From that factual assertion, he argues that it is an incorrect statement to call addresses "wallets" since the addresses belong to the same wallet. This pedantic argument is not a basis to exclude the charts.

OpenSea not only uses the word "wallet" to refer to what are technically wallet addresses, but in informational content on its website, OpenSea uses the same wallet graphic that the Government uses in its summary charts. *See* OpenSea, *What is a Crypto Wallet*, available at: https://opensea.io/learn/what-is-crypto-wallet. Trial witnesses will likewise use the word "wallet" interchangeably with "wallet address" and/or "OpenSea account," further confirming that the Government's use of the word is factually accurate and consistent with the evidence in the case. Moreover, the graphic in the Government's summary charts seems to already do what the

defendant is asking for: it literally conveys that there are addresses associated with wallets, and the charts themselves focus on the number of different addresses used by the defendant. The defendant takes issue with GX-926, GX-927, and GX-929 for saying "wallet" and not "address" or "wallet address." While not necessary, the Government will revise the charts to say, "wallet addresses." With or without that revision, the defendant has not articulated how any of this will confuse a jury or unfairly prejudice him, and therefore the objection should be denied.

### C.   The Summary Chart Referencing "Insider Trading" Will Be Revised

The defendant objects to GX-910, titled "Days With Alleged Insider Trading," because he says the term "insider trading" is inapplicable and the title is argumentative. (Dkt. 78 at 4). While the use of the term "insider trading" is appropriate for the reasons discussed above, the Government will revise the title of the slide to address the defendant's objection regarding improper argument.

### D.   The Conversion of Ethereum to U.S. Dollars in the Summary Charts Is Proper

The Government's summary charts tracing the defendant's purchase and sale of featured NFTs, as well as the charts referencing his profits, express values in U.S. dollars rather than Ethereum prices. Special Agent Whitehead will testify that the transactions in question occurred in Ethereum, but the charts show the transaction amounts in U.S. dollars. As part of that testimony, Special Agent Whitehead will show a summary exhibit, GX-900, that displays the value of Ethereum (expressed in a range) relative to the dollar during the period the defendant was buying and selling featured NFTs. The data described in that chart summarizing the range is publicly available daily price data from Coindesk. The converted values for particular transactions were taken from publicly available Etherscan and OpenSea data. She will also make clear that in converting Ethereum prices to dollars, the conversion rate as of the date and time of the transaction was used. The charts show the full cost the defendant paid for NFTs (including both NFT cost and transaction fees) and the profit (sale price minus transaction fees) for sales of NFTs. The summary

charts display transaction amounts in U.S. dollars instead of cryptocurrency so that the jury—who may not be familiar with Ethereum—will understand the value of transactions in terms they understand. The defendant has not objected to the accuracy of these conversions, but rather protests because he says none of the Ethereum he obtained was actually converted to dollars. That is not a reason to require the summary charts to be expressed in Ethereum prices.

The use of U.S. dollars on the summary charts is appropriate for several reasons. First, OpenSea shows the converted value right on a transaction-by-transaction basis on its website, so use of U.S. dollars in the summary charts is consistent with the underlying evidence. For instance, the following transaction from the defendant's public account activity log on OpenSea shows both the Ethereum and U.S. dollar price:



Ex. C (GX-300). So even if the defendant never converted the Ethereum he obtained to U.S. dollars, it is still consistent with the evidence to summarize the transactions in this way. Second, after the defendant's conduct was exposed, he told his girlfriend in a text message that he made "19 ETH which is about 65K." Ex. D (GX-603). That evidence shows that the defendant was thinking about his gains in terms of U.S. dollars. Third, U.S. dollar values will be easier for the jury to understand than Ethereum prices. Indeed, in order to compare the defendant's profit from his NFT trading to his OpenSea salary, it will be necessary to either convert his salary payments to Ethereum values, or his NFT profits to U.S. dollars.

The defendant argues that he never converted his Ethereum to U.S. dollars and therefore, citing the commentary to section 2B1.4 of the Sentencing Guidelines, he never realized any gains. The defendant is incorrect in his interpretation of the background commentary to section 2B1.4, and in any event, the Guidelines commentary is irrelevant to the use of converted values in the summary

charts.  Section 2B1.4 states that "gain" means the "total increase in value realized through trading," and here that would mean the total value realized by buying and then selling featured NFTs.  There is no legal support for the defendant's argument that he did not realize a gain because he never exchanged his Ethereum for U.S. dollars, and the Second Circuit has previously "rejected [the] argument that gain results from an offense only when a trading position taken on the basis of inside information is liquidated."  *United States v. Riley*, 638 F. App'x 56, 65 (2d Cir. 2016) (cleaned up).  Additionally, even if the defendant were right that he has not yet realized his gains, that does nothing to undermine the fact that he did in fact engage in profitable trading.  Nor is the defendant's decision not to cash out of Ethereum a basis to preclude the simple conversions on the summary chart.

The defendant's other objections to converting Ethereum to U.S. dollars are easily rejected.  The price data is sourced to Etherscan and OpenSea, both of which provide converted prices on a transaction-by-transaction basis using the real-time conversion rates.  As described above, the charts include transaction fees to reflect the defendant's total cost, but subtract them from the value of sale proceeds so as only to reflect profits.  In other words, the charts account for transaction costs in a way most favorable to the defendant.  The defendant has not identified any particular figures on the charts he believes are factually inaccurate, and since it is common for summary witnesses to make simple conversions (e.g., time zones), there is no basis to preclude these charts.

### E.   The Chart Referencing the Defendant's Compensation Is Admissible

The Government will offer a summary chart, GX-932, comparing the defendant's monthly OpenSea salary to his monthly profits from trading featured NFTs.  For the reasons discussed above, the defendant's motion to exclude evidence concerning his compensation should be denied.  Additionally, the chart presents the defendant's compensation only for the months in which the insider trading conduct occurred, and in a neutral, non-argumentative manner.  The objection to this chart should be denied.

## **CONCLUSION**

For the reasons set forth above, the Court should deny the defendant's motions *in limine*.

Dated:  New York, New York
        April 17, 2023

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney
                            for the Southern District of New York

                    By:     _s/_____
                            Thomas Burnett
                            Allison Nichols
                            Nicolas Roos
                            Assistant United States Attorneys
                            One Saint Andrew's Plaza
                            New York, New York 10007
                            Telephone: (212) 637-2421