UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                      :

UNITED STATES OF AMERICA,         :

                                :

                                :            22-CR-305 (JMF)

        -v-                    :

                                :           <u>OPINION AND ORDER</u>

NATHANIEL CHASTAIN,           :

                                :

                   Defendant.       :

                                :

------------------------------------------------------------------ X

JESSE M. FURMAN, United States District Judge:

      Defendant Nathaniel Chastain is charged with wire fraud and money laundering relating to his purchase and sale of Non-Fungible Tokens or "NFTs" on OpenSea, an online NFT marketplace. ECF No. 1 ("Indictment"), ¶¶ 1, 3. According to the Indictment, Chastain used confidential information he obtained by virtue of his position as a product manager at OpenSea to purchase NFTs shortly before they (or other NFTs made by the same creator) were featured on OpenSea's homepage and, shortly after they were so featured, sold them for a hefty profit. *Id.* ¶¶ 4, 8, 10, 12, 13. More specifically, the Government alleges that, in making these trades, Chastain "misappropriated OpenSea's confidential business information" — namely, the knowledge of which NFTs were going to be featured when on OpenSea's homepage — and, in so doing, committed wire fraud in violation of 18 U.S.C. § 1343. Indictment ¶ 13. The Government further alleges that, to conceal his involvement in buying and selling the featured NFTs, Chastain transferred funds through anonymous Ethereum blockchain accounts and new Ethereum accounts without any prior history and, in so doing, committed money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Indictment ¶ 15.

      Trial is scheduled to begin on April 24, 2023. Earlier this month, each side filed a motion seeking to preclude some or all of the other side's expert testimony. In particular, Chastain

moves to preclude the testimony of the Government's expert, Professor Daniel Taylor, *see* ECF No. 57, and the Government moves to preclude the testimony of Chastain's two experts, Professor Douglas Skinner and Dr. Matthew Edman, *see* ECF No. 61 ("Gov't Mem.").  At the heart of these motions is a dispute that first emerged in Chastain's motion to dismiss the Indictment: whether the Government is required to prove that "confidential business information" had "inherent economic value" to its owner (here, OpenSea) in order to establish that it is "property" for purpose of Section 1343, the wire-fraud statute.  Although the Court did not need to resolve that dispute to rule on Chastain's motion to dismiss, *see United States v. Chastain*, No. 22-CR-305 (JMF), 2022 WL 13833637 (S.D.N.Y. Oct. 21, 2022), it is ripe for resolution now.  For the reasons that follow, the Court concludes that the Government is not *required* to prove that the featured NFT information had inherent value to OpenSea but that such evidence can be considered by the jury in (among other things) evaluating whether the information was "confidential business information" and, thus, OpenSea's property.  In light of that ruling, and for other reasons discussed below, Chastain's motion to preclude Professor Taylor's testimony is largely denied, and the Government's motions to preclude are granted in part and denied in part.

## CONFIDENTIAL BUSINESS INFORMATION AS PROPERTY

The Court will begin with the parties' dispute over what the Government must prove to establish that the information about which NFT would be featured and when qualified as OpenSea's property.  Section 1343, the federal wire-fraud statute, criminalizes the use of certain interstate communications for a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  It is well established that "[a] scheme to deceive, however dishonest the methods employed, is not a scheme to defraud" within the meaning of Section 1343 "in the absence of a

property right to interfere with." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).  It is equally well established that "[c]onfidential business information" qualifies as "property" protected by Section 1343 even though it is "intangible." *Carpenter v. United States*, 484 U.S. 19, 25-26 (1987).  The question presented here is whether, to qualify as property, confidential business information must have some "inherent economic value" to its owner.  Chastain, reprising arguments that he made in support of his motion to dismiss, argues that it must.  ECF No. 58 ("Def.'s Mem."), at 9-13; ECF No. 63 ("Def.'s Opp'n"), at 3-7; *see also* ECF No. 19, at 12-19.  The Government, reprising is arguments in opposition to Chastain's earlier motion, argues that it need not.  Gov't Mem. 20 fn.3; ECF No. 62 ("Gov't Opp'n."), at 7-10; *see also* ECF No. 23, at 16-19.  The Government has the better of the argument.

The Court begins with the Supreme Court's decision in *Carpenter*, which is the primary precedent upon which the Government here relies.  In *Carpenter*, a columnist for the *Wall Street Journal* entered into a scheme in which he shared information "as to the timing and contents" of his market-moving column with traders so that they, in turn, could trade on the information and share the profits.  484 U.S. at 23.  On appeal, the Supreme Court unanimously affirmed the defendant's wire-fraud convictions, holding that "the *Journal*'s interest in the confidentiality of the contents and timing of the . . . column" qualified "as a property right" within the meaning of Section 1343.  *Id.* at 25.  "Confidential information acquired or compiled by a corporation in the course and conduct of its business," the Court stated, "is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy."  *Id.* at 26 (internal quotation marks omitted).  Quoting *International News Service v. Associated Press*, 248 U.S. 215, 236 (1918), for the proposition that "news matter . . . is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money

for it, as for any other merchandise," the Court concluded that "[t]he *Journal* had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the . . . column."  484 U.S. at 26.

Perhaps most significant for present purposes, the Supreme Court deemed it irrelevant that the defendants "did not interfere with the *Journal*'s use of the information" and "did not publicize it and deprive the *Journal* of the first public use of it."  *Id.*  "The confidential information was generated from the business," the Court reasoned, "and the business had a right to decide how to use it prior to disclosing it to the public."  *Id.*  More to the point, the defendants could not contend "that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it [was] sufficient that the *Journal* . . . [was] deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter."  *Id.* at 26-27.  In other words, it was enough for the Government to prove (1) that the information at issue was kept confidential by the *Journal* and (2) that it was "acquired or compiled . . . in the course and conduct of its business"; the Government did not have to prove more, let alone that the *Journal* had suffered any "monetary loss."  *Id.* at 26-27; *cf. United States v. O'Hagan*, 521 U.S. 642, 654 (1997) (relying on *Carpenter* to affirm a conviction for securities fraud where the defendant, a lawyer at a law firm, misappropriated information concerning a firm client, explaining that the information "qualifie[d] as property to which the company ha[d] a right of exclusive use").

Assuming for the sake of argument that *Carpenter* left the door ajar for an "inherent value" requirement, two later Second Circuit decisions all but slammed that door shut.  The first, *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), involved a law firm associate who was convicted of mail fraud based on his misappropriation of confidential information pertaining to one of the firm's clients.  On appeal, the defendant relied on *Carpenter*'s quotation from

*Associated Press* to argue that his firm "had no 'property interest' in the [client's] confidential information because [the firm] (1) could not use the information for its commercial value or have the exclusive right to exploit it; and (2) did not gather the information through its own enterprise, organization, skill, labor and money." 843 F.2d at 86.  The Second Circuit rejected this argument as "specious."  *Id.*  "In context," the court explained, *Carpenter*'s language "merely *describe*[*d*] the confidential information in that case; it [did] not require that *all* confidential information must be of the same nature to be considered 'property.'  *Carpenter* actually holds generally that, even though 'confidential business information' is intangible, it 'has long been recognized as property.'"  *Id.* (citation omitted).  With that, the court concluded that the law firm client's confidential information "*clearly* [fell] within the definition of property under *Carpenter.*"  *Id.* (emphasis added).  Moreover, that was true even though the law firm itself "could not commercially exploit the information by trading on it . . . .  As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients."  *Id.*

In the second case, *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), the defendants, traders at several brokerage firms, disclosed confidential communications about client orders — transmitted over devices known as "squawk boxes" — to a day trader, who "then placed trades in the squawked securities before the brokerage firms executed the squawked customer orders." *Id.* at 120.  On appeal, the Second Circuit vacated the defendants' convictions based on a failure to disclose exculpatory evidence.  More relevant for present purposes, however, the court rejected the defendants' challenge to the district court's jury instructions on the meaning of "confidential business information."  The defendants had requested a charge, based on case law concerning civil trade secret claims, that would have instructed the jury to consider, among other

things, "the value of the information to the business and its competitors" and "the amount of effort or money expended by the business in developing the information." *Id.* at 134. The district court declined the defendants' request and instead instructed the jury that "[c]onfidential information acquired by a company in the operation of its business is a form of property, to which the company has the exclusive right and benefit." *Id.* In a supplemental charge, the district court added that "confidential business information" qualified as property "[e]ven if it lacks commercial value to the company . . . . What is key is that the company treat the information as confidential and with knowledge of that fact, its employee nonetheless knowingly discloses that information for an improper use." *Id.* at 135.

The Second Circuit held that the district court did not err in rejecting the defendants' request because it "did not accurately reflect the law in every respect." *Id.* In particular, the requested "charge would have instructed the jury to consider factors, borrowed from case law discussing trade secrets, that do not necessarily bear on the confidentiality of the squawked information, including the value of the information to the business and business's investment in developing the information. Information may qualify as confidential under *Carpenter* even if it does not constitute a trade secret." *Id.* At the same time, the court explicitly "caution[ed] the district court that, if there is another trial, its instruction regarding confidential business information should provide more fulsome guidance to assist the jury in determining whether the squawked information was confidential." *Id.* "*Carpenter*," the court continued, "requires proof that the information was both considered *and* treated by an employer in a way that maintained the employer's exclusive right to the information. . . . If employers 'consider' information to be confidential but do not really take affirmative steps to treat it as such and maintain exclusivity, *Carpenter* is not satisfied." *Id.* at 135 n.14 (emphasis added). "The pertinent factors" to be considered by a jury "will, of course, vary from case to case, but may include written company

policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information." *Id.*

Taken together, these decisions make plain that the Government is not required to prove that "confidential business information" had "inherent value" to an employer for it to qualify as the employer's property for purposes of Section 1343. Indeed, at bottom, Chastain's argument to the contrary is no different from the arguments rejected by the Second Circuit in *Grossman* and *Mahaffy*. Like the defendant in *Grossman*, Chastain seizes on *Carpenter*'s quotation from *Associated Press* to argue that confidential business information qualifies as property only when it is "a company's 'stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who would pay money for it*." Def.'s Opp'n 5 (cleaned up) (emphasis in original). But that argument "distorts *Carpenter*." *Grossman*, 843 F.2d at 86. And like the defendants in *Mahaffy*, Chastain argues that confidentiality requires evidence that information has "value" to its owner. Def.'s Mem. 9-10. But such evidence "do[es] not necessarily bear on . . . confidentiality." *Mahaffy*, 693 F.3d at 135. Instead, *Carpenter* and its progeny require only that the information be "acquired or compiled by [an employer] in the course and conduct of its business," *Carpenter*, 484 U.S. at 26, and that "the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information," *Mahaffy*, 693 F.3d at 135 n.14. They do not leave the door open to adding an additional "inherent value" requirement.

In arguing for such a requirement, Chastain relies less on *Carpenter*, *Grossman*, and *Mahaffy* than he does on *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), in which the Second Circuit reversed a wire-fraud conviction for misappropriation of confidential information from the Centers for Medicare and Medicaid Services on the ground that the information did not

qualify as "property."  Def.'s Mem. 10-11; Def.'s Opp'n 4-6.  In doing so, the *Blaszczak* court did indeed invoke the "stock in trade" quote from *Carpenter*, describe the lack of "impact on the government's fisc," and refer to "inherently valuable" government information.  *Id.* at 243-44. But that language was merely part of the court's explanation for why the information in that case was "regulatory in character" rather than "money or property," *id.* at 244, a critical distinction following the Supreme Court's decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), the infamous "Bridgegate" case.  Chastain distorts *Blaszczak* in arguing that its language establishes a requirement for confidential information to have inherent value in order to qualify as property — let alone that it does so outside of the public corruption context in which the Supreme Court has been careful to construe the wire and mail fraud statutes strictly so as to avoid "a sweeping expansion of federal criminal jurisdiction" to police state and local governmental decisions. *Kelly*, 140 S. Ct. at 1574.  Indeed, *Blaszczak* did not involve confidential *business* information at all.  Nor did it purport to overrule *Grossman* and *Mahaffy*.  Thus, *Blaszczak* does not support the weight that Chastain puts on it.[1]

In sum, under *Carpenter* and its progeny, the Government is not required to prove that the information at issue in this case had "inherent value" to OpenSea in order to establish that it was confidential business information within the meaning of Section 1343.  Significantly,

---

[1]        Nor does the Solicitor General's letter brief in *Blaszczak*, which Chastain cites for the proposition that confidential business information must have "inherent market value to [its] owners."  Def.'s Mem. 10.  The full context for the phrase is "[u]nlike confidential news material or stock-trading statistics, which have inherent market value to their owners" — citing *Carpenter* and another case as examples — the "the draft reimbursement rates at issue here have value to the government *only* as a regulator, not 'as [a] property holder.'"  United States Supplemental Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811 et al. (2d Cir. June 4, 2021) (ECF No. 497) (citing *Kelly*, 140 S. Ct. at 1572).  If anything, therefore, the Solicitor General's letter brief demonstrates that *Kelly* and *Blaszczak* are inapposite because they apply only to officials exercising regulatory power.  Moreover, observing that confidential news material and stock-trading statistics have inherent market value is not the same as conceding that inherent value is a *requirement* for information qualify as property.

however, it does not follow that evidence and argument that the information did have "value" to OpenSea is irrelevant, let alone inadmissible.  The fact that information has "value" to an employer may well be relevant in evaluating whether the information is property.  For instance, it may be relevant to understanding why the employer would "acquire[] or compile[]" the information "in the course and conduct of its business," *Carpenter*, 484 U.S. at 26, or to understanding why the employer would consider and treat the information "in a way that maintained the employer's exclusive right to the information," *Mahaffy*, 693 F.3d at 135 n.14. To say that the Government *may* prove that the information at issue had inherent value to OpenSea is not, however, to say that it is *required* to do so.  For the reasons discussed above, the Government is not required to do so.

## THE PARTIES' *DAUBERT* MOTIONS

Having resolved the parties' "inherent value" debate, the Court turns to the actual relief that the parties are seeking in their motions: preclusion of one another's experts.  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the

task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").  "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue."  *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison."  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up). The Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).  Relatedly, expert testimony regarding "an ultimate determination that [is] exclusively within [the jury's] province," including witness credibility, must be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must an expert's testimony "on

issues of law," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.  Moreover, "[a]lthough a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also Nimely*, 414 F.3d at 395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . .").

## A. Chastain's Motion to Preclude the Testimony of Professor Taylor

The Court begins with Chastain's motion to preclude the testimony of Professor Taylor of the Wharton School.  *See* ECF No. 59-1 ("Taylor Notice"), at 1.  According to Taylor's report, he intends to provide an expert opinion related to economic theories about the use and value of the information about upcoming featured digital art.  *Id.*  In particular, he would opine that information about upcoming featured art was valuable because it provided profitable information about future demand; that companies often keep valuable information confidential for business reasons; and that maintaining the confidentiality of certain information promotes trust, which is especially important to the functioning of a marketplace.  *Id.*  Chastain moves to exclude the report and testimony of Taylor on a several grounds, namely, that (1) "Taylor impermissibly opines on ultimate legal issues in this case"; (2) Taylor's testimony is "irrelevant to key issues . . . and . . . rel[ies] on easily-understood economic concepts" not "beyond the ken of an average juror"; (3) "portions of Taylor's proposed testimony are based exclusively on irrelevant and unhelpful analogies"; (4) Taylor's opinion about trust "is not only irrelevant, but illogical"; and

(5) "Taylor's proposed testimony is unreliable because it fails to consider critical exculpatory evidence." Def.'s Mem. 1-2. The Court will address each argument in turn.

Chastain's first argument has force in one respect that is not even disputed by the Government: Taylor may not "opine that information about upcoming featured NFTs was 'confidential business information' or try to offer a definition of that term." Gov't Opp'n 5-6; *accord id.* at 11.[2] Any such testimony would impermissibly intrude on the province of the Court to define the law, *see, e.g.*, *Bilzerian*, 926 F.2d at 1294; the jury to draw legal conclusions, *see e.g., Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); or both. That one limitation aside, Chastain's first argument rests in part on the false premise that the Government may not offer evidence of the information's economic value if, as is the case, it is not required to prove "inherent value." That is, although the Government is not required to prove inherent economic value, it may nevertheless offer Taylor's testimony about the rise in prices due to heightened demand that occurs after an NFT is featured to help the jury understand the economic factors at play, including the incentives for Chastain to misappropriate the information at issue and the reasons why OpenSea may have had a business interest in safeguarding the exclusivity of the information. *See* Gov't Opp'n 11-12.

Chastain's second argument — his only other argument for exclusion of Taylor's first opinion about the economic value of the information at issue — is that "the law of supply and demand" is a "simple and easy to understand" concept that is not beyond the ken of the average juror. Def.'s Mem. 15-16 (internal quotation marks omitted). The argument is without merit.

---

[2]     The Government represents that Taylor "will not" offer such opinions, but his report is not quite as circumspect. *See, e.g.*, Taylor Notice at 1 ("Confidential business information about upcoming featured digital art was valuable because it provided information about expected future demand."); *id.* at 3 ("Chastain engaged in this sort of trading dozens of times, often re-selling the digital art he purchased using confidential business information for multiples of the purchase price.").

For starters, it is doubtful that all jurors have a solid grasp of basic economics, let alone could apply it to the facts of this case.  But more fundamentally, the argument overlooks (or mischaracterizes) the import of Taylor's testimony.  As the Government explains, Taylor merely "*begins* with the principle that, when supply is restricted and demand increases, price tends to rise.  He then goes further to explain how, because of this principle, *information about anticipated demand* can [itself] have value."  Gov't Opp'n 16 (initial emphasis added).  "This more subtle point — that, from an economic perspective, *information itself can have value* — is not something that jurors can be counted on to know," *id.* (emphasis added), and, for the reasons discussed above, is plainly relevant to the issues in this case.

Next, Chastain takes issue with a series of analogies Taylor makes — for example, about Coca-Cola's efforts to maintain the secrecy of its formula and the efforts of publicly traded companies to maintain the secrecy of pricing information in publicly disclosed contracts.  Def.'s Mem. 17-19.  Chastain's arguments for why the circumstances of these examples differ from the circumstances in this case are well taken, but they ultimately miss the point.  As the Court understands it, Taylor does not claim, or intend to claim, that information about OpenSea's upcoming featured NFTs is similar to Coca-Cola's secret formula or to public companies' pricing information.  (To the extent that he does so testify, Chastain may renew his objection at trial.)  Instead, the analogies are offered merely to help the jury understand a more basic point: that there are circumstances in which companies have an economic interest in controlling information — that is, keeping information confidential — rather than selling or licensing it, even when the information *could* be sold for a substantial sum.  Gov't Opp'n 18-20; Taylor Notice 3-4.  Chastain is obviously free to argue that Taylor's analogies are inapt — and in service of that argument, to explore (within reasonable limits) the differences between the analogies and this case through "[v]igorous cross-examination," if not "presentation of contrary

evidence." *Daubert*, 509 U.S. at 596.  But the differences are not a basis to preclude the relevant portion of Taylor's testimony.

Chastain's fourth argument attacks Taylor's opinions about the importance of trust to OpenSea's business — namely, that OpenSea had a business interest in controlling access to the information at issue because misuse risked undermining trust in its marketplace.  Def.'s Mem. 20-21.  In particular, Chastain contends that the opinion is irrelevant to the value of the information to OpenSea *ex ante*.  *See id.* at 20.  That is debatable, but ultimately irrelevant because it proceeds from the mistaken premise that the Government is required to prove that the information had inherent economic value to OpenSea.  As discussed above, the Government is not.  More broadly, Chastain's argument is based on an overly cramped understanding of "value" in this context.  As *Grossman* and *Mahaffy* make plain, information can have "value" to an employer even if the employer does not — or cannot — commercially exploit the information by selling it or trading on it.  *See Grossman*, 843 F.2d at 86; *Mahaffy*, 693 F.3d at 135.  "[B]y maintaining confidentiality," for example, a firm may be able to "protect or enhance [its] reputation, with the result that it would not lose its clients and perhaps would gain more clients." *Grossman*, 843 F.2d at 86; *see Mahaffy*, 693 F.3d at 135 ("Even if it lacks commercial value to the company, company policy may be to treat the information as confidential to protect the reputation of the company and its customers." (quoting the district court's jury instructions)).[3]

---

[3]     The Court's understanding is that Taylor's testimony about trust is focused on explaining economic principles and how they apply to OpenSea, not on demonstrating that Chastain's conduct caused an erosion of trust.  (The Government suggests that Taylor may offer limited testimony about the effects of Chastain's conduct "to corroborate his opinion that the economic literature related to trust applies to OpenSea."  Gov't Opp'n 22.  The Court is not entirely sure what that means, but it can and will consider objections to such testimony if it is offered at trial.  Moreover, if the Government offers such testimony, it may, as discussed below, open the door to evidence that Chastain's conduct did not have the effects that Taylor suggests.)  Given that, Chastain's criticism that Taylor did not "conduct[] an event study or empirical analysis," Def.'s Mem. 21, misses the mark.

Finally, Chastain argues that "Taylor utterly fails to account for OpenSea's statements" that "specifically conclud[e] that the relevant information had no . . . value." Def.'s Mem. 22. For example, Chastain points to a statement by a "senior officer" that "OpenSea did not think there was inherent value in the confidentiality of the featured NFT artist selection, as OpenSea would still get a cut of the sales and would have made the identity of it public regardless." *Id.* at 6. Whether these statements accurately reflect what the evidence will be at trial is disputed. *See* Gov't Opp'n 24-25. But whatever the case may be, Chastain's criticism is misplaced. Taylor will not — indeed, could not — testify about what OpenSea employees did, or did not, "think." *See, e.g.*, *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2023 WL 2307179, at *29 (S.D.N.Y. Mar. 1, 2023). Instead, his testimony will be limited to economic principles and how they apply to OpenSea generally. In preparing for that testimony, Taylor did review "documents describing the company's business model." Gov't Opp'n 23-24. But he did not review any notes from interviews with witnesses, favorable or unfavorable. *Id.* at 24. Thus, he cannot be accused of cherry-picking favorable evidence, as in the principal case on which Chastain relies, *In re Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005). *See* Def.'s Mem. 22. To the extent that Chastain wishes to challenge Taylor's testimony on the ground that he did not consider relevant facts, he may, of course, cross-examine on those points.

In sum, Chastain's motion is GRANTED (effectively on consent) to the extent that it seeks to preclude Taylor from opining that the information at issue in this case was "confidential business information" or from offering a definition of that legal term. Otherwise, the motion is DENIED.

### B.  The Government's Motion to Preclude Professor Skinner

Next, the Government moves to preclude the testimony of Professor Skinner, a professor

at the University of Chicago, Booth School of Business. *See* ECF No. 61-5 ("Skinner Notice"),

at 1. Chastain seeks to call Skinner to rebut the testimony of Taylor on several points. *See id.* at

2; Def.'s Opp'n 7. Among other things, Skinner proposes:

- to "offer background testimony regarding the economics of two-sided platforms based on the relevant academic literature," and specifically, "OpenSea's business model in the economic context of two-sided platforms," Skinner Notice 2-3;

- to explain "how 'fundamental information' related to the value of an asset is understood by economists as information pertaining to the asset's ability to generate cash flows and riskiness of those cash flows," and to "opine that the information that Mr. Chastain allegedly possessed differs from fundamental information as economists understand it," *id.* at 3;

- to "explain" the meaning of "confidential (or more precisely, proprietary) business information . . . in the academic literature" and "to opine that this type of proprietary business information is distinct from what Prof. Taylor characterizes as confidential information about upcoming NFT features on OpenSea's homepage," *id.*;

- to "address the concept of 'informed traders'" and to "explain that the private information deemed valuable and used by 'informed traders' to generate trading profits is often distinct from . . . proprietary or confidential business information," *id.*

- relatedly, to "explain that, as a result, information that may have value to traders may not have value to the platforms on which they trade" and to "opine that the information Mr. Chastain allegedly possessed about upcoming NFT features on OpenSea's homepage has not been shown by Prof. Taylor to have value to OpenSea," *id.*; and

- to "address Prof. Taylor's assertions with respect to trust," by opining "that Prof. Taylor has not demonstrated that the literature on trust is applicable to either the context of Mr. Chastain's alleged activities or any purported effects on OpenSea" and opining, "[b]ased on data and analysis of the activity on and involving OpenSea in the period following the public revelation of the news of Mr. Chastain's conduct," that there is "no reliable empirical evidence that OpenSea suffered harm from the alleged conduct, including through any purported 'erosion of trust,'" *id.* at 4.

The Government argues that some or all of Skinner's testimony should be precluded on the

grounds that it is irrelevant, unreliable, and usurps the role of the Court and the jury. Gov't

Mem. 13-25.

It is not entirely clear whether the Government seeks to preclude Skinner from testifying

altogether, *see* Gov't Mem. 24 (conceding that Skinner's proffered testimony on two-sided

markets and OpenSea's business model is "not necessarily impermissible"), but to the extent that it does, the motion is denied.  As discussed above, the Government is not *required* to prove that the information at issue had inherent value, but it may do so — and, through Taylor, it apparently intends to do so.  To the extent that it does, Chastain is plainly permitted to call his own expert to rebut that testimony and to offer an opinion, with appropriate reference to economic concepts and evidence in this case (including, but not limited to the concept of two-sided markets and OpenSea's business model), that "the information Mr. Chastain allegedly possessed about upcoming NFT features on OpenSea's homepage has not been shown by Prof. Taylor to have value to OpenSea."  Skinner Notice 3.  Similarly, Chastain is entitled to call Skinner to rebut any testimony that Taylor gives regarding the issue of trust.  Thus, to the extent that Taylor testifies that the economic literature regarding trust applies to OpenSea and the information at issue, Skinner may testify to the contrary.  So too, to the extent that the Government elicits testimony from Taylor about the effects of Chastain's conduct (purportedly "to corroborate his opinion that the economic literature related to trust applies to OpenSea," Gov't Opp'n 22), Skinner may testify that he has seen "no reliable empirical evidence" of those effects.  Skinner Notice 4.[4]

That said, the Court agrees with the Government that much of Skinner's proposed testimony is inadmissible.  First, just as Taylor may not opine on the meaning of "confidential business information" and whether the information at issue here meets the definition, Skinner may not testify about how "confidential (or more precisely, proprietary) business information" is understood "in the academic literature" or whether the information at issue here qualifies.

---

[4]     Even if Taylor does not testify about the effects of Chastain's conduct, Skinner may be able to testify to the lack of effects as a means of rebutting Taylor's opinion that the literature of trust applies to OpenSea.  In any event, to the extent *either* party introduces evidence regarding the effects of Chastain's conduct, the Court will give a curative instruction to the jury explaining that the Government is not required to prove that OpenSea was actually harmed to convict Chastain of wire fraud.  *See, e.g.*, *United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021).

Skinner Notice 3.[5]  Second, the Court agrees with the Government that Skinner's proposed

testimony about the academic definitions of "fundamental information" and "informed trading"

and a comparison between these definitions and the information in this case is largely, if not

entirely, inadmissible.  Whatever "fundamental information" and "informed trading" may be,

they have limited or no bearing on the issues in this case; and to the extent that they have any

probative value, it is substantially outweighed by the dangers of confusing or misleading the

jury.  *See* Fed. R. Evid. 401-403.  Moreover, to the extent that any of this testimony touches on

whether the information at issue in this case is confidential business information, it too would

invade the province of the jury.  *See, e.g.*, *Hygh*, 961 F.2d at 363.  Subject to rulings on

objections at trial, the Court will permit a *limited* amount of testimony about the meaning of

"fundamental information" and "informed trading" *if* they are necessary to explain Skinner's

admissible opinions — but beyond that, Skinner may not testify on these subjects.

  In short, the Government's motion to preclude Skinner's testimony is GRANTED in part

and DENIED in part.  Specifically, to the extent that Taylor testifies that the information at issue

had value and that the concept of trust is important to OpenSea, Skinner may testify to the

contrary, with appropriate reference to economic principles.  But Skinner may not otherwise

testify about the meaning of "confidential business information," "fundamental information,"

"informed trading," and whether the information at issue here meets any of these definitions.

**C.  The Government's Motion to Preclude Dr. Edman**

  Finally, the Government moves to preclude the testimony of Dr. Edman, "Partner & Co-

Founder of NAXO, a cybersecurity and investigations firm . . . specializing in cryptocurrency,

---

[5] Skinner's testimony on that score not only intrudes on the role of the Court and jury, but also suffers from a relevance problem.  Put simply, how "confidential business information" is understood in the academic literature is utterly irrelevant.  "Confidential business information" is a legal term of art and will be defined by the Court in its instructions to the jury.

cybersecurity, and digital forensic investigations."  ECF No. 61-4 ("Edman Notice"), at 1.

According to his expert disclosure, Edman intends to opine that "Defendant did not attempt to

obfuscate his identity or conceal his OpenSea activity by using a VPN or other anonymizing

technology," "Defendant did not attempt to obfuscate his OpenSea activity by laundering

cryptocurrency funds through the use of mixers, non-KYC exchanges, or other techniques often

associated with illicit activity," and that "[i]t is common for sophisticated cryptocurrency users to

use multiple wallets and wallet addresses to store and transact with their cryptocurrency."  *Id.* at

3-4.  The Government argues that this testimony should be precluded because it "is tantamount

to opinion testimony about Chastain's intentions and mental state" and because Edman's

"opinions that certain behaviors are 'common' for 'sophisticated cryptocurrency users' and thus

not indicative of intent to conceal one's online activity [are] not scientifically based and [are]

unhelpful to the finder of fact."  Gov't Mem. 7.  Ultimately, the Government contends that

"Edman's testimony should be excluded, or in the alternative, severely curtailed to avoid

confusion of the issues and misleading the jury."  *Id.*

The Court agrees that Dr. Edman's testimony must be curtailed, but there is no basis to

preclude it altogether.  First, on the impermissible side of the ledger, the Government is correct

that Edman may not opine on whether Chastain attempted "to obfuscate his identity or conceal

his OpenSea activity" as such testimony would invade the province of the jury and violate the

principle that experts may not testify "regarding the intent or motive of parties, or a party's state

of mind."  *Accent Delight Int'l Ltd.*, 2023 WL 2307179, at *28.  More broadly, Edman may not

offer "opinions about whether the defendant's conduct constitutes money laundering activity."

*United States v. Nektalov*, No. 03-CR-828 (PKL), 2004 WL 1469487, at *4 (S.D.N.Y. June 30,

2004).  But the technologies and some of the conduct at issue in this case are plainly "esoteric or

otherwise beyond the understanding of the average juror," and therefore an appropriate subject

19

matter for generalized expert testimony.  *Id.* at *2-3 (citing cases); *see also Munoz v. United States*, No. 07-CV-2080 (ILG), 2008 WL 2942861, at *44-45 (E.D.N.Y. July 28, 2008) (citing cases).  Thus, for example, Edman may provide *general* testimony about the technologies and steps that Chastain used (and did not use) in the transactions at issue; whether or to what extent these technologies and steps do (or do not) conceal one's identity and conduct; and common practices with respect to such technologies (such as the use of multiple cryptocurrency "wallets" and "wallet addresses").  To the extent that the Government takes issue with any of this testimony, it may object to specific questions at trial, challenge Edman on cross-examination, or present contrary evidence.  *See Daubert*, 509 U.S. at 596.

In sum, the Government's motion to preclude Edman's testimony is also GRANTED in part and DENIED in part.  More specifically, Edman may not opine on whether Chastain engaged in money laundering, including but not limited to whether he attempted to conceal his identity or conduct, but he may provide general testimony regarding the techniques and technologies that Chastain did and did not use in connection with the conduct at issue.

### CONCLUSION

In sum, the Court rules as follows:

- The Government is not required to prove that the information at issue had "inherent economic value" to OpenSea to establish that it was "confidential business information" and, thus, "property" for purposes of Section 1343;

- Nevertheless, evidence regarding the value of the information (or lack thereof) is relevant and admissible, as it may bear on whether the information qualifies as "confidential business information" and on Chastain's motive to misappropriate it;

- Chastain's motion to preclude the testimony of Professor Taylor is GRANTED to the extent that he proposes to opine on the meaning of "confidential business information" and whether the information at issue qualifies, but otherwise DENIED;

- The Government's motion to preclude the testimony of Professor Skinner is DENIED to the extent that Skinner properly rebuts testimony given by Taylor and otherwise GRANTED; and

- The Government's motion to preclude the testimony of Dr. Edman is GRANTED to the extent that Edman proposes to opine on whether Chastain engaged in money laundering or attempted to conceal his identity and conduct but DENIED to the extent that he would testify generally about the technologies and techniques that Chastain did and did not use in connection with the transactions at issue.

In light of the Court's analysis and ruling regarding "confidential business information" in this Opinion and Order, the parties shall, no later than **noon** on **April 21, 2023**, file revised versions of their proposed jury instructions — along with a redline showing all differences between the revised version and the version the party filed on April 13, 2023.  *See* ECF Nos. 77, 83.

The Clerk of Court is directed to terminate ECF Nos. 57 and 61.

SO ORDERED.

Dated: April 17, 2023
New York, New York

_____
JESSE M. FURMAN
United States District Judge

21