**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) No. 22-cr-305 (JMF) |
| NATHANIEL CHASTAIN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**SENTENCING MEMORANDUM OF NATHANIEL CHASTAIN**</u>

David I. Miller
Daniel P. Filor
Nicholas T. Barnes
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Attorneys for Nathaniel Chastain*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

I.    PRELIMINARY STATEMENT ............................................................... 1

II.   NATE CHASTAIN'S PERSONAL HISTORY AND CIRCUMSTANCES ................... 2

    A.   Nate's Upbringing Was Defined by Education and Hard Work ............................ 2

    B.   Nate's Life Is Marked with Acts of Generosity and Kindness .............................. 3

    C.   In Times of Unimaginable Hardship, Nate Has Selflessly
        Put the Needs of His Friends and Family Above His Own ................................. 5

    D.   The Instant Factual Conduct Is an Isolated Misstep in Nate's Life ...................... 6

III.  CONSIDERATION OF ALL THE PERTINENT SENTENCING
      FACTORS WARRANTS A NON-GUIDELINES SENTENCE ...................................... 7

    A.   The Advisory Guidelines Calculation ...................................................... 8

        1.   No Loss (or Gain) Enhancement Is Warranted ........................................... 9

        2.   Even if a Loss (or Gain) Enhancement Were to Apply,
            It Would Vastly Overstate the Seriousness of the Offense ...................... 11

        3.   A Reduction Is Warranted for Acceptance of Responsibility ................... 13

        4.   No Abuse of Trust Enhancement is Warranted ....................................... 14

    B.   Section 3553(a) Factors Strongly Favor a Non-Guidelines Sentence ................. 15

        1.   Nate's Personal Characteristics ............................................................ 16

        2.   Nature and Circumstances of Offense; Need for
            Sentence to Reflect the Seriousness of the Offense ............................... 18

        3.   Need for Sentence to Provide Specific Deterrence .................................. 19

        4.   Need for Sentence to Provide General Deterrence ................................. 20

        5.   Need to Avoid Unwarranted Sentencing Disparities ............................... 21

        6.   Forthcoming Amendments to the Sentencing Guidelines ....................... 23

IV.     FORFEITURE ............................................................................................................... 24

V.      CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dean v. United States*,
  581 U.S. 62 (2017)...............................................................................................16

*Gall v. United States*,
  552 U.S. 38 (2007)..................................................................................................7

*Kimbrough v. United States*,
  552 U.S. 85 (2007)..................................................................................................7

*Pepper v. United States*,
  562 U.S. 476 (2011)..............................................................................................15

*Rita v. United States*,
  551 U.S. 338 (2007)..............................................................................................15

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)..............................................................12, 16

*United States v. Algahaim*,
  842 F.3d 796 (2d Cir. 2016)..................................................................................12

*United States v. Allen*,
  644 F. Supp. 2d 422 (S.D.N.Y. 2009)...................................................................18

*United States v. Allen*,
  No. 06-1318, 2007 WL 2446013 (6th Cir. Aug. 29, 2007) ...................................13

*United States v. Anderson*,
  45 F.3d 217 (7th Cir. 1995) ...................................................................................11

*United States v. Block*,
  No. 16 Cr. 595 (JPO) (S.D.N.Y. Nov. 8, 2017)................................................22, 23

*United States v. Canova*,
  412 F.3d 331 (2d Cir. 2005)..................................................................................18

*United States v. Chow*,
  No. 17 Cr. 667 (GHW) (S.D.N.Y. Jan. 17, 2019).................................................22

*United States v. Collins*,
  No. 07 Cr. 1170 (LAP) (S.D.N.Y. July 15, 2013) .................................................23

*United States v. Coppola*,
  671 F.3d 220 (2d Cir. 2012)..................................................................................10

*United States v. Deutsch*,
  987 F.2d 878 (2d Cir. 1993)..................................................................................10

*United States v. DiAmbrosio*,
  No. 04 Cr. 66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008).................................19

*United States v. DiMattina*,
    885 F. Supp. 2d 572 (E.D.N.Y. 2012) ...................................................................................18

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..................................................................................12

*United States v. Garcia*,
    182 F.3d 1165 (10th Cir. 1999) ...........................................................................................13

*United States v. Ghavami*,
    No. 10 Cr. 1217 (KMW) (S.D.N.Y. July 23, 2013) ..............................................................11

*United States v. Gomez*,
    No. 11 Cr. 96 (RWS), 2013 WL 818717 (S.D.N.Y. Feb. 27, 2013) .....................................18

*United States v. Haddock*,
    12 F.3d 950 (10th Cir. 1993) ...............................................................................................11

*United States v. Howe*,
    543 F.3d 128 (3d Cir. 2008) .................................................................................................19

*United States v. Jones*,
    460 F.3d 191 (2d Cir. 2006) ...................................................................................................7

*United States v. Lumiere*,
    No. 16 Cr. 483 (JSR) (S.D.N.Y. June 14, 2017) ..................................................................22

*United States v. Mullings*,
    131 F. Supp. 3d 1 (E.D.N.Y. 2015) ......................................................................................19

*United States v. Munir*,
    953 F. Supp. 2d 470 (E.D.N.Y. 2013) ..................................................................................21

*United States v. Najera*,
    915 F.3d 997 (5th Cir. 2019) ...............................................................................................13

*United States v. Recck*,
    No. 15 Cr. 15 (JAM) (D. Conn. Oct. 31, 2016) ....................................................................22

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996) ...................................................................................................18

*United States v. Rosario*,
    No. 12-cr-403 (RWS), 2012 WL 4328092 (S.D.N.Y. Sep. 21, 2012) ...................................18

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007) .................................................................................................10

*United States v. Schulman*,
    No. 16 Cr. 442 (JMA) (E.D.N.Y. Sep. 26, 2017) .................................................................21

*United States v. Smith*,
    7 F. App'x 772 (9th Cir. 2001) ............................................................................................13

*United States v. Sterlingov*,
    No. 21 Cr. 399 (RDM) (D.D.C. May 17, 2023) ....................................................................24

iv

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ........................................................................21

*United States v. Strain*,
   No. 13 Cr. 906 (GBD) (S.D.N.Y. May 8, 2014) ......................................21

*United States v. Tighe*,
   No. 15 Cr. 62, 2018 WL 1307949 (E.D.N.Y. Mar. 13, 2018) ................21

## Statutes & Rules

18 U.S.C. § 981(a)(1)(c) ...............................................................................24

18 U.S.C. § 982(a)(1) ....................................................................................24

18 U.S.C. § 1343 .............................................................................................8

18 U.S.C. § 3553(a) ...............................................................................*passim*

28 U.S.C. § 2461(c) .......................................................................................24

USSG Ch. 1, Pt. A ..........................................................................................13

USSG Ch. 5, Pt. A ............................................................................................9

USSG § 1B1.3 ..............................................................................................8, 9

USSG § 2B1.1 .........................................................................................8, 9, 10

USSG § 2B1.4 ............................................................................................8, 12

USSG § 2C1.1 ..................................................................................................8

USSG § 2F1.1 ................................................................................................10

USSG § 2S1.1 ........................................................................................8, 9, 13

USSG § 3B1.3 ................................................................................................14

USSG § 3E1.1 ................................................................................................13

USSG § 4A1.1 ..................................................................................................9

USSG § 4C1.1 ..........................................................................................23, 24

USSG § 5C1.1 ................................................................................................23

## Other Authorities

Department of Justice, *Statement Of U.S. Attorney … On The Conviction Of
   Nathaniel Chastain*, May 3, 2023, https://www.justice.gov/usao-
   sdny/pr/statement-us-attorney-damian-williams-conviction-nathaniel-chastain ....................21

*Former Employee Of NFT Marketplace Charged In First Ever Digital Asset
   Insider Trading Scheme*, June 1, 2022, https://www.justice.gov/usao-
   sdny/pr/former-employee-nft-marketplace-charged-first-ever-
   digital-asset-insider-trading-scheme ........................................................14

Kevin Collier, *Former OpenSea employee arrested, charged with insider trading*, NBC NEWS (June 1, 2022),https://www.nbcnews.com/tech/internet/opensea-nft-nate-chastain-arrest-charged-insider-trading-rcna31489..................................................................20

James Fanelli, *First-Ever NFT Insider-Trading Case Heads to Trial*, WALL STREET JOURNAL (April 24, 2023), https://www.wsj.com/articles/first-ever-nft-insider-trading-case-heads-to-trial-2c5e9e97.....................................................20

United States Sentencing Commission, *Amendments to the Sentencing Guidelines* (April 27, 2023), available at ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.......................................23

United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf .......................................20

United States Sentencing Commission, Recidivism And The "First Offender" (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf. ............................20

This Sentencing Memorandum is respectfully submitted on behalf of Nathaniel ("Nate") Chastain.  On or about May 3, 2023, a jury found Nate guilty of one count of wire fraud and one count of money laundering.  For the reasons set forth below, and notwithstanding the jury's verdict, Nate respectfully requests that this Court impose a sentence of time served, or alternatively, a sentence of probation with community service and/or home confinement.

## I.  <u>PRELIMINARY STATEMENT</u>

As described in detail below, and in the many letters of support from his family, friends, and colleagues, Nate is a devoted son, loving brother, and caring friend, who is exceptionally kind and committed to helping those around him.  Prior to the conduct that led to his conviction, he lived a modest life defined by his devotion to family, education, and hard work, and he earned the respect, trust, and loyalty of his friends and colleagues.  He was, and remains, a young man defined by the character traits of generosity, honesty, and integrity.

The factual conduct underlying the instant case is an aberration and amounts to an isolated misstep in the context of Nate's entire life.  As a testament to his character, however, in the aftermath of his conduct coming to light, he immediately accepted responsibility and expressed remorse for his actions (though neither he nor OpenSea's management or employees thought it was criminal conduct), and voluntarily resigned from his position as Head of Product at OpenSea. Nonetheless, as a result of his error in judgment, he will forever be known among the general public as the first person ever to be convicted of "insider trading" in non-fungible tokens ("NFTs").

Nate accepts that he has been convicted and the Court must sentence him.  We do not here argue the reasons Nate maintains his innocence.  Rather, in addressing the scope of the offense conduct, we respectfully submit that the novel nature of this prosecution, along with the significant legal issues identified throughout the prosecution, the unusual facts underlying the alleged offense,

and the history and characteristics of the defendant, distinguishes this case from the heartland of typical fraud cases and justifies a non-custodial sentence.

## II.  NATE CHASTAIN'S PERSONAL HISTORY AND CIRCUMSTANCES

### A.  Nate's Upbringing Was Defined by Education and Hard Work

Nate Chastain was born on June 16, 1990, in Lawrence, Massachusetts, to Donna and Stephen Chastain, (PSR ¶ 46),[1] though he was raised by his parents primarily in Amesbury, Massachusetts, (*Id.* at ¶ 48).  His father, Stephen Chastain—a retired internal medicine physician— suffers from Alzheimer's disease and currently lives at an assisted care facility in Newbury, Massachusetts.  (*Id.* at ¶ 47).  His mother, Donna Chastain, is a registered nurse, living in Amesbury, Massachusetts.  (*Id.*).  Nate is the oldest of three children.  (*Id.* at ¶ 46).  His sister, Tara Chastain, age 27, is a registered nurse, (*Id.* at ¶ 47).  His brother, Stephen Chastain, Jr, tragically committed suicide at the age of 31 on February 11, 2023.  (*Id.*).

At the age of 18, Nate's parents separated and later divorced.  (*Id.* at ¶ 48).  Nate characterized his parents' marriage as rocky, due in part to their 16-year age gap, as well as emotional abuse inflicted upon his mother by his father, and the difficulty associated with his brother's Schizophrenia diagnosis.  (*Id.*).

Nate attended Philips Exeter Academy, (*Id.* at ¶ 61), a boarding school in New Hampshire, where he excelled academically and was an avid athlete, competing on his school's track and rowing teams.  After high school, Nate went to college at Lehigh University in Bethlehem, Pennsylvania, where he studied for just under a year.  (*Id.* at ¶ 60).  He then went on to earn his bachelor's degree, with a concentration in English, from Harvard University's Extension Studies program.  (*Id.* at ¶ 59).

---

[1] Citations to "PSR" refer to the August 4, 2023 Presentence Report filed by the United States Department of Probation in this case.

Since graduating from college in 2015, Nate has worked in the tech and crypto industries. He initially worked as an independently contracted software developer for Rehash Studio, a company that develops online interactive solutions (*Id.* at ¶¶ 77-78), and later accepted a full-time position at B Live Digital Inc., a livestreaming software platform, where he worked as a Frontend Developer. (*Id.* at ¶¶ 75-76). In 2018, after spending approximately two years at B Live digital Inc., Nate decided to pursue his passion for cryptocurrency and landed a job at Consensys, Inc., a company that develops various projects and services for the Ethereum blockchain. (*Id.* at ¶¶ 73-74). He was initially hired as a Frontend Developer but was later promoted to Product Manager, Senior Product Manager, and finally, Head of Product. (*Id.*).

Beginning in January 2021, and following a trial period, Nate worked at OpenSea, where he was employed as Head of Product until September 2021. (*Id.* at ¶¶ 71-72). Following his voluntary resignation from the company, Nate worked for several months as an independently contracted "Entrepreneur-in-Residence" at Quantstamp, a company that provides online blockchain security services. (*Id.* at ¶¶ 69-70). In or around March 2022, Nate founded and served as Chief Executive Officer of Oval Unlimited, which was developing a website and mobile application platform for NFTs. (*Id.* at ¶¶ 67-68). His title later changed to co-founder and Chief Product Officer after the company acquired venture capital funding. (*Id.*). Following his arrest in this case, however, he voluntarily separated from the company. (*Id.*). Currently, Nate is employed as the Head of Product for Nifty Island LLC, an online social gaming company. (*Id.* at ¶¶ 65-66).

### B. Nate's Life Is Marked with Acts of Generosity and Kindness

As a constant source of help and comfort, Nate has shown himself to be a concerned and caring friend and coworker, and his compassion and kindness are universally praised and echoed by those around him. Indeed, the words of his family, friends, and coworkers, contained within

the many letters of support that have been submitted on Nate's behalf, speak volumes about his character.  For example, Nate's former colleague, Luke Loreti, recalls that Nate served as a mentor when they worked together at Consensys, and he notes that Nate went out of his way to ensure that he (Loreti) had the opportunity to learn from more senior engineers and assimilate into the culture of the company.  (Loreti, 1).[2]  Similarly, Gavin Ching, who also spent time with Nate at Consensys, reports that in their two years working together, Nate always made sure that his team had a sustainable work-life balance to avoid unnecessary stress.  (Ching, 1).  Ching recalls a time when he was working late in the office to meet deadlines and Nate offered to stay with him and lend a hand.  (*Id.*).  Vincente Dragicevic, another former colleague from Consensys, writes about Nate's leadership and humanity when the company faced potential layoffs.  (Dragicevic, 1).  Specifically, Dragicevic recounts a time when Nate fought to keep a team of Latin American engineers together, sparing them from the uncertainty of unemployment.  (*Id.*).

As expected, Nate's generosity, kindness, and charitable efforts extend far beyond the workplace. Zack Guzman, Nate's friend from college, recalls their time writing for a sketch comedy news show and notes that Nate took on a leadership role in mentoring the younger students.  (Guzman, 1).  Guzman further details a time when Nate donated money to support him in a competition that was organized to raise money for breast cancer research.  (*Id.*).  Anna Chirico, one of Nate's longtime friends, recounts that Nate offers her a place to stay whenever she is in need and is always quick to lend an ear when she needs advice.  (Chirico, 1).  Jenna Martin, another one of Nate's long-time friends, recalls how Nate has helped her with several student film projects.

---

[2] Citations to letters of support include the author's last name and the page number on which the relevant information can be located.  Where necessary, the first initial of the author's first name is also provided.  Nate's letters of support are attached hereto as Exhibit 1.

(Martin, 1).  And Margaret Stevens describes how Nate is always willing to go out of his way for someone else, at any time, not just when it is convenient.  (Steven, 1).

Nate's family echoes this sentiment.  Ronald Bellanti, Nate's uncle, details the ways in which Nate assisted him with a drunk driving prevention campaign.  (R. Bellanti, 1).  Bellanti reports that Nate not only helped him with the technological aspects of the campaign, but also worked in sweltering heat on several occasions to help him move heavy equipment to his new offices.  (*Id.*).  This enabled Bellanti to avoid additional expenses and allowed more funds to be directed toward the campaign.  (*Id.*).  Additionally, Nate's sister, Tara, recalls many nights spent at their kitchen table while Nate helped her with math homework.  (T. Chastain, 1).

### C.  In Times of Unimaginable Hardship, Nate Has Selflessly Put the Needs of His Friends and Family Above His Own

Recently, Nate and his family have been dealing with his father's devastating Alzheimer's diagnosis.  Nate's uncle, Michael Bellanti, describes how Nate made the arrangements for his father's long-term care, spending hours researching which care facility would best meet his father's needs and assisting in the removal of his father's belongings from his home.  (M. Bellanti, 1-2).  Bellanti recalls that Nate exercised care and sensitivity in a manner that demonstrated his love and respect for his father.  (*Id.* at 2).  Nate's mother, Donna Chastain, further reports that Nate has remained patient and kind to his father, visiting every time he returns home.  (D. Chastain, 1).  And Nate's sister, Tara, describes how Nate has since stepped up and taken on the role of a father figure within the family.  (T. Chastain, 2).

In addition to dealing with his father's diagnosis, Nate and his family suffered an unimaginable loss when Nate's younger brother—who previously suffered a life-threatening injury at work, and who had a long history of mental illness—committed suicide in February of 2023.  As his family reports, Nate immediately and without question took on the responsibility of

planning all aspects of his brother's funeral services, as well as the responsibility of cleaning out his brother's apartment, to allow his mother and younger sister time to grieve.  (T. Chastain, 2; M. Bellanti, 2).  Despite dealing with his own grief from this devastating loss, Nate took care of his mother and younger sister who were understandably distraught.  (M. Bellanti, 2).  To this day, Nate continues to deal with the various issues that have arisen, and that will continue to arise, from his brother's passing.  (M. Bellanti, 2).

Sadly, Nate has been personally affected by suicide on another occasion as well.  Five years ago, Nate's college roommate, Alex Vance, tragically took his own life.  (Chirico, 1).  Anna Chirico remembers Nate's speech at Alex's memorial service as both eloquent and loving. (Chirico, 1).  Chirico says that Nate helps her to remember the best parts of Alex. (Chirico, 1).

### D.  The Instant Factual Conduct Is an Isolated Misstep in Nate's Life

Nate candidly admitted that he engaged in the factual conduct underlying this prosecution and that his conduct reflected a serious lapse in judgment.  He accepts responsibility for his actions, and he immediately accepted responsibility for them when they came to light.  *See* n.32 *infra*.  For the purpose of preserving the record, however, we continue to maintain that his factual conduct does not fall within the scope of the federal wire fraud or money laundering statutes.

Before this case, Nate had never been arrested, and there is zero indication that he is a person capable of repeating his conduct, which in all respects was an anomaly.  Unfortunately, however, his error in judgment has cost him everything: a job he enjoyed, including an equity stake in OpenSea that was worth millions of dollars (which would soon vest), his relationships, his reputation, and the goodwill that he has built throughout his life.  Recognizing the gravity of these circumstances, he remains dedicated to rebuilding his life and positively contributing to society.

III.     **CONSIDERATION OF ALL THE PERTINENT SENTENCING**
         **FACTORS WARRANTS A NON-GUIDELINES SENTENCE**

One of the fundamental principles of the federal sentencing statute is that the Court must impose a sentence "sufficient, but not greater than necessary," to accomplish the sentencing objectives of 18 U.S.C. § 3553(a).  Proceeding with this objective, the Court is normally required to calculate the Guidelines range prior to imposing any sentence.  It is clear, however, that the Guidelines are advisory in nature and simply represent the "starting point and the initial benchmark" in calculating a sentence.  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotation marks and citation omitted).  Accordingly, the Court "may not presume that the Guidelines range is reasonable," *Gall v. United States*, 552 U.S. 38, 50 (2007), and should instead exercise discretion in fitting a sentence to a defendant's individual circumstances, duly considering fairness and justice under all the circumstances, *see United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).  In this context, judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101.

Here, while the PSR appropriately recommends a non-Guidelines sentence, the PSR's recommendation of imprisonment for a year and a day fails to adequately reflect the novel nature of the instant prosecution, the pertinent facts underlying the instant case, and Nate's individual circumstances.  As set forth below, the advisory Guidelines, when calculated correctly and coupled with a more holistic consideration of the relevant section 3553(a) factors, warrant a sentence of time served, or alternatively, probation with community service and/or home confinement (*i.e.*, a sentence that is sufficient, but not greater than necessary, to effectuate the goals outlined in the federal sentencing statute).

### A.  The Advisory Guidelines Calculation

The Probation Department's Guidelines calculation results in a total offense level of 18

and yields a Guidelines range of 27 – 33 months' imprisonment.  In proceeding with its assessment,

Probation:

> (i)     correctly concluded that OpenSea sustained no loss in this matter[3];
> (ii)    correctly rejected the Government's contention that the instant Guidelines calculation should proceed under § 2B1.4[4];
> (iii)   erroneously calculated the total offense level under § 2S1.1(a)(2)[5];
> (iv)    failed to apply a two-level reduction for acceptance of responsibility[6]; and
> (v)     erroneously applied a two-level abuse of trust enhancement.[7]

As demonstrated herein, Probation's unjustified decision to proceed with its calculation

under § 2S1.1(a)(2) results in a total offense level that is drastically, and improperly, inflated.

Pursuant to § 2S1.1(a), the base offense level for money laundering is either:

> (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or
> (2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, or otherwise.

Notably, the Guidelines specify that subsection (a)(2) "applies to any case in which (i) the

defendant did not commit the underlying offense; or (ii) the defendant committed the underlying

offense (or would be accountable for the underlying offense under §1B1.3(a)(1)(A)), but the

---

[3] *See* PSR at 24 ("[T]he probation office concurs with defense counsel that OpenSea did not suffer any monetary loss."); *see also* Section (III)(A)(1) *infra*.

[4] *See* PSR at 22.  The Guidelines specifically note the statutory provisions covered under USSG § 2B1.4, *see* Appendix A (statutory index "specif[ying] the offense guideline section(s) in Chapter Two (Offense Conduct) applicable to the statute of conviction"), and 18 U.S.C. § 1343 is not identified as one of those covered provisions.  Instead, the Guidelines specify (and thus clearly demonstrate that Congress intended) that section 1343 is to be covered under USSG § 2B1.1 or § 2C1.1.

[5] Notably, in its draft presentence report, the Probation Department calculated the total offense level under § 2S1.1(a)(1).  In its final report, however, Probation incorrectly calculated the total offense level under § 2S1.1(a)(2).

[6] *See* Section III(A)(3) *infra*.

[7] *See* Section III(A)(4) *infra*.

offense level for the underlying offense is impossible or impracticable to determine." USSG § 2S1.1 comment. (n.3(A)).  Neither of those situations, however, applies here.  Thus, the base offense level is properly calculated under subsection (a)(1), which in turn directs the calculation to proceed under § 2B1.1 (*i.e.*, the provision governing "the underlying offense from which the laundered funds were derived").

When calculated correctly, the Guidelines' total offense level is 7, which comprises a base offense level of 7, a two-level enhancement for the related money laundering conviction, and a two-level reduction for acceptance of responsibility:

| | | |
|---|---|---|
| Base Offense Level:[8] | + 7 | |
| Specific Offense Characteristic (Loss):[9] | + 0 | |
| Specific Offense Characteristic (Money Laundering Conviction):[10] | | + 2 |
| (No) Adjustment for Role in Offense (Abuse of Trust): [11] | + 0 | |
| Acceptance of Responsibility: [12] | - 2 | |
| **Total Offense Level:** | **= 7** | |
| | | |
| Criminal History Points:[13] | 0 | |
| **Criminal History Category:** [14] | **I** | |

A total offense level of 7, combined with a criminal history category of I, yields a Zone A advisory Guidelines range of 0 – 6 months' imprisonment.

### 1. No Loss (or Gain) Enhancement Is Warranted

To establish a Guidelines sentencing enhancement based on a victim's purported loss, the government must prove by a preponderance of the evidence that the alleged offense caused "pecuniary harm" to said victim.  *See* USSG § 2B1.1, comment. (n.3(A)(iii)) (noting that pecuniary harm does not include harm to reputation or other non-economic harm).  Critically, the Second

---

[8] *See* USSG §§ 2S1.1(a)(1), 2B1.1(a)(1).
[9] *See* Section III(A)(1) *infra*.
[10] *See* USSG § 2S1.1(b)(2)(B).
[11] *See* Section (III)(A)(4) *infra*.
[12] *See* Section III(A)(3) *infra*.
[13] *See* PSR ¶ 42; USSG § 4A1.1 (Criminal History Category).
[14] *See* PSR ¶ 42; USSG Ch. 5, Pt. A (Sentencing Table).

Circuit has recognized that the government cannot satisfy this burden through mere speculation.[15] Instead, establishing loss for sentencing purposes requires an intensely fact-driven inquiry—one in which the government is typically expected to offer a rigorous methodology.[16]   Here, the government has utterly failed to satisfy this burden, as its contrived loss calculation—which values the loss to OpenSea (*i.e.*, the alleged victim) at $57,115 (PSR ¶ 23)—is purely speculative and lies completely untethered from the evidence adduced at trial.

As the Court is aware, and as Probation correctly concluded, OpenSea sustained ***no monetary loss*** as a result of the alleged offense, and in fact, gained from every one of the NFT transactions at issue.   Indeed, the evidence at trial undisputedly demonstrated that OpenSea collected a 2.5% commission on each NFT transaction conducted on its platform, including those related to the alleged offense.[17]   Accordingly, in the absence of any evidence showing that the relevant featured NFT transactions caused "pecuniary harm" to OpenSea, a six-level loss enhancement is not warranted.[18]

Similarly, a six-level increase is not warranted for alleged gains.  ***As the Guidelines make clear, in the absence of loss, the government is not permitted to circumvent its evidentiary burden by advancing the notion that the defendant's alleged gain serves as an adequate proxy for the victim's supposed loss***.  *See* USSG § 2B1.1, comment. (n.3(B)) ("The court shall use the

---

[15] *See, e.g., United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (remanding for resentencing where district court engaged in "pure speculation" when calculating loss under USSG § 2F1.1, the predecessor to the current fraud provision); *see also United States v. Coppola*, 671 F.3d 220, 249-50 (2d Cir. 2012) ("In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation.").

[16] *See, e.g., United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007) (remanding for recalculation of loss where district court accepted a loss estimate that failed to employ a methodology to separate fraud-related losses from market-decline related losses).

[17] *See* Trial Tr. at 490:15-17; 490:25 – 491:2 (Finzer Cross) (Q: "Now, OpenSea makes money by taking a 2.5 percent fee of each NFT sale completed on the platform, correct?" ‖ A: "Correct." ‖ Q: "And that holds true, the 2.5 percent fee for the featured NFTs, right? ‖ A: "Yes.").

[18] Notably, Probation agrees that "OpenSea did not suffer any monetary loss." PSR at 24.

gain that resulted from the offense as an alternative measure of loss *only if* there is a loss but it reasonably cannot be determined.") (emphasis added).[19]

### 2. Even if a Loss (or Gain) Enhancement Were to Apply, It Would Vastly Overstate the Seriousness of the Offense

Even if one were to accept the government's proposition that OpenSea sustained some amount of monetary loss, or alternatively, that Nate's alleged gain serves as an adequate proxy for OpenSea's alleged loss (it does not), the government cannot contest that the loss/gain figure is less than $57,115.00.[20]   During the trial testimony of FBI Special Agent Amelia Whitehead, the government entered certain charts into evidence to purportedly demonstrate that Nate's gain from the relevant NFT transactions was $57,115.[21]   But Special Agent Whitehead admitted on cross examination that her gain calculation included several transactions in which Nate purchased and sold certain NFTs ***after*** he featured the relevant NFT on OpenSea's homepage.[22]   In other words, Agent Whitehead's gain calculation included transactions that were not subject to the charged offense—a fact endorsed by both the government[23] and the PSR[24]—because the relevant NFTs

---

[19] *See, e.g., United States v. Ghavami*, No. 10 Cr. 1217 (KMW) (S.D.N.Y.), Sentencing Tr., July 23, 2013, ECF No. 424, at 8:7-12 (requiring government to show "that the resulting gain is a reasonable alternative measure of the loss"); *see also United States v. Anderson*, 45 F.3d 217, 221 (7th Cir. 1995) (noting that "gain may be used only as an alternative method of calculation when there is in fact a loss"); *United States v. Haddock*, 12 F.3d 950, 964 (10th Cir. 1993) (rejecting part of the government's reference to gain where those gains did not relate to any victim loss).

[20] Indeed, as the defense asserted in its closing argument, the gains in this case—to the extent they are calculated using the government's arbitrary conversion dates—could not be valued at more than approximately $800.  *See* Trial Tr. at 868:9 – 871:12 (noting that the government's gain calculation erroneously included transactions in July 2021, where Nate did not make purchases until *after* the NFTs were publicly featured, and August-September 2021, where Nate made his purchases *after* he had publicly disclosed to thousands of Twitter followers (including OpenSea employees) that he made such featured NFT purchases in advance of featuring them and was never instructed he should not).

[21] *See, e.g.,* GX 931 (calculating "Chastain's Profit" to be $57,115).

[22] Notably, Probation acknowledges that $57,115 "may not be an accurate account of the defendant's gains based on trial testimony."  PSR at 26.

[23] *See* Trial Tr. at 775:23 – 776:2 (government argued "[Mr. Chastain] took plans for ***upcoming*** features . . . and used it for his own illegal advantage.  He bought up NFTs ***right before*** they were going to be featured, then flipped them at a profit") (emphasis added); 782:6-10 (government stated "***the defendant's crime wasn't just buying and selling NFTs***.  The crime was using OpenSea's secret plans to buy those features ***before they went up on the home page***, when no one else knew what was going to be featured, then flipping them for a profit") (emphasis added).

[24] PSR ¶¶ 2, 13-20 (describing offense conduct as misappropriating OpenSea's confidential business information regarding what NFTs were going to be featured and using that information to purchase NFTs shortly before NFTs were featured).

had already been published to the public homepage of OpenSea's website; thus, the transactions did not rely on purported confidential business information,[25] they are not subject to the charged offense, and they cannot now count towards any gain computation.[26]

In any event, a six-level sentencing enhancement based on OpenSea's supposed loss, or the defendant's alleged gain, would vastly overstate the seriousness of the offense. As the Court is aware, it has long been noted that the Guidelines' emphasis on loss (or gain) can lead to unjust results. In 2004, for example, then-District Judge Gerard Lynch criticized the Guidelines, not only for placing "excessive weight" on the amount of loss involved in fraud cases but also for failing to adequately consider several other salient factors, such as the need to protect the public from further crimes of the defendant. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). In line with this sentiment, the Second Circuit has noted that the Guidelines' overemphasis on loss has invited downward departures from sentencing judges, and that a more rational regime might start by "selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permit[ting] adjustments up or down to reflect especially large or small amounts of loss." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).[27]

---

[25] *See* Trial Tr. at 414:10-15 (Whitehead Cross) (Q: "So the $57,000, however, includes [transactions in which Nate bought featured NFTs after they were featured], right?" || A: "It includes all of the transactions." || Q: "Including the ones where he bought after the featured art had been featured or along that continuum, right?" || A: "Yes."); PSR ¶ 13 ("Information regarding what NFT was going to be a featured on OpenSea was OpenSea's confidential business information because it was not publicly available until the featured NFT appeared on OpenSea's website homepage."); PSR ¶14 ("OpenSea kept confidential the identity of featured NFTs until those NFTs appeared on OpenSea's homepage.").

[26] Notably, Special Agent Whitehead also testified that the government's $57,115 figure was premised upon a conversion of the cryptocurrency, Ether (ETH)—which Nate received at the time of each NFT featured artist transaction in 2021—into U.S. Dollars at or around the time of those transactions. *See* Trial Tr. at 409:23 – 411:8; *see also* GX 900 (noting that 1 ETH ranged in value from $1,786 - $4,178 between May 1, 2021 and September 30, 2021). But there is no principled reason to convert the ETH to U.S. Dollars at those particular times, rather than at some other point. ***Even to this day, the ETH at issue has never been converted to U.S. Dollars and thus there has been no "realized gain"*** (which is a prerequisite for any gain enhancement to be applied under § 2B1.4). See USSG § 2B1.4 (Background). Accordingly, even if the Court were to accept the government's argument that this case should be evaluated under § 2B1.4—which respectfully it should not—a gain enhancement still should not apply.

[27] *See also United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense"), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008).

Here, the loss/gain figure provides little guidance to the Court in fashioning an appropriate sentence.  Indeed, if one were to accept the Probation Department's calculations, the loss/gain figure (+6) would account for over 33% of the total offense level (18), catapult this case to Zone D on the Sentencing Table, and in turn, potentially deprive Nate of years with his friends and family.  This result distorts the true nature of the alleged offense and is clearly unwarranted, particularly where Congress—in passing the Sentencing Reform Act of 1984—"sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."  USSG Ch. 1, Pt. A ¶ 3.[28]

### 3.  A Reduction Is Warranted for Acceptance of Responsibility

As noted in the Commentary to USSG § 3E1.1 (n.2) and cited by several courts in crediting defendants with a two-level reduction for acceptance of responsibility:[29]

> Conviction by trial … does not automatically preclude a defendant from consideration for [an Acceptance of Responsibility] reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

Such is the case here.  Indeed, at the very outset of trial—by way of brief example—the defense specifically informed the jury that it was not contesting the factual conduct lying at the heart of the government's allegations (*i.e.*, whether Nate bought and sold the relevant NFTs).  Rather, the defense asserted that the main issue in this case was whether information regarding soon-to-be-featured NFTs qualified as OpenSea's property under the wire fraud statute:

---

[28] Notably, even if the Court were to accept Probation's calculation under § 2S1.1(a)(2), the above arguments regarding loss/gain calculations, *see* Section III(A)(2) *supra*, equally apply to any determination regarding the amount of laundered proceeds.

[29] *See, e.g., United States v. Najera*, 915 F.3d 997, 1004 (5th Cir. 2019); *United States v. Allen*, No. 06-1318, 2007 WL 2446013, at *5-6 (6th Cir. Aug. 29, 2007); *United States v. Smith*, 7 F. App'x 772, 777 (9th Cir. 2001); *United States v. Garcia*, 182 F.3d 1165, 1175 (10th Cir. 1999).

> This case is not about whether Nate bought or sold the NFTs of the artists that he featured on the home page. He did it. He said he did it …. The issue in this case, and what's really at stake, is whether the information about who he liked … as the featured artists on OpenSea's home page was somehow OpenSea's property under the criminal wire fraud statute and whether Nate misappropriated, or stole that property from OpenSea.[30]

The short trial that followed—consisting of only four days of testimony—focused exclusively on "the applicability of a statute to his [uncontested] conduct," and thus falls squarely within the Guidelines' Commentary. Accordingly, given the novel nature of this prosecution,[31] the specific facts underlying this case (including Nate's immediate acceptance of responsibility in September 2021),[32] and the specific defense set forth throughout the course of this prosecution,[33] the defense respectfully submits that Nate should be afforded a two-point reduction for acceptance of responsibility.[34]

### 4. No Abuse of Trust Enhancement is Warranted

Pursuant to USSG § 3B1.3, the Abuse of Trust enhancement may not be applied "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." Here, the alleged offense specifically encompasses the misappropriation of confidential business

---

[30] Trial Tr. at 58:20-22; 59:15-22.

[31] Department of Justice, *Former Employee Of NFT Marketplace Charged In First Ever Digital Asset Insider Trading Scheme*, June 1, 2022, https://www.justice.gov/usao-sdny/pr/former-employee-nft-marketplace-charged-first-ever-digital-asset-insider-trading-scheme.

[32] Although the government opted to refrain from admitting evidence at trial demonstrating the extent of Nate's acceptance of responsibility and his articulated remorse for the relevant conduct, there can be no dispute that Nate: (i) immediately and truthfully informed OpenSea's management and several coworkers—prior to being aware of the existence of any government investigation—that he had bought and sold the NFTs at issue in this case because he "want[ed] to take full responsibility and accountability" for his actions, *see* Exhibit 2 (Slack chat with OpenSea employee Robert Sun); and (ii) immediately resigned from OpenSea in the aftermath of the alleged offense.

[33] *See, e.g.,* Defendant's Mot. to Dismiss the Indictment at 11-19 (ECF No. 19) (arguing that the indictment must be dismissed because information regarding soon-to-be-featured NFTs did not constitute "property" under the wire fraud statute); Defendant's Opp. to the Government's Mot. to Exclude the Testimony of Dr. Edman and Professor Skinner at 3-7 (ECF No. 63) (arguing that the government was required to prove at trial that information concerning soon-to-be-featured NFTs was the confidential business information of OpenSea, and that it had inherent value to OpenSea).

[34] Probation suggests that Nate has not displayed even "a modicum of outward acknowledgment" to demonstrate an acceptance of responsibility. PSR at 25. Probation's position fails to account for Nate's complete acceptance of responsibility in the immediate aftermath of the relevant conduct coming to light. *See* n.32 *supra*.

information in violation of a duty of trust owed to OpenSea.  *See* Indictment ¶¶ 1, 13 ("[I]n violation of the duties [of trust and confidence that] he owed to OpenSea, Chastain misappropriated OpenSea's confidential business information by purchasing NFTs that he knew were going to [be] featured on OpenSea's homepage…"); Trial Tr. at 915:15-18 (Jury Instructions) ("Count One charges the defendant with wire fraud. Specifically, it charges that … the defendant misappropriated OpenSea's confidential business information…."); Trial Tr. at 917:25 – 918:2 (Jury Instructions) ("The word 'misappropriate' refers to the fraudulent appropriation of property by a person to whom such property has been entrusted.").  Because the violation of a duty of trust was an element of the government's theory of the case, the Guidelines preclude this enhancement.

### B.  Section 3553(a) Factors Strongly Favor a Non-Guidelines Sentence

As the Court is aware, the mechanistic approach of the Guidelines does not control sentencing outcomes, and district judges should exercise discretion in fitting sentences to a defendant's individual circumstances.  *See Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (recognizing "the principle that the punishment should fit the offender and not merely the crime"). To this end, the sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a) to craft a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. In doing so, the sentencing judge has wide discretion to vary from the advisory Guidelines range.[35]

Pursuant to 18 U.S.C. § 3553(a), in determining the sentence to be imposed, the Court must consider: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the kinds of sentences available; (iii) the applicable Guidelines range; (iv) any

---

[35] See *Rita v. United States*, 551 U.S. 338, 351 (2007) ("[The sentencing judge] may hear arguments … that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply … perhaps because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless.").

pertinent policy statement; (v) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (vi) the need to provide restitution to victims of the offense.  The statute further specifies that the Court must consider the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.[36]

### 1.  Nate's Personal Characteristics

As Judge Rakoff recognized in *United States v. Adelson*:

"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant."  441 F. Supp. 2d at 514.

At every stage of his life, Nate has demonstrated his extraordinary devotion to and concern for others.  And the many letters of support submitted with this memorandum show that Nate has lived an exemplary life: (i) lending a hand to those in need; (ii) supporting friends through times of tragedy; (iii) contributing to charitable efforts; (iv) serving as a mentor to his coworkers; (v) dedicating time to building useful products for people; and (vi) stepping up for his family, not only in the aftermath of his father's Alzheimer's diagnosis, but also in the wake of his brother's recent suicide.  Shining through each one of these examples is the portrait of a caring and thoughtful young man, recognized by those around him as intelligent, funny, compassionate, honest, and kind.

---

[36] 18 U.S.C. § 3553(a)(2); *see Dean v. United States*, 581 U.S. 62, 67 (2017).

By way of brief but illustrative example, throughout his life, Nate has been a tutor, mentor, and guide to his family and colleagues:

- Mentoring younger students in entry-level writing positions for a collegiate sketch comedy news show (Guzman, 1);
- Ensuring that his junior colleagues were adequately prepared for the rigors of the workplace (Loreti, 2);
- Voluntarily working late with his coworkers so they would not be forced to work alone (Ching, 1); and
- Fighting to keep a team of Latin American engineers together and thereby sparing them from the uncertainty of unemployment (Dragicevic, 1).

Throughout his life, Nate has also been exceptionally generous:

- Lending an ear when his friends need advice, or offering his apartment when they need a place to stay (Chirico, 1);
- Setting aside time to help his friends with school projects or to reassure them in the aftermath of career disappointments (Martin, 1);
- Donating money to support his friend in a competition arranged to raise money for breast cancer research (Guzman, 1); and
- Helping his uncle with a drunk driving prevention campaign, which saved on expenses and allowed additional campaign funds to be contributed toward the cause (R. Bellanti).

Additionally, while suffering from his own grief and loss, Nate has continued to show kindness and compassion to those around him:

- Consoling his friend as she went through a divorce, and helping her move out of her home when she could not afford movers (Easthauser, 1);
- Supporting his friend, not only when her father committed suicide, but also when her friend, and Nate's roommate, committed suicide (Chirico, 1);
- Acting as a father figure in his family when his Dad was diagnosed with Alzheimer's (T. Chastain, 2), researching long-term care facilities that would provide the best home for his father, and assisting in the removal of belongings from his father's home (Bellanti, 1-2); and
- Planning all aspects of his brother's funeral service (just before trial commenced in this matter), cleaning out his brother's apartment, and taking care of his mother and younger sister who were understandably distraught.

Ultimately, Nate's life is defined by acts of kindness and giving, and the instant factual conduct is an isolated misstep in the context of his entire life. As noted by his current employer,

"[Nate is] a humble, hardworking, understated man whose motivations are good and who would make great use of a second chance."  (Smith, 2).  Accordingly, in light of his young age (33),[37] charitable actions and good character,[38] a below-guidelines sentence is appropriate and justified.

### 2.   Nature and Circumstances of Offense; Need for Sentence to Reflect the Seriousness of the Offense

Against the backdrop of a company that failed to implement policies and training regarding the definition and use of confidential business information, the factual conduct at issue lies outside of the heartland of typical fraud cases—and clearly is not conduct for which a term of imprisonment is warranted.  Indeed, the factual conduct took place over a short period of time, inflicted no monetary losses upon the purported victim, and resulted in relatively minimal gains. The pertinent facts underlying this novel prosecution—only some of which were elicited at trial— demonstrate compelling mitigating circumstances.  Identifying a select few:

- OpenSea did not have any rules clearly defining the types of information that constituted confidential business information until after Nate resigned.[39]
- OpenSea did not discuss the contents of the Clerky form with its employees or conduct trainings regarding the use of confidential information until after Nate resigned.[40]
- OpenSea co-founders offered conflicting accounts regarding the extent of any personalized modifications to the Clerky form.[41]

---

[37] *See, e.g., See United States v. Gomez*, No. 11-cr-96 (RWS), 2013 WL 818717, at *6 (S.D.N.Y. Feb. 27, 2013) (finding that defendant's young age (31) was a significant factor in justifying the court's departure from the Guidelines); *United States v. Rosario*, No. 12-cr-403 (RWS), 2012 WL 4328092, at *5 (S.D.N.Y. Sep. 21, 2012) (departure from Guidelines warranted "in light of defendant's youth"); *United States v. Allen*, 644 F. Supp. 2d 422, 437 (S.D.N.Y. 2009) (opining that "the youth of the defendants at the time of the relevant conduct" weighed in favor of a departure from the Guidelines).

[38] Several courts have found histories of charitable actions and good character to justify sentences below the relevant Guidelines range.  *See, e.g., United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (support letters attesting to defendant's "good character and many acts of charity" justified reduction); *see also United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on extraordinary public service and good works); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming district court's consideration of charitable works as appropriate basis for Guidelines departure).

[39] Instead, as the trial evidence showed, OpenSea relied on a boilerplate "Clerky" form that was purchased online. *See* GX 214 at 1-2; Trial Tr. at 305:15-17 (Atallah Cross); Trial Tr. at 486:1-8 (Finzer Cross).

[40] *See* Trial Tr. at 305:22 – 307:9 (Atallah Cross); Trial Tr. at 488:4 – 489:7 (Finzer Cross)

[41] While Atallah testified that he believed modifications may have been made to customize the Clerky template, *see* Trial Tr. at 302:1-9 (Atallah Cross), OpenSea's CEO Devin Finzer testified that he did nothing to modify the template, *see* Trial Tr. at 486:1-10 (Finzer Cross).

- OpenSea did not implement a policy prohibiting the purchase and sale of featured NFTs—or defining plans to feature or promote an NFT as "confidential information"—until after Nate resigned.[42]
- OpenSea co-founder and former Chief Technology Officer, Alex Atallah, conceded on cross examination that he himself violated OpenSea policies regarding the purchase of featured NFTs.[43]
- Dr. Matthew Edman testified that, in his expert opinion, Nate did not use a VPN, mixer, tumbler, or non-KYC exchange to obfuscate his cryptocurrency transactions, which were instead consistent with the common user who maintains a cold wallet for cryptocurrency storage and a hot wallet for cryptocurrency transactions.[44]
- In the aftermath of Nate's resignation, Finzer praised Nate for the "amazing work [he] did at OpenSea,"[45] and tried to help Nate find a new job with an OpenSea investor.[46]
- Prior to trial, counsel for OpenSea informed the government in attorney proffers that: (i) Finzer had stated, in sum and substance, that he "[did] not believe that there [was] anything intrinsically valuable to OpenSea [in keeping] the identity of the [NFT] featured work secret"[47]; and (ii) a senior leader at OpenSea had stated, in sum and substance, that "OpenSea did not think there was inherent value in the confidentiality of the featured NFT artist selection, as OpenSea would still get a cut of the sales and would have made the identity of it public regardless."[48]

Viewed collectively, the relevant facts and legal issues remove this case from the heartland of typical fraud cases, and the defense respectfully submits that a non-Guidelines, non-custodial sentence would sufficiently reflect the seriousness of conduct.[49]

### 3. Need for Sentence to Provide Specific Deterrence

Section 3553(a)(2)(C) requires the Court to take into consideration the need "to protect the public from further crimes of the defendant." Respectfully, Nate poses no threat of recidivism,

---

[42] *See* DX 18; GX 226.
[43] *See* Trial Tr. at 321:17 – 323:3 (Atallah Cross).
[44] *See* Trial Tr. at 637:10-13; 640:11-14; 644:22 – 645:4 (Edman Direct).
[45] See DX 22.
[46] *See* DX 23 (Finzer: "Hey Nate, wanted to intro you to Fred Ersham who I think would be good to chat with about future career moves"); Trial Tr. at 510:14 – 511:6 (noting that Fred Ersham is the co-founder of Coinbase—one of the largest cryptocurrency exchanges in the world—who led a funding round for OpenSea to the tune of hundreds of millions of dollars).
[47] 3503-001 at 3 (government 3500 material).
[48] 3507-001 at 2 (government 3500 material).
[49] *See United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (custodial sentence unnecessary where defendant's conduct "appeared to be an 'aberration' from his otherwise law abiding life"); *see also United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming non-Guidelines, non-custodial sentence of probation based in part on crime being an "isolated mistake"); *United States v. DiAmbrosio*, No. 04 Cr. 66, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (non-Guidelines, non-custodial where fraudulent conduct was exception to otherwise law-abiding life).

and there is no doubt that Nate has felt punishment as a result of his missteps.  Indeed, he spent two years enduring the stress of the government's investigation and subsequent prosecution; he resigned from his job at OpenSea—one of the largest and most well-known NFT marketplaces—before his equity shares vested,[50] which had a potential value of several million dollars; and his conduct was widely publicized, as he himself was a public figure in the NFT industry.[51]

These consequences, coupled with the immense personal shame resulting from his arrest and subsequent conviction, all but ensure specific deterrence from committing any further crimes, and thus, a non-custodial sentence is more than sufficient.  To be sure, publications by the U.S. Sentencing Commission confirm that "first offenders" like Nate, with no prior convictions or arrests, have an "extremely low recidivism rate."[52]  Moreover, defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[53]

### 4.   Need for Sentence to Provide General Deterrence

Section 3553(a)(2)(C) requires the Court to take into consideration the need "to afford adequate deterrence to criminal conduct," often viewed as the need to provide general deterrence. In light of the specific facts underlying this case, no term of imprisonment will advance this need. The punishment that Nate has endured thus far is more than sufficient to deter others who work in the NFT and/or cryptocurrency industries from engaging in similar conduct.  Not only has Nate's

---

[50] *See* Trial Tr. at 480:20 – 481:5.

[51] *See, e.g.,* Kevin Collier, *Former OpenSea employee arrested, charged with insider trading*, NBC NEWS (June 1, 2022),  https://www.nbcnews.com/tech/internet/opensea-nft-nate-chastain-arrest-charged-insider-trading-rcna31489; James Fanelli, *First-Ever NFT Insider-Trading Case Heads to Trial*, WALL STREET JOURNAL (April 24, 2023), https://www.wsj.com/articles/first-ever-nft-insider-trading-case-heads-to-trial-2c5e9e97.

[52] U.S. Sentencing Commission, Recidivism And The "First Offender" (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf, at page 16-17 (reporting a 6.8% recidivism rate for true first time offenders).

[53] U.S. Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf, at 20.

reputation been irreparably damaged, but his prospects of obtaining future work in the NFT and/or crypto industries have been significantly curtailed.[54]   In sum, it is hard to imagine that anyone would want to risk landing in Nate's shoes.

Further, many major American newspapers, from the Wall Street Journal to The New York Times, as well as several tech-related news outlets, have reported on this case with great interest. As the government's declared first-ever criminal case involving the so-called "insider trading" of digital assets, every significant moment of this case has been reported in real time.   The media, therefore, has done its part to deter any would-be NFT traders from engaging in similar conduct.[55] Moreover, the government's own statements should have extinguished any hypothetical appetite of the general public to engage in similar conduct.[56]   Thus, we respectfully submit that the goals of general deterrence have already been achieved and that prison time will not advance those goals.

### 5.   Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) provides that "the court shall consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   Due to the novel nature of this prosecution, there is no perfectly analogous precedent. Many courts, however, have imposed non-custodial sentences in fraud cases where the conduct was far more serious than the offense conduct here.[57]   Similarly, courts within this Circuit have

---

[54] *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence … is lessened because the conviction itself 'already visits substantial punishment on the defendant.'").
[55] *See, e.g., United States v. Munir*, 953 F. Supp. 2d 470, 475 (E.D.N.Y. 2013) (recognizing that "[p]ublicity will probably add to the taint of a conviction even after a defendant has served his sentence").
[56] Department of Justice, *Statement Of U.S. Attorney … On The Conviction Of Nathaniel Chastain*, May 3, 2023, https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-nathaniel-chastain.
[57] *See United States v. Schulman*, No. 16 Cr. 442 (JMA) (E.D.N.Y.), Sentencing Tr., Sep. 26, 2017, ECF No. 155, at 26:22-24, 37:6-12, 40:1-16 (calculating Guidelines range of 41 – 51 months' imprisonment and imposing sentence of three years' probation with 2,000 hours of community service and a $50,000 fine, after jury conviction, where defendant committed "textbook insider trading"); *United States v. Tighe*, No. 15 Cr. 62, 2018 WL 1307949, at *1 (E.D.N.Y. Mar. 13, 2018) (sentences of four years' probation with six months' home confinement after defendants pled guilty to years-long wire fraud conspiracy); *United States v. Strain*, No. 13 Cr. 906 (GBD) (S.D.N.Y.), Sentencing Tr., May 8, 2014, ECF No. 25 at 4:2-6:1, 25:11-26:5 (sentence of three years' probation, six months' home confinement, and 500 hours of community service, and restitution, where defendant stole more than $500,000 in client

imposed significantly below-Guidelines sentences on defendants convicted by juries of fraudulent

conduct that was far more egregious than the conduct at issue here:

- In *United States v. Chow*, No. 17 Cr. 667 (S.D.N.Y.), following a jury trial, the defendant was convicted of securities fraud and conspiracy to commit securities fraud. Sentencing Tr., Jan 17, 2019, ECF No. 161, at 37:14-22. Specifically, in violation of a non-disclosure agreement that expressly limited the types of information that the defendant could share regarding an upcoming merger, the defendant provided material non-public information regarding that merger to a co-conspirator, which allowed the co-conspirator to make many millions of dollars in profit. *Id*. at 74:1-7. Although the Guidelines range was 63 – 78 months' imprisonment, *id*. at 40:10-13, Judge Woods sentenced the defendant to 3 months' imprisonment followed by two years of supervised release, including 9 months of home imprisonment. *Id.* at 84:6-85:25.
- In *United States v. Lumiere*, No. 16 Cr. 483 (S.D.N.Y.), a former analyst and portfolio manager at Visium Capital Management was convicted of securities and wire fraud for his participation in a scheme to mismark securities in a credit fund to overstate the value of the fund. *See* Gov't Sentencing Letter, ECF No. 98, at 3-4. The government argued that the scheme caused $9.5 to $25 million in loss to investors, *see id.*, and the parties agreed that it resulted in millions of dollars in unlawful gain, Sentencing Tr., June 14, 2017, ECF No. 117, at 2:2-8. Judge Rakoff determined that defendant played a "highly significant" role, and "even when he was on the verge of being caught, sought ways to turn the scheme to his further advantage through [an] attempt at blackmail." *Id*. at 29:14-19. Nevertheless, the court varied from the Guidelines range of 87 to 108 months, *id*. at 2:17-19, to a sentence of 18 months of imprisonment, *id*. at 30:8-10.
- In *United States v. Block*, No. 16 Cr. 595 (S.D.N.Y.), the former chief financial officer of a public company was convicted of manipulating the company's financial results by fraudulently inflating a key metric used by investors to evaluate real estate investment trusts. *See* Sentencing Tr., Nov. 8, 2017, ECF No. 169, at 68:7-20. Judge Oetken concluded that defendant was the "mastermind" of the fraud, *id*. at 40:15, and that he "brazenly" committed the fraud "by simply making up numbers to plug a gap," *id*. at 68:7-16. Probation determined a $3 billion loss, *id*. at 35:15-36:2, and recommended seven years' imprisonment, *id*. at 71:14-15, while the government offered an alternative calculation of $350 million in shareholder loss, *id*. at 36:18-37:4, and sought at least seven years' imprisonment, *id*. at 71:15-16. The court concluded that while it was clear that defendant's fraud directly caused significant losses, and the court believed that the government's loss estimate "[was] probably about right," the calculation was not sufficiently reliable, and the court declined to impose a loss enhancement. *Id*. at 38:12-39:17. Noting, among other things, that

---

funds); *United States v. Recck*, No. 15 Cr. 15 (JAM) (D. Conn.), Sentencing Tr., Oct. 31, 2016, ECF No. 42 at 8:1-8, 77:3-81:25 (calculating Guidelines range of 21 – 27 months' imprisonment and imposing sentence of five years' probation, six months' home confinement, 600 hours of community service, and restitution, where defendant stole approximately $125,000 from a charitable organization and filed a false tax return).

defendant had otherwise led a law-abiding life, *id*. at 69:14-19, the court imposed a sentence of 18 months' imprisonment, *id*. at 72:6-7.

- In *United States v. Collins*, No. 07 Cr. 1170 (S.D.N.Y.), defendant was a lawyer at Mayer Brown who had played an "indispensable role" in the Refco fraud, which included "preparing legal documents over years for the transactions planned by company insiders to effect the fraud." Sentencing Tr., July 15, 2013, ECF No. 244, at 21:8-14. The government contended that there were thousands of victims and billions of dollars in losses, *id*. at 17:7-9, Refco was defendant's primary client, and defendant's participation was not aberrant, but rather went on "year after year," *id*. at 15:15-23. Although the Guidelines called for life imprisonment, Judge Preska imposed a sentence of one year and one day. *Id*. at 35:9-12.

When comparing the above-listed defendants' conduct to Nate's conduct, it is apparent that any term of imprisonment here would significantly overstate the seriousness of Nate's conduct. Accordingly, we respectfully submit that a below-Guidelines sentence for Nate is not only appropriate, but necessary, to avoid such unwarranted sentencing disparities.

### 6. Forthcoming Amendments to the Sentencing Guidelines

On April 5, 2023, the U.S. Sentencing Commission voted to include a new Guideline, § 4C1.1, and to amend the existing § 5C1.1, which covers the imposition of terms of imprisonment. Noting that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points have considerably lower recidivism rates than other offenders," the U.S. Sentencing Commission will implement USSG § 4C1.1, which will provide a two-level decrease from the offense level determined under Guidelines Chapters Two and Three if the defendant meets certain criteria (applicable here). [58] Critically, the Commission will advise, beginning in November 2023—just over two months after Nate is scheduled to be sentenced—that a non-incarceratory sentence is generally appropriate for first-time offenders who qualify for an adjustment under USSG § 4C1.1, and whose applicable guidelines range is in Zone A or Zone B

---

[58] U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines* (April 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf, at 79, 87-92.

of the Sentencing Table.  Additionally, where a first-time offender's applicable Guidelines range is in Zone C or Zone D of the Sentencing Table, the Commission will advise that a non-incarceratory sentence may be appropriate if the offender received an adjustment under USSG § 4C1.1 and "the applicable [G]uideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."  The Court should consider these upcoming amendments in fashioning Nate's sentence.

## IV.    <u>**FORFEITURE**</u>

The Probation Department properly recognizes that "forfeiture is an issue in this case," PSR at 26, and correctly notes that (i) the relevant forfeiture provision governing the wire fraud count mandates forfeiture of any and all property that "constitutes or is derived from" proceeds traceable to the alleged commission of the wire fraud offense, *see* PSR ¶ 4 (citing 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c)), and (ii) the forfeiture provision governing the money laundering count mandates forfeiture of any and all property "involved in" the alleged commission of the money laundering offense, *see* PSR ¶ 5 (citing 18 U.S.C. § 982(a)(1)).

Under both provisions, the property subject to forfeiture is the cryptocurrency (ETH) "derived from" and/or "involved in" the relevant NFT transactions.  As noted above, there is no principled reason to convert the relevant ETH to U.S. Dollars near the time that the relevant transactions took place, or any time thereafter.  Even to this day, the relevant ETH has never been converted to U.S. Dollars.  Thus, the property subject to forfeiture is the cryptocurrency ETH, not a U.S. Dollar amount (which was never "derived from" or "involved in" the transactions at issue).[59]

Finally, even if the recommended forfeiture amount is ultimately set forth in U.S. Dollars and based on the government's arbitrary conversion dates, which it should not be as a matter of

---

[59] *See United States v. Sterlingov*, No. 21-cr-399 (D.D.C. May 17, 2023), ECF No. 119, at 1-2 (Notice of Bill of Particulars For Forfeiture) (government seeking forfeiture of cryptocurrency rather than U.S. dollar equivalent).

law, we note that the total forfeiture amount must be less than $57,115.00, *see* PSR at 26 (noting "there is merit to defense counsel's argument that the forfeiture amount … may not be an accurate account of the defendant's gains"), given Agent Whitehead's concession at trial that the government's gain computation included transactions that were not subject to the alleged offense.

V.      **CONCLUSION**

For the foregoing reasons, and notwithstanding the Probation Department's recommendation that the Court impose a sentence of one year and one day, Nate respectfully requests that this Court impose a non-guidelines sentence of time served, or alternatively, a sentence of probation with community service and/or home confinement.


Dated:  New York, New York
        August 8, 2023

                                        Respectfully submitted,

                                        GREENBERG TRAURIG, LLP

                                        By: */s/ David I. Miller*          .
                                        David I. Miller
                                        Daniel P. Filor
                                        Nicholas T. Barnes
                                        Charles J. Berk
                                        One Vanderbilt Avenue
                                        New York, NY 10017
                                        Telephone: (212) 801-9200
                                        Facsimile: (212) 801-6400

                                        *Attorneys for Nathaniel Chastain*