UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                               :
UNITED STATES OF AMERICA                       :
                                               :         22 Cr. 305 (JMF)
            -  v.  -                            :
                                               :
NATHANIEL CHASTAIN,                            :
                                               :
                              Defendant.        :
                                               :
-------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Thomas Burnett
Allison Nichols
Nicolas Roos
Assistant United States Attorneys
    - *Of Counsel* -

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Nathaniel Chastain scheduled for August 22, 2023.

Chastain, the head of product at OpenSea, the largest online marketplace for auctions and sales of non-fungible tokens ("NFTs"), misappropriated OpenSea's confidential business information regarding NFTs that would be featured on OpenSea's website so that he could secretly purchase dozens of NFTs shortly before they were featured and resell them shortly afterwards at a significant profit.  This crime was not the result of an isolated error in judgment.  Rather, the defendant participated in a sophisticated criminal scheme that spanned approximately twelve weeks and involved the creation and use of two dozen crypto wallets to obfuscate his role in the transactions.   In total, Chastain traded in at least approximately 45 NFTs and generated $57,115 in profits.

The defendant was not any ordinary OpenSea employee.   As a result of his role as head of product and one of the start-up's first employees, Chastain had routine access to sensitive, confidential business information regarding OpenSea's business plans.   As to the information about featured NFTs, it was Chastain himself who conceived of the practice of selecting independent artists for prominent display on OpenSea's website and Chastain himself who led the process for selecting the artists.   This information was valuable because being featured caused the price of the featured NFT to increase, often by significant margin.   OpenSea's confidentiality policy was clear that employees were prohibited from using any confidential or non-public information that they obtained as a result of their employment for their own personal gain.   Rather than closely guard OpenSea's corporate secrets as he had promised that he would, the defendant instead chose to exploit his sensitive role.   He breached the trust that was placed in him by

OpenSea, and, by extension, by OpenSea's user and artist constituencies, by appropriating the information to turn a profit for himself.

While the defendant suggests that a sentence of time served would be sufficient and the Probation Office recommends a year and a day, the Government respectfully submits that neither of those recommended sentences would fully vindicate all of the Section 3553(a) factors.   As is discussed in further detail below, a sentence of a year and a day would be inadequate because it would, among other things, fail to fully reflect the seriousness of the offense conduct and be inadequate to promote both specific and general deterrence.   It would also lead to unwarranted sentencing disparities compared to the two-year sentence the Honorable Loretta A. Preska recently imposed on Ishan Wahi in *United States v. Ishan Wahi*, 22 Cr. 392 (LAP), whose conduct – trading cryptocurrency based on confidential information he learned through his employer, Coinbase – was analogous to the defendant's.

In light of the seriousness of the offense conduct, the goals of sentencing – particularly just punishment, promotion of respect for the law, and adequate deterrence – will be served by a term of imprisonment within the Guidelines range calculated by the Government of 21 to 27 months' imprisonment. Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## PROCEDURAL HISTORY

On May 31, 2022, a grand jury in the Southern District of New York returned an indictment charging Chastain with one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).   Both charges arose out of Chastain's scheme to misappropriate confidential business information from his employer, OpenSea, about what NFTs OpenSea planned to feature on its homepage, so Chastain

could secretly purchase those NFTs before they were featured, then resell them at a profit.   (*See* Indictment ¶¶ 1-3).

On August 19, 2022, Chastain moved to dismiss the Indictment, arguing principally that the confidential information he misappropriated was not "property" within the meaning of the wire fraud statute, that an insider-trading-wire-fraud charge is limited to trading in securities and commodities, and, as to Count Two, that the Government failed to allege the elements of money laundering. (Dkt. 19).   On October 21, 2022, the Court denied Chastain's motion, holding that Chastain's argument that the wire fraud charge requires an allegation of trading in securities or commodities was "wholly without merit" and that his other arguments concerned the sufficiency of the evidence, not the adequacy of the Indictment, and therefore were not an appropriate basis for dismissal.   (Dkt. 39 at 4).   Chastain also filed a suppression motion (Dkt. 27) and a motion to strike surplusage from the indictment (Dkt. 30), which were likewise denied (Dkt. 43).

Trial commenced on April 24, 2023 and ended on May 3, 2023, when the jury found the defendant guilty on both counts.   (Dkt. 128).   At the trial, the Government called eight witnesses, including OpenSea's co-founders, several other current and former OpenSea employees, an NFT artist, and an FBI agent.   The defendant called one witness, an expert in in cryptocurrency blockchain analysis and cybersecurity investigations.

## STATEMENT OF FACTS

From approximately February 2021 through September 2021, Chastain worked as head of product at OpenSea, an online marketplace for auctions and sales of NFTs.   (PSR ¶¶ 10, 14).   In that capacity, in approximately May 2021 Chastain conceived and helped execute a redesign of OpenSea's website homepage intended to drive traffic to the site and promote engagement with users and artists by rotating a different featured NFTs on an approximately biweekly basis.   (PSR

¶ 14).   Chastain took input from other OpenSea employees on the featured work but was responsible for selecting NFTs from OpenSea's marketplace to feature.   (*Id.*).   Neither Chastain nor anyone else at OpenSea advertised, disclosed, teased, or promoted the featured work *before* it was featured—not even to the individual artist whose work was selected.   The selection of the featured work was confidential until it went live on the OpenSea homepage.   (PSR ¶ 13).

Works that were featured and other NFTs by the same artist increased in value upon being featured, sometimes dramatically.   (PSR ¶ 13; GX 908).

Chastain knew and understood that the selection of the featured work was OpenSea's confidential business information and that it would therefore be improper to appropriate it to his own use.   OpenSea required its employees, including Chastain, to sign a confidentiality agreement which required him "to hold in strictest confidence, and not to use, except for the benefit of the Company . . . any Confidential Information that I obtain, access or create during" his employment relationship.   (GX 214).   In chats with his colleague Pascal Marsolais in May 2021, Chastain demonstrated, in his own words, an understanding that he may not use confidential information about the featured NFTs to his own benefit but expressed "FOMO," or fear of missing out, due to not purchasing the featured works:

Nate Chastain, Pascal Marsolais

**Nate Chastain**  *8:56:09*
I almost FOMO'd into Dario's collection (featured homepage artist) for $400 today

**Pascal Marsolais**  *8:56:16*
oh!!

**Nate Chastain**  *8:56:20*
It's so funny because I am directly responsible for creating the FOMO-able situation lol

**Nate Chastain**  *8:56:29*
I could have easily bought one yesterday before I selected him for the homepage feature

**Pascal Marsolais**  *8:56:33*
you need to buy BEFORE featuring

**Pascal Marsolais**  *8:56:46*
😉

**Nate Chastain**  *8:56:51*
I know, I failed 🙁

**Pascal Marsolais**  *8:56:55*
hehe

**Nate Chastain**  *8:57:19*
I realize this is a strange way to operate as an employee of OpenSea but I still have such a hard time spending hundreds of dollars on an NFT

(GX 207).   Just a few days later, Chastain asked Pascal if Pascal had purchased a particular NFT, remarking, "Only because initially I thought you were proposing it for a feature haha. I think our community will take us to task if we feature something we own."   Pascal agreed that would be a "conflict of interest."   (GX 208).   Several days later, Chastain expressed "fomo" again:

Nate Chastain, Pascal Marsolais

 **Pascal Marsolais** *8:57:40*
i was also chatting with Dario, the artist that was featured just before. I asked if he has some recommendations / suggestions

 **Nate Chastain** *8:58:09*
Oh sweet, feel free to pass him my congrats and let him know I selected him, I wanted to give him congratulations but couldn't connect with him on Twitter

 **Pascal Marsolais** *8:58:44*
🙂 awesome

**Pascal Marsolais** *8:58:45*
will do

**Pascal Marsolais** *9:02:15*
he recommended this collection. I agree it looks amazing https://opensea.io/collection/art-by-gabe-weis

 **Nate Chastain** *9:05:15*
I feel like I am destined to fomo every one of these promotional features lol

 **Nate Chastain** *9:05:36*
if you are successful in flipping this for 1 ETH I will feel like I am very bad with money for not doing the same lol

 **Pascal Marsolais** *9:05:45*
oh yeah fore sure thats a life changing opportunity for those artist

**Pascal Marsolais** *9:06:14*
yeah i wasnt sure if it was ethical to do so...but...i bought it after it was already featured....

**Pascal Marsolais** *9:06:20*
no previlege

(GX 209).

Chastain's fear of missing out eventually got the better of him.  On June 21, 2021, Chastain purchased copies of the NFT "Cryptopanda" by JSKY that OpenSea featured on its homepage and other NFTs in the same collection.  (GX 912).  Chastain made some of his purchases just before the "Cryptopanda" NFT was featured and others in the minutes after, routing his transactions through an anonymous wallet not publicly associated with him.  *(Id.)*.  Two weeks later, Chastain purchased the "Don't get me wrong" NFT eight minutes after OpenSea featured it on the homepage, reselling it five minutes later for more than double what he had paid.  (GX 913).  On July 19, 2021, Chastain purchased the NFT "THOUGHTS" six minutes after it was featured on OpenSea's homepage, reselling it nineteen minutes later for more than double

6

what he had paid.   (GX 914).   Both of these July purchases were routed through anonymous wallets not publicly associated with Chastain.   (GX 913, 914).

On August 2, 2021, Chastain bought a copy of "The Brawl 2" thirteen minutes before it was featured on OpenSea's website using a public wallet associated with his name and his "CryptoPunk" avatar.   (GX 915).   Over the next few minutes, and before "The Brawl 2" was featured on the website, Chastain bought four additional copies of the NFT using anonymous wallets not publicly associated with him.   (GX 916).   A Twitter user noticed the purchase Chastain made with his public wallet and publicly tweeted "Looks like Nate from OS had the jump on everyone else."   (GX 705A).   Chastain responded on Twitter, "I just wanted to secure one of these before they all disappeared tbh [to be honest]."   (*Id.*).   Chastain did not disclose, on Twitter or otherwise, that he had in fact purchased five copies of the NFT before it had been featured, as opposed to just one.   Nor did he retain any copies of "The Brawl 2" for his collection long-term. Chastain sold the four copies he had secretly purchased later that night, turning a significant profit of a little less than double what he had paid.   (GX 916).   Chastain sold the copy he had purchased with his public wallet, which he had explained on Twitter he "wanted to secure" before it "disappeared" twenty-four days later for nearly seven times what he had paid.   (GX 915).

Thereafter, Chastain's purchases of featured NFTs occurred before the NFT was featured on the homepage and using anonymous wallets.   (GX 918-925).   His concealment of his involvement in these purchases became more uniform and sophisticated over time: after the first few purchases of featured NFTs, Chastain never used the same wallet twice.   (GX 926).   From August 16 onward, he always routed his purchases through at least two anonymous wallets, and at times used three.   (Id.).   All told, Chastain purchased approximately forty-five featured NFTs on eleven separate occasions, reselling them for profits typically ranging for between two- and five-

times the purchase price.   (PSR ¶ 21).

Chastain's scheme ended when another user on Twitter traced anonymous wallets back to Chastain and publicly tweeted, tagging both OpenSea and Chastain:



Zuwu
@0xZuwu

Hey @opensea why does it appear @natechastain has a few secret wallets that appears to buy your front page drops before they are listed, then sells them shortly after the front-page-hype spike for profits, and then tumbles them back to his main wallet with his punk on it?

7:28 PM · Sep 14, 2021

(GX 706).   Dan Viau, an OpenSea employee who was with Chastain at a dinner with other OpenSea employees, showed Chastain the tweet that night.   (Tr. 538-40).   Chastain shook his head and said "no," indicating a denial of the allegation in the tweet.   (*Id.*).   Later that night, Alex Atallah, one of OpenSea's co-founders, was biking home from the same dinner when he was emailed the same tweet.   (Tr. 266-67).   Concerned about the allegation in the tweet, Atallah called Chastain from the bike path.   (Tr. 268-69).   Chastain falsely denied having already seen the tweet, which, unbeknownst to Atallah, Viau had already showed him.   (Tr. 269-70).   Chastain further falsely denied the truth of the allegation, "saying it's possible that they had seen him buy right after or very close to the time of featuring the NFT, and that they were just mistaken, or that it wasn't, you know, it wasn't an instance of him buying it before."   (Tr. 270).   The next day, OpenSea asked for Chastain's resignation, and he resigned.   (Tr. 271).

## GUIDELINES CALCULATION

The Government, Probation Office, and the defendant each have proposed a different Guidelines calculation, although the calculations conducted by the Government and the Probation Office result in the same sentencing range.   For the reasons that follow, the Government

respectfully submits that the Court should find a total offense level of 18, a criminal history category of I, and an applicable Guidelines range of 27 to 33 months' imprisonment, but, as described below, should also apply a variance equivalent to a two-level reduction in the offense level, resulting in a Guidelines range of 21 to 27 months' imprisonment.

### Government's Guidelines Calculation

The Government concurs with the Probation Office's assessment that Counts 1 and 2 are grouped pursuant to U.S.S.G. § 3D1.2(c), and that the offense level applicable to Count 2 applies because it produces a higher offense level than that applicable to Count 1.   (PSR ¶ 30).

The base offense level for Count 2 is U.S.S.G. § 2S1.1(a)(1), which provides that the offense level for the underlying offense from which the laundered funds were derived applies, provided that the defendant committed the underlying offense and that the offense level for that offense can be reasonably determined.

The underlying offense here is insider trading, which is addressed in U.S.S.G. § 2B1.4. The background notes to § 2B1.4 provide that in addition to applying to violations of Rule 10b-5, § 2B1.4 also applies to "[c]ertain other offenses … that involve misuse of inside information for personal gain."   Because the wire fraud here involved misuse of inside information from OpenSea so that the defendant could trade in advance of featuring of NFTs, a plain reading of the application notes indicates that the § 2B1.4 Guideline applies.[1]   Such an approach is consistent with the

---

[1] Application of § 2B1.4 would be consistent with the calculation of the Probation Office and the finding of the Court in *United States v. Wahi*, 22 Cr. 392 (LAP).   (*See* 22 Cr. 292 Dkt. No. 94 at 11 (Gov't. Sent. Submission, describing Guidelines calculation); Sent. Tr. 3 (attached here as Exhibit A, adopting the offense level computation set forth in presentence report and described in the Gov't Sent. Submission)).   In the *Wahi* case, as here, the defendant was charged with wire fraud (in that case, two counts of wire fraud and two counts of conspiracy to commit wire fraud) based on his involvement in a scheme to misappropriate his employer's confidential business information regarding his employer's planned crypto asset listings.   In that case, as here, the

Sentencing Guidelines' modified real-offense sentencing framework, which takes into account that "the hundreds of overlapping and duplicative statutory provisions that make up the federal criminal law forced the Commission to write guidelines that are descriptive of generic conduct rather than guidelines that track purely statutory language." U.S.S.G. § 1A1.4(a) at p.6. It is also consistent with the conclusion of the Honorable Lewis Kaplan that Section 2B1.4 was the appropriate Guideline to use in calculating the offense level for defendants convicted of similar conduct under 18 U.S.C. § 1348. *See United States v. Blaszczak*, No. 17 Cr. 357 (LAK), Dkt. No. 412, at 11 ("2B1.1(c)(3) in my judgment warrants the application of 2B1.4.") (vacated on other grounds); *see also United States v. Stuck*, 419 F. Supp. 3d 373, 375 (D. Conn. 2019) (describing the distinction between a "charge offense" system and a "real offense" system).

The base offense level pursuant to U.S.S.G. § 2B1.4(a) is 8; because the gain resulting from the offense was more than $40,000 but less than $95,000, 6 levels are added pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(D); and because the defendant occupied and abused a position of special trust in a manner that significantly facilitated the commission or concealment of the offense, two levels are added pursuant to U.S.S.G. §§ 3B1.3 and 2B1.4, Application Note 2. Accordingly, the total offense level for the underlying offense is 16, which forms the base offense level pursuant to U.S.S.G. § 2S1.1. Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), 2 levels are added because the defendant was convicted under 18 U.S.C. § 1956, resulting in a total offense level of 18.

No reduction for acceptance of responsibility is warranted. The defendant went to trial and did not do so merely to "preserve issues that do not relate to factual guilt." U.S.S.G. § 3E1.1 cmt. n.2. As the defendant's objections to the PSR and his sentencing submission make clear, he

---

defendant was not charged with violating Rule 10b-5, but U.S.S.G. § 2B1.4 applied, as it accurately characterized the conduct at issue.

continues to contest factual guilt, asserting for instance that the information in question was neither confidential nor property, that he did not violate company policy, and that he did not act secretly or surreptitiously.   (*E.g.*, Def. Mem. 18-19).   His attorneys also argued vigorously at trial that the defendant did not know what he was doing was wrong, and that OpenSea changed the rules after the fact.   None of those arguments are consistent with acceptance of responsibility.   *See* U.S.S.G. § 3E1.1 cmt. n.2 (acceptance of responsibility adjustment is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt").   The total offense level is therefore 18.   The defendant's criminal history category is I.   Accordingly, the applicable Guidelines range is 27 to 33 months' imprisonment.

Although, as described above, the Guidelines range currently applicable to the defendant is 27 to 33 months' imprisonment, it is expected that on November 1, 2023, an amendment to the Sentencing Guidelines will go into effect that will provide a further two-level reduction in the offense level for first-time, nonviolent offenders.   In order to account for this expected amendment, the Government has reached an agreement with defense counsel to request the Court apply the two-point reduction at Chastain's sentencing.   Should the Court apply the two-level reduction in its Guidelines calculation, and consider the non-custodial recommendations set forth in proposed U.S.S.G. § 5C1.1, the defense agrees not to later seek a sentence reduction pursuant to 18 U.S.C. § 3582(c)(2) on the basis of the amendments.[2]   With the two-level reduction, the new total offense level is 16, and the new Guidelines range is 21 to 27 months' incarceration.

---

[2] Although the Government certainly does not object to the Court considering all possible sentences, it does not appear that the potential amendment to § 5C1.1 would apply here, since the defendant's Guideline range is in Zone D and the defendant was convicted of an "otherwise serious offense."   Proposed U.S.S.G. § 5C1.1 cmt. n.4(B); *see* U.S.S.G. Ch. 1, Pt. A, at 9 (noting the view of the Sentencing Commission that insider trading and fraud are "serious" offenses).

*The Probation Office's Guidelines Calculation*

The Probation Office comes to the same total offense level (without the variance) by a different route.   As previously noted, the Probation Office found that Counts 1 and 2 are grouped pursuant to U.S.S.G. § 3D1.2(c), and that the offense level applicable to Count 2 applies because it produces a higher offense level than that applicable to Count 1.   (PSR ¶ 30).   As to the base offense level for the underlying wire fraud offense, Probation declined to apply § 2B1.4 because "this guideline is not referenced in Appendix A of the Guidelines Manual for a violation of 18 U.S.C. 1343, and because the offense of insider trading was not clearly established as part of the jury's verdict." (PSR at p.22).   Probation determined that the appropriate Guideline provision for wire fraud should be § 2B1.1.   (*Id.*).   However, instead of using § 2B1.1 to form the base offense level pursuant to § 2S1.1(a)(1), the Probation Office instead applied § 2S1.1(a)(2), apparently reasoning that the offense level for wire fraud could not reasonably be determined because the loss to a specific victim could not be established.   (PSR at p. 22-23).

The Probation Office's application of § 2S1.1(a)(2) is not warranted here.   (*See* Def. Mem. 8).   For the reasons previously discussed, the Government respectfully submits that the appropriate Guideline for the underlying offense is § 2B1.4, which can be reasonably determined. But even if the Court were to find that § 2B1.1 applies to the wire fraud offense conduct here, Application Note 3 to that provision specifically dictates that the Court "shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n.3(B).   This application note appears to resolve the difficulty of the calculation of the underlying offense, making application of § 2S1.1(a)(2) unwarranted.

As previously noted, the Government concurs with the enhancements for specific offense

characteristics and adjustment for role in the offense the Probation Office calculated.   (PSR ¶¶ 32,

34).   Probation calculates a total offense level of 18, no reduction for acceptance of responsibility,

and a Guidelines range of 27 to 33 months' incarceration.

<em>The Defendant's Guidelines Calculation</em>

The defendant calculates a total offense level of 7.   He arrives there by first applying

U.S.S.G. § 2B1.1 to the wire fraud count; applying no enhancement for loss to the victim or for

his own pecuniary gain from the offence; applying no enhancement for abuse of trust pursuant to

U.S.S.G. § 3B1.3; applying a two-point enhancement for the money laundering conviction

pursuant to U.S.S.G. § 2S1.1(b)(2)(B); and granting himself a 2-point reduction for acceptance of

responsibility.   (Def. Mem. 9).   For the reasons that follow, the defendant's calculation is flawed,

even if the Court were inclined to apply U.S.S.G. § 2B1.1, rather than U.S.S.G. § 2B1.4, to the

wire fraud count.

Section 2B1.1 has a base offense level of 7.   The defendant then asserts that no

enhancement for his pecuniary gain is appropriate, because OpenSea sustained no monetary loss

as a result of the offense.   He further contends that § 2B1.1 Application Note 3 does not apply

because gain to the defendant may be used as an alternative to loss only if there is a loss but the

loss cannot reasonably be determined.   (Def. Mem. 10-11).   The defendant's reasoning as to loss

amount is incorrect.

OpenSea is not seeking restitution, but that does not mean that it did not suffer any loss.

Through the defendant's actions in the instant offense, OpenSea lost the exclusive use of its

information—the value of which is directly proportionate to the defendant's exploitation of the

information, as measured by his trading profits.   As the defendant himself acknowledged,

OpenSea's homepage feature was "an incredibly important promotional area that anyone would

13

pay for access to." (GX 201 at 1). OpenSea chose, as part of its business model, not to directly monetize the website feature section, but its loss was the defendant's trading profits, which rightly belonged to OpenSea and not the defendant.

Moreover, as a direct result of the defendant's actions, OpenSea commissioned an external investigation (Tr. 275 (referring to third-party review)) and created and promulgated new policies related to how employees could use OpenSea's information. (Tr. 280). The Guidelines provide that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C); *see United States v. Norman*, 776 F.3d 67, 79 (2d Cir. 2015) ("The sentencing court is not required to calculate the amount of loss with certainty or precision."); *see also United States v. Zangari*, 677 F.3d 86, 92–93 (2d Cir. 2012) (contrasting the permissibility of substituting gain for victims' actual losses for purposes of calculating the adjusted offense level under § 2B1.1 of the Guidelines with the impermissibility of using gain as a proxy for victims' loss for restitution purposes). The Court has sufficient information here to reasonably conclude that the amount of OpenSea's loss, though impossible to precisely determine, is greater than zero. Accordingly, the defendant is incorrect that his gain may not be used to calculate his adjusted offense level under § 2B1.1.

All of the foregoing underscores why U.S.S.G. § 2B1.4 is a better fit for the defendant's offense conduct than § 2B1.1. The commentary to U.S.S.G. § 2B1.4 notes:

> Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.

U.S.S.G. § 2B1.4 cmt. background. That is precisely the situation here.

In any event, the defendant's contention that he should not be held responsible for any

14

pecuniary loss or gain under the Sentencing Guidelines is without merit and should be rejected.[3] Should the Court apply U.S.S.G. § 2B1.1 rather than § 2B1.4, 6 levels should be added pursuant to U.S.S.G. § 2B1.1(b)(1)(D).

The defendant also argues that the Guidelines enhancement for abuse of trust should not be applied because "the violation of a duty of trust was an element of the government's theory of the case" and therefore the Sentencing Guidelines provision effectively precluding double-counting of the enhancement also precludes its application here. (Def. Mem. 14-15). This argument is senseless. The defendant was able to commit his crime only because he held a high-ranking position at OpenSea and, as a result of that position, was entrusted with selecting featured works for the company's homepage. Indeed, as the Supreme Court noted in the seminal case upon which the Government's theory of criminal liability in this case was predicated, conduct like the defendant's violates the wire fraud statute precisely because it constitutes embezzlement, "which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (internal quotation marks and citations omitted). If there were any question that this is quintessentially abuse of trust, the Court need look no further than § 2B1.4, the Sentencing Guideline that most squarely addresses the misappropriation of confidential business information in violation of a duty of trust. Application Note 2 to § 2B1.4 states that the abuse of trust enhancement "should be applied if the defendant occupied and abused a position of special trust" such as a corporate officer "who

---

[3] The defendant argues in the alternative that if the Court does take his gain into account, it should exclude those instances where he bought featured NFTs after they were featured. (Def. Mem. 11-12). The Government respectfully submits that the defendant's gains should include all of his trading in featured NFTs, as discussed further in the section addressing forfeiture. In any event, the defendant's gains from trading featured NFTs after they were featured amounted to an amount sufficiently small that the Guidelines would not be affected.

misused information" about a "planned but announced" corporate event.  That is exactly what took place here.

Finally, the defendant argues that he is entitled to a 2-point reduction for acceptance of responsibility because he did not contest buying and selling featured NFTs.  (Def. Mem. 13-14).  But virtually all trial defendants concede some aspects of the Government's case as part of a trial strategy.   Under Chastain's reading of the Guidelines, any such concession, however circumscribed, should result in the preservation of acceptance of responsibility points.   Here, as the defendant's objections to PSR and his sentencing submission make clear, he has not truthfully admitted the conduct comprising the offense but rather continues to contest factual guilt, asserting for instance that the information in question was neither confidential nor property, that he did not violate company policy, that he did not act secretly or surreptitiously, and that he did not appreciate his conduct was wrong.   He has not accepted responsibility for his actions.  *See* U.S.S.G. § 3E1.1 cmt. n.1-2.

## DISCUSSION

In light of the sophistication and deception inherent in the crime, the repetitive and surreptitious nature of the offense, the defendant's significant abuse of the trust of his employer, and the defendant's personal history and characteristics, a term of imprisonment within the adjusted Guidelines range as calculated by the Government of 21 to 27 months is necessary to meet the statutory ends of sentencing, including just punishment, deterrence, and promoting respect for the law.   The defendant's request for a time-served sentence would not adequately reflect the seriousness and wrongfulness of the defendant's conduct, would result in unwarranted sentencing disparities, and would be contrary to the sentencing goals of 18 U.S.C. § 3553.  Moreover, general deterrence is also an important factor that should weigh heavily in favor of a

Guidelines sentence in this case.   A sentence within the Guidelines range will send a strong signal to those who work in the cryptocurrency and NFT industry, as well as other alternative or developing markets, and regularly have access to confidential business information that misappropriating and using such information for personal profit and to tip others is a serious offense that will be met with serious punishment, including a lengthy jail term.

## A.      Nature and Circumstances of the Offense

The defendant's offense involves a serious breach of trust and warrants substantial punishment in order to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.   The defendant engaged in an extended course of illegal conduct over a period that spanned approximately twelve weeks and ended only because he got caught.   The defendant's crime involved a substantial abuse of the trust that OpenSea had placed in him as the head of product.   The defendant was not similarly situated to other OpenSea employees and, as the final selector of the featured NFTs, was one of the few, and at many times the only, employee who knew which NFT would be featured next.   This information moved volatile NFT prices and was highly valuable.   Chastain misappropriated and misused information entrusted to him to gain an unlawful advantage in the NFT market.   Rather than closely guard and protect this sensitive and valuable commercial information, as he had promised OpenSea that he would, the defendant instead repeatedly stole this sensitive information to trade.

Contrary to the arguments he made to the jury and continues to make in his sentencing submission, the defendant understood the wrongfulness of his actions.   This is demonstrated primarily by the furtive nature of his conduct.   If Chastain had believed that he was permitted to front-run the featured NFTs, he would have traded openly, using his public wallet, and perhaps even tweeted about his purchases, as he did for other, non-featured NFTs he purchased during this

time period.   Instead, Chastain opened new, anonymous wallets, quickly adopting the practice of using a new anonymous wallet for each verboten transaction.   When confronted with a Twitter user over his August 2, 2021, public purchase of "The Brawl 2" thirteen minutes before it was featured on OpenSea's website, Chastain responded dishonestly, claiming he just wanted a copy of that NFT for his own collection without disclosing that he had used an anonymous wallet to purchase four additional copies, reselling them within hours, just to make money.   If Chastain had believed he was permitted to do that, he would have simply admitted it.   Likewise, when another Twitter user uncovered Chastain's use of secret wallets to purchase the featured NFT on September 14, 2021, Chastain denied that he had done so, both to Viau and then to Atallah.   These denials are inconsistent with Chastain's incredible assertions that he did not understand that the information was confidential or intend to misappropriate it.

As he did during the trial, Chastain attempts to redirect attention from his own mental state by shifting blame onto OpenSea for "fail[ing] to implement policies and training regarding the definition and use of confidential business information."   (Def. Mem. 18).   As the jury determined through its verdict, this argument lacks merit, and, for purposes of sentencing, reflects more on Chastain's utter lack of acceptance of responsibility than it does on any ambiguity in OpenSea's policies.[4]   As OpenSea's co-founders testified, while the company's leadership had not thought specifically about the confidentiality of the featured NFT prior to learning of Chastain's conduct, they had sought to implement a broad confidentiality policy that required employees to safeguard non-public information learned through the course of their employment

---

[4] Chastain's "apology," attached to his sentencing submission as Exhibit 2, reflects a similar deflection.   While purporting to "take full responsibility and accountability for the situation," Chastain also critiques OpenSea for not having "a clear policy in place."   Notably, Chastain specifically refers to OpenSea's lack of policy "around purchasing assets" without mentioning the confidentiality policy he signed, which he cannot plausibly claim was unclear.

and refrain from using such information for their own benefit.   Nothing more is required.
Employers cannot anticipate every way an employee might misappropriate confidential
information, which is underscored by the facts of this case—the category of confidential
information Chastain misappropriated did not even exist until after OpenSea's website redesign in
May 2021.

**B.      Deterrence**

A sentence within the advisory Guidelines range of 21 to 27 months' imprisonment is also
necessary in this case to afford adequate deterrence to criminal conduct.   *See* 18 U.S.C.
§ 3553(a)(2)(B).   The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed
deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*,
455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984
U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)
(deterrence of white-collar crime is "of central concern to Congress").   General deterrence is an
important sentencing factor in fraud and white-collar cases because the decision to commit fraud
is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and
fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or
opportunity, these crimes are prime candidates for general deterrence." (quotation marks and
citation omitted)).   The Second Circuit and courts in this district have noted the appropriateness
of significant sentences in the context of financial crimes, including specifically insider trading,
committed by defendants who make the calculation that white collar crime is "a game worth
playing."   *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and
affirming sentence of 66 months' imprisonment for insider trading offense); *United States v.
Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other

cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").   A Guidelines sentence will appropriately signal to others contemplating insider trading that that their conduct will be met with serious punishment.

The defendant underscores what he repeatedly refers to as the "novel" nature of this prosecution to support his request for no jail time.   This argument is unpersuasive for at least two reasons.   First, contrary to the defense arguments, nothing distinguishes this case from the "heartland" of typical fraud cases.   (Def. Mem. 18).   Chastain was a corporate insider who abused a duty of trust he owed to his employer by misappropriating confidential information to trade for his own benefit.   This is heartland insider trading, heartland fraud, heartland white-collar crime.   The fact that the marketplace in question concerned NFTs is irrelevant to the core conduct, to the defendant's mental state, and to the end of deterrence as articulated by countless courts sentencing white-collar fraud defendants.

Furthermore, to the extent that the novel subject matter of the prosecution has any bearing on the sentence, rather than supporting Chastain's request for a non-incarceratory sentence, those circumstances, consistent with the principles of both general and specific deterrence, counsel in favor of a significant term of imprisonment.   As to general deterrence, a sentence within the range proposed by the Government will send a clear and unequivocal message to those tempted to engage in insider trading in crypto assets that such conduct will be treated just as this conduct is treated in the equity markets, and that those who cross the line can be assured they will likely face jail time. Moreover, NFTs are only a few years old, and a few years from now there could be a new industry that is as-yet unconceived.   Robust sentences for fraudulent conduct in new and emerging markets are needed not only to deter others in those specific markets from engaging in fraud, but to impress

upon others who may be tempted to cheat in any future market that fraud will not be tolerated.

Deterrence is additionally of particular import in this case because sophisticated crimes such as this one are particularly difficult to detect and prosecute.   Indeed, while traditional insider trading in the equity markets is itself a difficult crime to detect and prosecute, when this conduct occurs in the crypto markets it is even more difficult to uncover and prosecute.   Those who choose to engage in insider trading in crypto assets can easily conceal their involvement including by, as Chastain did, making use of anonymous Ethereum wallets that have no actual link to their identity, as well as additional techniques such as using various forms of technology to conceal their true internet protocol ("IP") addresses, and opening accounts at various offshore cryptocurrency exchanges without providing any identity documentation.   Accordingly, deterring the already difficult to detect crime of insider trading is particularly necessary in the context of the crypto markets, where uncovering and prosecuting such crimes is even more challenging for law enforcement.   *See Gupta*, 904 F. Supp. 2d at 355 ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

The same considerations apply equally to specific deterrence for Chastain.   As discussed, Chastain continues to deny that he had fraudulent intent by claiming that OpenSea's policies were unclear, that he was inadequately trained, that OpenSea implemented sufficiently clear policies

only after he resigned, and that others at OpenSea violated the company's confidentiality polices (Def. Mem. 18-19)—in other words, to point the finger at everyone but himself.   These arguments underscore his failure to accept responsibility, and, taken with the clear evidence that he was aware of the wrongfulness of his conduct and took contemporaneous steps to conceal his actions, suggest that he may be tempted in the future to cross a line if he thinks he can get away with it.   Far from suggesting that he has "felt [sufficient] punishment," the fact that Chastain has "endur[ed]" stress from the prosecution and "personal shame" from his conviction does not meaningfully distinguish him from any other defendant.   (Def. Mem. 20).   Indeed, the Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

The publicity this case has received if anything weighs in favor of a substantial sentence. This case presents an appropriate opportunity for the Court to send a strong signal to market participants, and, especially in light of the publicity to which the defendant points, an unjustifiably

22

lenient sentence would encourage others who might be tempted to engage in fraudulent misappropriation that the rewards of such wrongful activity may be worth the price. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

**C.     The Sentence Proposed by the Defendant Would Fail to Provide Just Punishment or Promote Respect for the Law and Would Result in Unwarranted Sentencing Disparities**

The defendant proposes in his submission that a sentence of time served is sufficient to vindicate the Section 3553(a) factors.   In addition to failing to promote respect for the law and provide just punishment, for the reasons described above, such a sentence would result in a disparity with the closest corollary, defendant Ishan Wahi, the first corporate insider to be convicted of trading in crypto assets based on confidential business information.   The loss amount attributed to Ishan Wahi was, at $1.5 million, significantly greater than here, and, unlike Chastain, Wahi also tipped his brother and friend.   On the other side of the ledger, Wahi, unlike Chastain, did not engage in money laundering, and accepted responsibility for his conduct by pleading guilty to his crimes.   Wahi was sentenced by Judge Preska to 24 months' incarceration.   Dramatically different sentences for these two similarly situated defendants would be unwarranted.

<u>**FORFEITURE**</u>

The applicable forfeiture amount is $57,115, the amount the defendant made from trading in featured NFTs as converted from ETH to dollars at the time of each of the trades.   The defendant presents two arguments in support of lower forfeiture: that the Court may only take the ETH itself, not its dollar equivalent, and that any purchases he made of featured NFTs after the

feature went live must be excluded.   Neither argument is correct.

The defendant was on notice in the Indictment that, as to both Counts One and Two, the Government may seek "a sum of money in United States currency representing the amount of property involved in said offense."   (Indictment ¶¶ 16, 17).   He has no "right to challenge the [G]overnment's election to seek a money judgment in lieu of a jury-determined forfeiture of specific property." *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2021 WL 5411162, at *4 (S.D.N.Y. Nov. 19, 2021) (quoting *Christie v. United States*, No. 08 Cr. 1244 RWS, 2014 WL 2158432, at *10 (S.D.N.Y. May 23, 2014)).   His argument that the Government is limited to the specific ETH he obtained is without merit.

Nor should the defendant's trades in the minutes after the featured NFTs went live be excluded from the forfeiture amount.   These trades were sufficiently close in time to the feature going live that they still incorporated the defendant's unfair advantage over other market participants.   Chastain cites no law to the contrary.   It is well established that information becomes public when disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group," *Dirks v. SEC,* 463 U.S. 646, 653 n.12 (1983) (citing *In re Faberge, Inc.,* 45 S.E.C. 249, 256 (1973)), or when, although known only by a few persons, their trading on it "has caused the information to be fully impounded into the price of the particular stock," *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993).   Trades Chastain executed six and fewer minutes after OpenSea changed its homepage cannot reasonably be viewed as trades executed when Chastain was at parity with other market participants or when the market had fully absorbed the information about the new feature.

## **<u>CONCLUSION</u>**

For the reasons discussed above, the Government respectfully submits that a Guidelines sentence between 21 and 27 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.

Dated: New York, New York
       August 15, 2023

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

                   By:      /s/ Allison Nichols
                            Thomas Burnett
                            Allison Nichols
                            Nicolas Roos
                            Assistant United States Attorneys
                            Tel. (212) 637-2366