N8MGchaS

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                      22 Cr. 305 (JMF)

NATHANIEL CHASTAIN,

                                    Sentence
            Defendant.

------------------------------x

                                    New York, N.Y.
                                    August 22, 2023
                                    2:30 p.m.


Before:

                  HON. JESSE M. FURMAN,

                                    District Judge


                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ALLISON NICHOLS
NICOLAS ROOS
     Assistant United States Attorney

DAVID I. MILLER
DANIEL POST FILOR
     Attorneys for Defendant


Also Present:   Amelia Whitehead, FBI Special Agent
```

N8MGchaS

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MS. NICHOLS:  Good afternoon, your Honor.  Allison

5     Nichols and Nicolas Roos for the government.  And with us is

6     FBI Special Agent Amelia Whitehead.

7          MR. MILLER:  Good afternoon, your Honor.  David Miller

8     and Dan Filor.  And also at counsel table is the defendant,

9     Nathaniel Chastain.

10         THE COURT:  Good afternoon, everyone.  Welcome back.

11         We're here for purposes of sentencing.  Let me itemize

12    what I have received and reviewed.  First, the presentence

13    report dated August 4th, 2023 and second the defense

14    submissions dated August 8th and August 15th and August 21st of

15    this year, as well as the attachment to the first of those

16    submissions, namely letters addressed to me from the

17    defendant's mother, girlfriend, parents of his girlfriend, his

18    current employer and various other family, friends and current

19    or past coworkers -- or I guess past coworkers -- as well as an

20    Exhibit 2, I think it is, a Slack conversation.  And the

21    government's submission dated August 15th, 2023, as well as the

22    attachment to that submission, namely the sentencing transcript

23    in United States v. Wahi.

24         Are there any additional submissions that I should

25    have received?  Obviously, I presided over trial and therefore

N8MGchaS

1    have that record that I'm familiar with.  Anything else I

2    should have received?

3                MS. NICHOLS:  No, your Honor.

4                MR. MILLER:  No, your Honor.  Thank you.

5                THE COURT:  And I take it from the presentence report

6    that the victim here has been notified of this proceeding; is

7    that correct?

8                MS. NICHOLS:  Yes, your Honor.

9                THE COURT:  And I take it that they do not wish to be

10   heard; is that correct?

11               MS. NICHOLS:  That's correct.

12               THE COURT:  Mr. Miller, have you reviewed the

13   presentence report?

14               MR. MILLER:  Yes, your Honor.

15               THE COURT:  And have you discussed it with

16   Mr. Chastain?

17               THE DEFENDANT:  Yes, your Honor.

18               THE COURT:  Putting aside the guidelines for a

19   moment -- have discussion about that in short order -- any

20   objections or corrections to the factual recitation set forth

21   in the report?

22               MR. MILLER:  None that weren't already reflected in

23   the PSR as our objections.

24               THE COURT:  Thank you.

25               Mr. Chastain, have you reviewed the presentence

N8MGchaS

1      report?

2              THE DEFENDANT:  I have, your Honor.

3              THE COURT:  Did you review it with your lawyers?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Did you have enough time to do that, to go

6      over the report with them, to discuss any mistakes in the

7      report and anything more broadly that you wish to bring to my

8      attention in connection with your sentencing today?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Thank you.

11             Ms. Nichols, did you review the presentence report?

12             MS. NICHOLS:  Yes, your Honor.

13             THE COURT:  Again, focusing just on the factual

14     recitation, not the guidelines just yet, any objections or

15     corrections?

16             MS. NICHOLS:  No, your Honor.

17             THE COURT:  Hearing no objections, I will adopt the

18     factual recitations set forth in the presentence report, which

19     will be made part of the record in this matter and be placed

20     under seal.  Counsel on appeal may have access to the sealed

21     report without further application to me.

22             That brings us to the guidelines.  As counsel know,

23     I'm not bound by, don't have to follow the guidelines, per se,

24     but I am required to consider the applicable guidelines range

25     in imposing a sentence and must therefore accurately calculate

N8MGchaS

1    the sentencing guidelines range.  There are any number of

2    disagreements and open issues on this front.  Let me address

3    some of them and hear from you on some of them.

4            Now, first, everyone appears to agree that the two

5    offenses are grouped pursuant to Section 3D1.2(c) and that the

6    offense level applicable to Count Two, namely the money

7    laundering charge, is the one to be applied here.

8            I take it that's correct, Ms. Nichols.

9            MS. NICHOLS:  Yes, your Honor.

10           THE COURT:  Mr. Miller.

11           MR. MILLER:  Yes, your Honor.

12           THE COURT:  Second, the parties both take issue with

13   probation's application of Section 2S1.1(a)(2), and I agree

14   with the parties that subsection (a)(1) applies, because

15   whichever guideline applies to the underlying offense -- and

16   we'll address that in a moment -- the defendant indisputably

17   committed the underlying offense and the offense level for it

18   can in my judgment be determined, so for that reason I agree

19   that the presentence report is wrong in applying subsection

20   (a)(2) and subsection (a)(1) should apply.

21           Now, that raises the question, which guideline applies

22   to the wire fraud offense.  It's not clear to me that it

23   ultimately matters very much.  Candidly, I don't think my

24   sentence will turn on it.  But for what it's worth, I do agree

25   with the government that Section 2B1.4 apply because the

N8MGchaS

gravamen of the offense conduct here is insider trading, that

is to say, misappropriation of confidential business

information to which Mr. Chastain was privy to by virtue of his

insider status and trading on that information.  To be sure,

the offense conviction references Section 2B1.1, but

2B1.1(c)(3) where, quote, conduct set forth in the count of

conviction establishes an offense specifically covered by

another guideline in chapter two, that the Court is supposed to

apply that other guideline.  Thus, by its terms, the focus is

on the conduct and here the conduct is indeed covered by 2B1.4

because it is trading on information obtained as an insider,

namely the confidential business information.  So I agree that

2B1.4 is the applicable guideline.

        Under that guideline, the base offense level is eight

and six points are added because the gain exceeded $40,000.

        Next, I do agree with the government that the abuse of

trust enhancement in Section 3B1.3 applies.  I don't think

there's really any reasonable dispute of that, candidly.  That

is to say, I think it squarely applies, contrary to the defense

argument that the enhancement is, if you will, baked into the

underlying guideline as application note two to 2B1.4 makes

plain, that is not the case, since the note itself explicitly

contemplates that the enhancement, the abuse of trust

enhancement should be applied in some cases subject to the

guideline, but not all.  So that makes clear that it's not

N8MGchaS

1    baked in.  But the commission contemplated that it should be

2    separate and apart from 2B1.4.

3              And finally, I think there's no dispute that two

4    points are added under Section 2S1.1(b)(1)(B) because

5    Mr. Chastain was convicted under 18, US Code, Section 1956.

6              That results in 18 points.

7              The only other issues, one is flagged by my order this

8    morning, namely whether 2S1.1(b)(3) applies, that is a two

9    point enhancement for, quote, unquote sophisticated laundering.

10             Does counsel wish to be heard on that?

11             MR. MILLER:  Yes, your Honor.

12             So, your Honor, a couple points.  Obviously, with

13   preserving all of our other arguments, of course, with respect

14   to 2S1.1(b)(3), we don't think this enhancement should apply.

15   If your Honor, of course, looks at even referencing 2B1.1 on

16   sophisticated means and all the arguments that are made in the

17   commentary, this is not a case in which mixers or tumblers or

18   other efforts to conceal and obfuscate were used.  In fact, to

19   the extent that anybody would argue that because it involves

20   particular technology, meaning the blockchain or crypto, that

21   it must involve sophisticated means, under 2S1.1, sophisticated

22   laundering, that would then apply to literally every case that

23   involved the blockchain or crypto.  So as a threshold matter,

24   we think that argument obviously fails.  Just because there

25   were transfers on a blockchain doesn't mean all of a sudden

N8MGchaS

1   there was sophisticated laundering.

2          There's nothing particularly complex here with what

3   happened, particularly given the fact -- and notably given the

4   commentary to 2S1.1(b)(3) -- that in fact any transfers that

5   occurred among wallet addresses here is, our recollection,

6   from -- including from the government exhibits -- showed those

7   transfers occurred before the purchases of the NFTs were made

8   and that the proceeds that transferred to the hot wallet, the

9   MetaMask wallet -- there's different addresses within the

10  MetaMask wallet -- to the cold wallet.  So ultimately, what

11  we're talking about here is whether or not the mere transfers

12  from the platform to one's hot wallet to one's cold wallet

13  would constitute sophisticated laundering.  That, again, going

14  back to the technology involved here, would involve most cases

15  that involved blockchain and cryptocurrency.  Because most

16  people who are engaging in trading on the blockchain are going

17  to have some kind of either hot wallet, cold wallet or both in

18  interacting with the platforms, particularly in crypto exchange

19  platforms.

20          So ultimately, what you are talking about here are

21  different wallet addresses, that as your Honor probably recalls

22  from the trial, Dr. Edman testified about and indicated in his

23  expert opinion, which is consistent with practice, that in fact

24  what people usually do is they create multiple wallet addresses

25  within their hot wallet, their MetaMask wallet in order to keep

N8MGchaS

1   track of cryptocurrency and for tax purposes, as well as other

2   organizational purposes.

3           So there's nothing particularly sophisticated here

4   that's within the application note of 2S1.1(b)(3) and the

5   commentary.  So we don't think this should apply.  It certainly

6   shouldn't apply just because we're talking about blockchain

7   technology or because we're talking about the fact that there

8   was a hot wallet and a cold wallet.  That's our general

9   position, your Honor.

10          THE COURT:  Ms. Nichols.

11          MS. NICHOLS:  The government does not think that that

12  enhancement applies here either, just based on the application

13  notes and the description of the kind of conduct that is

14  contemplated by that enhancement.

15          THE COURT:  Well, I suppose I could have started with

16  the government.  In any event, I will not apply the guideline.

17  I think it's a slightly closer question, which is what prompted

18  me to include it in the order, only given application five to

19  the guideline, which provides examples, one of which is two or

20  more levels of transactions, transfers or transmissions and

21  there, at least, I think, if I remember correctly, some

22  transactions here in which multiple wallets were used in an

23  effort, I think, to conceal the transactions or at least

24  Mr. Chastain's connection to them.  But be that as it may,

25  since the government doesn't seek it and I think it's a close

1   call and not clearly applicable, I will not apply it.

2           Now, nor will I reduce the offense level for

3   acceptance of responsibility.  I read the defense argument.

4   Candidly, I don't think it's a close call.  Yes, Mr. Chastain

5   conceded certain elements of the offenses at trial, that is to

6   say, he didn't dispute things that I think were really not

7   reasonably disputable, such that he engaged in the

8   transactions.  But he fundamentally disputed and continues to

9   dispute his factual guilt, that is to say, whether he did

10  anything wrong, whether the information here was confidential.

11  And in that regard, I don't think that he's entitled to

12  acceptance of responsibility credit.

13          To the extent that the defense points to the Slack

14  chat in Exhibit 2 or whatever the case may be, I don't find

15  that particularly persuasive.  At that point, the jig was up,

16  he had been caught, he knew he was not going to be employed at

17  OpenSea any longer.  The fact that he was permitted to resign,

18  as opposed to being fired, is neither here nor there.  To me,

19  the more significant conduct was before, when the initial Tweet

20  came out about it and he was confronted by Mr. Viau and

21  Mr. Atallah, and not only did Mr. Chastain not admit his

22  conduct, but he actually lied about it.  So more to the point,

23  I don't think that his conduct throughout this litigation can

24  reasonably be described as accepting his responsibility for his

25  conduct.  Yes, he doesn't dispute all of it, but that's not the

N8MGchaS

1    standard.  He doesn't accept his factual guilt.  He continues

2    to maintain his innocence, which he's certainly entitled to do.

3    But he's not entitled to do that and get credit for acceptance

4    of responsibility.  So I will not reduce it for that.

5           That yields a total offense level of 18.

6           For what it's worth, I don't think we need to go

7    through the exercise of how the guidelines would be calculated

8    under 2B1.1.  But it is certainly conceivable that it would

9    be -- whatever the calculation would be roughly equivalent

10   somewhere -- either 17 or 19, depending on whether the

11   sophisticated means enhancement applies -- but because I don't

12   think we need to go through that exercise and whether the

13   offense level is 17, 18 or 19, I don't think it would affect my

14   sentence and it doesn't ultimately really matter.

15          So all that is to say, based on what the parties do

16   agree on, based on my resolution of the disagreements and the

17   parties' objections, based on my independent calculation of the

18   guidelines, I find that the total offense level is 18, the

19   criminal history category is I, and the guidelines range, in is

20   using the November 2021 edition of the guidelines, which is

21   currently still in effect, is 27 to 33 months' imprisonment

22   with a supervised release range of one to three years and a

23   fine range of 10,000 to $500,000.

24          That said, I will, consistent with the parties'

25   agreement and what I've done in other cases, I do plan to and

N8MGchaS

1    do apply the proposed zero point offender amendment to the

2    guidelines that, absent congressional action, will go into

3    effect in a matter of months, so that would result in an

4    offense level of 16 and a guidelines range of 21 to 27 months.

5              Anything further on that?

6              Obviously, the defendant has preserved his objections,

7    as set forth in the sentencing submission.  Anything further

8    from the government on the guidelines calculation?

9              MS. NICHOLS:  No, your Honor.

10             THE COURT:  Mr. Miller.

11             MR. MILLER:  No, your Honor.  We preserve our

12   objections.

13             THE COURT:  Does either side believe there is a basis

14   for departure that is within the guidelines system and distinct

15   from what has become to be known as a variance?

16             Ms. Nichols.

17             MS. NICHOLS:  No, your Honor.

18             MR. MILLER:  We have a number of 3553(a) arguments.

19             THE COURT:  Understood.

20             But no departures, that is, within the guidelines

21   system?

22             MR. MILLER:  No.

23             THE COURT:  I nevertheless have considered the record

24   and also agree that there's no basis or need for a departure,

25   which is distinct from what has come to be known as a variance.

1          With that, I will hear first from the government then

2     from defense counsel and then from Mr. Chastain, if he wishes

3     to say anything before I impose sentence.

4          I did, as you know, pose some questions in my order of

5     earlier today.  To the extent that they pertain to the

6     guidelines, I think we have already covered them and you don't

7     need to address them.  But I will want you to address the

8     others, namely whether there are any insider trading, in

9     quotes, cases involving as little loss or gain as that involved

10    in this case, and the questions that I posed about forfeiture,

11    that is to say, dollars and conversion amounts and timing

12    questions on that front.

13         So let me begin with the government.  And I may pose

14    some additional questions beyond those, but I'll start with

15    you.  I do want to stress, obviously, I presided over trial and

16    am obviously quite familiar with the record here and have read

17    your very helpful and thorough sentencing submissions, so you

18    don't need to reiterate things I would already know, but

19    anything you think I ought to consider you are welcome to

20    share.

21         Go ahead.

22         MS. NICHOLS:  Thank you, your Honor.

23         I'll try to be brief and try to be focused on what the

24    Court is most focused on based on the order this morning.  I

25    think the Court's question about small gain amounts is

1    consistent with how the government has been trying to think

2    about comparable defendants who have been sentenced in recent

3    memory before the court.  And we tried to find specific answers

4    to the Court's question.

5           And there are a few cases in the insider trading

6    context where the insider, the tipper, actually makes no money

7    at all.  And so their guidelines calculation ends up baking in

8    a gain or loss amount that's attributable to the downstream

9    tippees, but I think those folks would be -- in direct answer

10   to the Court's question -- insider trading defendants who made

11   nothing, so --

12          THE COURT:  But I don't think those are the right

13   comparators, because there is a loss in those cases, the people

14   who traded without the benefit of that inside information.  So

15   it may be that the profit, if you will, is yielded by the

16   tippee rather than the tipper, but under the guidelines and the

17   principles of criminal liability, the tipper is accountable for

18   that.

19          I think here -- I'll be blunt -- my question is posed,

20   in part, for the following reason:  Having spent eight or nine

21   years in the US attorney's office, having spent 11 years on the

22   bench, I genuinely wonder, but for the fact that this raised in

23   a slight sexy, new arena, NFTs, whether it would have been

24   charged if it were insider trading and yielded only $56,000 in

25   profits.  If not -- I'm not saying the defendant should be let

N8MGchaS

| | |
|---|---|
| 1 | off scot-free, I think the jury's verdict was an absolutely |
| 2 | defensible one -- it strikes me as a relevant consideration |
| 3 | that under other circumstances, in another arena the defendant |
| 4 | might not even have been charged with a crime. |
| 5 | MS. NICHOLS:  So I think just three things in |
| 6 | response, your Honor.  We're not quibbling with the Court's |
| 7 | assessment that, typically, at least in this district, the loss |
| 8 | amounts in insider trading cases tend to be more eyebrow |
| 9 | raising, but that does not mean that lesser amounts are not |
| 10 | criminal in nature and I think that there is no sort of de |
| 11 | minimus exception to the applicability of the law. |
| 12 | THE COURT:  I'm not suggesting there is.  But it |
| 13 | certainly matters for evaluating culpability and sentencing |
| 14 | exposure.  So no question, I don't intend to quibble with the |
| 15 | jury's verdict in this case at all, there was no motion to |
| 16 | review it, but I probably would have denied any such motion, |
| 17 | because I think the jury certainly reached a defensible |
| 18 | verdict.  I'm not suggesting there is a de minimus exception. |
| 19 | I'm not suggesting that he shouldn't have been charged, that's |
| 20 | not my prerogative.  It does strike me as a relevant question. |
| 21 | MS. NICHOLS:  Let me round out my response, your |
| 22 | Honor.  I understand why the Court is asking the question. |
| 23 | I think the second thing that I'll say is that a lot |
| 24 | of times the loss amount becomes -- or the gain amount, |
| 25 | rather -- becomes a really pivotal topic at sentencing, in |

N8MGchaS

1    particular because of the way the guidelines end up really

2    tracking that number.  And I think in this district, in

3    particular, there's often a significant haircut off of the

4    guidelines because of a perception that the actual wrongdoing

5    associated with the crime is the misappropriation of the

6    information.  And the degree of loss or gain is somewhat

7    incidental to the wrongful conduct.  And just as in this case,

8    I think, Mr. Chastain had no way of knowing ex ante whether the

9    featuring of the CryptoPanda NFT versus the Focus NFT would

10   trigger a tenfold increase in the value of that token versus a

11   twofold increase.  And I think that to get extraordinarily

12   focused on the gain amount is actually, I think, a little bit

13   incidental to the core purposes of sentencing when looking at

14   the 3553(a) factors.

15           The third point that I'll make, your Honor -- this

16   tied into something I wanted to address earlier -- we have

17   talked at the onset of this case about whether it's a novel

18   prosecution theory.  Defense counsel has emphasized that and

19   emphasized it to the jury and emphasized it in legal arguments

20   to the Court.  And I think, from the government's perspective,

21   I think this cuts the other way.  I think that what we see from

22   Mr. Chastain's conduct is that he perceived a gray area and he

23   exploited it.  And I think that's why actually a serious

24   sentence that focuses on the misappropriation of confidential

25   information by an insider versus what is this industry or what

N8MGchaS

```
 1      is the loss amount is really the thing that the government

 2      thinks that the Court should be focused on at sentencing and

 3      for the purposes of the 3553(a) factors.

 4              THE COURT:  I think both sides sort of missed the

 5      point a little bit in stressing the novelty of this case.  I

 6      know the defense has done that from the outset in suggesting

 7      that it's therefore not a crime.  To me, as I think I have said

 8      from the outset, this case falls squarely in the Carpenter box

 9      and it just happens to arise in a new arena involving slightly

10      sexy assets.  But it could just as well been a box store where

11      the decision to put something in the window elevated the price

12      and he happened to trade on that.  It was more atmospheric than

13      it was central to the case.  Having said that, I think, as the

14      trial made clear, the key question was whether OpenSea did

15      consider and treat development information as business

16      information.  I think the jury's verdict on that was a

17      defensible one, but there were certainly arguments that the

18      defense did make and could make on that score, most notably

19      that Mr. Finzer hadn't even thought about the information until

20      it came to light that Mr. Chastain was trading on this.  The

21      quote, unquote Clerky form, I think everybody will agree, while

22      I think the jury was on firm ground in concluding that this

23      information fell within the definition of confidential

24      information and that Mr. Chastain knew that, as reflected by

25      his own conduct, there's no question it wasn't a very well
```

N8MGchaS

1    lawyered form and the company didn't have policies on these

2    issues until his conduct came to light.  As you know, they

3    changed them.  There was no training on the issue.  It was a

4    little bit of a wild west situation.  That isn't to say he can

5    commit a crime.  I think his own conduct revealed that he

6    understood he was doing something untoward.  But it does

7    suggest that -- I mean, I guess my question is:  Where the

8    victim of the crime itself, as reflected by Mr. Finzer most

9    notably, didn't consider it to be insider trading -- if I

10   remember that interview -- where he referred Mr. Chastain to

11   one of the primary investors of OpenSea within weeks for a job,

12   where he invited him to his birthday party within weeks of his

13   resignation, that's not the kind of way that a victim typically

14   acts to someone who has violated their trust and committed a

15   crime.  How should that weigh in here?  Which is not to say

16   that he didn't commit a crime, it's just to say that the victim

17   itself didn't perceive this to be such an egregious breach that

18   he wouldn't recommend him for a job, for example.  I realize I

19   just said a lot of different things, so address what you want

20   in there.

21            MS. NICHOLS:  Sure.  Thank you, your Honor.

22            So I think as to the comment that OpenSea was a wild

23   west and didn't have sort of like more grownup type policies,

24   procedures, trainings for its employees until after the fact, I

25   mean, I take the Court's point, because it goes squarely to how

N8MGchaS

1    did OpenSea protect the information, that's important.  But I

2    think it's important also that courts not penalize, if you

3    will, a company for being a startup.

4          This company was growing.  It was growing very

5    quickly.  And as we point out in our submission, the category

6    of confidential information that Mr. Chastain misappropriated

7    did not exist at the time that he signed the so-called Clerky

8    form.  So I think that is how I understood Mr. Finzer's remark

9    that he hadn't thought about this ahead of time.

10         And I think that Mr. Atallah maybe spoke about it in a

11   way that was a little more thoughtful, perhaps, insofar as he

12   referred to it as an umbrella policy, it was meant to capture

13   all of the confidential information that a person could -- the

14   nonpublic information that an employee would learn through the

15   course of his employment.  I think that is what the form said.

16   That is what Mr. Chastain agreed to.

17         So I think that the fact that it was only later that

18   OpenSea got a head of HR, it only later they got a GC, it was

19   only later they started doing formal training and onboarding

20   for employees, I don't think that should suggest that they

21   didn't take confidentiality seriously and that they weren't

22   trying to protect their confidential information.  It's just

23   that a company that has 200 employees is necessarily going to

24   do that differently than a company that has ten employees.

25         THE COURT:  Can you focus on the second part of my

N8MGchaS

1    long remarks, that is to say, really focusing on Mr. Finzer

2    more than anyone, that his reaction to learning about

3    Mr. Chastain' conduct, that is to say, yes, I think it's clear

4    from the testimony that he felt that there had been a violation

5    of trust, yes, he felt that he needed Mr. Chastain to resign or

6    be fired.  But at the same time, he described it as the most

7    difficult thing he had to do, at least up to that point in his

8    experience at the company -- more to the point, he recommended

9    him for a job with one of the primary investors or at least

10   connected him to that person, he had him at his birthday party,

11   he said he didn't consider it to be insider trading, I don't

12   know if it went beyond that.  Can you describe what impact, if

13   any, that should have.

14        MS. NICHOLS:  I'm not sure it should have any impact,

15   your Honor.  I think that Mr. Finzer and Mr. Chastain were

16   friends and I think that the fact that Mr. Finzer found this

17   entire situation extraordinarily difficult on a personal level

18   was very clear.  I do not think that Mr. Finzer is aware of the

19   Carpenter line of cases and his opinion that this is not

20   insider trading is worth nothing.  And I think, in context, his

21   comments were related to the fact that his understanding of

22   insider trading was that it is about securities and NFTs are

23   not securities.

24        THE COURT:  What about the reference to the Coinbase

25   member of the board, investor, whoever he was?  That, to me, is

N8MGchaS

1    definitely an odd case, where the victim doesn't feel

2    victimized, right, prosecutors are prosecuting this case.  The

3    victim is not seeking restitution.  I agree with you there's

4    loss and certainly there's gain and 2B1.4 applies, doesn't

5    matter.  It's not a legal issue, but as just --

6            MS. NICHOLS:  As a philosophical matter, your Honor,

7    it's my view and I think this office's view in a lot of

8    circumstances that the feelings of the victim do not matter.

9    And where this comes up a lot, at least in my docket is --

10           THE COURT:  I don't think that's the position of the

11   United States government with respect to prosecutions generally

12   or consistent with the Crime Victim's Rights Act, which says

13   these victims absolutely do matter and need to be reasonably

14   heard --

15           MS. NICHOLS:  Yes, your Honor.

16           THE COURT:  -- except where the victim doesn't want to

17   be heard.

18           MS. NICHOLS:  Victims absolutely need to be consulted

19   at various points consistent with the law and with the justice

20   manual, your Honor.

21           But what I'm trying to say is that if a victim does

22   not subjectively feel victimized, that does not mean that a

23   prosecution is inappropriate and it does not mean that this

24   office declines prosecution.

25           And this happens a lot in domestic violence cases that

have come before the federal court on VOSRs on a very frequent

basis.  And these cases are declined in state court.  And

oftentimes, federal court is the only game in town for

prosecuting those kind of crimes where very frequently the

victim does not want any part of it and for reasons that are I

think a lot more complicated than the ones we have here.

I think the fact that Mr. Finzer recommended

Mr. Chastain or offered to put him in touch with a third party

immediately after -- and I could be mistaken, I think that was

immediately after -- he was fired, but before the prosecution

was brought, I think that speaks to his personal affection for

the defendant, which I think is something that the Court can

and should consider in the 3553(a) factors, insofar as the

defendant was liked by his colleagues.  And he has family

support.  I think that's reflected in sort of the many Slack

communications that we have reviewed and we put into evidence.

I think that there's no question that he had the affection and

the support of his colleagues.  But I do think that that is

separate from the offense conduct.  And so I don't think that

it minimizes the crime.  I think it may be something that the

Court can separately take into consideration when looking at

the whole person as the law suggests that you do.

THE COURT:  Other than forfeiture, I don't have any

other questions, but anything else you wish to say, aside from

addressing the forfeiture issues?

1          MS. NICHOLS:  I think I won't reiterate anything in

2     any detail that we put in our submission.  I know the Court

3     said that it read it and doesn't have any other questions.  I

4     just think what we would like to emphasize is that a

5     significant sentence is important for both specific and general

6     deterrence here.  The novel, so-called novel nature of this

7     case, I think, as I said, actually cuts the other way.  What we

8     have here is, in many ways, the same kind of white collar fraud

9     that we're seeing in other contexts.  And the fact that it is

10    in a different context, pertaining to NFTs, it is on the

11    blockchain does not warrant a lesser sentence or any kind of

12    leniency.  We think that a sentence within the guidelines is

13    appropriate.

14          As to the forfeiture, the Court has two questions,

15    which I think are sort of four questions.  I think that we

16    addressed the question of which transactions should be applied

17    in our sentencing submission.  The instances where the

18    defendant was trading after the NFT had been featured were

19    minutes afterwards, and so I think that there's no real --

20          THE COURT:  Let me press you on that.  I think you

21    have a tough road to prevail on that one for two reasons.  One

22    is, at trial, the government took the position that certain

23    transactions -- and distinguished Mr. Chastain from a colleague

24    of his, who had traded on something minutes after an NFT was

25    posted -- and your colleague who is not here today, I think,

1     literally argued to the jury that that's not a problem because

2     it had already been made public at that point, taking the

3     position that once it is featured and public it's not a crime,

4     I think it is a little hard to now say those should be treated

5     as a crime.  Second, how is it nonpublic information, once it's

6     posted on the website and available to the entire world in an

7     instant?  I mean, theoretically, somebody who is doing -- I

8     don't know if there's high frequency trading -- one could have

9     it set up where the moment something is posted on OpenSea, they

10    instantaneously buy and then trade on it.  It's not public

11    anymore.  So in that regard, it may be as a practical matter,

12    they posted things and then a minute later bought them, there

13    is a query whether he would have been charged with a crime and

14    may well have made the same profit, I'm not inclined to include

15    those transactions in the forfeiture amount.  I don't know how

16    hard you want to fight me on that, but you have a hard battle

17    to prevail.

18              MS. NICHOLS:  I can move on, your Honor.

19              THE COURT:  Okay.

20              MS. NICHOLS:  If we just look at the transactions that

21    occurred pre-feature, the profit is $50,000, $50,113, and that

22    is converting the ETH at the time of the transaction into

23    dollars.  If we don't do the conversion, the total ETH is 15.9

24    for those pre-feature buys.

25              I need to say one more thing about how we get there.

N8MGchaS

1    We used a convention -- where there are some transactions prior

2    to featuring and some transactions after featuring, in order to

3    make the distinction, we used a first-in, first-out comparison.

4            THE COURT:  Okay.  Can you address the ETH versus

5    conversion into dollars question.  In other words, if he has

6    never liquidated the ETH and still has it, is that not the

7    property derived from the offense, and should the forfeiture

8    not just be the ETH, would that not be the most straightforward

9    way to do it?  And I would point you rely on the Wahi

10   sentencing as a comparator, the forfeiture was with respect to

11   the crypto involved, not a converted amount.

12           MS. NICHOLS:  That's true, your Honor.  And I think

13   it's hard to argue that what you are suggesting is the simplest

14   way, I think the --

15           THE COURT:  Hard to argue it is or --

16           MS. NICHOLS:  You are right, you are right, your

17   Honor, that what you are saying is straightforward, just to

18   take the ETH, if that's how the Court is inclined to do it, I

19   think the number is 15.9 ETH.

20           I think our view on that is that with analogy to the

21   McDonald case in the securities world, the defendant choosing

22   so keep his investment in ETH, it's actually a separate

23   investment decision that he has made.  And why he did that, I

24   don't think anyone would know.  But I think it's fair to

25   surmise that, at the time, that he thought that ETH was going

N8MGchaS

1    to keep going up.  As it happens, ETH has tumbled and it's now

2    worth about half as much as it was.  But I think that our view

3    is that it is appropriate to measure his gain at the time of

4    the transaction, which is significantly greater than it is some

5    years later when he has held and there have been all these

6    other market forces.

7            THE COURT:  Can I ask you a question on that.  I would

8    presume that, if the ETH had skyrocketed since the transaction

9    and was now worth 3X what it was at the time, that you would be

10   here arguing that he should be required to forfeit the ETH

11   itself, even though it has appreciated in value, that all of

12   that is traceable to the crime, and I think there's case law

13   that supports that.  Is it a one-way ratchet, where the

14   government gets to choose the point in time and pick the most

15   valuable point?

16           MS. NICHOLS:  I think that what distinguishes this

17   from the McDonald case and the securities cases is that there's

18   actually sort of two ways to measure what the thing is.  So he

19   sold the NFTs and he took his gains in ETH.  And then he could

20   have -- but didn't -- but he could have chosen to convert to

21   dollars.  So I think the question is whether it's appropriate

22   to give him the benefit, so to speak, of having chosen to

23   maintain an investment in ETH after the fact.

24           My colleague is pointing out that the purpose of

25   forfeiture is to prevent the defendant from getting and

N8MGchaS

1  maintaining ill-gotten gains, to think of it as one

2  directional, such that he is not being put in the position to

3  benefit from the crime.

4         THE COURT:  Okay.  Anything else?

5         MS. NICHOLS:  No, that's it from the government, your

6  Honor.  Thank you.

7         THE COURT:  Mr. Miller.

8         MR. MILLER:  Thank you, your Honor.

9         Would you prefer here or at the podium?

10        THE COURT:  Up to you, as long as you speak into a

11  microphone.

12        MR. MILLER:  I'll stand here, your Honor.

13        I have a number of responses to your Honor's questions

14  and points and I thought if it was okay with your Honor, rather

15  than jumping around, I would do it in the context of my 3553(a)

16  analysis.

17        Let me begin, if I might, your Honor, by introducing

18  you to Nate Chastain's friends and family that are here with

19  him today.  I think, primarily in the first and second rows,

20  you have Donna Chastain, Mr. Chastain's mother; you have

21  Elizabeth Sherman, Mr. Chastain' girlfriend; you have Ron

22  Criscetiello, Mr. Chastain's mother's boyfriend; you have

23  Kachina Studer, Mr. Chastain's friend; you have Harrison Hines,

24  Mr. Chastain's former CEo at Token Foundry and friend; and I

25  believe you also have Royce Moroch, who is a former coworker.

N8MGchaS

1          Your Honor, there are a number of issues that I want

2     to walk through with respect to 3553(a).  I, of course, am

3     aware that your Honor has reviewed closely --

4          THE COURT:  Before you do that, let me welcome all

5     those people, many of whom submitted letters to me and I read

6     and appreciated.  If I could ask, Mr. Miller, when this is over

7     to give the court reporter spellings of those names, that would

8     make sure the record is accurate.

9          MR. MILLER:  Absolutely, your Honor.

10          THE COURT:  Go ahead.

11          MR. MILLER:  Thank you, your Honor.

12          There's a few points I want to highlight, the most

13     important points under 3553(a).  And in the context of doing

14     that, address some of the points you raised, some of the points

15     you just raised to government's counsel.  And the Court is

16     obviously well aware of the factors, I'm not going to waste

17     everybody's time going through what the factors are.  But I do

18     want to say a few things about each factor that show that a

19     nonguidelines, noncustodial sentence is appropriate here.

20          Let me begin with Mr. Chastain's personal history and

21     circumstances.  At every stage of life, Nate Chastain has

22     demonstrated his extraordinary devotion to and concern for

23     others.  And many of the letters of support that were submitted

24     to your Honor illustrate that, whether he's lending a hand to

25     those in need, supporting friends through times of tragedy,

1   contributing to charitable efforts, serving as a mentor to his

2   coworkers, dedicating time to building useful products for

3   people, and stepping up, frankly, for his family, not only in

4   the aftermath of his father's Alzheimer's diagnosis, but also

5   in the wake of his brother's recent suicide.  And this, of

6   course, was all happening, as your Honor is well aware, as he

7   was being prosecuted and tried in this court.  We have been

8   honored, frankly, your Honor, to represent such a kind,

9   compassionate, intelligent, respectful and caring person.  I

10  think I speak for our entire team on that front.  And frankly,

11  it doesn't always go that way, your Honor, where we're

12  representing people of such caliber as Nate Chastain.

13         Nate's upbringing was defined by education and hard

14  work.  Now, as we discussed in our sentencing submission, he

15  had a difficult family upbringing, but he was fortunate to

16  attend some good schools, both at the prep school level, then

17  ultimately in college.  But he went on to earn his bachelor's

18  degree and engage in hard work.  Since graduating from college

19  in 2015, he's worked in the tech and crypto industries,

20  including several companies that we have list in our sentencing

21  submission and I know your Honor has reviewed and for those

22  companies, people have submitted letters in support from those

23  companies, as well as even attending today.

24         Nate Chastain's life has been marked, as I sort of

25  previewed earlier with acts of generosity and kindness, and the

1    letters exemplify that.  Nate's former colleagues at Consensus,

2    people talk about what he did for them as a mentor and helping

3    people who were in danger of being fired.  His generosity and

4    kindness and charitable efforts even extend beyond the

5    workplace, as we saw from letters like from his friend from

6    college that provided help, money that Mr. Chastain gave in

7    support for promotions for cancer research, and even one person

8    who described how he's always willing, always willing to go out

9    of his way for someone else at any time, not just when it's

10   convenient.  And I think these letters speak volumes, because

11   sometimes we see, your Honor, in sentencing submissions where

12   you have 30, 40, 50 letters, but they're not of substance.  The

13   16 or 17 letters that were submitted with this sentencing

14   submission are of substance and demonstrate the kind of person

15   that Mr. Chastain is.

16          And frankly, it's not just a matter of his friends or

17   colleagues, work colleagues, people from school, his family

18   echos this sentiment.  Nate's uncle described how Nate Chastain

19   helped him with his drunk driving prevention campaign.  Other

20   people talked about how he helped them avoid expenses,

21   particularly during hard times.  And he's so generous.  It

22   wasn't like he had so much money to begin with.  His sister

23   talks about the time and the many nights that he spent helping

24   her, particularly with homework and other endeavors.  And

25   frankly, in times of unimaginable hardship, Mr. Chastain has

N8MGchaS

1   selflessly put the needs of his friends and family above his

2   own, your Honor.

3           I referenced, obviously, his father's Alzheimer's

4   diagnosis and what he's been doing, even during this

5   prosecution, when he's been going back to Massachusetts to help

6   his mother, to help his sister.  As your Honor is well aware,

7   tragically, Mr. Chastain's younger brother, who previously

8   suffered life-threatening injury at work and who had a long

9   history of mental illness committed suicide in February of this

10  year.  And Mr. Chastain immediately and without question,

11  without any issues took on the responsibility of planning all

12  aspects of his brother's funeral services.  And I remember

13  this, your Honor, as we were preparing for trial in February.

14  And he did everything to help his family, his mother, his

15  sister be able to grieve.

16          I'll note too that five years ago, his college

17  roommate tragically took his own life.  And one of the letters

18  that we appended to our submission speaks about how

19  Mr. Chastain helped friends, including at the funeral, and did

20  what he needed to do and gave up himself, notwithstanding the

21  grief that he felt, to help other people and put other people

22  at ease.

23          This is a man, your Honor, who has stepped up in life

24  for everyone.  And I think that is extremely important to note

25  as part of a 3553(a) assessment.

1          To that end, your Honor, the instant factual

2    conduct -- and your Honor is of course aware that we're

3    preserving certain arguments, but in terms of the conduct that

4    was done, namely the trading, we haven't contested that -- we

5    still submit this is an isolated misstep in Mr. Chastain's

6    life.  Before this case, as your Honor is well aware,

7    Mr. Chastain had never been arrested and there is zero

8    indication that he is a person capable of repeating the conduct

9    at issue, which in all respects, all respects was an anomaly on

10   his record.

11         We note that obviously this is a relatively young man,

12   33 years old.  He has engaged in those young years in immense

13   character building, immense charitable actions, and as I just

14   recited, the kind of guy who will help everybody at the drop of

15   a hat.

16         Now, if I may, your Honor, talk about the nature and

17   circumstances of the offense here.  The factual conduct

18   obviously took place over a relatively short period in 2021.

19   As probation agreed with us in their computation, it inflicted

20   no monetary losses on the supposed victim, OpenSea, and

21   resulted in minimal gains.  Your Honor actually already raised

22   some of the points that I was going to raise about what

23   actually happened here and most importantly OpenSea's response.

24         I understand your Honor's point about the Court's

25   belief that this case falls squarely within Carpenter and that

N8MGchaS

1    the jury made its assessment and convicted him of wire fraud

2    and money laundering, I'm not here to quibble about the jury's

3    verdict, certainly not.  But I think your Honor made an

4    important point at the very beginning of government counsel's

5    argument that I was going to make, your Honor, and that is I

6    too wonder if this case would have ever been brought if this

7    didn't involve non-fungible tokens and blockchain.  That's not

8    an irrelevant point for 3553(a) purposes, especially

9    considering that the gain amount here -- to the extent there

10   was a gain under the guidelines -- is, depending upon how you

11   compute it, 50 grand or even as low as 23 grand.  I'm not

12   suggesting that because somebody commits a crime and it's

13   little money that it's not important.  I'm not saying that,

14   your Honor.  I am saying for assessing what constitutes a

15   reasonable sentence in this proceeding that absolutely should

16   be considered.  Because I think the real answer to your Honor's

17   question about whether this case would have ever been brought

18   is no.  And again, I respect the jury's verdict and the Court's

19   opinion of what's going on here.  But nevertheless, I think

20   that must be considered in fashioning an appropriate sentence

21   under 3553(a).

22           I was a little surprised at government counsel's

23   defense of Mr. Atallah's testimony but equivocation when it

24   came to Mr. Finzer's testimony when talking about the nature

25   and circumstances of offense here and the level of culpability.

N8MGchaS

1    The jury certainly was asking questions, and they did bring up
2    Mr. Finzer's testimony in their jury questions.  They certainly
3    didn't bring up Mr. Atallah's.  And obviously, our arguments
4    were presented in our closing argument about Mr. Atallah's
5    testimony and the value of it and I need not repeat those.  But
6    I think it's important to note, with respect to Finzer exactly
7    what the Court has already said, and I need not repeat it.  But
8    I think your Honor hit the nail squarely on the head as to what
9    Mr. Finzer, the signatory of that Clerky form, and what OpenSea
10   thought about the conduct here.

11          So I would also like to point out that the government,
12   in its submission, describes this as a serious case because
13   Mr. Chastain stole, I think they used the word, corporate
14   secrets, making this sound like a typical insider trading case.
15   It is anything but.  As we argued at trial, there was no
16   commonly known rules and policies here, and I'm not going to go
17   in depth on that, your Honor has already referenced that in
18   your colloquy today.  The secrets at issue were something that
19   were devised by Mr. Chastain in his head, which NFTs to
20   feature, and to keep the website looking nice and ever
21   changing.  And there was no training, and we talked about that.

22          But I think it's also important to note, in terms of
23   the trades that were involved here, obviously, these were
24   issues about arbitrage with respect to small gains.
25   Mr. Chastain did not believe that he was defrauding OpenSea or

N8MGchaS

1    that the conduct was criminal.  But most importantly, if you

2    look at when these trades occurred -- this was something we

3    referenced in closing, and I think it is important to consider

4    from a 3553(a) perspective, there was a trade in June that was

5    one of the trades that was charged here, and that was what we

6    call a straddle trade, where some of it was before it was

7    publicly available, others after, some of the items.  And then

8    there were the two July trades, which were made after the NFT

9    was featured on the home page.  And then on August 2nd of 2021,

10   there was the Twitter blast to over 10,000 followers, including

11   people at OpenSea, where Mr. Chastain admitted buying pre-NFT

12   feature, but nobody objected to that, nobody took him to task

13   for that.  So certainly, an argument could be made, your

14   Honor -- just talking about now from a 3553(a) perspective --

15   is what we're dealing with is the conduct in June, which

16   amounted to approximately $800.  Again, I'm raising this just

17   for the purposes of the nature and circumstances of the

18   offense.

19          I'll end on this particular fact by saying it's not

20   fair for the government to say this case is just as serious as

21   sort of the run of the mill insider trading case, where the

22   rules of the road were not known, this was, to use your Honor's

23   words, the wild west at OpenSea.  And putting aside the guilt

24   or innocence under the counts, clearly, these facts must go to

25   the level of under culpability under 3553(a).

N8MGchaS

1          Now, let me say a few things --

2          THE COURT:  Can I stop you there.  And I recognize

3     that you are drawing a little bit from the comments that I

4     made, but I think partially what I was saying was that was what

5     made this case a triable case.  I think the jury's verdict was

6     totally defensible, not withstanding the company was not fully

7     formed, developed, lawyered, what have you, I think the jury

8     reached a totally defensible verdict, this was confidential

9     business information, given the definition, given the term

10    confidential in the, quote, unquote, Clerky form, and frankly,

11    most notably in the context, which made it quite clear that he

12    treated it as confidential and took substantial steps to

13    conceal what he was doing from his employer and from the

14    public.  So I understand -- I mean, you made those arguments,

15    the jury rejected them.  In that regard, it gives me pause and

16    concern that to this day -- I understand you want to want to

17    preserve arguments for appeal, and that's totally fine -- I did

18    not give acceptance of responsibility credit.  It's troubling

19    to me that, sitting here today, you or Mr. Chastain through

20    you, continue to maintain he didn't do anything wrong and

21    everything was unclear and there was ambiguity here and so

22    forth.  That's not how I view his conduct and certainly not how

23    the jury took his conduct.  So what should I make of that?

24          MR. MILLER:  Your Honor, I apologize if your Honor is

25    taking that a way, that's not what I'm saying.  Mr. Chastain is

N8MGchaS

```
1    going to read a statement in which he talks about how he
2    thought and that he thought that he shouldn't have done what he
3    did, as he admitted to everybody in September of 2021.  Our
4    argument separate from that is that -- again, this goes to the
5    legal issue of whether or not this information is property --
6    the reason why I have raised the rules of the road and some of
7    the arguments that we made -- and I understand your Honor's
8    point about why you were saying what you were saying -- is that
9    this does go to the level of culpability and the nature of the
10   offense here under 3553(a), that's the only reason why I'm
11   raising this.  I'm not suggesting that Mr. Chastain believes
12   that he should have done what he did.  He is going to tell you.
13   And we have conceded that, I conceded it in opening, your
14   Honor, I said to the jury, you may think this is a little
15   sketchy.  And he's not standing here today, your Honor, to say
16   I did nothing wrong, absolutely not.  The question is whether
17   from -- and again, preserving arguments -- whether this was a
18   crime under the wire fraud statute, that's a different point.
19   But what Mr. Chastain did, which he acknowledged, I think, in
20   some text that was ethically brave and, in retrospect, probably
21   not, you're going to hear that today.  So I want to be very
22   clear on that, your Honor.  And I apologize if I presented any
23   alternative view.
24              THE COURT:  Okay.  Go ahead.
25              MR. MILLER:  Let me move on to deterrence.
```

1          First, there is no need here for a sentence that

2     somehow is an incarceratory sentence to provide specific

3     deterrence.

4          THE COURT:  Let me interrupt you.  I agree with that.

5          The question is general deterrence.  In particular, my

6     impression, both anecdotally and I think there's some empirical

7     support for this, is that in the context of these kinds of

8     prosecutions, white collar prosecutions, insider trading

9     prosecutions, that this is an area where these prosecutions and

10    sentences do have a deterrent effect on participants.  This

11    case has received some attention in the press.  It, I guess,

12    will receive attention, whatever sentence I impose.  Does that

13    not matter and does it both undermine the deterrent effect and

14    breed cynicism or look of respect for the law if Mr. Chastain

15    is perceived as getting a slap on the wrist?

16         MR. MILLER:  No, I don't think so, your Honor.  I

17    think at this point anybody would be hard pressed to say

18    whatever sentence your Honor imposes -- we hope it's time

19    served or probation with a condition of home confinement,

20    something we have suggested in our papers -- I think anybody

21    who knows and has read the press on this or knows what this

22    case is about knows -- especially considering, frankly, the

23    amounts involved, right, this wasn't millions of dollars or

24    anything like that -- knows that if you even, to a small extent

25    might try to replicate Mr. Chastain's behavior, here is what's

1    going to happen to you, your reputation is going to be

2    irreparably damaged, you're going to get fired from your job,

3    you're going to lose potential to vest in shares that are worth

4    millions of dollars, and you are going to have a hard time

5    getting another job, not to mention the fact that you are going

6    to be constantly scrutinized in the press.  And then you are

7    going to have to go through a prosecution by the United States

8    Attorney's Office for the Southern District of New York, which

9    nobody wants to go through.

10           So I don't think just because of the fact that the

11   government has decided to charge this case, because it involved

12   novel technology and non-fungible tokens and, as we just heard

13   earlier, sexy products, that all of a sudden now that means

14   that Mr. Chastain should be treated more harshly than other

15   defendants because the government is trying to make a point in

16   this new area of technology that it is attempting to enforce

17   its laws in.  I make that argument a little harsher with the

18   SEC, I know why the United States Attorney's Office is doing

19   what it is doing, I think that would be frankly the wrong way

20   to look at this, your Honor.

21           I mean, the government declared this when it charged

22   this case, as the first ever criminal case involving the

23   so-called insider trading of digital assets.  And as we just

24   sort of discussed here, every significant moment of this case

25   has been covered.  And I think anybody who is viewing this and

N8MGchaS

1    is seeing now that Mr. Chastain was convicted after a trial,

2    not to mention all the reporting that's been going on,

3    understands that, even for the amount that was involved, they

4    don't want any part of this.  I think if your Honor

5    appropriately provides a noncustodial sentence, that means that

6    all of a sudden the general deterrence in this new space goes

7    out the window, I don't think that's true.

8          And I'll note this, Mr. Chastain, as I sort of

9    referenced earlier, shouldn't be penalized for the fact that

10    this involves new technology, which brings me to the need to

11    avoid unwarranted sentencing disparities.  And this is, I

12    think, your Honor's sort of first point on your order today

13    about whether there's a comparable case here.  There isn't.

14    And the cases that I think the government just sort of

15    discussed with your Honor at the very beginning, tipping cases,

16    as your Honor appropriately pointed out, are apples and

17    oranges.

18          In the situation where you have a tipping case, the

19    tipper, even if they make no money, if they're tipping a friend

20    or a family member as Dirks and its progeny and Martoma talked

21    about, it is as if the insider trading on that information,

22    taking the cash and giving it to their family member or

23    friends, which is why they're on the hook and responsible and

24    should be responsible for the overall gain amount.  And I think

25    we noted in pages 21 to 23 of our sentencing submission and

N8MGchaS

1   pointed out cases with much larger gain amounts, where the

2   defendants got noncustodial sentences, including in the insider

3   trading context, or much lower sentences than the government's

4   request.  And just because this case involves NFTs doesn't mean

5   now that Mr. Chastain should suffer from getting a

6   disproportionate sentence.  So I think that's important to note

7   for your Honor.

8        If I may I would like to finish the remaining factors

9   and then talk about forfeiture.  I'm sorry, there was one other

10  point I wanted to mention.  The government points to the Ishan

11  Wahi case to argue that a sentence within the 21 to 27 range is

12  appropriate.  As the Court may be aware, I was Mr. Wahi's

13  counsel.  That case was much different factually and no

14  unwarranterred disparity would be created through our request

15  for Mr. Chastain here.  The indictment allegations in both

16  cases speak for themselves.  And of course, the amounts

17  involved and the facts involved are different and the

18  government knows that.  Just because they alleged, quote,

19  unquote insider trading involving digital assets or crypto

20  doesn't make the cases necessarily similar.

21        And it bears mentioning that what the government

22  didn't tell your Honor in that submission is that Judge Preska

23  did vary below the guidelines in imposing the sentence that she

24  imposed, which was 24 months, which was a significant variance

25  from the guidelines that were computed and adopted by the Court

N8MGchaS

1    in the PSR, significant variance.  So the cases are apples and

2    oranges and that comparison deserves no moment, no

3    concentration on it whatsoever.  And it only is brought up

4    because that's the other insider trading case involving crypto

5    that they charged in the last year.

6         On the forthcoming amendments point, I appreciate your

7    honor has applied, intends to apply the 4C1.1, or did apply the

8    4C1.1 in computing the offense level.  We would still like to

9    reference that the forthcoming guideline 4C1.1 does note that a

10   nonincarceratory sentence could be appropriate in this

11   situation, and we mention that in our submission.

12        THE COURT:  The government responded to that in a

13   footnote and says that it doesn't apply because the commission

14   views this offense as a, quote, unquote serious offense and

15   therefore that provision doesn't apply.  Do you take issue with

16   that?

17        MR. MILLER:  I do.  I take greatly.  I'm not saying

18   that the offense -- one doesn't look to the name of the offense

19   or the statute in determining whether or not a crime is serious

20   under that assessment.  If that was the case, then almost every

21   crime would be serious, warranting time of incarceration.  So

22   we take issue with that.

23        I'm not going to go through -- I think your Honor has

24   our letter from yesterday and argument and submissions -- it

25   sounds like the government may have backed off the concept of

N8MGchaS

1    using any gains from after the work had been featured, and

2    obviously, for the reasons we have already set forth, those

3    should not be included, including from a forfeiture

4    perspective.

5           Finally, I just note --

6           THE COURT:  Can I ask you on that -- I don't know if

7    they backed off so much as saw the handwriting on the wall --

8    if I conclude, number one, that those trades are not to be

9    included in the forfeiture order and, two, that the most

10   appropriate way of doing this is to order forfeiture of the ETH

11   itself, do you agree that the total is 15.98, I believe, is

12   what Ms. Nichols said.

13          MR. MILLER:  One moment.

14          Yes, your Honor, that's fine.

15          THE COURT:  Okay.

16          MR. MILLER:  So I had a number of points that I was

17   going to go through about in bringing up certain cases in the

18   Second Circuit and others as to why a money judgment is

19   inappropriate here.  If your Honor is inclined to award the

20   forfeiture as the ETH involved, which we think would be correct

21   as a legal matter, I can move on.

22          THE COURT:  Move on.

23          MR. MILLER:  Thank you, your Honor.

24          So let me close on this, your Honor.  Mr. Chastain is

25   a nonviolent, first time offender, convicted in a prosecution

N8MGchaS

1   that does involve several novel and, we would submit,

2   substantial legal issues.  And other than the underlying

3   factual events here, we submit he has led a blameless and

4   indeed praiseworthy life.  He has given himself, all of himself

5   to assist family, friends and others in times of need, and he's

6   made a difference in people's lives.  He works hard and is a

7   considerate selfless individual.  He is a good human being.

8   And Mr. Chastain has lost a great deal already.

9       He lost a highly lucrative, life-changing job, he's

10  lost his professional reputation and potentially his liberty

11  over an isolated period in the summer of '21 of poor judgment.

12  And given the guideline issues that we've discussed and

13  assessment of the 3553(a) factors and accounting for who Nate

14  Chastain is, we respectfully request that a sentence of time

15  served or, alternatively, a sentence of probation with

16  community service and/or home confinement would be a sentence

17  that is sufficient, but not greater than necessary, to

18  accomplish the sentencing objectives of 18, United States Code,

19  Section 3553(a).

20      Thank you, your Honor.  And now, Mr. Chastain, with

21  the Court's indulgence, has a few words to say.

22      THE COURT:  Thank you, Mr. Miller.

23      Mr. Chastain.

24      THE DEFENDANT:  Thank you, your Honor.

25      I'm here today because two years ago, I let down the

community I was serving and lost sight of the person I aspired

to be.  I apologize to OpenSea, a company that gave me the

opportunities and autonomy to do fulfilling work, a company

that surrounded me with team members that inspired me and a

company that I poorly represented.  I'm sorry for putting my

colleagues and friends from OpenSea through this ordeal.

            In September of 2021, I did my best in the immediate

aftermath to communicate how sorry I was.  While I do not

believe and did not believe I had defrauded OpenSea, I

apologized to the founders the night my conduct was being

discussed on Twitter in private messages and in all meetings

with the OpenSea team and on numerous occasions in the day that

followed, so much so that the general counsel joked to our CEO

that I was self-flatulating.  I had prided myself on resolving

problems for the company and I felt awful that I had created

one.  I am still as deeply remorseful for these actions today

as I was then.

            This conduct was antithetical to my personal and

professional values.  And so I have undergone a significant

amount of reflection and self-auditing over the past two years

to ensure a better understanding.  While I feel confident that

I will never make this mistake again, I am here to own the

mistakes I have made in the past.

            I am focused now on doing right by those around me and

helping out where I can.  Since June of last year, I have been

N8MGchaS

1    working full-time in the product world for a team that his an

2    understanding about my situation.  And additionally, I

3    regularly provide feedback and mentorship to other product

4    teams whenever possible.  If I find that the path is closed for

5    me to build another product, I'm hopeful that I may be able to

6    guide someone else on their path.

7          Outside of my professional life, I am committed to

8    nurturing and strengthening my personal relationships.  Despite

9    losing many relationships due to my conduct at issue here, I am

10   extremely grateful that others were willing to look past my

11   flaws and continue to support me.  To that end, I am sorry to

12   my mother and sister for compounding their grief with the

13   stress of these proceedings.  I placed an unnecessary burden on

14   them during what was already a trying time.  Similarly, I

15   apologize to my girlfriend for complicating our future together

16   through my conduct.  She has been an unwavering source of joy

17   and strength in my life and I wish that I had done better by

18   her.  I recognize that she and others have had to carry the

19   weight of this case with them and for that I'm deeply sorry.

20         I would like to close by thanking the Court and the

21   jury for their diligence in reviewing the facts of my case.

22   Thank you for your time, your Honor.

23         THE COURT:  Thank you, Mr. Chastain.

24         So I don't often do this and don't do it lightly, I'm

25   going to take a short break, in part, candidly, so I can think

1  about the appropriate sentence here.  This is an unusually

2  difficult one.  We've also been going at this a while, I want

3  to give the court reporter a few minute break.  So why don't

4  you be ready to go in five minutes, and I'll take the bench as

5  quickly thereafter as I can and we'll pick up from there.  So

6  I'll see you in a few minutes.

7          (Recess)

8          THE COURT:  Counsel, is there any reason why sentence

9  should not be imposed at this time?

10          MS. NICHOLS:  No, your Honor.

11          MR. MILLER:  No, your Honor.

12          THE COURT:  In imposing sentence, I'm required to

13  consider the factors set forth in 3553(a).  In the interest of

14  time, I'm not going to recite them in full, but suffice it to

15  say, I have and will consider all of the seven relevant

16  factors, including the guidelines range that we discussed

17  earlier, as modified by the forthcoming amendment on the zero

18  point offender front.  Ultimately, I'm required to impose a

19  sentence that is sufficient, but no greater than necessary, to

20  comply with the purposes of sentencing set forth in subsection

21  (a)(2), namely to reflect the seriousness of the offense, to

22  promote respect for the law, to provide just punishment for the

23  offense, to afford adequate deterrence to criminal conduct, to

24  protect the public from further crimes of the defendant and to

25  provide the defendant with needed educational or vocational

N8MGchaS

1    training, medical care or other corrective treatment in the

2    most effective manner.

3          Now, as I said before I took a break, I find this

4    sentence unusually difficult.  I have said before that

5    sentencing is the hardest thing that a judge has to do.

6    There's a range within that, and I think this one is especially

7    hard for a variety of reasons.  On one hand, I am certainly --

8    I, again, think that the verdict was a totally defensible one.

9    And indeed, I think that the only explanation for

10   Mr. Chastain's conduct is both greed and that he knew exactly

11   what he was doing.  Yes, there were some ambiguities at OpenSea

12   at the time, it was a relatively new company and not very well

13   lawyered at the time this conduct occurred.  I think

14   Mr. Chastain's own conduct, his use of more than two dozen

15   anonymous or synonymous, whatever you want to call it, wallets,

16   his reaction to the Tweets that called him out, his reaction

17   when first confronted by Mr. Viau and Mr. Atallah, I think that

18   makes abundantly clear that he knew exactly what he was doing

19   and he took advantage of an opportunity, fear of missing out,

20   as he himself put it.  I think he would be the first to

21   acknowledge that that conduct was profoundly dumb, that the

22   little he gained financially, compared to what he has lost and

23   what he's been through the last couple years, that it really

24   pales in comparison to that.  I think that, for those

25   reasons -- whoever is typing in the back, please stop; you are

N8MGchaS

1    not supposed to be using electronic devices in here for one

2    thing and, for another, it is distracting -- I do think that

3    respect for the law, deterrence -- not for Mr. Chastain, I am

4    persuaded that he is unlikely to re-offend, but more broadly,

5    that those are factors that warrant a sentence, warrant

6    punishment, and I'll elaborate on what I mean by that in a

7    moment.

8            On the flip side, I do agree that there are a number

9    of mitigating circumstances here that warrant a variance and a

10   substantial variance from the guidelines at that.  Now,

11   Mr. Chastain is a first time offender.  To some extent I have

12   given him credit on that score already by taking into account

13   the zero point offender amendment.  I think, as the letters

14   that Mr. Miller emphasized, made clear -- and were quite

15   eloquent letters -- I think to really quote Mr. Chastain's

16   uncle, a one time bad, dumb act in a lifetime of good, smart

17   acts is sort of a way that I think aptly describes it.  They

18   describe someone who is a generous and caring friend, son,

19   brother, talented person that can do good in the world and I

20   think he likely will do good in the world, but somebody who

21   strayed and should have known better, as Mr. Chastain himself

22   acknowledged.

23           Now, third, his prospect of steady employment with the

24   marketable skills suggest to me that Mr. Chastain has a

25   potentially promising future, as exemplified from his current

N8MGchaS

employer, Mr. Smith and Mr. Hines, who is here today.  That is
to say, on the one hand, he suffered serious reputation harm
and consequences and that will no doubt hamper and dog him for
potentially the remainder of his professional life.  On the
other hand, he seems to have overcome that in some respects,
and that's a testimony to his hard work and, frankly, to his
integrity, this episode aside.

All that persuades me that his lack of remorse
notwithstanding -- and I remain concerned and understand and
respect that they need to preserve issues for appeal -- but the
fact of the matter is, I think Mr. Chastain has admitted to
certain portions of his conduct, but not to all of it, and in
an effort to maintain his innocence -- as I said before I am
fully persuaded that he knew exactly what he was doing here --
that notwithstanding, I'm convinced he's very unlikely to
re-offend.

So where does that leave me?  That leaves me
struggling to figure out what an appropriate sentence is.  And
I would say part of that is my concern that I articulated to
Ms. Nichols before, which is there aren't so many comparable
cases to this.  My law clerk did find one where the defendant
made $76,000 in profits and received a five-month sentence in a
2017 case before Judge Broderick.  That may be the closest
comparable case that we were able to find, but the bottom line
is there aren't many.  And I am somewhat concerned that, but

1  for the fact that this conduct took place in a slightly sexy

2  new arena, that it might have never been charged by the US

3  attorneys, but that is very different from saying it wasn't a

4  crime, it's very different from saying it doesn't warrant

5  punishment.  I think it is a factor to be weighed.

6        All that leads me to the conclusion that a relatively

7  short amount of jail time, but some jail time is warranted, but

8  not as much as probation recommends, certainly not as much as

9  the guidelines would call for.  That is not a judgment that I

10 reach lightly, but it's one that, balancing all the

11 considerations, the need to promote respect for the law and to

12 provide adequate deterrence to those that are engaging in

13 conduct in the space, weighing that against the other factors

14 that I described, my confidence that Mr. Chastain has indeed

15 learned a lesson and will not commit that sort of thing in the

16 future, will use his talents for good, not for harm, and that

17 is what I think is the right way to balance them.

18        With that, you may rise.  I'll ask you to please rise,

19 Mr. Chastain.  I'll state the sentence I intend to impose.

20        Mr. Chastain, it is the judgment of the Court that you

21 will be remanded to the custody of the Bureau of Prisons for

22 three months on each count, to be served concurrently, to be

23 followed by a period of three years of supervised release with

24 a special condition of three months of home detention.

25        During the term of supervised release, you will be

N8MGchaS

1    subject to the mandatory conditions set forth on pages 30 and

2    31 of the presentence report.  You shall satisfy your financial

3    obligations that I will discuss shortly, including any

4    installment schedule that I impose.  In addition, the standard

5    conditions of supervised release, which are set forth on pages

6    31 and 32 shall apply, that includes you may not possess a

7    firearm or destructive device, you shall report to the

8    probation office in the judicial district where you are

9    authorized to reside within 72 hours of your release from

10   custody.  And finally, you must meet the special conditions

11   that are set forth on page 32, with the following two

12   additions:  Number one, as I said, you shall serve three months

13   of supervised release on home detention, it's to be enforced by

14   location monitoring, and I'll give you the relevant language on

15   that in a moment; in addition, I'm going to require that during

16   your term of supervised release that you perform 200 hours of

17   community service as approved by the probation officer.

18          I want to make clear, as I suggested earlier, that I

19   would impose the same sentence even if I were to have included

20   that Section 2B1.1 is the proper guideline to be applied.

21          I am going to impose a fine, given Mr. Chastain's

22   ability to pay a fine, and I'm going to impose a slightly

23   larger fine than the bottom of the guidelines, in part, because

24   of the forfeiture order I'm going to impose.

25          Let me start with forfeiture.  I am going to order

N8MGchaS

1   forfeiture of the ETH itself, that is the property derived from

2   the offense.  The parties seem to agree that that figure is

3   15.98 ETH.  I'm going to ask the parties to try and reach

4   agreement in the terms of an appropriate forfeiture order that

5   makes that clear, but that is part of the sentence.

6           I do think there's an argument that a defendant should

7   be subject to essentially the maximum forfeiture, whether

8   that's at the time of the offense or if it appreciates in

9   value.  Bottom line is, to avoid some of those thorny

10  questions, I'm going to order forfeiture of the ETH itself, but

11  as a result of that I'm going to impose a slightly higher fine

12  than I otherwise would have, given the ability to pay here and

13  the rest of the sentence that I imposed.  In particular, I'll

14  order that Mr. Chastain pay a fine in the amount of $50,000 to

15  be paid within six months of the commencement of his term of

16  supervised release, in the first six months of supervised

17  release.

18          And finally, I'm imposing the mandatory special

19  assessment of $100 per count for a total of $200.

20          I think this should be clear from the colloquy, but

21  that forfeiture amount is based solely on the trades that

22  occurred before purchases that occurred before the NFTs were

23  featured on the website.  I'm excluding the transactions where

24  it went in the opposite order.

25          On the location monitoring front, let me just add

N8MGchaS

1    that, Mr. Chastain, you are to be monitored for a period of

2    three months while you are on home detention and must abide by

3    all technology requirements.  You must pay all or parts of the

4    costs of participation in location monitoring program as

5    directed by the probation department based on your ability to

6    pay.  And I will leave the technology to the discretion of the

7    probation officer.

8            Does either counsel know of any legal reason why the

9    sentence should not be imposed as stated?

10           MS. NICHOLS:  No, your Honor.

11           MR. MILLER:  No, your Honor.

12           THE COURT:  The sentence as stated is imposed.

13           I find that it is sufficient, but no greater than

14   necessary, to satisfy the sentencing purposes set forth in

15   Section 3553(a)(2), including the need to promote respect for

16   the law, provide just punishment for the offense, to afford

17   adequate deterrence -- again, not so much to Mr. Chastain -- to

18   others, to protect the public from further crimes of the

19   defendant.  I think that factor does not weigh heavily here.

20           Mr. Chastain, I don't send anybody to prison lightly,

21   and I certainly didn't here for the reasons I articulated.  I

22   do think something more than what might be perceived to be a

23   slap on the wrist is appropriate.  It's not a particularly long

24   sentence, but nor would I want to spend three months in prison.

25   I didn't do that lightly.  I think it is what I deem is the

appropriate thing given what I view as the wrongfulness of your

conduct and conduct that I think you knew was wrong.  So I

certainly understand that you are trying to walk a fine line in

terms of the issues that you are preserving for appeal, while

acknowledging the ways in which you went astray, but I think

that you know in your heart of hearts that you went astray a

little bit more than you have acknowledged.  Be that as it may,

the letters that were submitted to me, your own remarks make

clear to me that you are more than this conduct would suggest,

and I would hope that after you serve your time and you have

paid your debt to society that you are able to use your

considerable talents to good use.  You will have to, by virtue

of the community service requirement that I have imposed, but

the letters from your current employer, from Mr. Hines, make

clear you still have supporters, not only in your family, among

your friends, you should be thankful for all of that, also

among people who are willing to take advantage of your talents.

I hope that you learned a lesson from this.  I hope that you

can teach other people the lesson so that they can learn from

this and that when you have served your time that you are able

to go back to steady employment, that you will do good in the

world and not put this behind you -- because you shouldn't

forget it, but rather learn from it -- and profit from it in a

moral sense, not a financial sense.

Now, I would assume that you would request a

N8MGchaS

1    recommendation to the Bureau of Prisons for a designation

2    either in the New York City area or in the Massachusetts area.

3            Mr. Miller.

4            MR. MILLER:  Your Honor, we request Otisville, the

5    camp at Otisville.

6            THE COURT:  I'm prepared to make that recommendation

7    consistent with the maintenance and ties to Mr. Chastain's

8    friends and family.  I also do not think that a high security

9    facility is necessary here.  Obviously, that's up to the Bureau

10   of Prisons, not up to me.

11           I don't think there are any open counts to be

12   dismissed, unless I'm misremembering.

13           MS. NICHOLS:  No, your Honor.

14           THE COURT:  Mr. Chastain, to the extent that you --

15   well, you did not give up your right to appeal in any

16   respect -- you have the right to appeal.  Any notice of appeal

17   must be filed within 14 days of the entry of judgment.  If you

18   cannot afford to pay the cost of appeal, you may apply for

19   leave to appeal in forma pauperis.

20           I am going to grant voluntary surrender.  I don't

21   think there's any reason to do otherwise here.  Mr. Chastain,

22   let me give you a date in approximately six weeks or so out

23   from now.  Mr. Miller, that puts us to, I would say,

24   October 5th.

25           Do you have any reason to say that date is not

N8MGchaS

1    appropriate?

2            MR. MILLER:  I think Mr. Chastain was hoping to attend

3    a wedding at the end of October, if November 1st is possible.

4            THE COURT:  Whose wedding is it?

5            MR. MILLER:  His girlfriend's best friend.

6            THE COURT:  I don't think a few weeks will make a

7    material difference, so I'll order that Mr. Chastain will

8    self-surrender to the facility to which he's designated by

9    November 2nd, 2:00 p.m. on November 2nd.

10           In the unlikely event that a facility has not been

11   designated at that time, normally, I would say that he would be

12   required to self-surrender to the MDC, but I think that's in

13   nobody's interest here.  Mr. Miller, in that unlikely event --

14   first of all, confer with the government and see if you can

15   spur a designation well before then -- but second of all, if

16   you seek an extension of the surrender date, I'm prepared to

17   grant that.  Unless or until I say otherwise, you're to

18   surrender by 2:00 p.m. on November 2nd to a facility to which

19   you are designated.

20           Let me stress two things:  First of all, you must

21   surrender by that time to whatever that facility is.  If you

22   don't, that is a separate offense and would subject you to

23   punishment above and beyond the punishment you received today,

24   I don't expect that to the happen, but do you understand that?

25           THE DEFENDANT:  Understood, your Honor.

N8MGchaS

1    THE COURT:  Second, until that date, the conditions on

2  which you have been released until today will continue to

3  apply.  If you violate any of those conditions, number one, it

4  may result in your being remanded sooner to the MDC, which

5  again I doubt you want.  But more broadly, you may also be

6  subject to punishment above and beyond what you received today.

7    Do you understand that?

8    THE DEFENDANT:  Understood, your Honor.

9    THE COURT:  Can I ask, counsel, can you submit a

10  proposed forfeiture order -- hopefully agreed upon -- within a

11  week of today, is that feasible?

12    MS. NICHOLS:  Yes, your Honor.

13    MR. MILLER:  Yes, your Honor.

14    THE COURT:  Anything else from the government?

15    MS. NICHOLS:  No.  Thank you, your Honor.

16    THE COURT:  From the defense, Mr. Miller.

17    MR. MILLER:  Yes, your Honor.

18    We have one application, under 18, United States Code,

19  Section  3143(b), we would ask that the Court grant bail

20  pending appeal, given the substantial legal questions involved

21  in this case, your Honor.  My understanding is the government

22  takes no position on this.

23    THE COURT:  Ms. Nichols.

24    MS. NICHOLS:  We don't concede, your Honor, that

25  there's a substantial question, but we defer to the Court on

N8MGchaS

1    this question.

2             THE COURT:  Mr. Miller, I'm not going to rule on it

3    based on an oral application.  Why don't you submit something

4    in writing.  You don't need to address 3143(b)(1)(A), which is

5    to say that I don't think there's a danger of Mr. Chastain

6    fleeing or posing a danger to the community.  But if you could

7    focus your attention on subsection (B) and why that condition

8    is met.  I would at least appreciate a preview of what

9    arguments you would raise on appeal in enabling me to evaluate

10   whether that is met.

11            MR. MILLER:  Thank you, your Honor.

12            By when, your Honor?

13            THE COURT:  Up to you.  He's to surrender by

14   November 2nd.  I would obviously give me ample time to give you

15   a ruling, if you want to appeal that ruling, so use your time

16   wisely and keep in mind the government will be entitled to

17   respond as well.

18            Anything else from the defense?

19            MR. MILLER:  No, your Honor.  Thank you.

20            THE COURT:  In that case, Mr. Chastain, I do wish you

21   and your family the best of luck.  My condolences on your loss

22   of your brother earlier this year.  And we are adjourned.

23   Thank you.

24            (Adjourned)

25