1:22-cr-00305-JMF-1

23-7038
*United States v. Chastain*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

———————

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED   7/31/2025

AUGUST TERM 2024

No. 23-7038

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**NATHANIEL CHASTAIN,**
*Defendant-Appellant.*[*]

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

ARGUED: NOVEMBER 19, 2024
DECIDED: JULY 31, 2025

———————

Before:    CABRANES, WESLEY, and MENASHI, *Circuit Judges.*

Nathaniel Chastain appeals his judgment of conviction for wire fraud and money laundering. A jury found him guilty of those offenses based on trades he made while employed at the online NFT marketplace OpenSea. Chastain argues that the district court erred by

———————

[*] The Clerk of Court is directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 07/31/2025

instructing the jury that it could find him guilty of defrauding OpenSea of its property if he misappropriated an intangible interest unconnected to traditional property rights. He maintains that this error affected the jury's decision. We agree. We reject Chastain's additional arguments that the district court erred by preventing him from introducing evidence at trial. We vacate the judgment of conviction for wire fraud and money laundering and remand for further proceedings consistent with this opinion.

Judge Cabranes concurs in part and dissents in part in a separate opinion.

————————

ALEXANDRA A.E. SHAPIRO, Shapiro Arato Bach LLP, New York, NY (Jason A. Driscoll, Shapiro Arato Bach LLP, New York, NY; David I. Miller, Daniel P. Filor, Greenberg Traurig, LLP, New York, NY, *on the brief*), *for Defendant-Appellant*.

NICOLAS ROOS, Assistant United States Attorney (Thomas S. Burnett, Allison C. Nichols, Danielle R. Sassoon, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

————————

MENASHI, *Circuit Judge*:

Nathaniel Chastain appeals his judgment of conviction for wire fraud in violation of 18 U.S.C. § 1343 and for money laundering in violation of 18 U.S.C. § 1956. A jury found Chastain guilty of those offenses based on trades he made while employed at OpenSea, an online marketplace for non-fungible tokens ("NFTs"). As head of

product, Chastain selected the NFTs that the company would feature in a section of its website. When an NFT was featured, its value increased. Chastain would purchase an NFT before it was featured and sell it afterward for a profit. He made about $57,000.

The district court instructed the jury that Chastain's decision about which NFT to feature was OpenSea's property even if that information lacked commercial value to OpenSea. It further explained that the jury could find that Chastain engaged in a scheme to defraud if he "conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general and business life of society." App'x 411.

Chastain argues that the instructions were erroneous because the jury could have convicted Chastain of fraud based on unethical business dealings even if he did not intrude on anything resembling a traditional property interest of OpenSea. We agree.

We further conclude that the error cannot be considered harmless. The jury heard testimony that OpenSea could have experienced reputational harm if its users learned about Chastain's conduct, but the evidence also indicated that the featured NFT information was so tangential to OpenSea's business that failing to maintain the confidentiality of the featured NFTs would not affect users' attitudes toward the platform. A note from the jury suggested that it believed that OpenSea did not view the featured NFT information as confidential but that Chastain acted unethically by trading on the information. Under these circumstances, we cannot say that the jury would have reached the same verdict if it had been properly instructed that fraud requires the appropriation of a property interest rather than unprofessional business conduct.

3

Chastain additionally contends that the district court abused its discretion by excluding evidence relating to (1) whether other OpenSea employees viewed the featured NFT information as confidential, (2) whether OpenSea made changes to the template it used to create the confidentiality agreement that Chastain signed, and (3) the trading history of one of OpenSea's co-founders. We conclude that the district court did not abuse its discretion.

We vacate the judgment of conviction for wire fraud and money laundering, and we remand for further proceedings consistent with this opinion.

## BACKGROUND

OpenSea is an online marketplace for buying and selling NFTs. An NFT is a "unique digital artifact" that "can be bought and sold on the blockchain." App'x 167. OpenSea itself does not buy or sell any NFTs that are traded on its platform. Instead, the company collects a fee of two-and-a-half percent for each transaction on the platform. In 2021, OpenSea added a section to its website that would promote user interest by highlighting specific NFTs. When an NFT was featured, the publicity typically led its price to increase. OpenSea did not receive payments from the creators of NFTs featured on the website. Nor did OpenSea engage in any trades of featured NFTs. Instead, for each transaction involving a featured NFT, OpenSea received its standard fee of two-and-a-half percent.

## I

Chastain was the first head of product at OpenSea. In that role, he was "responsible for evaluating current and new features, to figure out how well they were doing." *Id.* at 186. He obtained "feedback" and conducted "user interviews" about the features, and he considered "new changes" that could "improve the site. He would

help organize engineers to work on these projects and designers." *Id*. He also selected the NFTs that the website would feature.

Chastain purchased approximately fifteen NFTs that were then featured on the website. Chastain generally purchased and sold the featured NFTs using anonymous accounts. For each trade, he transferred cryptocurrency from his personal account into an anonymous account that he used to purchase the NFT. The anonymous account would sell the NFT after it was featured, and Chastain transferred the proceeds back into his personal account. He made about $57,000.

Chastain did not always use anonymous accounts. On August 2, 2021, an OpenSea user noticed that Chastain had used his personal account to purchase an NFT before it was featured. The user posted to Twitter that it "[l]ooks like Nate from OS had the jump on everyone else," adding an emoji of two eyeballs. *Id.* at 593. Chastain responded to the post that he "just wanted to secure one of these [NFTs] before they all disappeared tbh." *Id.* At this point, no one at OpenSea told Chastain to stop purchasing featured NFTs.

On September 14, 2021, another OpenSea user posted about Chastain's trading, this time tagging OpenSea:

> Hey @opensea why does it appear @natechastain has a few secret wallets that appears to buy your front page drops before they are listed, then sells them shortly after the front-page-hype spike for profits, and then tumbles them back to his main wallet … ?

*Id.* at 594. The next day, OpenSea asked Chastain to resign. After his resignation, Chastain maintained friendly social relationships with OpenSea's co-founders. *See id.* at 238, 325.

## II

On May 31, 2022, the government filed a two-count indictment.
Count One charged Chastain with wire fraud in violation of 18 U.S.C.
§ 1343. Count Two charged Chastain with money laundering in
violation of 18 U.S.C. § 1956. The wire fraud served as the predicate
crime for the money laundering count. Chastain moved to dismiss the
indictment. He argued that the indictment failed to allege that the
featured NFT information was OpenSea's property because it lacked
commercial value to OpenSea. The district court denied the motion.
*See United States v. Chastain*, No. 22-CR-305, 2022 WL 13833637
(S.D.N.Y. Oct. 21, 2022).

## A

At trial, the government introduced records and testimony
showing that Chastain purchased NFTs ahead of featuring them. The
government also offered testimony from OpenSea's co-founders,
Alex Atallah and Devin Finzer, and other OpenSea employees.
Atallah testified that the "goals" of the featured NFT section were to
make OpenSea's website "more dynamic," "to explain what an NFT
was to the new users," and to "engage indie artists and show that
OpenSea is a place for them too." App'x 229. Atallah further testified
that OpenSea did not trade featured NFTs because doing so "was not
aligned with [its] main goals as a company" and "would have kind of
compromised on OpenSea's brand of neutrality." *Id.* at 228-29. Even
though profits from the featured NFT section "wouldn't have been
substantial for the business," OpenSea "wouldn't have wanted
people to think that OpenSea was trying to make money on its own
featuring of artists, because we wanted artists to all feel they had a
chance and it was a meritocracy to be selected." *Id.* at 229.

Atallah testified that the process for selecting which NFTs to feature was not secretive. OpenSea posted a link on its website inviting the public to "get featured on the home page" by using OpenSea's "NFT creator tool" and then sharing a link to their NFTs on Twitter or Instagram. *Id.* at 218. By soliciting proposals from the public, OpenSea hoped to convey that the company was "open to ideas from everybody" and to "help people engage with OpenSea on social media." *Id.* at 219. Proposals also came from an employee-only group chat, in which OpenSea employees suggested NFTs to feature. Chastain ultimately picked the featured NFT.

The government introduced evidence suggesting that Chastain viewed it as unethical to profit from the featured NFT section. In a discussion with a co-worker, Chastain said that "our community will take us to task if we feature something we own." *Id.* at 505. Chastain confided in another coworker that he "kn[ew] full well that the increased exposure would increase their price" but "deluded [himself] into thinking that because [he] was introducing them to a larger audience, it was okay that [he] was capturing some upside." *Id.* at 588. Chastain also told Atallah that it "could be a problem" if the company featured an NFT that an OpenSea employee had created. *Id.* at 231-32.

Atallah and Finzer both testified that they believed the featured NFT information was covered by the confidentiality agreement that Chastain signed when he began working at OpenSea. The confidentiality agreement required Chastain "to hold in strictest confidence, and not to use, except for the benefit of the Company … any Confidential Information that [the employee] obtain[s], access[es] or create[s] during the term of the [r]elationship … until such Confidential Information becomes publicly and widely known and made generally available." *Id.* at 524. "Confidential Information"

7

included "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties." *Id.* The confidentiality agreement did not reference NFTs.

When asked whether OpenSea considered the selection of the featured NFT to be confidential, Atallah said that he "considered it to be confidential information," *id.* at 221, but Finzer testified that he "hadn't thought explicitly about whether it was confidential information" prior to the "incident" with Chastain, *id.* at 305. Finzer explained that he learned about Chastain's trading after OpenSea was tagged in the September 2021 post on Twitter. Finzer was "concerned that users would believe" that Chastain had traded featured NFTs "and that they would lose trust in Nate and/or OpenSea as a result." *Id.* at 235. Finzer testified that it was a "hard decision" to ask Chastain to resign. *Id.* at 316. The day after the resignation, Finzer texted Chastain that asking him to resign was "[u]ndoubtedly the most difficult call [the company] had to make." *Id.* at 603.

## B

Chastain argued that the NFT information was not property as a matter of law because (1) it had no commercial value to OpenSea and (2) the company did not take steps to protect its confidentiality. The district court allowed Chastain to question Atallah and Finzer "about the clarity of the [confidentiality] agreement (or lack thereof)." Special App'x 30. But the district court prevented Chastain "from questioning other OpenSea employees … about their opinions on whether OpenSea's confidentiality rules were adequate or clear" because "how *other* employees interpreted or understood the rules is irrelevant and improper opinion testimony." *Id.* at 30-31. The district court explained that Chastain was "free to question OpenSea

8

employees … about the existence (or non-existence) of relevant policies and trainings" and "to make arguments at trial based on the language of such policies and trainings or to testify about *his* interpretations and understanding of these matters." *Id.*

Chastain sought to introduce a redlined document showing the changes OpenSea made to a template of a confidentiality agreement in order to produce its own agreement. The district court excluded the document because (1) the proposed exhibit had "minimal, if any relevance," (2) the facts relevant to the redline had been elicited through witness testimony, and (3) "introducing the redline can only cause confusion and undue prejudice." App'x 375-76.

The district court also prevented Chastain from questioning Finzer about his trading activity. Finzer had purportedly traded in a cryptocurrency token, MATIC, after OpenSea had decided to integrate MATIC's blockchain into OpenSea's platform but before the integration was announced to the public. The district court excluded this line of questioning as irrelevant, unfair, and prejudicial because (1) there was no evidence that Chastain knew about Finzer's trading at the time that Chastain traded featured NFTs, and (2) the testimony was not relevant to the issues in the case and served only to disparage Finzer.

## C

When instructing the jury about the property element of wire fraud, the district court said:

> A company's confidential business information is a type of property. Information is confidential business information if it was acquired or created by a business for a business purpose, and the business both considered and treated that information in a way that maintained

> the company's exclusive right to that information. …
> Factors you may consider in determining whether
> OpenSea treated the information at issue as confidential
> include, but are not limited to: Written company policies
> and agreements, employee training, measures the
> employer has taken to guard the information's secrecy,
> the extent to which the information is known outside the
> employer's place of business, and the ways in which
> other employees may access and use the information.
> You may also consider whether the information had
> economic value to the employer, *but the government is not*
> *required to prove that the information had such value.*

*Id.* at 412-13 (emphasis added). The district court rejected Chastain's
argument that the jury should be instructed that information is
property under the wire fraud statute "only if it is … confidential
business information (which must be treated as such) *and has inherent*
*value to the purported victim.*" *Id.* at 40-42 (emphasis added).

For the scheme-to-defraud element of wire fraud, the district
court instructed the jury:

> Fraud is a general term that includes all efforts and
> means that an individual may devise to deprive another
> of money or property by trick, deception, swindle, or
> overreaching. In order to establish a scheme to defraud,
> the government need not show that the defendant made
> a misrepresentation. You may find the existence of a
> scheme to defraud if you find that the conduct of the
> defendant was deceptive or if you find that the
> defendant conducted himself in a manner that departed
> from traditional notions of fundamental honesty and fair
> play in the general and business life of society.

*Id.* at 411. The district court disagreed with Chastain that it was
"critically important to include a robust willfulness charge because

without it the government could convict Mr. Chastain [of] wire fraud based solely on unethical workplace behavior." *Id.* at 133.

During the first full day of deliberation, the jury sent a note to the district court that read: "Please have transcript of Devin Finzer's testimony. We also need testimony of transcript for Alex Atallah." *Id.* at 439. Later that day, the jury sent a second note: "We are unable at this time to reach a unanimous verdict. Do you have any guidance for us in terms of next steps?" *Id.* at 440. The district court told the jury to "stick with it." *Id.* at 446. That afternoon, the jury sent a third note: "Re Count One, Element 1 [the property element], if the defendant viewed the information as confidential but Devin Finzer, the other signatory to the confidentiality agreement, did not, is that enough to consider it confidential?" *Id.* at 448.

After receiving submissions from the government and from Chastain about how to respond to the third note, the district court repeated the instruction that "[i]nformation is 'confidential business information' if it was acquired or created by a business for a business purpose, and the business both considered and treated that information in a way that maintained the company's exclusive right to that information." *Id.* at 485. The district court told the jury that "if the company 'considers' information to be confidential but does not take affirmative steps to treat it as such and maintain exclusivity, it does not qualify as property." *Id.* at 485-86. The jury then asked the district court to "provide a definition of trade secret," and the district court told the jury that "[i]nformation may qualify as confidential business information even if it does not constitute a trade secret." *Id.* at 488, 497.

11

The next morning, the jury returned a verdict of guilty on both counts. The district court sentenced Chastain to three months of imprisonment and three years of supervised release.

## DISCUSSION

Chastain challenges his conviction on two grounds. First, Chastain argues that the jury instructions were erroneous. In his view, the featured NFT information does not qualify as property under the wire fraud statute. The district court allowed the jury to conclude otherwise because it instructed the jury that (1) proof of commercial value was not required, and (2) a scheme to defraud may involve conduct that merely departs from traditional notions of honesty and fair play. Chastain claims that he was prejudiced by the erroneous instructions because the government failed to establish that the featured NFT information was OpenSea's property and because the jury may have convicted him based on conduct that it found to be unethical rather than fraudulent.

Second, Chastain argues that the district court abused its discretion by excluding evidence relating to (1) whether other OpenSea employees viewed the featured NFT information as confidential, (2) whether OpenSea made changes to the template it used to create the confidentiality agreement that Chastain signed, and (3) the trading history of one of OpenSea's co-founders.

We agree with Chastain that confidential business information must have commercial value to a company to qualify as its property under the wire fraud statute. The district court erred by instructing the jury that it could find Chastain guilty of wire fraud even if it found that he misappropriated information that lacked commercial value to OpenSea. The district court further erred by instructing the jury that it could find Chastain guilty if it found his conduct to have departed

12

from "fundamental honesty and fair play in the general and business life of society." Because we cannot conclude that the erroneous instructions did not prejudice Chastain, we vacate the judgment of conviction and remand for further proceedings. At the same time, we identify no abuse of discretion in the evidentiary rulings that Chastain challenges.

## I

Chastain argues that the district court erred by instructing the jury that the government was not required to prove that the featured NFT information had commercial value to OpenSea. He maintains that confidential business information must have commercial value to a company to qualify as its property under the wire fraud statute. We review jury instructions *de novo*. *See United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (quoting *United States v. Naiman*, 211 F.3d 40, 51 (2d Cir. 2000)).

## A

"To be guilty of wire fraud, a defendant must (1) 'devise' or 'intend to devise' a scheme (2) to 'obtain money or property' (3) 'by means of false or fraudulent pretenses, representations, or promises.'" *Kousisis v. United States*, 145 S. Ct. 1382, 1391 (2025) (alterations omitted) (quoting 18 U.S.C. § 1343). "[T]he fraud statutes do not vest a general power in 'the Federal Government to enforce (its view of) integrity in broad swaths of state and local policymaking.'" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (alteration omitted) (quoting *Kelly v. United States*, 590 U.S. 391, 404 (2020)). The fraud statutes instead "protect property rights only." *Id.* (alteration omitted)

(quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)). Because the statutes "require[] the object of the fraud to be 'property' in the victim's hands," the statutes do not "place under federal superintendence a vast array of conduct traditionally policed by the [s]tates." *Cleveland*, 531 U.S. at 26-27.

The Supreme Court has explained that the phrase "money or property" encompasses "property rights" that are both "tangible" and "intangible." *Carpenter v. United States*, 484 U.S. 19, 25 (1987). In either form, however, "the wire fraud statute reaches only traditional property interests." *Ciminelli*, 598 U.S. at 316. To qualify as a traditional property interest, even an intangible right must protect "an interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Id.* at 314 (quoting *Carpenter*, 484 U.S. at 26).

Under these standards, not all information kept confidential qualifies as property. Neither the Supreme Court nor our court has held that confidential information that lacks commercial value will qualify as property under the wire fraud statute. In *Carpenter*, the Supreme Court explained that the Wall Street Journal's prepublication content was "information acquired or compiled by [the newspaper] in the course and conduct of its business." *Carpenter*, 484 U.S. at 26 (quoting 3 William Meade Fletcher, Cyclopedia of Law of Private Corporations § 857.1, at 260 (rev. ed. 1986)). Although it was "intangible," the prepublication "[n]ews matter" was the Journal's "stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise." *Id.* at 25-26 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918)). The Journal's interest in its prepublication news information was

therefore comparable to the property rights of another business in its goods or trade secrets.[1]

Our court followed this precedent in holding that a law firm had a property right in confidential information that its client provided to the firm. *See United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988). In *Grossman*, we upheld the conviction of an associate under the wire fraud statute when the associate misappropriated the confidential information. We explained that even though the law firm "could not commercially exploit the information by trading on it," "several partners of the firm testified" that "by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients." *Id.* at 86. Although in *Grossman* the relationship between the confidential information and its economic value was more attenuated than in *Carpenter*, the evidence that the firm would "lose its clients" showed that the firm would suffer commercial harm if it failed to keep the information confidential.

Because "the wire fraud statute reaches only traditional property interests," we must decide whether confidential business information qualifies as a traditional property interest even if it lacks commercial value to the business. *Ciminelli*, 598 U.S. at 316; *see also Cleveland*, 531 U.S. at 24. We conclude that it does not. When the Supreme Court said in *Carpenter* that "[c]onfidential business information has long been recognized as property," the Court relied

---

[1] *See Carpenter*, 484 U.S. at 26-27 ("The confidential information was generated from the business, and the business had a right to decide how to use it prior to disclosing it to the public. … [I]t is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter.").

on the traditional legal protections for trade secrets. 484 U.S. at 26. *Carpenter* cited case law according to which the collection of "quotations of prices on sales of grain and provisions for future delivery" was "entitled to the protection of the law" because "[i]t stands like a trade secret." *Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 245, 250 (1905). And *Carpenter* relied on the prior holding that "commercial data" about a company's pesticides was its "property" because the data were protected as trade secrets under state law, had "many of the characteristics of more tangible forms of property," were "assignable," could serve as "the res of a trust," and could "pass[] to a trustee in bankruptcy." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984). In each of the examples, the information had commercial value to the company.

Like confidential business information, trade secrets are intangible and kept confidential but receive legal protection. A trade secret has commercial value. [2] To be sure, we have said that "[i]nformation may qualify as confidential under *Carpenter* even if it does not constitute a trade secret." *United States v. Mahaffy*, 693 F.3d 113, 135 (2d Cir. 2012). But while *Carpenter* "does not require that *all*

---

[2] *See* Restatement (First) of Torts § 757 cmt. b (1939) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."). The examples in the Restatement—"a machine or formula for the production of an article" and "a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers"—describe information with commercial value to the company. *Id.*; *see also* Restatement (Third) of Unfair Competition § 39 (1995) ("A trade secret is any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others.").

16

confidential information must be of the same nature to be considered 'property,'" to merit that designation it must be that "it 'has long been recognized as property.'" *Grossman*, 843 F.2d at 86 (quoting *Carpenter*, 484 U.S. at 26). Information that lacks commercial value has not been so recognized. "The general rule has been that ideas or information are not subject to legal protection." *Pearson v. Dodd*, 410 F.2d 701, 707 (D.C. Cir. 1969) (Wright, J.). But when "information is gathered and arranged at some cost and sold as a commodity on the market, it is properly protected as property," and when "ideas are formulated with labor and inventive genius, as in the case of literary works or scientific researches, they are protected." *Id.* at 707-08 (footnotes omitted). The characteristic feature of information and ideas protected as property is that "they constitute instruments of fair and effective commercial competition," so "those who develop them may gather their fruits under the protection of the law." *Id.* at 708. Information cannot qualify as a traditional property interest if its holder has no economic interest in its exclusive use or in otherwise keeping the information confidential.[3]

---

[3] The Supreme Court has recently emphasized that the mail and wire fraud statutes do not protect "intangible interests" in the control of information "unconnected to traditional property rights." *Ciminelli*, 598 U.S. at 312. In *Ciminelli*, the Supreme Court rejected the argument that "the right to control the use of one's assets" qualified as property under the wire fraud statute. *Id.* at 311. The Court explained that "the right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest." *Id.* at 315 n.4. The Court concluded that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest." *Id.* at 309 (internal quotation marks omitted). The conclusion that the connection between the information and a commercial interest cannot be too attenuated provides additional support for the principle that

The government argues that confidential business information, as the Supreme Court described it in *Carpenter*, is only "information a company creates or acquires for a business purpose (the 'business' part) that the company considers and treats as confidential (the 'confidential' part)." Appellee's Br. 14. But that characterization omits the full description of information that receives legal protection as property. Confidential information that is "acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and *which a court of equity will protect through the injunctive process or other appropriate remedy*." *Carpenter*, 484 U.S. at 26 (emphasis added) (quoting Fletcher, *supra*, § 857.1, at 260). A court of equity will protect information from disclosure when it has commercial value to the owner. In *International News Service*, for example, the Supreme Court approved the issuance of an injunction that restrained the use by others of the news information of the Associated Press "*until its commercial value as news to the complainant and all of its members has passed away*." *Int'l News Serv.*, 248 U.S. at 245 (emphasis in original) (quoting *Associated Press v. Int'l News Serv.*, 245 F. 244, 253 (2d Cir. 1917)).[4]

The government further suggests that the decision of the Supreme Court in *Kousisis v. United States* demonstrates that

---

confidential information that lacks any connection to economic decision-making does not qualify as a traditional property interest.

[4] The partial dissent similarly relies on language from *Carpenter* to conclude that exclusive use, without more, suffices to establish a traditional property interest. But "judicial opinions are not statutes, and we don't dissect them word-by-word as if they were." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). Instead, we rely on the principles the Court articulated to establish when information receives protection as property.

information may qualify as a traditional property interest even if it has no commercial value to its holder.[5] In *Kousisis*, however, the Supreme Court held only that *actual economic loss* is not an element of a wire fraud offense. The Court reiterated that "[o]btaining the victim's money or property must have been the 'aim' … of the defendant's fraud." *Kousisis*, 145 S. Ct. at 1391. Whether the holder of confidential business information must suffer an economic loss is a different question from whether that information must have commercial value to the company to qualify as property. As the Court explained, the Journal in *Carpenter* did not need to have suffered a monetary loss; "that the newspaper 'had been deprived of its right to exclusive use' of its proprietary information" was sufficient to establish the invasion of a property interest. *Id.* at 1396-97 (quoting *Carpenter*, 484 U.S. at 26). In *Kousisis*, the Court did not need to address the circumstances under which information might qualify as property because the defendants aimed to obtain "tens of millions of dollars," which obviously counts as a traditional property interest. *Id.* at 1391. These cases do not undermine the conclusion that confidential information does not qualify as a traditional property interest unless it has commercial value to the company that holds it.

**B**

The district court instructed the jury that the government did not need to show that OpenSea had a commercial interest in the featured NFT information as long as the information was "acquired or created by [OpenSea] for a business purpose" and OpenSea "both considered and treated that information in a way that maintained the company's exclusive right to that information." App'x 412. That

---

[5]  *See* Rule 28(j) Letter, *United States v. Chastain*, No. 23-7038 (2d Cir. May 27, 2025), ECF No. 56.

instruction allowed the jury to return a guilty verdict for wire fraud based on the misappropriation of the company's "exclusive right" to use information that had no economic implications for the company.

The jury instructions would allow a conviction under the wire fraud statute even if OpenSea thought it was merely unseemly to reveal the planned featured NFT before it appeared on the website—and even if the evidence showed that treating the featured NFT as confidential had no commercial value. The right to exclusive use of information, without evidence that maintaining the confidentiality of the information had economic value to the company, is an "intangible interest[] unconnected to traditional property rights" that cannot qualify as property under the wire fraud statute. *Ciminelli*, 598 U.S. at 312.

The district court instructed the jury that it could find Chastain to have committed wire fraud if (1) he "conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general and business life of society," App'x 411, and (2) used information his employer kept confidential even if "the government [did not] prove that the information had [economic] value" to the employer, *id.* at 413. Given these instructions, the jury could have returned a guilty verdict based on a determination that it was dishonest for Chastain to trade on the featured NFT information even if that information was tangential to OpenSea's business and its misuse could not have affected the company's economic interests.

In other words, the instructions allowed the jury to convict based the government's "view of[] integrity" in business conduct rather than the misappropriation of "property rights only." *Ciminelli*, 598 U.S. at 312. Indeed, the district court told the jury that it could

"find the existence of a scheme to defraud" if it found "that the conduct of [Chastain] was deceptive" or "departed from traditional notions of fundamental honesty and fair play in the general and business life of society." App'x 411.

If the wire fraud statute criminalized conduct that merely departed from traditional notions of fundamental honesty and fair play, "almost any deceptive act could be criminal." *Ciminelli*, 598 U.S. at 315. That approach would "vastly expand[] federal jurisdiction without statutory authorization" by "mak[ing] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Id.* The Supreme Court long ago clarified that a conviction for fraud requires more than "merely the breach of a fiduciary duty." *United States v. O'Hagan*, 521 U.S. 642, 654 (1997). But the standards that informed the jury instruction here—such as the condemnation of "conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society,'"[6] and the prohibition of a scheme that "conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing"[7]—reflect the development of "a federal, common-law fiduciary duty" that became known as "the pre-*McNally* honest-services doctrine," *Skilling v. United States*, 561 U.S. 358, 416-18 (2010) (Scalia, J., concurring in part and concurring in the judgment). That

---

[6] *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1967) (quoting *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958)).

[7] *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979).

purported duty does not supply the standard for the offense of wire fraud under § 1343.[8]

### C

The instructions of the district court with respect to the property and scheme-to-defraud elements of wire fraud were erroneous because those instructions failed to "adequately inform the jury on the law." *Naiman*, 211 F.3d at 51 (quoting *United States v. Walsh*, 194 F.3d 37, 52 (2d Cir. 1999)). But "[a] harmless error standard of review applies if the defendant objected to the instruction." *United States v. Zhong*, 26 F.4th 536, 550 (2d Cir. 2022). Accordingly, Chastain will receive a new trial only if the erroneous instructions caused him prejudice. *See Naiman*, 211 F.3d at 51. We see such prejudice here because we are not "convinced that the error did not influence the jury's verdict." *United States v. Moses*, 109 F.4th 107, 114 (2d Cir. 2024).

The government introduced evidence suggesting that the featured NFT information was so tangential to OpenSea's business that it lacked commercial value to the company. The evidence showed, for example, that OpenSea did not commercialize Chastain's ideas about which NFTs to feature. Atallah testified that the "benefit" to the company of featuring NFTs in a section of the website was to develop a "more dynamic home page with interesting content, to explain what an NFT was to the new users, and to … engage indie

---

[8]  In *McNally v. United States*, the Supreme Court held that the fraud statutes are "limited in scope to the protection of property rights." 483 U.S. 350, 360 (1987). "And in the decades since then, the Court has made clear that the fraud statutes do not enact Article III judges' sense 'of moral uprightness, of fundamental honesty, fair play and right dealing.'" *United States v. Porat*, 76 F.4th 213, 224 (3d Cir. 2023) (Krause, J., concurring) (quoting *Skilling*, 561 U.S. at 418 (Scalia, J., concurring in part and concurring in the judgment)).

artists and show that OpenSea is a place for them too." App'x 229. He testified that the company "believed that a lot of NFT projects wanted visibility or wanted to occasionally get noticed" and that through the website OpenSea "could help them out and work with them to that end." *Id.* at 183. OpenSea promoted the NFTs without charging a fee because "[i]t was just a wider ability to share different art." *Id.* at 171. When asked about the "business reason for promoting NFTs," Atallah explained that "having fresh content that was just new and not stale provided an incentive for people to visit the site." *Id.* at 183.

Moreover, OpenSea had no organized process for selecting the featured NFTs. Chastain picked an NFT to feature after "shar[ing] ideas" with other OpenSea employees and with the public. *Id.* at 209-10. The choice of a particular NFT to feature—the specific information that purportedly constituted the property of OpenSea in this case—made no difference "in terms of the fee" that the company collected because "[w]hen the featured NFTs would sell, OpenSea just made its standard 2.5 percent fee from the seller." *Id.* at 305, 229. OpenSea did not trade the featured NFTs itself because, among other things, doing so "wouldn't have been substantial for the business." *Id.* at 229. This evidence indicated that keeping the selected NFT confidential before it appeared on the website was not important enough that its revelation would affect the commercial interests of OpenSea.

To be sure, some testimony suggested that employee trading of featured NFTs "could compromise OpenSea's brand and stance as a neutral and fair marketplace" because "the public would probably lose trust in … the company as a whole." *Id.* at 230-31. But aside from speculation about "trust," there was no evidence that "maintaining confidentiality" was necessary to "the firm's reputation, with the result that it would not lose its clients." *Grossman*, 843 F.2d at 86. An abstract reputational harm that does not affect the economic interests

23

of the company is too "ethereal" to qualify as a traditional property interest. *Carpenter*, 484 U.S. at 25. Unlike the law firm in *Grossman*, OpenSea did not charge its clients to "maintain[] the confidentiality of the information." *Grossman*, 843 F.2d at 86. We cannot conclude that the jury necessarily believed that OpenSea had a commercial interest in the confidentiality of the featured NFT information. The equivocal testimony that disclosure of Chastain's conduct "would have kind of compromised on OpenSea's brand of neutrality" was hardly overwhelming. App'x 228-29. And that testimony was presented alongside other evidence indicating that the featured NFT information was so tangential to OpenSea's maintenance of the trading platform—its actual business—that failing to maintain its confidentiality would not have affected users' attitudes about the platform, let alone caused them to abandon it.[9]

The jury's third note to the district court implied that it had concluded that OpenSea regarded the featured NFT information as unimportant but that Chastain still acted unethically by trading on it. The jury asked whether "[i]f the defendant viewed the information as confidential but Devin Finzer, the other signatory to the confidentiality agreement, did not, is that enough to consider it confidential?" App'x 448. If Finzer, as the representative of OpenSea who signed the confidentiality agreement, did not care about the

---

[9]   The government suggests that the district court's definition of "'confidential business information' as confidential information gathered or acquired by the company and used for a business purpose, necessarily implies that the information is derived from and used for a fundamentally commercial pursuit." Appellee's Br. 25. But a company may compile information for a business purpose—such as building access codes, employee addresses, or information that helps it to make "discretionary economic decisions"—that is nevertheless "unconnected to traditional property rights." *Ciminelli*, 598 U.S. at 312-16.

24

confidentiality of the featured NFT information, it would suggest that OpenSea lacked a commercial interest in its confidentiality.

The note additionally indicated that the jury had concluded that Chastain acted unethically by trading on the featured NFT information. The government introduced evidence that Chastain had a guilty conscience about the trading activity. One witness recounted a conversation in which Chastain "sort of apologiz[ed] for what this would potentially put the company and the people working at the company through." App'x 272-73. The government also introduced evidence suggesting that Chastain believed that trading on featured NFT information would elicit disapproval from "our community." *Id.* at 505; *see also id.* at 502-08.

On this record, we cannot confidently conclude that the jury did not convict Chastain on the theory that although the featured NFT information did not have commercial value to OpenSea, Chastain nevertheless acted unethically by using the information for his own benefit. As a result, we vacate the judgment of conviction for wire fraud and for money laundering predicated on the fraud. We remand for further proceedings.

## II

Because a new trial may result, we consider Chastain's argument that the district court abused its discretion by excluding evidence purporting to show that (1) other employees of OpenSea did not view featured NFT information as confidential, (2) OpenSea did not make material changes to the template it used to create its confidentiality agreement, and (3) OpenSea's co-founder traded on information similar to the featured NFT information.

"We review evidentiary rulings for abuse of discretion." *Zhong*, 26 F.4th at 551. "[E]ven if a ruling was manifestly erroneous, we will

still affirm if the error was harmless." *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015). "[I]f defense evidence has been improperly excluded by the trial court, we normally consider … '(1) the importance of … unrebutted assertions to the government's case; (2) whether the excluded material was cumulative; (3) the presence or absence of evidence corroborating or contradicting the government's case on the factual questions at issue; (4) the extent to which the defendant was otherwise permitted to advance the defense; and (5) the overall strength of the prosecution's case.'" *Id.* at 184 (quoting *United States v. Gupta*, 747 F.3d 111, 133-34 (2d Cir. 2014)). "Evidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019) (quoting Fed. R. Evid. 401).

## A

First, Chastain argues that the district court abused its discretion because it "permitted the government to introduce OpenSea's founders' opinions about company policy but precluded Chastain from introducing other employees' testimony on that subject." Appellant's Br. 40. The district court prevented Chastain "from questioning other OpenSea employees … about their opinions on whether OpenSea's confidentiality rules were adequate or clear." Special App'x 30. In doing so, the district court ruled that Chastain was "free to question OpenSea employees … about the existence (or non-existence) of relevant policies and training" and similarly "free to make arguments at trial based on the language of such policies and trainings or to testify about *his* interpretations and understanding of these matters." *Id.* at 30-31. But Chastain could not ask how the OpenSea employees themselves "interpreted or understood the

rules" because such testimony would be "irrelevant and improper opinion testimony." *Id.* at 31.

We see no abuse of discretion. The district court expressly permitted Chastain to testify about his own interpretation and understanding of the relevant policies and trainings because such testimony would relate to his mental state. But the views of other employees about the clarity of OpenSea's rules—and their interpretations of the confidentiality agreement—were not relevant to his mental state. The district court did not abuse its discretion by deciding that testimony about other employees' understandings of the confidentiality agreement would amount to improper opinion testimony. *See* Fed. R. Evid. 701. We have explained that the "meaning of the contract" is a legal conclusion, and "[i]t is not for witnesses to instruct the jury as to applicable principles of law." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). The meaning of OpenSea's confidentiality agreement is a legal question to which a witness cannot provide an answer. And to the extent that Chastain sought to document his mental state, that would depend on his own understanding—which might be informed by what he heard from others but would not depend on the independent judgments of other employees. *Cf. Litvak*, 808 F.3d at 188-90 (holding that evidence was relevant to whether the defendant acted in "good faith" when it showed that his supervisors "regularly approved of conduct identical to that with which Litvak was charged").

Chastain suggests that by excluding this testimony the district court prevented him from showing "whether OpenSea was taking the requisite 'affirmative steps' to keep the information confidential." Appellant's Br. 55 (quoting *Mahaffy*, 693 F.3d at 135 n.14). But the district court precluded cross examination only about "the meaning of the contract and whether the rules and the contract were clear."

App'x 474-75; *see also id.* at 464 (precluding questions "about the meaning and clarity of the contract and of the rules"). Chastain was able to question employees about how the company "thought about or treated" the information, including whether the employees believed that under the company's rules "the information [was] treated as confidential." *Id.* at 474-75. The district court also allowed Chastain to question OpenSea's co-founders about the "clarity of the agreement (or lack thereof)" to the extent that the government had asked which information they intended the confidentiality agreement to cover. Special App'x 30.

**B**

Second, Chastain argues that the district court should have admitted a redline comparison between the confidentiality agreement that Chastain signed and the template that OpenSea had used to create the agreement. According to Chastain, the redline comparison (1) showed that OpenSea made minimal substantive changes to the template and therefore did not take "affirmative steps" to protect the confidentiality of the information, and (2) could be used to impeach the testimony of OpenSea's co-founders that they made changes to the template. We again see no abuse of discretion.

Chastain suggests that OpenSea's failure to make substantive changes to the template would show whether the company considered the NFT information to be confidential. We have identified factors that provide "guidance" about "how to evaluate whether employers treat information as confidential." *Mahaffy*, 693 F.3d at 135 n.14. The factors include "written company policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other

28

employees may access and use the information." *Id.* The factors are based on the Supreme Court's requirement in *Carpenter* of "proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information." *Id.*

We have not identified the origin of the confidentiality agreement as a "pertinent factor[]," and it is not especially helpful here. *Id.* Even assuming that it was largely based on a template, the confidentiality agreement would show that OpenSea took "affirmative steps" to treat the information as confidential and to "maintain exclusivity" if the company understood the agreement to cover the information. *Id.* Chastain was able to explore whether it was so understood.

The redline comparison was not necessary to impeach Atallah, who testified that the "agreement was based on a template that was generated by a website called Clerky" and that OpenSea "made modifications on Clerky's website to customize the template that they had, and then generated the form from the site." App'x 246. Chastain was able to introduce evidence that the template was not substantively modified. He elicited testimony from Atallah that "the Clerky form was basically boilerplate language." *Id.* at 249. And he prompted Finzer to agree that he "personally didn't modify this template." *Id.* at 300. The redline comparison would therefore have been cumulative.

In light of these considerations, we cannot say that the district court abused its discretion by deciding that the "the precise changes" that OpenSea made to the template would "only cause confusion and undue prejudice" because "to the extent it has relevance, it's already been elicited through the witnesses." *Id.* at 376.

29

**C**

Third, Chastain argues that the district court should not have excluded evidence about the trading activities of one of OpenSea's co-founders. Chastain sought to question Finzer about his purchase of MATIC, cryptocurrency tokens affiliated with the Polygon blockchain, before OpenSea announced that it would integrate the Polygon blockchain into the company's platform. Chastain claims that Finzer "profited greatly from a rise in the tokens' value after OpenSea's public announcement." Appellant's Br. 61.

Chastain suggests that evidence that Finzer "us[ed] similar company information for personal benefit" would show that the co-founder "didn't believe company policy precluded officers or employees from using similar company information for personal benefit." *Id.* at 63. But Chastain did not offer evidence that he had believed that his trading of featured NFTs was permissible because Finzer had made similar trades. Chastain did not even establish that he knew about Finzer's trades at the time of his own trades. The district court explained that "to the defendant's knowledge, there is no evidence that's been proffered he was actually aware of this" and "[t]he mere fact it was on the public blockchain does not substantiate that." App'x 330-31. It noted that its decision "might be different" if "there were a proffer made of evidence that would come later," but "there hasn't been." *Id.* at 331. We conclude that the district court did not abuse its discretion.

\*        \*        \*

The district court erred by instructing the jury that the featured NFT information could be OpenSea's property under the wire fraud statute even though the information had no commercial value to the company. The district court compounded the error by instructing the

30

jury that it could find that Chastain engaged in a scheme to defraud if he acted in a manner that departed from "traditional notions of fundamental honesty and fair play in the general and business life of society." Those instructions invited the jury to return a guilty verdict if it found that Chastain had acted unethically even if he did not invade a traditional property interest of the company.

We cannot conclude that the jury did not reach its verdict based on such a finding. Therefore, although we conclude that the district court did not abuse its discretion with the evidentiary rulings that Chastain challenges, the erroneous jury instructions were not harmless. We vacate the judgment of conviction for wire fraud and money laundering and remand for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

31